# ATTACHMENT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TERRY G. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | 2:05-cv-01235-MHT-DRB |
| R. EDMOND SPRAYBERRY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF R. EDMOND SPRAYBERRY

I, R. Edmond Sprayberry, make the following declaration pursuant to 28 U.S.C. § 1746:

1.

I am the Director of the Office of Public Housing for the Birmingham Field Office of the United States Department of Housing and Urban Development ("HUD"). I have been employed in this capacity since December 24, 2003.

2.

In my position, I am responsible for carrying out HUD's oversight of the 147 Public Housing Authorities in Alabama, including the Montgomery Housing Authority ("MHA"), that provide federally-funded public housing for low-income families. My duties include overseeing the administration of federal public housing programs in Alabama to ensure that PHAs spend federal funds only for allowable purposes. This oversight duty comes from the United States Housing Act of 1937, 42 U.S.C. § 1437 et seq. ("the Housing Act") and its implementing regulations, the Annual Contribution Contract ("ACC") signed between all PHAs and HUD, and other HUD guidance (i.e., handbooks, guidebooks, notices, etc.). The Housing Act, for example, provides that HUD is

responsible for providing financial and technical assistance to public housing authorities ("PHA") to facilitate the development of decent, safe, and sanitary housing for low-income families under the public housing program. It mandates that all PHAs receiving federal funds from HUD enter into an ACC that requires, among other things, that they comply with the Housing Act, the ACC, and all HUD regulations, requirements, and procedures, in return for the receipt of federal funds. HUD's oversight of PHA federal funding is considered essential to ensure PHA fiscal integrity and that Congressional intent is implemented.

3.

HUD's oversight responsibility of PHAs' use of federal funds includes the responsibility of determining the reasonableness and necessity of fees that the PHA requests to expend from federal funds, including fees for legal services. HUD's approval is concerned solely with whether requested expenditures are an eligible program expense (i.e., are allowed to be paid by the PHA from its federally-funded operating budget) and are reasonable. HUD does not make actual payment of legal services or any other type of expenses, or certify that the PHA has funds available to cover an expense. HUD also has no authority over how a PHA uses non-federal funds. If HUD disallows the expenditure of federal funds for the procurement of goods or services, the PHA can still obtain those goods or services with non-federal funds (if available).

4.

Authority for determining the eligibility of the payment of expenditures from federal funds is found in the Housing Act, and its implementing regulations, the ACC, and other HUD guidance (i.e., handbooks, guidebooks, notices, etc.). The following provides a sampling of the regulations and guidelines that I and my staff relied upon in making decisions and determinations regarding

Page 2 of 19

AES
1/5/07

expenditure and procurement activity requests by the MHA from November 2004 through the present:

a) Office of Management Budget Circular A-87 requires that costs for professional services be reasonable in relation to the services rendered and should be related to work under Federal grants and contracts; b) HUD Guidebook 7510.1, Public and Indian Housing Low-Rent Technical Accounting Guide, Section II(5) provides, in part, that funds are allotted by HUD to housing authorities for costs that are: (1) necessary and reasonable for administration of the program; (2) authorized or not prohibited by State or local law; (3) either a direct cost of the program or an indirect cost which is proper for the program and allocated to the program on an equitable basis; and (4) consistent with the policies, regulations, and procedures that apply uniformly to both the HUD program and other activities of the housing authority. In addition, HUD Procurement Handbook 7460.8, Rev. 1, contains guidelines regarding PHA procurement actions.

5.

My office carries out its oversight responsibility in several ways. One of the tools utilized by HUD is to require the PHA to provide documentation supporting all its actions. Pursuant to the Act, each PHA that receives federal funds, like the MHA, must provide the Secretary of HUD, or any of his duly authorized representatives, access to any books, documents, papers, and records of the PHA that are pertinent to its operations with respect to financial assistance under the Act. Another HUD discretionary tool is to institute procurement review of all PHA procurement transactions and review all Line of Credit Control System ("LOCCS") drawdowns, a process that requires HUD prior approval before a PHA can make procurement transactions, enter into any contracts for good or services involving federal funds, or spend federal funds from its operating budget. This procurement and LOCCS draw-down review can be utilized in extraordinary situations when HUD believes that

RE\
//5/07

there is the potential for a PHA to abuse federal funds or make inappropriate expenditures. When a PHA is not under procurement and LOCCS review, it need not obtain prior HUD approval to enter contracts or spend federal funds as long as these expenditures have been budgeted in a five-year and annual plan.

6.

I cannot personally review every document and action taken by the 147 PHAs in Alabama. As a result, to carry out HUD's oversight duties under the Housing Act in Alabama, I supervise a staff of 21 employees and rely on their review and expertise. Carol Harmon, Director Southern Division for the State of Alabama, has oversight authority over the PHAs in the Southern part of Alabama including the MHA. Her duties include directing a staff of public housing revitalization specialists and technical staff who provide monitoring, evaluation, and technical assistance to PHAs in her jurisdiction. Holly Potecte is a Public Housing Revitalization Specialist under Ms. Harmon's supervision who has been delegated specific areas of oversight responsibility over the MHA.

### 2001 Procurement Review of the MHA

7.

In June/July 2001, I was Director of the Grants and Facilities Management Division for HUD in Birmingham. In this capacity, I personally conducted a procurement review at the MHA as part of a general HUD management review of the MHA. I examined randomly selected procurement activities and found significant procurement problems where, contrary to the ACC, either procurement policy procedures appeared to have been violated or adequate justification for the procurement expenditure appeared to be missing. The MHA acknowledged in some cases that it could not adequately support its costs, or provide documentation that it had complied with HUD's or its own

RE &
1/5/07

procurement regulations.

8.

On December 4, 2001, HUD Public Housing Director Mack Heaton placed the MHA on procurement review. This review, which was removed in February 2002, required the MHA to obtain advance HUD approval of all procurement actions. This included, among other things, submitting all Requests for Proposal ("RFP") for approval prior to solicitation, and submitting all competitive procurements, excluding small purchase procurement actions being approved in advance.

### MHA 2003-2004 Contract Attorney Hourly Rates

9.

Between February 27, 2002, and November 18, 2004, the MHA was not under procurement review. During this time period, the MHA procured the services of Mr. Terry Davis to be a contract attorney for the MHA Board of Commissioners from January 1, 2003 through December 31, 2004. I did not review any documents, contracts, RFPs, RFP responses, or evaluations related to the advertising of the Board Attorney position, or to the MHA's contract for legal services with Mr Davis or any other attorney during that time. I had no discussions with Mr. McInnish, the MHA's Executive Director, or anyone else at the MHA or HUD regarding the selection or contract of Mr. Davis, or any other attorneys providing legal services to the MHA. While the MHA's contract with Mr. Davis stated that it was "subject to HUD review," this language is boilerplate and was not mandated by HUD. Neither myself nor anyone in my office had anything to do with the contract.

10.

I had no role in setting Mr. Davis's hourly rate of pay and had no discussions with Mr. McInnish or anyone else at the MHA regarding Mr. Davis's hourly rate or the hourly rate of any other

Page 5 of 19

ᏒᏋᏏ
1/5/07

attorneys hired by the MHA.  Mr. Davis and the MHA agreed upon Mr. Davis's hourly rate.  HUD plays no role dictating the hourly rates that PHAs agree to pay their contract attorneys.

### *November 18, 2004 Procurement Review*

11.

On or around November 17, 2004, I learned from Jill West, an employee of the MHA, that the MHA Board had suspended Mr. McInnish from his position as Executive Director.

12.

I found the suspension of Mr. McInnish to be very unusual and unexpected.  In my public housing experience, the suspension of an Executive Director is not a common action and usually indicates very serious problems at a PHA.  I had not been advised by anyone at the MHA that it was having any problems with Mr. McInnish.  It appeared that Mr. McInnish was satisfactorily performing his job and had helped to ameliorate the MHA's past procurement problems.

13.

After learning about the suspension, I contacted Thomas Taylor, Chairman of the MHA Board, to ask him about the situation at the MHA.  Mr. Taylor told me that he could not give me any information regarding why the MHA had suspended Mr. McInnish.  I was surprised at this very unusual response.  Due to the funding and oversight relationship between HUD and PHAs, PHA Boards are usually responsive and cooperative to my questions and requests for information.

14.

Since I could not get information from the MHA Board Chairman, I separately contacted Board Vice-Chair Luann Long, Board Member Richard Bollinger, and Board Member Clifford Holmes, and asked each of them if they knew why McInnish had been suspended.  Neither Ms. Long, Mr.

Bollinger, nor Mr. Holmes knew why Mr. McInnish had been suspended. They further indicated that they were surprised by the suspension.

15.

After talking to the Board members, I was very troubled by what was going on at the MHA. I would have expected to know about problems with the MHA's Executive Director upon my request to the Board Chairman, would have expected all the Board Members to know about the problems prior to a vote for suspension, and would have expected notice of the charges and a hearing for the Executive Director on the charges before any discipline was taken, followed by a vote on discipline. This out-of-the-blue suspension, pending a later hearing, was extremely unusual and troubling, especially since none of the Board members to whom I spoke could tell me why Mr. McInnish had been suspended.

16.

I did not contact Mr. McInnish to see what had occurred at the MHA, and he never contacted me. I felt that it would have been inappropriate for me to talk to a suspended Executive Director about the reasons for his suspension, especially since I had no idea what was going on at the MHA. I did not talk to Mr. McInnish about any matter concerning the MHA until approximately August 2005, after he had dropped his EEOC charge against the MHA and the MHA and Mr. McInnish had reached an agreement that he would retire and the MHA would drop any and all disciplinary charges against him.

17.

I considered the MHA's unexplained suspension of Mr. McInnish and the MHA's past procurement problems, and foresaw an environment at the MHA that could put federal funds at risk.

Page 7 of 19

As a precautionary and proactive measure, my staff and I discussed the situation and made the decision to place the MHA on procurement review and LOCCS drawdown reviews on November 18, 2004. Our objective was to ensure that the MHA properly used, supported, and maintained control of federal funds. As the Executive Director is the person in charge of procurement activities and I could get no information from the Board regarding the suspension, I had no way of determining whether HUD funds were already at risk or what exactly was going on at the MHA.

18.

When a PHA is under LOCCS drawdown and procurement review, it is required to receive prior approval from HUD before making any expenditure of federal funds and participating in procurement activities. The objective of this review is to allow HUD to ensure that the PHA properly supports its drawdown of HUD funds and makes purchases for goods and services in accordance with HUD and federal requirements and the PHA's own procurement policies. During this process, HUD reviews any documents supporting the initiation, review, and approval of a procurement action by a PHA to ensure the PHA was following HUD regulations and its own procurement policies in the procurement process and in making the selection for award of a contract.

19

On the same day, I also wrote Board Chair Mr. Taylor and requested that a special meeting be called with the MHA Board so that all the Board members and myself could learn why Mr. McInnish had been suspended. A true and accurate copy of my request is attached as Exhibit A. Mr. Taylor refused this request. I found this refusal to be very unusual, since other PHAs had usually been cooperative with my office and had not refused to cooperate. Around the same time, Mr. Taylor indicated in a letter that I could contact the Board Counsel, Terry Davis, if I had any questions about

Page 8 of 19

RB/a
1/5/67

the MHA. A true and accurate copy of his letter is attached as Exhibit B. As Director, my general practice was to communicate directly with Board Members of PHAs in my jurisdiction and not with contract attorneys. As a result, I did not call Mr. Davis and continued to try to have the MHA Board set up a special meeting to discuss the reasons for the suspension. My efforts were ultimately unsuccessful.

20

Based on the unexplained suspension of McInnish and our inability to get information regarding what was going on at the MHA from the Board, I also exercised the authority granted under the ACC that allows HUD to access all records of the MHA, and by letter dated December 8, 2004, required that effective immediately, the MHA send all Board meeting minutes to HUD for my staff to review. My objective was for HUD to gain insight into any problems that existed at the MHA so that HUD could take all appropriate measures to safeguard federal funds.

### *MHA's Requests to Spend Federal Funds for Legal Services*

21.

On or about December 1, 2004, Mr. Taylor requested that HUD approve the MHA's expenditure of up to $35,000 in federal funds for an investigation into Mr. McInnish. A true and accurate copy of his request is attached as Exhibit C. I discussed the request with my staff and we shared some common concerns about its unusual nature. Mr. Taylor's request was for a very significant amount of money (that would have to come from somewhere in the MHA's federally-funded budget), it asked for an attorney to be paid to do investigative work, and it sought funds to conduct an investigation after the MHA had already taken action to suspend Mr. McInnish. Pursuant to the procurement review imposed by HUD and HUD regulations requiring costs incurred by PHAs

RE&
1/5/07

to be reasonable and necessary, I had Ms. Harmon and Ms. Poteete review the request, along with Mr. Davis's contract with the MHA (which had not been reviewed by this office previously).

22.

My office could not determine what issues were to be investigated, why an attorney was necessary, and why so much money was needed. I was particularly troubled by the fact that I had not been able to get any information from the MHA regarding the reasons for the suspension and now they were seeking an extremely large amount of money to conduct an investigation without any explanation or justification. It appeared to me that the MHA improperly wanted federal money to come up with reasons to support an action that had already been taken. Furthermore, HUD has an Office of Inspector General ("OIG") that can conduct investigations into fraud, abuse, or mismanagement of federal programs. If the MHA had any concerns about Mr. McInnish that related to those areas, I believed that it would be a better use of federal resources to have the OIG investigate rather than a contract attorney. I was not aware of HUD ever authorizing a PHA to use federal funds to pay a contract attorney to conduct an investigation into an employee's activities after that employee had already been suspended.

23.

After discussion with Ms. Poteete and Ms. Harmon of their review of the MHA's request, the decision was made that HUD could not determine if the $35,000 requested was eligible for reimbursement, reasonable in relation to the services rendered, and within the "scope of services" of Mr. Davis's Attorney Employment Agreement. As a result, Ms. Poteete drafted a letter, according to OMB Circular A-87 and other HUD regulations, dated December 9, 2004, for my signature, with a

RE 8
1/5/07

concurrence by Carol Harmon, denying the request and seeking additional information. A true and accurate copy of the letter is attached to this declaration as Exhibit D.

24.

In the same letter, I asked Mr. Taylor to advise HUD of any issues to be investigated relating to the mismanagement, fraud, and abuse of HUD programs at the MHA, and the reasonable basis for those charges, so that HUD or the OIG could possibly conduct an appropriate investigation. No response to this inquiry was received from the MHA. I did subsequently receive a two-page document listing charges against Mr. McInnish, some of which related to events after his suspension. The MHA, however, did not provide me with the reasonable basis for the bare allegations contained in the charges. Furthermore, my receipt of the charges, more than a month after the MHA had suspended Mr. McInnish and after four Board members had been unable to tell me anything, supported my suspicion that the MHA had come up with the charges only after it had suspended Mr. McInnish. If these charges had existed prior to the suspension, then the MHA would not have needed any federal funds to investigate and come up with them.

25.

While the MHA never provided HUD with any response to the December 9, 2004 letter denying the MHA authority to spend $35,000 and seeking additional information, I received a letter from Mr. Thomas Taylor dated January 20, 2005, stating that the investigation being conducted by Mr. Davis into Mr. McInnish had exceeded its budget and asking for approval to spend up to $65,000 for the investigation. This second request completely ignored the fact that HUD had denied the MHA budgetary approval to spend federal funds to investigate McInnish in its December 9, 2004 letter, that the MHA had not provided requested information to allow HUD to determine if the requested costs

Page 11 of 19

RE &
1/5/07

were reasonable, allowable, and within the scope of services of Mr. Davis's contract, and that absent

HUD approval, the MHA had no authority to spend any federal funds on the investigation. A true and

accurate copy of this second request is attached as Exhibit E.

26.

After discussion with Ms. Harmon and Ms. Poteete about an appropriate course of action, I

sent a letter dated January 27, 2005, to Mr. Boggs (drafted for my signature by Ms. Poteete) denying

the request for an additional $65,000 in attorney expenses for the same reasons as set forth in the

December 9, 2004 letter. My letter also stated that any expenses incurred by Mr. Davis after the

December 31, 2004 expiration of his contract with the MHA were not eligible for reimbursement from

federal funds. A true and accurate copy of this letter is attached as Exhibit F.

27.

On or about February 3, 2005, I received a request from the MHA to review and approve a

settlement that the MHA had reached with Mr. McInnish. The request for settlement included a

request that HUD not approve the settlement with Mr McInnish without approving attorney fees for

Mr. Davis related to his investigation into McInnish, estimated at $65,243.25. I found this request to

be alarming, as HUD had not given approval to the MHA to spend any federal funds on a McInnish

investigation. After review, I did not give approval of the settlement and provided the reasons in a

letter dated February 8, 2005. A true and accurate copy of this letter is attached as Exhibit G. I

specifically advised Mr. Taylor in my response letter that the MHA had been repeatedly informed that

HUD had not approved any legal fees for an investigation and that the issue of legal representation

for any investigation should have been resolved initially, prior to the MHA having incurred such an

exorbitant legal bill.

Page 12 of 19

REB
1/5/07

28.

In early March 2005, the MHA forwarded invoices, along with a letter, from Mr. Davis, seeking payment for legal services he provided to the MHA in November and December 2004. While I conducted no independent review of this submission, I understand from my staff that the bulk of the November and December invoices requested payment for services performed for the MHA in these months relating to an investigation into McInnish. I found this submission disconcerting because HUD had never granted the MHA approval to pay for such an investigation from federal funds. Additionally, Mr. Davis' letter suggested that he had also performed services for the MHA in January and February 2005, and HUD had told the MHA numerous times that it did not have approval to pay Mr. Davis any amounts incurred after the expiration of his contract. After discussion with Ms. Harmon and Ms. Poteete, Ms. Poteete drafted a letter, for my signature, to the MHA denying the MHA approval to pay Mr. Davis federal funds for any investigation into McInnish but allowing the payment of his other legal fees. Our letter to the MHA specifically reminded the MHA that HUD had denied approval for federal funds to be used for an investigation into McInnish in earlier letters, including letters dated December 9, 2004, January 12, 2005, and January 27, 2005. A true and accurate copy of the letter is attached to this Declaration as Exhibit H.

29.

At all times, I acted pursuant to federal statutes, regulations, handbooks, my public housing experience, and the inherent monitoring and oversight authority of the Director's position when determining whether the MHA could expend the requested federal funds. I consulted Ms. Harmon and Ms. Poteete regarding my decisions, as needed, and they agreed on the same course of action. All actions regarding the MHA would have been taken regardless of the particular attorney that happened

RE &
1/5/07

to be incidental to the MHA's requests to expend federal funds for an attorney to conduct a post-suspension investigation.

### _Procurement Review of MHA Attorney Contracts for 2005-2006_

30.

Pursuant to HUD's November 18, 2004 institution of procurement and LOCCS reviews, the MHA was required to submit, for prior review and concurrence, all documents relating to procurement actions, including requests for proposals, evaluations and proposed awards, and contracts. My office reviewed the MHA submissions to ensure that the MHA was following HUD and MHA procurement policies. We did not care who the MHA selected, so long as we could determine that HUD and MHA procurement regulations and policies were being followed and the decisions were supported by documentation. In my office, Ms. Poteete had the duty of reviewing MHA procurement requests regarding non-engineering and non-maintenance matters.

31

In early January 2005, I learned that the MHA had submitted for HUD review a proposed contract between the MHA and Davis, Hatcher & Parchmen, LLC, for a legal services position. Ms. Poteete was still reviewing the MHA's RFPs for attorney contracts pursuant to HUD's procurement review and this request to execute a contract was premature because the review of the RFPs was not finished. The procurement review required the MHA to obtain review and concurrence at each step of the process. After the MHA had evaluated and ranked the RFP responses, but before the MHA Board voted to award any contract, the MHA should have obtained HUD review and approval of the evaluation process. Since HUD had not completed the review and given approval of even the RFPs at this point in time, any contract executed prior to HUD approval would be considered null and void.

RE 
1/5/07

As a result, Ms. Poteete drafted a letter to Mr. Boggs, for my signature, explaining that HUD was still reviewing the proposal and selection process related to the RFPs for legal representation for the MHA in general legal matters and evictions and collections, and since HUD had not approved the RFP, we could not recommend execution of the contract. The letter also advised the MHA that ineligible expenditures (i.e. those incurred after the expiration of Plaintiff's employment agreement, and those incurred prior to the execution of any new agreement) could not be made retroactive.

32.

In mid January 2005, my staff provided me with a draft letter for my signature, written by Ms. Poteete and concurred in by Ms. Harmon, addressing the MHA's request for HUD review and approval of the award of contracts to two legal firms, one to provide general legal representation to the MHA and one to provide legal representation in evictions and collection matters. The letter indicated that my staff, based on review of the RFPs, the proposals received, and the MHA's ratings, had been unable to determine that the evaluations adequately documented and supported the selections made. The letter also mentioned numerous problems that my staff had found in the evaluation process used by the MHA to fill both attorney positions, and provided advice to the MHA on how to conduct a proper procurement process. The letter required the MHA to re-evaluate and re-submit for HUD review and approval the responses to the RFPs for both the general legal representation position and the evictions and collections position. It did not suggest to the MHA who it should select, or advise the MHA that it could not select any law firm. I did not independently review the documents submitted by the MHA in support of its selections, as I trusted the experience and judgment of my staff and had no reason to question their conclusions. I concurred with and signed the letter to the MHA, a true and accurate copy of which is attached as Exhibit I.

RE&
1/5/07

33.

Subsequently, I was advised by Ms. Harmon that the MHA had requested the assistance of HUD in conducting re-evaluations of the law firm proposals. We agreed that our office could not send a person to assist in this process. However, I called the Regional Contracting and Procurement Officer, Norma Cannon, in the HUD Atlanta office, and told her about the MHA's request. She indicated that she would send someone from Atlanta to assist in the review process and provide training. I never talked to Ms. Cannon, or the person ultimately sent from Atlanta, about the attorneys that had submitted proposals to the MHA, who the MHA had initially selected, or the problems with the first selection process found by my staff. I had no opinion as to who the MHA should award contracts to for the two positions at issue (legal representation and evictions and collection work) and did not know any details about the law firms that had submitted proposals. I also had no knowledge of the races of the attorneys working for the law firms who had submitted RFP responses to the MHA.

34.

On or about February 18, 2005, I reviewed and signed a letter to Mr. Boggs from myself that had been written by Ms. Poteete indicating that HUD had no objection to the MHA awarding the legal services contract to Hill, Hill, Carter, Franco, Cole & Black P.C. On or about February 25, 2005, I reviewed and signed a letter from myself to Mr. Boggs, written by Ms. Poteete, indicating that HUD had no objection to the MHA awarding the evictions and collections contract to Chambless & Math, P.C. I did not review any MHA submissions regarding its selections for the two contracts, but instead relied upon the expertise of my staff and its conclusion that the requests were properly documented and that HUD and MHA procurement policies had been followed.

### *Investigation into possible violations of the ACC between the MHA and HUD*

RE &
1/5/07

35.

In July 2005, the MHA reached a settlement with Mr. McInnish and both the MHA and Mr. McInnish requested that HUD approve the settlement. I did not approve the settlement. I did not believe that the MHA had properly managed federal funds in its handling of the entire situation, as it had suspended Mr. McInnish, with pay, for approximately eight months, and then agreed to pay him in relation to its settlement. I was of the opinion that the MHA should have held a hearing and made a decision on the appropriate disciplinary action.

36.

The ACC requires PHAs to comply with state and federal laws pertaining to civil rights, equal opportunity, and non-discrimination regarding its employees and applicants    Due to charges of discrimination that had been made against the MHA by Mr. McInnish, the MHA's refusal to be cooperative in providing HUD information, and the MHA's poor financial judgment in settling with Mr. McInnish, I authorized a neutral investigation to determine the validity of the charges raised by Mr. McInnish, and determine if the MHA had violated the ACC. Based on the results of the investigation, I drafted an October 31, 2005, letter, in which I proposed that the MHA had violated provisions of its ACC agreement with HUD and asked for its response. The investigation and my subsequent letter to the MHA had nothing to do with Mr. Davis, who ceased being a contract attorney for the MHA on December 31, 2004.

RE&
1/5/07

37.

37.

After correspondence with the MHA on the issues covered by my October 31, 2005 letter, HUD ultimately made a discretionary determination not to pursue action against the MHA regarding possible violations of the ACC.

### General Statements

38.

I give this declaration for use in relation to my Motion for Summary Judgment in the litigation filed against me by Plaintiff Terry Davis. I gave my deposition in this matter on October 18, 2006, and this declaration is designed to supplement my testimony.

39.

I have never met, seen, or had any conversations with Mr. Davis prior to the filing of his lawsuit against me. I did not learn Mr. Davis's race until after reading the Complaint filed against me in this lawsuit. Race was not a factor in any of the decisions that I made regarding the MHA, which may have incidently affected Mr. Davis.

40.

Ms. Harmon and Ms. Polecte were in agreement with all the decisions I made regarding the MHA, which may have incidently affected Mr. Davis. I had no discussion with Mr. McInnish, Ms. Long, or any other MHA employee about any of my decisions, and they had no input into any of them.

41.

HUD has a funding relationship with the MHA, and not with its employees or any of the MHA's contract personnel. HUD's decisions regarding the MHA are influenced only by consideration for the protection of federal funds and the best interests of the residents of PHAs.

Page 18 of 19

RES
1/5/07

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statement

of **41** paragraphs is true and correct.

R. Edmond Sprayberry

Executed this **5** day of January, 2007.

# EXHIBIT A




**U. S. Department of Housing and Urban Development**
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, Alabama 35203-5301

November 18, 2004

Mr. Thomas Taylor
Chairman, Board of Commissioners
Montgomery Housing Authority
1020 Bell Street
Montgomery, AL 36104-3056

Dear Mr. Taylor:

It has come to my attention that the Board of Commissioners suspended Mickey McInnish, Executive Director, Montgomery Housing Authority, at the regularly scheduled board meeting on Tuesday, November 16, 2004. A motion was made to suspend Mr. McInnish with pay and it was passed with a 6 to 1 vote. Mr. McInnish was asked to turn in his phone and leave the premises. No reason was given for the suspension.

I have personally talked with three housing authority board commissioners and none of them have any idea why the Board took this action on Tuesday evening. I am therefore requesting that a special Board meeting be called next week to discuss with all the Board members why this action has taken place. I would also like to be invited to the Board meeting.

The interests of the Montgomery Housing Authority, its staff, and the residents served are at stake in this decision. Your prompt response to this request is appreciated.

Should you have any questions or wish to discuss this matter further, please do not hesitate to contact me at (205) 731-2630 extension 1101.

Sincerely,

R&#1059;&#1058; 11-18-2004

R. Edmond Sprayberry
Director
Office of Public Housing

cc:
All Board of Commissioners, Montgomery Housing Authority

4CPHJ
11/2/04 V. Stkarmon

# EXHIBIT B



**Montgomery HOUSING Authority**

C. MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET • MONTGOMERY • ALABAMA • 36104-3008
(334) 206-7200 • (334) 206-7222 Fax • MHAToday.org

THOMAS TAYLOR
CHAIRMAN

November 17, 2004

Mr. R. Edmond Sprayberry
Director, Office of Public Housing
HUD Birmingham Office
Suite 900
950 22nd Street, N
Birmingham, Alabama 35203

Dear Ed,

Thank you for your call today and your inquiry into to recent events regarding the suspension of Mickey McInnish, Executive Director of the Montgomery Housing Authority. I regret I was unable to provide you more detail, but there are matters under investigation regarding Mr. McInnish's suspension. What I can tell you is that the Board, by a vote of 6 to 1, voted to suspend Mr. McInnish with pay until further notice. An investigation is taking place and Mr. McInnish will be given a due process hearing regarding matters which will be presented to the Board.

You should know that Mr. Lemuel Boggs, our Assistant Executive Director has been named the Interim Executive Director, and the Montgomery Housing Authority is operating smoothly. There has been no interruption in any aspect of our operation. I have directed Board Counsel, Terry Davis, to answer any specific questions you may have and to provide you with regular updates regarding this matter. His telephone number is (334) 270-0592.

We at the Montgomery Housing Authority greatly appreciate the support you provide us and we will continue strive to improve the quality of services and programs for our residents and citizens.

With Best Regards,

I am,

Sincerely yours

Thomas Taylor
Chairman

SPRAY-0001



LUAN LONG, Vice-Chair
BETTIE BARNETT

RICHARD N. BOLLINGER
CLIFFORD HOLMES

JOHN F. KNIGHT Jr.
RON DRINKARD

ANNIE B. UPCHURCH
DAVID E. BARLEY, II

Mr. R. Edmond Sprayberry
November 18, 2004
Page 2


xc:    Mr. Lemuel Boggs
        Terry Davis, Esq
        Barbara Etheridge, Esq.

SPRAY-0002

# EXHIBIT C



**Montgomery HOUSING Authority**

C. MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET • MONTGOMERY • ALABAMA • 36104-3005
(334) 206-7200 • (334) 206-7222 Fax • MHAToday.org

THOMAS TAYLOR
CHAIRMAN

December 1, 2004

Mr. R. Edmond Sprayberry
Director, Office of Public Housing
HUD Birmingham Office
Suite 900
950 22nd Street, N
Birmingham, Alabama 35203

Dear Mr. Sprayberry:

On behalf of the Board of Commissioners of the Montgomery Housing Authority, please allow me to express my deepest sympathy regarding the loss of your father. We will keep you and your family in our prayers.

Let me also say thank you for your recent explanation to me regarding your request for information from the Montgomery Housing Authority. I now understand that you did what was necessary under the circumstances. Also, the staff has informed me that they have been in contact with your office. They have been assured that the appropriate personnel will be available to provide a prompt turn-around to prevent our normal operations from being delayed, as it relates to procurement requests.

Lane Boggs has informed me that only authorized personnel have access to our accounts. Mr. Boggs has also informed me that our operation is running smoothly, and he anticipates no expenditures or procurements for matters that are out of the ordinary. The only expense we anticipate that was not planned for relates to the suspension and due process hearing that must be afforded to Mickey McInnish. I have asked Mr. Davis, Board Counsel, to provide me with his estimate of costs associated with a full investigation and presentation of evidence to the Board in the due process hearing. Mr. Davis informed me that there are a number of variables to be considered, but he does not expect the costs to exceed $35,000.00. I would ask that you approve this request so that the investigation and presentation of evidence can proceed as smoothly and quickly as possible.

I will look forward to hearing from you at your earliest convenience.

SPRAY-002



LILLIAN LONG, Vice-Chair
BETTYE BARNETT

RICHARD N. BOLLINGER
CLIFFORD HOLMES

JOHN F. KNIGHT Jr.
RON DRINKARD

ANNIE B. UPCHURCH
DAVID S. BARLEY, II

Mr. R. Edmond Sprayberry
December 1, 2004
Page 2

Sincerely yours,

Thomas Taylor
Chairman

xc:    Lane Boggs
       Interim Executive Director

       Terry Davis, Esq
       Board Counsel

SPRAY-0023

# EXHIBIT D



**U. S. Department of Housing and Urban Development**
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, Alabama 35203-5301

December 9, 2004

Mr. Thomas Taylor
Chairman, Board of Commissioners
Montgomery Housing Authority
1020 Bell Street
Montgomery, AL 36104-3006

Dear Mr. Taylor:

This letter is in response to your letter dated December 1, 2004, requesting approval of "costs associated with a full investigation and presentation of evidence to the Board in the due process hearing" relating to the suspension of Mickey McInnish, Executive Director. You stated that Terry Davis, Board Counsel, will do the investigation and he has stated that he does not expect the costs to exceed $35,000. Is there a Board resolution authorizing this action?

We have reviewed the Attorney Employment Agreement for Terry Davis, effective February 18, 2003, signed by Mickey McInnish, Executive Director, and Terry Davis, Attorney Representative. We have also reviewed the Response to the Request for Proposal for Legal Representation, submitted October 31, 2002, outlining the description of legal services to be provided under the Agreement.

HUD regulations dictate that costs for professional services should be reasonable in relation to the services rendered and that allowable costs under HUD programs be necessary and reasonable for the administration of the program(s). You did not state in your letter what the issues are to be investigated, nor was there an explanation given as to why an attorney is needed to conduct an investigation. Therefore, we cannot determine if the costs associated with this request are eligible, reasonable, and within the "scope of services" of the Attorney Employment Agreement for Mr. Davis.

If there are issues to be investigated relating to the mismanagement, fraud and abuse of HUD programs at the Montgomery Housing Authority, please inform me what these charges are and the reasonable basis for such charges so that I can investigate or refer the matter to the Office of Inspector General for investigation.

SPRAY-0033

Based on the aforementioned reasons, this request for $35,000 for legal costs is not being approved. Should you like to discuss the matter further, please do not hesitate to contact me at (205) 731-2630 extension 1101.

Sincerely,

R. Edmond Sprayberry
Director
Office of Public Housing

cc:
Mr. Lemuel E. Boggs
Interim Executive Director

SPRAY-0034

# EXHIBIT E



**Montgomery HOUSING Authority**

C. MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET • MONTGOMERY • ALABAMA • 36104-2004
(334) 206-7200 • (334) 206-7222 Fax • MHAToday.org

THOMAS TAYLOR
CHAIRMAN

January 20, 2005



Mr. R. Edmond Sprayberry
Director, Office of Public Housing
HUD Birmingham Office
Suite 900
950 22nd Street, N
Birmingham, Alabama 35203

RE:    Investigation of Executive Director and Disciplinary Hearing

Dear Mr. Sprayberry:

    Please be advised that I have been notified by our general counsel, Terry Davis, that the costs for conducting the investigation into the conduct of Executive Director C. Michael McInnish has exceeded the original estimate. The investigation began on November 16, 2004. As a result of the investigation, Mr. McInnish has been recommended for termination of his employment. You have previously been provided with a copy of the charges. The termination hearing is now scheduled for February 10, 2005. Our attorney estimates that the revised cost of the investigation through the disciplinary hearing should not exceed $65,000.00. We request your immediate approval of this request.

    If you have any questions, please contact me.

Sincerely yours,

Thomas Taylor
Chairman

xc:    Lane Boggs
       Interim Executive Director

       Board of Commissioners
       Montgomery Housing Authority

       Terry G. Davis
       General Counsel

       Hon. Barbara Etheridge

**SPRAY-0064**



LUAN LONG, Vice-Chair
BETTYE BARNETT

RICHARD N. BOLLINGER
CLIFFORD HOLMES

JOHN F. KNIGHT Jr.
RON DAVIS-AYD

ANNIE B. UPCHURCH
DAVID B. BARLEY, II

# EXHIBIT F



U. S. Department of Housing and Urban Development
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham. Alabama 35203-5301

JAN 2 7 2005

Mr. Lemuel E. Boggs
Interim Executive Director
Montgomery Housing Authority
1020 Bell Street
Montgomery, AL 36104-3056

SUBJECT: Extension of Attorney's Contract/Investigation Expenses

Dear Mr. Boggs:

This responds to the PHA's letter dated January 20, 2005, requesting approval of the fees for the investigation of Mr. McInnish not to exceed $65,000.

Our letter dated December 9, 2004, disapproved your request for approval of expenditure of $35,000 for legal costs associated with the investigation of Mr. McInnish. Your letter of December 1, 2004, did not state what issues were to be investigated. Since that time, you have not provided information that would allow us to determine:

- If the costs associated with this request are reasonable in relation to the services rendered;
- That the costs are allowable costs under HUD programs and necessary and reasonable for the administration of the program(s); and
- That the costs are eligible and within the "scope of services" of the previous Attorney Employment Agreement for Mr. Davis.

As we advised you in our letter dated January 12, 2005, the PHA's current contract with Terry G. Davis expired December 31, 2004, and expenses incurred after that date are ineligible for payment by the PHA. Based on the facts that Mr. Davis has an expired contract and that you were previously informed we would not approve additional legal fees for this investigation, your request for $65,000.00 in legal fees is denied.

As a result of our review of the Requests for Proposals for legal services, we were unable to determine that the evaluations adequately documented and supported the selections made. We look forward to receipt of the reevaluation of the Requests for Proposals for legal services.

SPRAY-0066

If you have any questions or need additional information, please contact me at (205) 731-2630, extension 1101.

Sincerely,

R℥℥ 1/27/2005

R. Edmond Sprayberry
Director
Office of Public Housing

cc:
Mr. Thomas Taylor
Chairman, Board of Commissioners
All Board Members

SPRAY-0067

If you have any questions or need additional information, please contact me at (205) 731-2630, extension 1101.

Sincerely,

R. Edmond Sprayberry
Director
Office of Public Housing

SPRAY-0068

# EXHIBIT G



U. S. Department of Housing and Urban Development
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, Alabama 35203-5301

February 8, 2005

Mr. Thomas Taylor
Chairman, Board of Commissioners
Montgomery Housing Authority
3929 Piedmont Court
Montgomery, AL 36104

Dear Mr. Taylor:

    I have received your letter dated February 3, 2005, concerning a proposed settlement with
Mr. Mickey McInnish. Your letter stated that the Board of Commissioners of the Montgomery
Housing Authority (Board) is prepared to approve a reasonable settlement because Mr. McInnish
now has agreed to resign and then be eligible to retire. You are recommending settlement subject
to formal Board and HUD approval. There are eleven terms of settlement listed in your letter
including a severance payment of $110,000.00 and reasonable attorney fees for Mr. McInnish
totaling $16,500.00.

    After carefully reviewing your request along with all historical documentation and
consulting with HUD's legal counsel, a decision has been made not to approve the proposed
settlement because of the following reasons:

1.  The hearing is scheduled for Thursday, February 10, 2005, only two days away. At
    this time the hearing officer will decide whether or not Mr. McInnish should be
    sanctioned, terminated, or return to work.
2.  If the hearing officer finds in favor of the Montgomery Housing Authority, then the
    Board's decision to settle for $126,500.00 would appear wasteful and not in
    conformance with its annual contributions contract with HUD.
3.  If the hearing officer finds in favor of Mr. McInnish, he may return to work and
    continue his "Charge of Discrimination Suit" against the Board. We will address this
    situation later depending upon subsequent events. (HUD plans to investigate the
    discrimination charges regardless of the outcome of the hearing and any settlements.)

SPRAY-0795

4. You asked that we not approve the proposed settlement without approving attorney fees, currently estimated at $65,243.25, for the Board's attorney. You have been informed in several letters that HUD has not approved any legal expenses for this action taken by the Board. You have also been informed that the attorney representing the Board in this action does not have a contract. The issue of legal representation should have been resolved initially, prior to having incurred an exorbitant legal bill.

Our recommendation is to proceed with the hearing scheduled for Thursday and depending on the outcome, chart a course of action.

My staff and I are committed to working with the Montgomery Housing Authority and resolving these serious issues in a fair and efficient manner. I plan to attend the hearing on Thursday and expect to see you there.

Sincerely,

R. Edmond Sprayberry
Director
Office of Public Housing


cc: Board of Commissioners

SPRAY-0796

# EXHIBIT H



**U. S. Department of Housing and Urban Development**
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, Alabama 35203-5301

MAR   2005

Mr. Lemuel E. Boggs
Interim Executive Director
Montgomery Housing Authority
1020 Bell Street
Montgomery, AL  36104-3056

SUBJECT:  Requests for Proposals (RFP) for Audit Services – Revised

Dear Mr. Boggs:

This responds to the PHA's fax dated March 4, 2005, transmitting a request for approval for the PHA to pay a bill for services rendered by Terry G. Davis during the months of October, November, and December 2004.

Based on the request in your fax that the October bill be reduced to reflect 15.3 hours as indicated by the attorney's contract, we have no objection to the PHA paying the October bill in the amount of $2,718.25.

We are reducing the bills for November and December to remove expenses related to the investigation of Mr. McInnish. Our letter dated December 9, 2004, denied budgetary approval of $35,000 for legal costs for several reasons, some of which are restated below. Our letter dated January 12, 2005, advised that expenditures incurred by Mr. Davis other than those previously approved would be ineligible and could not be made retroactive. Our January 27, 2005, letter further emphasized the previous letters and denied the request for approval of the $65,000 in legal fees requested.

In accordance with the Annual Contributions Contract (ACC), the PHA shall not incur expenditures except pursuant to and in accordance with an approved operating budget. As stated previously, HUD regulations dictate that costs for professional services be reasonable in relation to the services rendered and that allowable costs under HUD programs be necessary and reasonable for the administration of the program(s).

We requested information from you reflecting the Board's approval of the investigation as well as information on the issues to be investigated relating to the mismanagement, fraud and abuse of HUD programs at the Montgomery Housing Authority. Since we did not receive the

SPRAY-0251

requested information, it could not be determined that these costs were reasonable or that the services rendered would be necessary for the administration of the programs.

The bills are reduced as follows:

| Total Hours | Reduced Hours | Total Hours Allowed |
|---|---|---|
| 168.95 | 146.20 | 22.75 |
| | | |
| Amount Billed | Amount Reduced | Amount Allowed |
| $29,566.25 | $25,585 | $3981.25 |
| | | |
| Office Supplies Billed | Office Supplies Reduced | Office Supplies Allowed |
| 403.55 | $338.98 | $64.57 |

The number of hours allowed must be reduced by 3 hours per month each for November and December according to the attorney's contract with the PHA (6 x 175 = 1050). Reducing the amount by 6 hours for the two months (3981.25 − 1050) brings the allowable hourly amount to $2931.25. The total amount that is eligible for payment is $3,334.80, which includes both the acceptable hours and the prorated office supplies (2931.25 + 403.55). We have provided an analysis of the rate reduction and an analysis of the reduction of the office supplies for your information.

Should you like to discuss the matter further, please do not hesitate to contact me at (205) 731-2630, extension 1101.

Sincerely,

*RE> 3-15-2005*

R. Edmond Sprayberry
Director
Office of Public Housing

Enclosure (2)

*4 CPH*
*Poteete*
*3/15/05*

*4c PH*
*as Chairman*
*3/15/05*

SPRAY-0252

**Analysis of Rate Reduction**

| November/ December 2004 | Rate | Hours | Total Reduced |
|---|---|---|---|
| 11/16 | 175.00 | 3 | 525 |
| 11/17 | 175.00 | 7 | 1225 |
| 11/18 | 175.00 | 8 | 1400 |
| 11/19 | 175.00 | 7.5 | 1312.5 |
| 11/22 | 175.00 | 8.7 | 1522.5 |
| 11/23 | 175.00 | 6 | 1050 |
| 11/24 | 175.00 | 6.75 | 1181.25 |
| 11/25 | 175.00 | 7 | 1225 |
| 11/29 | 175.00 | 8.5 | 1487.5 |
| 12/07 | 175.00 | 1 (4-3) | 175 |
| 12/08 | 175.00 | 7 | 1225 |
| 12/09 | 175.00 | 8 | 1400 |
| 12/13 | 175.00 | 8 | 1400 |
| 12/14 | 175.00 | 7.5 | 1312.5 |
| 12/15 | 175.00 | 5.75 | 1006.25 |
| 12/16 | 175.00 | 3.75 | 656.25 |
| 12/17 | 175.00 | 4 | 700 |
| 12/18 | 175.00 | 6.75 | 1181.25 |
| 12/20 | 175.00 | 7 | 1225 |
| 12/22 | 175.00 | 8 | 1400 |
| 12/23 | 175.00 | 7 | 1225 |
| 12/27 | 175.00 | 6 | 1050 |
| 12/29 | 175.00 | 3 (6-3) | 525 |
| 12/30 | 175.00 | 1 | 175 |
|  |  | 146.2 | 25585 |

| November/ December 2004 | Rate | Hours | Total Allowed |
|---|---|---|---|
| 11/10 | 175.00 | 3.75 | 656.25 |
| 11/11 | 175.00 | 1 | 175 |
| 11/12 | 175.00 | 1.5+3.5=5 | 875 |
| 11/15 | 175.00 | 3 | 525 |
| 12/7 | 175.00 | 3 | 525 |
| 12/21 | 175.00 | 4 | 700 |
| 12/29 | 175.00 | 3 (6-3) | 525 |
|  |  | 22.75 | 3981.25 |

SPRAY-0253

**Analysis of Reduction of Office Expenses**

Expenses prorated based on the percentage of allowed expenses to total expenses -
3981.25/25585 = 15.56 or 16%

| November/ December 2004 | Office Charges | 16% of Total Expenses |
|---|---|---|
| 12/31 | 161.25 | 25.80 |
| 12/31 | 40.50 | 6.48 |
| 12/31 | 64.57 | 10.33 |
| 12/31 | 137.23 | 21.96 |
| | 403.55 | 64.57 |

Total Expenses Allowed: $64.57

SPRAY-0254

# EXHIBIT I



U. S. Department of Housing and Urban Development
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, Alabama 35203-5301

Mr. Lemuel E. Boggs
Interim Executive Director
Montgomery Housing Authority
1020 Bell Street
Montgomery, AL  36104-3056

SUBJECT:  Requests for Proposals (RFP) for Legal Services
               Eviction and Collection and General Legal

Dear Mr. Boggs:

        This responds to the PHA's memoranda received on January 7, 2005, requesting approval of the award for two qualified legal firms to provide legal representation and represent the PHA in 1) eviction and collection matters and 2) general legal matters.

        Based on our review of both RFPs, the proposals received, and the PHA's ratings, we were unable to determine that the evaluations adequately document and support the selections made.  We offer the following comments concerning the proposals:

RFP for Evictions and Collections

- The evaluations are not signed and do not contain narratives justifying how or why the scores were given.
- The points awarded by the evaluators to the proposals do not appear to be appropriately assigned based on the information provided in the proposals.
- There is no evidence that an evaluation panel was selected for this proposal or indication of who is on the panel.
- The Attorney Employment Agreement submitted for review from Davis, Hatcher & Parchman, LLC, indicates selection has been made prior to HUD approval and
    1.  changed the term from that stated in the RFP;
    2.  changed the notice for termination from 30 days as stated in the RFP to 90 days; and
    3.  does not list scope but references RFP.
- There is no documentation on whether cost analysis is necessary for evaluation of this proposal.

McInnish 672

RFP for General Legal Services

- The evaluations are not signed and do not contain narratives justifying how or why the scores were given.
- The points awarded by the evaluators to the proposals do not appear to be appropriately assigned based on the information provided in the proposals.
- There is no evidence that an evaluation panel was selected for this proposal or indication of who is on the panel.
- Evaluations are not documented in a thorough, objective manner that will support selection in case of litigation. We are in receipt of a copy of a letter from a bidder requesting documentation on how the selections were made.
- There is no evidence that a cost/price analysis was conducted or that negotiations were properly conducted or documented, nor was the file documented to show that an in-depth cost analysis was not necessary. The Attorney Employment Agreement submitted separately for Davis, Hatcher & Parchman, LLC, indicated that negotiations were conducted with this firm; however, there is no documentation to indicate that negotiations were conducted with the other bidders.

In accordance with the Procurement Handbook 7460.8, REV-1, Chapter 4, all evaluations should be impartial, consistent, and fair. Objectivity must be readily apparent upon review. The technical evaluation requires a detailed evaluation plan to be successful that shall include a rating sheet for each offeror, which lists the evaluation criteria and the weight assigned. The rating description shall be clearly stated and should require the technical evaluator to assign both numerical ratings and narrative justifications to support the ratings given.

An evaluation panel should be officially appointed in writing with the chairperson indicated. (We recommend the panel be comprised of persons who have a technical level of expertise in performing similar work as solicited in the RFP.) The evaluation shall be based on the evaluation factors set in the RFP and not on personal knowledge or factors not specified in the RFP. Evaluators should be careful to make the evaluations as thorough, objective, and well documented as possible since the evaluations may be made public after award and especially in the case of litigation.

An evaluation report documenting the evaluation of each technical proposal shall be developed that ranks the offerors by technical merit, using point scores and/or similar methodology. A narrative must accompany the scores to explain how the scores were determined.

The Contracting Officer or someone on staff knowledgeable in public contract cost and price analysis shall perform an evaluation of cost analysis when the RFP requests cost proposals broken down by element of cost. The evaluation should be performed using appropriate techniques required in Chapter 4-35 and any other evaluation process described in the RFP.

For the purpose of conducting negotiations, the PHA should develop a competitive range taking into account the evaluation of both the technical and cost/price proposals; and each proposal should be classified whether they are acceptable based on the established competitive range. All proposals determined acceptable or potentially acceptable shall be included in the competitive range. A prenegotiation memo based on the results of the technical and cost evaluations should be prepared by the Contracting Officer explaining which offerors are in the competitive range.

*Negotiations shall be conducted with all offerors in the competitive rage.* A memorandum of negotiation objectives should be prepared to outline the goals of the negotiation and to provide a basis for documenting the procurement file with the results of the negotiations, helping to create a complete record to justify the award of the contract. Any substantial oral clarification of a proposal shall be made in writing by the offeror.

After negotiations are completed, the Contracting Officer shall establish a common date and time for submission of best and final offers. After best and final offers are received, a final round of technical and cost/price evaluations must occur. The Contracting Officer shall prepare a price negotiation memo that summarizes the results of the negotiation and explains the basis for the award decision.

Awards shall only be made to responsible contractors, in accordance with the terms of the solicitation, taking into consideration both price and technical factors.

The PHA should reevaluate the proposals using the procurement requirements stated above concerning evaluation of proposals and resubmit the reevaluations to this office for approval before issuance of the contracts for these RFPs. We would expect to see evaluations properly documented in all selection of all proposals submitted for our review.

If you have any questions or need additional information, please contact me at (205) 731-2630, extension 1101.

Sincerely,

R. Edmond Sprayberry
Director
Office of Public Housing