# ATTACHMENT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TERRY G. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | 2:05-cv-01235-MHT-DRB |
| R. EDMOND SPRAYBERRY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF CAROL S. HARMON

I, Carol S. Harmon, make the following declaration pursuant to 28 U.S.C. § 1746:

1.

I am a Division Director of the Office of Public Housing for the Birmingham Field Office of the United States Department of Housing and Urban Development ("HUD"). I have been employed in this position in an Acting capacity since early 2004, and in a permanent capacity since September 2004. Prior to being promoted to Division Director, I held the position of Public Housing Program Analyst with a background in public housing finance and accounting. My supervisor is R. Edmond Sprayberry, Director of the Office of Public Housing for the Birmingham HUD Field Office.

2.

In my position, I have responsibility for supporting the Director in the implementation of all public housing programs by Public Housing Authorities (PHAs) in the southern part of the State of Alabama, including the Montgomery Housing Authority ("MHA"). My general duties and responsibilities include: (a) directing a staff of public housing revitalization specialists and technical

Page 1 of 11

staff who provide monitoring and oversight, evaluation, and technical assistance to 72 PHAs in my

jurisdiction; (b) making recommendations and decisions on various public housing programs; (c)

resolving sensitive issues by interpreting and applying new and existing policy and procedural

instructions for staff and PHAs; and (d) assessing PHAs' performance and compliance, concerns,

trends, and technical assistance needs.

3.

In mid November 2004, I learned from a member of my staff that the MHA Board of

Commissioners had suspended the Executive Director of the MHA, Mr. McInnish. I discussed the

matter with Mr. Sprayberry. We did not know why the MHA had suspended its Executive Director,

had not been aware that the MHA had any problems with him, and did not know what was going on

at the MHA. Considering the unexplained suspension, our lack of information, and the MHA's

history of serious procurement problems, we made the determination, as a proactive and

precautionary measure that the MHA should be placed on a Line of Credit Control System

("LOCCS") and procurement review. We believed that LOCCS and procurement reviews were

necessary to protect HUD and the MHA assets. Accordingly, I drafted a letter for Mr. Sprayberry's

signature placing the MHA on LOCCS draw-down review and procurement review on November

18, 2004. Mr. Sprayberry concurred and signed the letter, a true and accurate copy of which is

attached as Exhibit A.

4.

When a PHA is under LOCCS drawdown and procurement review, it is required to receive

prior approval from HUD before making any expenditure of federal funds and participating in

procurement activities. The objective of this review is to allow HUD to ensure that the PHA



properly supports its drawdown of HUD funds through the Line of Credit Control System, and makes purchases for goods and services in accordance with HUD and federal requirements and the PHA's own procurement policies.

5.

Ms. Holly Poteete, a Public Housing Revitalization Specialist on my staff, had oversight responsibilities that included the MHA. She was the primary HUD contact for the MHA in relation to the procurement review of non-maintenance and non-engineering matters. I did not perform any independent review of the MHA's procurement activities but relied upon the expertise of my staff. The MHA contracting officer, Georgianna Wigginton, or the interim Executive Director, Lane Boggs, would submit the procurement transactions to our office for review. I would then route the non-engineering and non-maintenance materials to Ms. Poteete, who was responsible for reviewing the submissions to determine whether they complied with HUD and MHA regulations and policies. I would concur in her review after any necessary discussion, and a letter would be drafted for Mr. Sprayberry's signature denying or concurring in the MHA's request.

6.

As my background is that of a financial analyst, I was very concerned with the financial aspects of the MHA's requests. In addition to the Annual Contribution Contract ("ACC") and the Code of Federal Regulations sections pertaining to public housing, there are several HUD circulars and guidebooks that HUD uses to evaluate a PHA's procurement process and its expenditure of federal funds. For instance, OMB Circular A-87 provides that costs for professional services should be reasonable in relation to the services rendered and should be related to work under Federal grants and contracts. HUD Guidebook 7510.1, the Public and Indian Housing Low-Rent Technical

Accounting Guide, states that allowable costs under HUD programs must be necessary and reasonable for the administration of the program and must be supported with supporting documentation. In addition, the HUD Procurement Handbook 7460.8, REV-1, Chapter 4, contains guidelines relating to the procurement process used by PHAs.

7.

On or about December 1, 2004, Thomas Taylor, Chairman of the MHA Board, requested that HUD approve the MHA's expenditure of up to $35,000 in federal funds for an investigation into the MHA's suspended Executive Director, Mr. McInnish. Due to the procurement review and HUD regulations requiring that PHA costs for professional services be reasonable and necessary, I discussed this request with Mr. Sprayberry and Ms. Poteete. The request was unusual because it was for a very large amount of money, it asked for an attorney to be paid to do investigative work, and it sought funds to conduct an investigation after the MHA had already taken the action to suspend the Executive Director.

8.

I reviewed the request, as well as Mr. Davis's contract with the MHA (which I had not previously reviewed). I had several serious concerns about this request.

9.

First, the December 1, 2004 request was for a very large amount of money that the MHA had not budgeted in its annual operating budget and that would have to come from some other line item in its budget or from its operating reserves. I was concerned with the MHA's budget and financial situation, because it had previously been declared financially-troubled, its operating reserves were being greatly reduced, and HUD had already approved the incorporation of an additional $18,847.50

Page 4 of 11

into its legal budget to cover legal fees in August 2004. It concerned me that the MHA Board did not appear to be exercising sound financial controls over its assets, and I could see the possibility of the MHA regressing backward into financial and procurement problems. It was also unclear if the Board had authorized this action, because HUD was not aware of any Board resolution authorizing this large expenditure of funds for an investigation.

10.

Second, I could not determine if the MHA Board had taken any measures to determine if having an attorney conduct this investigation was cost-effective or reasonable. The MHA had contracted with Mr. Davis to provide legal representation to its Board and not to conduct investigative services, and I questioned whether an attorney was the proper person to conduct an investigation or whether the MHA should have initiated a procurement process to hire an investigator. Based on Mr. Davis's hourly rate of $175.00, the requested $35,000 for an investigation would equate to 200 hours of work. This seemed to be an excessive amount of work, especially when the MHA had not provided any information regarding what issues were to be investigated. In addition, HUD had an Office of Inspector General (OIG) that could conduct investigations relating to possible mismanagement or abuse of federal funds. If there were any issues relating to fraud or mismanagement of federal funds, then it would make sense for the MHA to provide that information to HUD for investigation instead of spending money to pay their Board attorney to do it.

11.

Third, there were concerns that the MHA was requesting the funds to investigate McInnish after it had already suspended him, rather than before it took any disciplinary action. The MHA had



not provided to HUD any reasons for the suspension of its Executive Director. This request for a large amount of money to conduct an investigation, after the fact, appeared to be an attempt to spend money to come up with a justification for an action that had already been taken.

12.

Based on the review conducted by myself and Ms. Poteete of the request, we could not determine what issues were to be investigated, why an attorney was necessary, and why so much money was needed. The decision was made, after discussion with Mr. Sprayberry of our findings, that HUD could not determine if the $35,000 requested was eligible for reimbursement, reasonable in relation to the services rendered, and within the "scope of services" of Mr. Davis's Attorney Employment Agreement. As a result, Ms. Poteete drafted a letter, for my concurrence and Mr. Sprayberry's signature, denying the request and seeking additional information.

13.

At around the same time, HUD received a request from the MHA to approve the payment of $3,243.25 to Mr. Davis for legal work he had performed in October. Since HUD was now reviewing the MHA's procurement actions and expenditures under the November 18, 2004, LOCCS draw-down review and procurement review, I started paying very close attention to the MHA's operating budget and was very concerned that it had vastly overspent its legal budget for the year and continued to request additional funds. I was concerned that HUD had authorized the MHA to incorporate an additional $18,847.50 into its operating budget to pay Mr. Davis's legal bills in August 2004 and was now seeking additional funds for an investigation. The MHA did not have unlimited reserves and did not appear to be wisely managing its resources. To help us determine what was going on at the MHA and why so much money was being paid for legal fees, we asked the

MHA to provide information on whether there was money in its current operating budget to cover these fees, how much it had charged to its legal fees line item for the year for legal fees, and how much had been paid for the year to Mr. Davis under his current contract. We also sought clarification as to whether Mr. Davis's bill was for 15.30 hours or 18.30 hours, since his contract stated he would be paid $175 per hour for services rendered in excess of three hours a month. After discussion, Ms. Poteete drafted a December 9, 2004 letter from Mr. Sprayberry regarding Mr. Davis's October invoice to Mr. Boggs, and I concurred in the letter. Mr. Sprayberry then concurred and signed the letter. A true and accurate copy is attached as Exhibit B.

14.

On or about January 2005, the MHA sent a response to the December 9, 2004 letter regarding Plaintiff's October 2004 invoices that answered some, but not all, of HUD's questions. Specifically, the letter did not answer the question regarding whether Mr. Davis was billing for 18.3 or 15.3 hours. A true and accurate copy of the MHA's response letter is attached as Exhibit C. We subsequently sent a January 12, 2005 letter reminding the MHA that HUD needed this information for authorizing the payment of Mr. Davis's October fees. A true and accurate copy of that letter is attached as Exhibit D. HUD did not receive the requested information regarding the October invoice until March 2005, when Mr. Davis indicated in a letter to the MHA, that was forwarded to HUD, that the bill should be reduced by three hours per his MHA contract to 15.3 hours, or $2,718.25. HUD authorized the payment of the invoice after receiving the requested information.

15.

I am not aware of HUD receiving any response to the December 9, 2004 letter denying the MHA authority to spend $35,000 and seeking additional information regarding the request. In mid



January 2005, however, Mr. Taylor sent a letter advising Mr. Sprayberry that the investigation being conducted by Mr. Davis into Mr. McInnish had exceeded its budget and asking Mr. Sprayberry for approval to spend up to $65,000 for the investigation of Mr. McInnish through a disciplinary hearing. The request completely ignored the fact that HUD had denied the MHA budgetary approval to spend federal funds to investigate McInnish in its December 9, 2004 letter, that the MHA had not provided requested information to allow HUD to determine if the requested costs were reasonable, allowable, and within the scope of services of Mr. Davis's contract, and that absent HUD approval, the MHA had no authority to spend any federal funds investigating McInnish. Furthermore, at a rate of $175.00 per hour, this amount equated to approximately 372 hours of investigation. The request to spend this amount of money was financially irresponsible and unsupported.

16.

After discussion with Ms. Poteete and Mr. Sprayberry, Ms. Poteete drafted a letter to Mr. Boggs from Mr. Sprayberry denying the request for an additional $65,000 in attorney expenses for the same reasons as set forth in the December 9, 2004 letter, and further stating that any expenses incurred by Mr. Davis after the December 31, 2004 expiration of his contract were not eligible for reimbursement from federal funds. I concurred in the final letter.

17.

In early March 2005, the MHA forwarded invoices from Mr. Davis seeking payment for $28,919.80 in legal services he provided to the MHA for November and December 2004. Mr. Davis's invoices requested payment for 146.20 hours ($25,585.00) in legal services that he performed for the MHA in these months relating to an investigation into McInnish. The MHA requested that HUD approve the payment of the invoices, even though the MHA had never obtained



prior approval to expend federal funds for an investigation into McInnish. Ms. Poteete and I discussed this request and she drafted a March 15, 2005, letter to the MHA denying the MHA approval to pay Mr. Davis with federal funds for those portions of the invoices relating to the investigation of Mr. McInnish because HUD had never authorized the MHA to incur such expenses. Our letter to the MHA specifically indicated that HUD had denied approval for federal funds to be used for an investigation into McInnish in earlier letters, including letters dated December 9, 2004, January 12, 2005, and January 27, 2005. Our letter advised the MHA that it could only pay Plaintiff for work that did not relate to the investigation of McInnish. I concurred in the final letter.

18.

In early January 2005, I learned that the MHA had submitted a proposed contract between the MHA and Davis, Hatcher & Parchmen, LLC, for a legal services position. Ms. Poteete was still reviewing the MHA's RFPs under HUD's November 18, 2004 procurement review and this request to execute a contract was premature because the review was not finished. Ms. Poteete drafted a letter to Mr. Boggs, for Mr. Sprayberry's signature, explaining that HUD was still reviewing the proposal and selection process for two RFPs for legal representation for the MHA in general legal matters and evictions and collections, and since HUD had not approved the RFP, we could not recommend execution of the contract. Any contract executed prior to HUD approval would be considered null and void since the MHA was under procurement review. The letter also noted that any fees incurred by an attorney prior to execution of a new contract, and after the expiration of an old contract, were not eligible for payment from federal funds. I concurred in the final January 12, 2005 letter.

Page 9 of 11



19.

In January 2005, Ms. Poteete discussed with me problems that she encountered in her review of the MHA's RFPs, the law firm proposals received by the MHA, and the MHA's evaluations of the law firms' proposals, and explained how she could not determine that the MHA had followed HUD and MHA procurement procedures in making its selections. I concurred in her letter of January 18, 2005, advising the MHA of the problems HUD had found in its procurement process and instructing it to re-evaluate and resubmit the RFPs for HUD review and approval. The letter did not provide any instructions to the MHA as to who it should, or should not, select after the re-evaluation.

20.

At some point afterwards, I received a telephone call from Mr. Boggs at the MHA requesting assistance with conducting re-evaluations of the law firm proposals received by the MHA. I informed him that the HUD Birmingham office could not provide such specific contracting assistance, but that I would relay his request to Mr. Sprayberry. I discussed the matter with Mr. Sprayberry, and we agreed that our office could not provide a person to assist in the evaluations. Mr. Sprayberry, however, called the Regional Contracting and Procurement Officer, Norma Cannon, in the HUD Atlanta office, and told her of the MHA's request. Ms. Cannon sent a procurement officer from Atlanta to assist in the MHA's review process and to conduct some on-site training in the procurement review process.

21.

I am aware that Terry Davis has filed a lawsuit against Mr. Sprayberry, and I give this declaration for use in Mr. Sprayberry's Motion for Summary Judgment in that case.

22.

I have never met, seen, or had any conversations with Mr. Davis. I did not learn Mr. Davis's race until after I learned that Mr. Davis had filed a lawsuit against Mr. Sprayberry alleging race discrimination. I have never heard Mr. Sprayberry, or any HUD employee, make any remarks regarding the race of Mr. Davis. Race was not a factor in any of the decisions made by HUD regarding the MHA.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statement of 22 paragraphs is true and correct.

*Carol S. Harmon*

Carol S. Harmon

Executed this 22nd day of December, 2006.

# EXHIBIT A



**U. S. Department of Housing and Urban Development**
Birmingham Office
*Region IV*
Medical Forum Building, Suite 900
950 22ⁿᵈ Street, North
Birmingham, Alabama 35203-5301

November 18, 2004

Mr. Lane Boggs
Interim Executive Director
Montgomery Housing Authority
1020 Bell Street
Montgomery, AL 36104-3056

Dear Mr. Boggs:

    This is to advise you that effective this date, this office is requesting the review of all procurement transactions and all draw down of funds from the Line of Credit Control System (LOCCS). All requests of this nature should be faxed to this office or mailed to the appropriate staff person for review and approval.

    This action is necessary with the recent suspension of Mickey McInnish, Executive Director, pending his hearing.

    Should you have any questions, please do not hesitate to contact me at (205) 731-2630 extension 1101.

                       Sincerely,

                       R. Edmond Sprayberry
                       Director
                       Office of Public Housing

cc:
· Mr. Thomas Taylor, Chairman, Board of Commissioners, Montgomery Housing Authority

SPRAY-0300

# EXHIBIT B



**U. S. Department of Housing and Urban Development**
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22ⁿᵈ Street, North
Birmingham, Alabama 35203-5301

December 9, 2004

Mr. Lane Boggs
Interim Executive Director
Montgomery Housing Authority
1020 Bell Street
Montgomery, AL 36104-3056

Subject: **Billing for the Month October 2004 (Terry G. Davis)**

Dear Mr. Boggs:

This is in reference to the request dated November 30, 2004, requesting approval for payment of attorney fees in the amount of $3,243.25 submitted by Terry G. Davis for the month of October 2004.

According to OMB Circular A-87, costs for professional services should be reasonable in relation to the services rendered and should be related to work under Federal grants and contracts. Guidebook 7510.1, Public and Indian Housing Low-Rent Technical Accounting Guide, states that allowable costs under HUD programs be necessary and reasonable for the administration of the program.

We have reviewed the itemized billing for services and the Attorney Employment Agreement effective February 18, 2003, and have the following questions and concerns:

1. Are there sufficient funds budgeted in the PHA's current budget for these legal fees? Our letter of August 10, 2004, approved the incorporation of an additional $18,847.50 into the operating budget for legal fees for Terry G. Davis.
2. What is the total amount of legal fees charged to date to Account 1410.4, Legal Expense, under the current operating budget?
3. The billing submitted for Mr. Davis is for 18.30 hours. His contract states, "Any services rendered in excess of three hours per month shall be billed at $175.00 per hour." Are his total hours for the month of October 18.30 or 15.30 for legal services for the Montgomery Housing Authority?
4. What is the total amount of legal fees approved and paid to date for the legal services of Terry G. Davis under this contract?

www.hud.gov          espanol.hud.gov

**SPRAY-0039**

Because the Attorney Employment Agreement states that it is subject to review and approval by HUD, we wish to review the above requested information before approving additional legal expenses beyond the $18,847.50 approved in August 2004.

Should you have any questions concerning this matter, please do not hesitate to contact me at (205) 731-2630 extension 1101.

Sincerely,

R. Edmond Sprayberry
Director
Office of Public Housing

SPRAY-0040

# EXHIBIT C



**Montgomery HOUSING Authority**

C. MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET ♦ MONTGOMERY ♦ ALABAMA ♦ 36104-3006
(334) 206-7200 ♦ (334) 206-7222 Fax ♦ MHAToday.org

THOMAS TAYLOR
CHAIRMAN

January 5, 2005

Mr. R. Edmond Sprayberry
Director, Office of Public Housing
U.S. Dept. of Housing & Urban Development
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, Alabama 35203-5301

Subject:    **Billing for the month of October 2004 (Terry G. Davis)**

Dear Mr. Sprayberry,

In reference to your letter of December 9, 2004 on the above reference subject, the following is our response to the itemized questions and concerns raised:

1. **Are there sufficient funds budgeted in the PHA's current budget for these legal fees? Our letter of August 10, 2004, approved the incorporation of an additional $18,847.50 into the operating budget for legal fees for Terry G. Davis.**
   <u>Response</u>: The MHA would need to use monies in Reserves to pay the additional fees of $18,847.50.
2. **What is the total amount of legal fees charged to date to Account 1410.4, Legal Expense, under the current operating budget?**
   <u>Response</u>:   The total amount charged to date to Account 1410.4, Legal Expense, under the current operating budget is $60,707.74.
3. **The billing submitted for Mr. Davis is for 18.30 hours. His contract states, "Any services rendered in excess of three hours per month shall be billed at $175.00 per hour." Are his total hours for the month of October 18.30 or 15.30 for legal services for the Montgomery Housing Authority?**
   <u>Response</u>: Attorney Davis was requested, via fax, to respond to this question. As of this date, we await his response.
4. **What is the total amount of legal fees approved and paid to date for the legal services of Terry G. Davis under this contract?**
   <u>Response</u>: Please see attached listing that shows payments made from March 2003 through October 18, 2004.

Continued...2

SPRAY-0275



LUAN LONG, Vice-Chair
BETTIE BARNETT

RICHARD N. BOLLINGER
CLIFFORD HOLMES

JOHN F. KNIGHT Jr.
RON DRINKARD

ANNE B. UPCHURCH
DAVID S. BARLEY, II

Letter to Mr. Sprayberry, HUD dt. January 5, 2005          **Page 2**
re:Billing for October 2004 (Terry G. Davis)

Please note that as soon as we receive a response/clarification from Attorney
Terry G. Davis to item number three above, we will immediately send this
information to you.

If you should have any questions please do not hesitate to call either Ms. Gail
Moseley at 334 206-7127 or me at 334 206-7227.

Sincerely,

Lemuel E. Boggs, Jr.
Interim Executive Director

ATTACHMENT

Cc:    Gail Moseley
       Asst. Comptroller-MHA

LBjr/jb

SPRAY-0276

# EXHIBIT D



**U. S. Department of Housing and Urban Development**
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, Alabama 35203-5301

January 18, 2005

Mr. Lemuel E. Boggs
Interim Executive Director
Montgomery Housing Authority
1020 Bell Street
Montgomery, AL  36104-3056

SUBJECT:  Monthly Retainer for Attorney

Dear Mr. Boggs:

This responds to your fax dated January 12, 2005, requesting approval for payment of the following expenses:

• Monthly Retainer for Davis, Hatcher & Parchman, LLC in the amount of $3,000
(Months of October, November, and December)

Based on the limited information provided, we have no objection to payment of the expenses listed above.

Please note that we await a response to our question transmitted in our letter dated December 9, 2004, in which we requested whether the bill for the month of October is for 18.3 hours or 15.3 hours. The billing submitted for Mr. Davis is for 18.30 hours. His contract states, "Any services rendered in excess of three hours per month shall be billed at $175.00 per hour." Our processing of the request for approval of the October bill will continue upon receipt of this information.

If you have any questions or need additional information, please call Holly Poteete, Public Housing Revitalization Specialist, at (205) 731-2630, extension 1133.

Sincerely,

*YSH 1/18/25*

Carol S. Harmon
Director
Southern Division
Office of Public Housing

*4 CPH
Poteete
1/18/05*

SPRAY-0058