IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TERRY G. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | 2:05-cv-01235-MHT-DRB |
| R. EDMOND SPRAYBERRY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT SPRAYBERRY'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Defendant R. Edmond Sprayberry, by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, and submits this Memorandum in Support of Defendant Sprayberry's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, there are no genuine disputes of material fact, and Sprayberry is entitled to judgment as a matter of law on all Plaintiff's claims.

## STATEMENT OF THE CASE

In this lawsuit, Plaintiff, a former contract attorney for the Montgomery Housing Authority ("MHA"), seeks to challenge decisions made by the United States Department of Housing and Urban Development ("HUD"), in its oversight capacity, regarding the MHA's expenditure of federal funds. Specifically, Plaintiff alleges that Defendant Sprayberry, HUD's Director of Public Housing for the State of Alabama, violated Plaintiff's equal protection (race), due process (property), and speech rights under the First, Fifth, and Thirteenth Amendments when he made HUD oversight decisions regarding the MHA's use of federal funds to pay for an investigation into its suspended executive director, Mickey McInnish, and required the MHA to

comply with HUD procurement policies.  (2nd Amend. Comp. ¶¶ 15-18, 20, 22).  In addition to challenging HUD actions, Plaintiff asserts claims against the MHA and McInnish.  (Id., ¶¶ 5-9).

For the reasons that follow, when settled law is applied to the undisputed facts, Plaintiff's claims against Sprayberry fail as a matter of law.  First, Plaintiff lacks standing to challenge HUD actions involving the MHA that incidentally may have affected him by making his job as a MHA contract attorney more difficult, as he did not suffer any personal or individual harm and cannot raise claims on behalf of third parties.  Second, the undisputed evidence establishes that Sprayberry, who was exercising HUD's oversight authority over the MHA's use of federal funds, did not violate any of Plaintiff's constitutional rights and is entitled to qualified immunity from all Plaintiff's claims.  More specifically, Plaintiff's race discrimination claim fails because Plaintiff has no evidence that Sprayberry treated him differently from similarly-situated individuals or made any decisions due to his race.  Plaintiff's due process claims fail because he had no entitlement to be paid federal funds for legal fees that he incurred conducting an investigation for the MHA that had not been pre-approved by HUD or to receive a contract with the MHA that was subject to HUD approval.  Moreover, he also failed to avail himself of adequate post-deprivation remedies.  Finally, Plaintiff's First Amendment claims fail because he did not engage in any constitutionally-protected speech, and Sprayberry did not take any actions to retaliate against him.  In short, when the law is applied to the undisputed facts, Plaintiff's claims are nothing more than second-guessing of legitimate federal agency actions by an incidental bystander.  This Court should, therefore, grant summary judgment to Sprayberry.

## STATEMENT OF THE FACTS

### I.    Federal Oversight Over Public Housing Authorities.

The United States Housing Act of 1937 ("USHA") establishes an administrative framework through which HUD provides financial and technical assistance to public housing authorities ("PHAs") to facilitate the development and administration of federally-subsidized public housing.  See 42 U.S.C. § 1437 et seq.  Pursuant to this framework, HUD enters into Annual Contribution Contracts ("ACCs") with PHAs that will administer local public housing programs.  See id.; 24 C.F.R. § 941.103.  The ACC sets forth the terms and conditions under which HUD will assist PHAs in providing decent, safe, and sanitary public housing for low-income families.  See 24 C.F.R. § 941.103.  PHAs receive federal funds from HUD, and they agree in return to comply with the USHA; the ACC; and all HUD implementing regulations, requirements, and procedures.  See id.  See also Brown v. Housing Authority of City of McRae, Ga., 784 F.2d 1533, 1537 (11th Cir. 1986) ("HUD disburses federal funds to the local authorities provided that the local authorities comply with the [USHA] and HUD regulations").  The USHA further charges HUD with the responsibility of overseeing, administering, and enforcing all the federal laws, regulations, and contracts relating to the operation, administration, and maintenance of public housing programs by the PHAs.  See 42 U.S.C. § 1437 et seq.  In HUD's oversight and enforcement role, it has promulgated regulations and handbooks concerning how a PHA can utilize federal funds. (Harmon Dec. ¶ 6; Sprayberry Dec. ¶ 4; Poteete Dec. ¶ 6).[1]

---

[1]Sprayberry cites depositions as follows: Deponent/Witness's last name, source (Dep. for deposition followed by I, II, or III if there are multiple volumes), page number(s): line number(s). Furthermore, Defendant will cite to declarations as follows: Declarant's last name, Dec., and paragraph number.  Depositions are attached to Defendants Sprayberry and McInnish's Joint Evidentiary Submission.  Declarations are attached to Sprayberry's Motion for Summary Judgment.

Defendant Sprayberry is Director of Public Housing in HUD's Birmingham Office. (Sprayberry Dep. 15:16-17:7). In this capacity, he exercises HUD's federal oversight responsibility over the 147 PHAs in Alabama to ensure that they operate, administer, and maintain public housing programs in compliance with the USHA and all HUD implementing regulations, requirements, and procedures. (Sprayberry Dec. ¶¶ 2-5). The Montgomery Housing Authority ("MHA"), a public housing authority incorporated pursuant to Alabama Code § 41-1-20 et seq., is the third largest of the PHAs within the jurisdiction of Sprayberry's office.[2] (Sprayberry Dep. 19:12-17). The MHA has an ACC with HUD; it receives federal assistance under the USHA to administer federally-subsidized low-rent public housing; it has agreed to comply with HUD requirements; and it is subject to HUD oversight. (Sprayberry Dec. ¶¶ 2, 5).

To carry out HUD oversight in Alabama, Sprayberry supervises a staff of 21 employees. (Sprayberry Dep. 17:22-18:1; Sprayberry Dec. ¶ 6). Carol Harmon, Director of the Southern Division of Alabama, has oversight authority over PHAs in South Alabama including the MHA. (Harmon Dec. ¶¶ 1-2). Her duties include directing a staff who provide monitoring, evaluation, and technical assistance to PHAs and work to ensure that legal, regulatory, and policy directives that promote HUD's mission are followed. (Harmon Dec. ¶ 2). Holly Poteete is a Public Housing Revitalization Specialist under Harmon's supervision who is responsible for performance oversight over 11 PHAs, including the MHA. (Poteete Dec. ¶ 2). Since Sprayberry

---

[2] Plaintiff, despite having been counsel for the MHA for two years, was unable or unwilling at his deposition to recognize that the MHA is a distinct entity from HUD. Indeed, at one point, he testified that the MHA was a federal agency and that his job was akin to that of an Assistant U.S. Attorney. (Pl. Dep. II, 51:16-52:4). Plaintiff, however, was unable to identify any federal statute or regulation that made the MHA part of the United States Government, and ultimately admitted, after approximately fifteen minutes of questioning, that the MHA is really an Alabama State entity that merely receives federal funds and is not actually a federal agency. (Pl. Dep. II, 58:11-62:14).

cannot personally review every document from the 147 PHAs in Alabama that arrives in his office, he relies on his staff to review the pertinent regulations and documents and often draft letters for his review and signature. (Sprayberry Dep. 91:2-20, 192:11-21; Sprayberry Dec. ¶ 6).

Generally, HUD does not review every PHA transaction or expenditure of federal funds. (Sprayberry Dec. ¶ 5). As part of its oversight powers under the USHA and the ACC, however, HUD has the authority to require that a PHA obtain prior HUD approval of all procurement transactions and expenditures of federal funds. (Sprayberry Dec. ¶¶ 2-5; Harmon Dec. ¶ 6). This action is a precautionary measure that HUD has the discretion to institute when there is the potential for a PHA to abuse federal funds or make inappropriate expenditures. (Sprayberry Dec. ¶ 5). The review allows HUD to ensure that PHAs are following HUD and PHA procurement regulations, are using federal funds for allowable purposes, and have support and documentation for their actions. (Sprayberry Dec. ¶ 5; Harmon Dec. ¶ 4; Poteete Dec. ¶ 5). From November 30, 2001, through February 27, 2002, for example, former HUD Public Housing Director Mack Heaton placed the MHA on procurement review due to the discovery of serious procurement violations by the MHA. (Sprayberry Dec. ¶¶ 7-8; Poteete Dec. ¶ 3).

Between February 27, 2002, and November 18, 2004, HUD did not have the MHA under procurement review, and HUD did not review and concur in any of the contracts for legal services that the MHA entered during that period. (Poteete Dec. ¶ 4; Sprayberry Dec. ¶ 9). Accordingly, Sprayberry had no involvement in the MHA's decision to contract with Plaintiff to be MHA Board Counsel for the time period of January 3, 2003, through December 31, 2004, or

in setting the hourly rate that Plaintiff agreed to accept from the MHA for his services.[3] (Sprayberry Dec. ¶¶ 9-10; Poteete Dec. ¶ 4).   Moreover, Sprayberry had no conversations with the MHA's Executive Director, Defendant McInnish, or anyone else at the MHA, regarding Plaintiff's hourly rate or the hourly rates of any MHA contract attorneys. (Sprayberry Dec. ¶ 10).

## II.    November 18, 2004 Procurement Review Over the MHA.

On November 17, 2004, Sprayberry heard from Jill West, an MHA employee, that the MHA Board had voted to suspend its Executive Director, Defendant McInnish.   (Sprayberry Dep. 42:17-43:22; Sprayberry Dec. ¶ 11).   West told Sprayberry that on the previous night, the MHA Board had suspended McInnish and had him immediately escorted from the premises. (Sprayberry Dep. 43:12-22).   She also told Sprayberry that the MHA staff was confused and did not know why the MHA Board had taken the action.   (Sprayberry Dep. 43:12-22).

In an effort to determine what was going on at the MHA, Sprayberry called Thomas Taylor, Chairman of the MHA Board.   (Sprayberry Dep. 53:3-13; Sprayberry Dec. ¶ 13).   He asked Taylor why McInnish had been suspended.   (Sprayberry Dep. 55:1-8; Taylor Dep. 112:12-113:1).   Taylor refused to tell Sprayberry the reason for the suspension.   (Sprayberry Dec. ¶ 13; Taylor Dep. 116:18-117:11).   As a result, Sprayberry called MHA Board Vice-Chairman Lu An Long, MHA Commissioner Richard Bollinger, and MHA Commissioner Clifford Holmes.

_____

[3]On October 7, 2003, the MHA issued Request for Proposals ("RFP") seeking bids from law firms for three positions: (1) counsel to the MHA Board; (2) general counsel to the MHA; and (3) counsel for MHA evictions and collections.   (Pl. Dep. I, 23:10-24:11, Ex. 1; McInnish Dep. 55:11-17).   Plaintiff's law firm, Davis & Hatcher, LLC, was subsequently awarded the position as Board Counsel, and the firm signed a contract with the MHA, for the period of January 3, 2003 through December 31, 2004, agreeing to be paid a monthly retainer of $1,000 and an hourly rate of $175.00 after the first three hours billed each month.   (Pl. Dep. I., 28:15-29:1; Pl. Dep. II, 82:2-14; McInnish Dep. 71:11-72:23).   Plaintiff never contacted Sprayberry, or anyone else at HUD, to request that the hourly rate in his contract with the MHA be increased.   (Pl. Dep. I, 30:16-31:11).

(Sprayberry Dec. ¶ 14).  None of them could tell him the reason for McInnish's suspension.[4] (Sprayberry Dep. 56:3-20; Long Dep. 19:5-17; Sprayberry Dec. ¶¶ 14-15).

Sprayberry subsequently talked to his staff about the situation at the MHA, which he considered to be alarming and troubling because PHAs did not often take disciplinary action against executive directors and he had been unable to determine from the MHA the reason for the suspension.  (Sprayberry Dec. ¶¶ 15, 17).  Due to the extraordinary situation presented by the unexplained suspension and concerns that the MHA might revert to past procurement violations, Sprayberry and Harmon decided to exercise HUD's discretionary authority to require the MHA to submit for prior review and approval all procurement transactions and all draw downs of federal funds from the Line of Credit Control System ("LOCCS").  (Sprayberry Dep. 61:3-62:11, 70:5-10, 71:2-9; Sprayberry Dec. ¶ 17; Harmon Dec. ¶ 3).  This action was precautionary in nature and designed to protect the MHA's federal funds from abuse or mismanagement. (Sprayberry Dec. ¶ 17; Harmon Dec. ¶¶ 3-4).  Sprayberry notified the MHA of this procurement and LOCCS draw-down review in a November 18, 2004, letter to Lane Boggs, the MHA's interim Executive Director.[5]  (Sprayberry Dep. 59:9-14, Ex. 3; Harmon Dec. ¶ 3, Ex. A).

When under procurement and LOCCS review, the MHA had to obtain advance permission from HUD <u>before</u> making any expenditure of federal funds related to procurement matters.  (Sprayberry Dep. 60:12-61:2; Sprayberry Dec. ¶ 18; Harmon Dec. ¶ 4). During this

---

[4]Sprayberry did not contact McInnish about the suspension because he did not know the reason for the suspension and thought it would be inappropriate.  (Sprayberry Dec. ¶¶ 13-16; McInnish Dep. 126:16-127:5).  In fact, Sprayberry did not talk to McInnish about any issues concerning the MHA until after August 2005, after the MHA and McInnish had reached a settlement regarding McInnish's suspension and both requested HUD approval.  (Sprayberry Dec. ¶ 16).

[5]Sprayberry also sent a letter to Taylor the same day explaining that he had been unable to determine why McInnish had been suspended and requesting that the MHA Board hold a special meeting to discuss the reasons for the suspension.  (Sprayberry Dep. 63:5-64:4, Ex. 4).  Taylor refused to hold this special meeting.  (Sprayberry Dec. ¶ 19).

process, the MHA was required to send for HUD review and approval all documents supporting procurement actions so that HUD could ensure that the MHA was following HUD regulations and its own policies in the procurement process and in selecting parties for the award of contracts.  (Sprayberry Dec. ¶ 18; Harmon Dec. ¶ 4; Poteete Dec. ¶ 5).

III.    **MHA Request for Federal Funds to Investigate Suspended Executive Director.**

While acknowledging that Sprayberry had the authority to implement procurement and LOCCS draw-down reviews and indicating that the MHA would comply with the reviews, MHA Chairman Taylor originally objected to HUD's decision to institute the reviews.  (Taylor Dep. 132:15-133:2, Ex. 50).  Subsequently, however, Taylor thanked Sprayberry in a December 1, 2004, letter for explaining the rationale for the reviews, and acknowledged that the action was "necessary under the circumstances."  (Pl. Dep. Vol. II, at 95:7-14).  In the same letter, Taylor requested that HUD approve the MHA's expenditure of $35,000 in federal funds for Plaintiff to conduct an investigation into the actions of the MHA's suspended Executive Director.  (Sprayberry Dep. 81:3-82:6, Ex. 7; Pl. Dep. I at 310:7-15; Taylor Dep. II, 17:4-17).

Sprayberry and his staff reviewed this request due to the procurement and LOCCS draw-down review and found it to be unusual for a number of reasons.  (Sprayberry Dec. ¶ 21; Harmon Dec. ¶¶ 7-12; Poteete Dec. ¶ 8).  First, the request was for a very large amount of money, the MHA had already exceeded its legal budget for the year, and the money would have to come from another line-item in its budget or its operating reserves.  (Sprayberry Dec. ¶ 21; Harmon Dec. ¶ 9; Poteete Dec. ¶ 8).  Second, it was unclear whether the MHA had considered if the requested $35,000 for an attorney to conduct an investigation was a cost-effective or reasonable use of federal funds.  (Harmon Dec. ¶ 10).  HUD has an Office of Inspector General ("OIG") that can investigate possible misconduct relating to federal programs and it would not make sense for a PHA to pay an attorney to do such an investigation.  (Sprayberry Dec. ¶ 21).

Third, the MHA was requesting the funds <u>after</u> it had suspended McInnish and refused to tell HUD why it had suspended him, thus suggesting that the funds were being improperly sought to justify the prior suspension. (Sprayberry Dec. ¶ 21; Harmon Dec. ¶ 11; Poteete Dec. ¶ 8).

HUD requires that PHA costs for professional services be reasonable in relation to the services rendered and that allowable costs under HUD programs be necessary and reasonable for the administration of the program and supported by documentation.[6]  (Harmon Dec. ¶ 6). Harmon and Poteete, after review, could not determine whether the investigation was authorized by a Board resolution, which issues were to be investigated, why an attorney was necessary, and why so much money was needed.  (Harmon Dec. ¶ 12; Poteete Dec. ¶ 20).  After discussion, the decision was made to deny the MHA's request and seek additional information.  (Sprayberry Dec. ¶¶ 22-23; Harmon Dec. ¶ 12; Poteete Dec. ¶ 10).

Accordingly, in a December 9, 2004, letter, Sprayberry denied the MHA's request for $35,000 to conduct an investigation into McInnish's suspension and asked for additional information.  (Poteete Dec. ¶ 10; Sprayberry Dep. 96:2-97:17, Ex. 11).  The letter stated that under HUD regulations the costs for professional services had to be reasonable in relation to the services rendered and that costs allowable under HUD programs must be necessary and reasonable for the administration of the program.  (Sprayberry Dep., Ex. 11).  It further stated that HUD could not determine from the information available to it whether "the costs associated with this request [were] eligible, reasonable, and within the 'scope of services' of the Attorney Employment Agreement for Mr. Davis."  (Sprayberry Dec. ¶ 22, Ex. D).  Finally, the letter

---

[6]Office of Management Budget ("OMB") Circular A-87 provides that costs for professional services should be reasonable in relation to the services rendered and should be related to work under Federal grants and contracts.  (Harmon Dec. ¶ 6 ).  HUD Guidebook 7510.1, the Public and Indian Housing Low-Rent Technical Accounting Guide, states that allowable costs under HUD programs must be necessary and reasonable for the administration of the program and supported by documentation.  (Harmon Dec. ¶ 6).

advised the MHA that if it was aware of any conduct by McInnish that might relate to fraud or abuse of HUD programs, to please advise HUD of both the charges and a reasonable basis for the charges so that the matter might possibly be referred to HUD's OIG. (Sprayberry Dec. ¶ 24).

On January 20, 2005, despite the fact that HUD had never given the MHA the required prior approval to begin spending federal funds to investigate McInnish, Sprayberry received a letter from Taylor advising him that Plaintiff's investigation had exceeded its budget and seeking approval to spend up to $65,000 on the investigation through a disciplinary hearing.[7] (Sprayberry Dec. ¶ 25; Pl. Dep. I, 324:15-21). The second letter completely ignored the fact that the original request for $35,000 had not been approved and that the MHA had not supplied the information requested by HUD to show that the expenditure was reasonable and necessary.[8] (Sprayberry Dec. ¶ 25; Harmon Dec. ¶ 15). Accordingly, Sprayberry agreed with Poteete and Harmon that the MHA's second request for federal funds should be denied for the same reasons as the first request. (Sprayberry Dec. ¶¶ 25-26; Poteete Dec. ¶¶ 12-14; Harmon Dec. ¶¶ 15-16). The denial was communicated to the MHA in a January 27, 2005 letter, setting forth HUD's rationale for the decision. (Sprayberry Dec. ¶ 26, Ex. F).

---

[7]Plaintiff, who states that he was just doing his job and who knew that HUD had not authorized payment for an investigation, nevertheless investigated McInnish and billed the MHA for his work. (Pl. Dep. I, 311:21-314:15, Pl. Dep. II, 77:23-78:10, Ex. 64). Plaintiff also admits that there was no Board resolution authorizing the investigation and that he was not given any specific issues to investigate. (Pl. Dep. I, 258:1-14, 259:15, 261:5-11). Plaintiff ultimately came up with ten charges of misconduct against McInnish that were presented to the MHA Board on December 23, 2004. (Pl. Dep. I, 71:4-13, Ex. 47). Sprayberry subsequently received a copy of these charges. (Sprayberry Dep. 121:10-17, Ex. 14)  The post-suspension charges, however, did not contain any information providing the reasonable basis for them, and they did nothing to explain to Sprayberry why the MHA needed at least $35,000 in federal funds after suspending McInnish to conduct an investigation into his actions. (Sprayberry Dec. ¶ 24; Sprayberry Dep. 131:12-21).

[8]Moreover, Plaintiff's contract with the MHA expired on December 31, 2004, and HUD could not authorize funds to an attorney who had no contract with the MHA. (Poteete Dec. ¶¶ 13-14; Harmon Dec. ¶¶ 15-16).

Finally, on March 5, 2005, Plaintiff submitted to the MHA, for the first time, invoices seeking payment for 146.20 hours, or $25,585.00, that he had billed the MHA for investigating McInnish in November and December 2004, even though he knew HUD had not authorized the expenditure of federal funds for such an investigation. (Pl. Dep. II, 41:5-42:10, Ex. 64; 45:12-23, 73:20-74:4). The MHA forwarded Plaintiff's letter, and his invoices, to HUD, and requested that it be paid. (Harmon Dec. ¶ 17; Poteete Dec. ¶¶ 15-16). By this point, Sprayberry had repeatedly advised the MHA that it had to obtain prior approval for expenditures of federal funds, that expenditures could not be retroactively approved, and that HUD had not approved the MHA using federal funds from its operating budget for an investigation into its suspended Executive Director.[9] (Sprayberry Dep. 165:3-12, 168:1-169:1, 216:9-220:20; Sprayberry Dec. ¶¶ 27-28; Poteete Dec. ¶ 16; Harmon Dec. ¶ 17). Accordingly, Sprayberry responded in a March 11, 2005, letter advising the MHA that HUD would not authorize the payment of the $25,585.00 billed by Plaintiff for an investigation into McInnish out of federal funds.[10] (Sprayberry Dep. 161:18-162:22; Sprayberry Dec. ¶ 28, Ex. H). Sprayberry's letter reiterated that HUD had denied budgetary approval for the MHA to spend federal funds on such an investigation on

_____

[9]In February 2005, Sprayberry received a request from Taylor that he approve the payment of approximately $65,000 to Plaintiff for his investigation into McInnish in connection with a proposed settlement between the MHA and McInnish. (Sprayberry Dec. ¶ 27). Sprayberry refused to approve the settlement or to authorize the payment of federal funds for an investigation. (Sprayberry Dec. ¶ 27). In his letter denying the request, Sprayberry advised the MHA that it had been repeatedly advised by HUD that HUD had not approved the expenditure of any federal funds for an investigation, and that the MHA should have resolved the issue of legal representation for an investigation before incurring such an exorbitant legal bill. (Sprayberry Dec. ¶ 27, Ex. G).

[10]The letter allowed the MHA to pay Plaintiff his fees for hours billed that did not relate to the McInnish investigation. (Sprayberry Dep., Ex. 19). This included some fees that HUD had not approved previously because HUD had been waiting on some information from the MHA or Plaintiff that was not received by HUD until early March. (Harmon Dec. ¶¶ 13-14).

December 9, 2004, for the reasons given in that letter, and in letters dated January 12, 2005, and January 27, 2005.[11]   (Sprayberry Dec. ¶ 28, Ex. H; Harmon Dec. ¶ 17; Poteete Dec. ¶ 16).

## IV.   HUD Review of the MHA's Attorney Procurement Process for 2005-2006 Term.

On or about September 24, 2004, the MHA issued two Requests for Proposals ("RFP") seeking work proposals from law firms interested in representing the MHA in either general legal matters or in evictions and collections for the period of January 1, 2005 through December 31, 2006.  (Pl. Dep. I, 83:1-84:7, Ex. 66).  Plaintiff, whose contract with the MHA to serve as its Board Counsel expired on December 31, 2004, filed a response to the RFP for general legal matters.  (Pl. Dep. II, 82:2-14, 84:15-23).  The MHA subsequently had a panel evaluate the law firm RFP responses and make a recommendation to the MHA Board on whom to award a contract.  (Long Dep. 82:2-10, Ex. 5).  On December 21, 2004, before HUD had reviewed the RFPs or evaluations as required by HUD's procurement review, the MHA Board voted to hire, subject to HUD approval, Plaintiff's law firm to represent the MHA in general legal matters and the law firm of Holloway & Moxley to represent the MHA in evictions and collections.  (Pl. Dep. I, 35:8-36:14, Ex. 2; Pl. Dep. II, 101:15-102:3, 108:2-7, 119:12-23; Sprayberry Dec. ¶ 31).

Pursuant to HUD's November 18, 2004, procurement review, the MHA was required to submit its legal RFPs, its evaluations, and its proposed selections for HUD review and concurrence during each step of the procurement process.  (Sprayberry Dep. 59:9-14, Ex. 3; Plaintiff Dep. II, 88:2-90:13; Sprayberry Dec. ¶ 31).  On January 7, 2005, HUD received packages from Georgia Wigginton, the Procurement/Contract Administrator for the MHA, seeking HUD review and approval of the RFPs, the evaluations, and the selections of Plaintiff's law firm and Holloway & Moxley.  (Poteete Dec. ¶ 17, Ex. A).  Poteete, who was the primary

---

[11]Notably, HUD's decision regarding the use of federal funds would not have prevented the MHA from paying Plaintiff out of funds that were not part of its federally-funded budget. (Sprayberry Dep. 172:1-3; Sprayberry Dec. ¶ 3).

MHA contact for non-engineering and non-maintenance procurement matters, reviewed the RFPs, the law firm proposals received by the MHA, and the MHA's evaluations of the law firms's proposals under HUD and MHA procurement guidelines at the same time.  (Poteete Dec. ¶¶ 17, 19).   She reviewed the submissions to determine whether the MHA had followed procurement policies and adequately documented its selection.[12]  (Poteete Dec. ¶ 19).

After review, Poteete was unable to determine that the MHA evaluations adequately documented and supported the selections as required by procurement policies.  (Poteete Dec. ¶ 19).  Specifically, Poteete found numerous violations of the HUD Procurement Handbook in the MHA's evaluation process for the attorney positions.  (Poteete Dec. ¶ 19).   She could not determine who had served on the evaluation panel, and the evaluations submitted to her did not contain the required narratives or comments.  (Poteete Dec. ¶ 19).  Poteete also found that the points assigned for various criteria did not appear to be based on information contained in the proposals received from the law firms.  (Poteete Dec. ¶ 19).   In short, she concluded that the evaluations were not documented in the required thorough and objective manner that would support the selections if challenged, and she could not determine that the MHA's process had been "impartial, consistent, and fair" as required by procurement guidelines. (Poteete Dec. ¶ 19).

After discussing her findings with Harmon, Poteete wrote a letter to the MHA detailing the problems she had found in her procurement review and instructing the MHA to re-evaluate and re-submit the attorney RFP Responses for HUD review.  (Poteete Dec. ¶¶ 20-21; Harmon

---

[12]While Poteete was still reviewing the MHA's RFPs and selections for the general legal services and evictions and collections attorney positions, the MHA prematurely sent HUD for review and approval a proposed legal contract for Plaintiff.  (Sprayberry Dep. 154:13-156:15, Ex. 16A; Poteete Dec. ¶ 18).   Sprayberry understood that his staff was still reviewing the MHA's procurement submissions.  (Sprayberry Dec. ¶ 31; Harmon Dec.  ¶ 18).  As a result, he responded, via letter, that HUD was still in the process of reviewing the RFPs for the general legal services and eviction and collection attorney positions, that the RFPs had not been approved, and that since the RFPs had not been approved yet, HUD did not recommend execution of the contract.  (Sprayberry Dep. 156:18-158:13, Ex. 16B; Sprayberry Dec. ¶ 31; Poteete Dec. ¶ 18; Harmon Dec. ¶ 18).

Dec. ¶ 19).   Poteete also provided advice to the MHA on how to conduct an "impartial, objective, and well-documented" procurement process.   (Poteete Dec. ¶ 20).   Among other things she noted that an evaluation panel should be appointed, that it should perform evaluations based on the evaluation factors in the RFP and not on personal knowledge or factors not in the RFP, and that it should provide narratives explaining scores.   (Poteete Dec. ¶ 20).   She further suggested that, to the extent the MHA wanted to negotiate rates after the submission of an RFP, the MHA should first determine a competitive range of rates, have a memorandum in writing explaining that range, negotiate with everyone within that range, and then document the negotiations and final offers.   (Poteete Dec. ¶¶ 20-21, Ex. C).   Sprayberry and Harmon reviewed and approved Poteete's letter, without independent review of the MHA submissions, and it was sent to the MHA on January 18, 2005, signed by Sprayberry.[13]   (Sprayberry Dec. ¶ 32; Harmon Dec. ¶ 19).   Sprayberry and his staff did not instruct the MHA which law firms to select, or not select, during the re-evaluation.   (Sprayberry Dec. ¶ 32; Poteete Dec. ¶ 22; Harmon Dec. ¶ 19).

Subsequently, Poteete received a request that HUD review and approve the MHA's selection of the law firm of Hill, Hill, Carter, Franco, Cole & Black, P.C., to represent the MHA in general legal services and the law firm of Chambless & Math, P.C. to represent it in evictions and collections.[14]   (Poteete Dec. ¶¶ 23-25).   Unlike the earlier requests, these requests were accompanied by detailed memoranda setting forth the names of the evaluation panel members, when they met, and a narrative addressing the law firms that submitted bids and the reasons for the scores assigned them.   (Poteete Dec. ¶¶ 23-25, Exs. D, G). The memoranda also explained

---

[13]Sprayberry, who depended on the expertise of his staff, relied on Poteete's findings and did not personally review the evaluation sheets. (Sprayberry Dep. 227:19-228:5; Sprayberry Dec. ¶ 32).

[14]Plaintiff admits that the firm selected by the MHA after the second evaluation process (Hill, Hill, Carter, Franco, Cole & Black, P.C.) is "a very good firm, so I don't have a problem with the firm itself."  (Pl. Dep. II, 130:6-8).

the reasons for the panels' selections, and the evaluation sheets contained notes explaining the scores. (Poteete Dec. ¶¶ 23-25, Exs. D, G). After review, Poteete concluded that the MHA had followed procurement policy and that the selections were documented in an objective and impartial manner. (Poteete Dec. ¶¶ 23-25). Accordingly, she drafted letters indicating that HUD had no objection to the MHA's selections. (Poteete Dec. ¶¶ 23-25). Harmon and Sprayberry concurred in the letters, without independently reviewing the MHA submissions, and they were sent to the MHA. (Poteete Dec. ¶¶ 24-25; Sprayberry Dec. ¶ 34).

**V.     Subsequent Events.**

In July 2005, the MHA reached a settlement with McInnish, who had been on paid leave since November 16, 2004, and who had filed an EEOC race discrimination charge against the MHA relating to his suspension. (McInnish 127:6-13; Sprayberry Dec. ¶ 35). HUD did not approve the settlement, despite the requests of both parties. (Sprayberry Dec. ¶ 35).

Sprayberry subsequently had a neutral investigation conducted regarding the MHA's possible violations of the ACC's anti-discrimination provisions. (Sprayberry Dec. ¶ 36). Based on the investigation, Sprayberry sent an October 31, 2005, letter to the MHA indicating his conclusion that the MHA had violated ACC provisions by discriminating against McInnish when it had suspended him. (Sprayberry Dec. ¶ 36). The letter requested a response from the MHA. (Sprayberry Dec. ¶ 36). When Sprayberry sent the letter, Plaintiff had not been employed by the MHA for over ten months. (Pl. Dep. II, 204:10-14, Ex. 74). The letter did not accuse Plaintiff of engaging in discrimination and merely made a passing reference to him. (Pl. Dep. II, 212:18-21, Ex. 74). HUD ultimately did not take any action against the MHA. (Sprayberry Dec. ¶ 37).

**VI.    Present Lawsuit and Plaintiff's Allegations.**

Plaintiff never filed any appeals or administrative challenges to any of Sprayberry's decisions. (Pl. Dep. II, 14:8-21, 129:7-130:1). Instead, he filed the present lawsuit seeking to

challenge almost every action Sprayberry took concerning the MHA on the grounds that such actions somehow violated Plaintiff's First, Fifth, and Thirteenth Amendment rights.[15]   (2nd Amend. Comp., ¶¶ 15-18, 22, 24).   As set forth below, this Court should grant summary judgment to Sprayberry because Plaintiff lacks standing and his claims fail as a matter of law.[16]

## <u>ARGUMENT AND CITATION OF AUTHORITY</u>

The Court should grant summary judgment on Plaintiff's claims because they fail as a matter of law.  The Federal Rules of Civil Procedure require that summary judgment be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56; <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986).   Once a party moving for summary judgment demonstrates a lack of any genuine issues of material fact, the non-moving party has the burden of coming forward with specific facts and cannot merely rest on the pleadings.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  If the record "taken as a whole" could not lead a reasonable juror to find for the non-moving party, then there is no "genuine issue for trial" and summary judgment should be granted.  <u>See</u> <u>id</u>.   In this case, as set forth below, Plaintiff lacks standing to challenge all Sprayberry's actions concerning the MHA because he was at most indirectly and incidently

---

[15]Plaintiff is on his third complaint.  On August 10, 2006, the Court dismissed his original complaint, which asserted 42 U.S.C. § 1983, Federal Tort Claims Act, and breach of contract claims, and gave Plaintiff leave to amend to add a <u>Bivens</u> claim against Sprayberry in his individual capacity.  (August 10, 2006, Order).  Plaintiff's subsequent First Amended Complaint did not make basic allegations necessary for a <u>Bivens</u> claim.  (Sprayberry's Memorandum in Support of Motion to Dismiss [First] Amended Complaint, docket no. 66).  After Sprayberry moved to dismiss, Plaintiff filed his current Second Amended Complaint and dismissed counts one (breach of contract) and three (Federal Tort Claims Act) against Sprayberry on the grounds that they had been accidently re-pled after being dismissed.  (Plaintiff's Notice of Voluntary Dismissal, docket no. 83).

[16]Sprayberry has a pending motion to dismiss Plaintiff's Second Amended Complaint on the grounds that Plaintiff cannot use <u>Bivens</u> to recover damages from individual federal officials because the Administrative Procedures Act is the appropriate tool to challenge agency actions.  (Sprayberry's Motion to Dismiss Second Amended Complaint, docket No. 102).  This motion to dismiss would be rendered moot if this Court grants Sprayberry Summary Judgment.

affected by them, and he cannot assert claims on behalf of a third party. Furthermore, Sprayberry is protected by qualified immunity because Plaintiff has failed to show that any of Plaintiff's constitutional rights were violated, much less any rights that were clearly established.

I.      **Plaintiff Lacks Standing to Challenge HUD Oversight of the MHA.**

As an initial matter, Plaintiff lacks standing to challenge Sprayberry's decisions regarding the MHA that only indirectly affected him as a contract employee of the MHA. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992). The issue of standing relates to whether "the litigant is entitled to have the court decide the merits of the dispute or of particular issues." See Kaimowiz v. Board of Governors, 940 F.2d 610, 612 (11th Cir. 1991) (citation omitted). In this case, even a cursory reading of Plaintiff's Second Amended Complaint and deposition transcripts reveals that his primary contention is that Sprayberry's decisions were "oppressive" to the MHA and that Sprayberry should not have interfered with the MHA's decision to investigate or discipline McInnish. (2nd Amend. Comp. ¶¶ 10-15; Pl. Dep. I, 313:9-16, 314:4-9, 328:8-21, 327:11-15, 335:9-21; Pl. Dep. II, 77:17-22, 98:14-99:13, 106:4-18, 134:7-136:12). Plaintiff seeks to challenge, for example, Sprayberry's decision to institute procurement review of all MHA transactions, Sprayberry's request that the MHA call a special meeting to discuss the reasons for McInnish's suspension, Sprayberry's refusal to allow the MHA to expend federal funds to investigate McInnish, Sprayberry's decisions regarding the MHA's selection of a hearing officer for McInnish, Sprayberry's requirement that the MHA follow procurement policies when awarding contracts, Sprayberry's alleged "excessive oversight procedures" that inferred with MHA day-to-day operations, and Sprayberry's issuance of his October 31, 2005, letter to the MHA, on the grounds that all such actions were taken by Sprayberry to prevent the MHA from investigating and disciplining McInnish as well as to

discriminate against Plaintiff.[17]    (2nd Amend. Comp. ¶¶ 15-18; Pl. Dep. II, 130:15-131:3, 131:11-16, 141:5-142:21, 145:5-18, 157:9-163:2, 165:18-166:21, 208:16-21, Ex. 63; Pl. Dep. III, 104:4-107:21).   Plaintiff cannot meet his burden of showing that the laundry list of alleged actions by Sprayberry in Paragraph 15 of his complaint and elsewhere harmed him in the direct and personal manner necessary to confer standing.  See Lujan, 504 U.S. at 560 n.1

To have standing, a plaintiff bears the burden of showing that he satisfies the "constitutional minimum of standing" and that prudential limitations do not prevent him from asserting a claim.  See Harris v. Evans, 20 F.3d 1118, 1121-1122 (11th Cir. 1994).   The constitutional aspect of standing requires a plaintiff to show that:  (1) he personally suffered an "injury in fact," defined as "an invasion of a legally protected interest which is concrete and particularized, actual or imminent" and affects the plaintiff in a "personal and individual way"; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable decision.  See Lujan, 504 U.S. at 560-561 & n.1 (emphasis added); Granite State Outdoor Advertising, Inc. v. City of Clearwater, Fla., 351 F.3d 1112, 1117 (11th Cir. 2003).  If a plaintiff fails to demonstrate even one of these three elements, then he lacks standing.   See Granite State Outdoor Advertising, 351 F.3d at 1116.   The prudential limitations on standing dictate that a plaintiff "cannot rest his claim ... on the legal rights or interests of third parties" but must "assert his own legal rights and interests." See Bochese v. Town of Ponce Inlet, 405 F.3d 964, 984 (11th Cir. 2005); Granite State Outdoor Advertising, 351 F.3d at 1116-1117; Harris, 20 F.3d at 1121-1122.

Pursuant to these principles, it is settled that a plaintiff lacks standing when he did not suffer a personal and individual injury but instead seeks to litigate an alleged harm that is

---

[17]Plaintiff even goes so far as to claim that "HUD's decision to review every expenditure of federal funds, including for toilet paper, was taken to discriminate against [him] because [he is] African-American." (Pl. Dep. II, 132:22-133:4).

incidental to harm suffered by another entity.  See Gregory v. Mitchell, 634 F.2d 199, 202 (5th Cir. 1981).  See also Pagan v. Calderon, 448 F.3d 16, 29 (1st Cir. 2006) ("the agent must allege an injury that does not derive from the principal").  Thus, for instance, an employee who suffers a financial loss because a defendant took some action against his employer lacks standing to sue the defendant because any harm he suffered merely derives from the harm to his employer.  See Pagan, 448 F.3d at 29; Bellows v. Amoco Oil, Inc., 118 F.3d 268,  277 (5th Cir. 1997) (collecting cases).  This rule applies even when a plaintiff alleges that a defendant took an action against his employer to discriminate against him.  See Pagan, 448 F.3d at 29 (noting standing inquiry concerns the nature of the alleged injury and not the motive behind an action).  In short, the party suffering the direct harm from an action is the proper party to file a lawsuit and not every incidentally-harmed employee or contractor.  See id. ("when a government actor discriminates against a corporation based on a protected trait of a corporate agent, it is the corporation – and only the corporation – that has standing to seek redress.").

In this case, when Plaintiff was asked how Sprayberry's decisions had harmed him, he repeatedly asserted that the decisions made his job as a contract attorney for the MHA more difficult.[18]  (Pl. Dep. II, 137:2-8, 141:5-142:21, 174:20-175:12, 193:13-18).  He also repeatedly expressed his opinion about how oppressive and unreasonable Sprayberry's actions had been to the MHA.  (Pl. Dep. II, 75:16-23, 98:14-99:13, 101:2-14, 106:11-18, 132:21-134:6, 141:10-23, 145:5-18).  He admits, however, that some decisions, such as Sprayberry's decision to institute procurement review, made the jobs of all MHA employees more difficult.  (Pl. Dep. II, 136:16-138:4).  More importantly, he admits that other actions he seeks to challenge – such as

---

[18]Plaintiff did assert that he was financially harmed at the point that Sprayberry informed the MHA that it could not pay him federal funds for his investigation.  (Pl. Dep. II, 137:2-8).  Even this alleged harm, however, is merely an indirect result of the MHA never obtaining the necessary prior approval to spend federal funds on any investigation.  (Pl. Dep. II,  45:12-23, 73:20-74:4).

Sprayberry's request for the MHA Board to hold a special meeting to discuss the reason for McInnish's suspension and Sprayberry's decisions regarding the MHA's selection of a hearing officer – did not cause him any personal harm at all.  (Pl. Dep. II, 151:13-16; 174:4-175:12). The harms Plaintiff identifies are indirect and incidental to the impact on the MHA of Sprayberry's decisions regarding the use of federal funds.  Indeed, when asked whether any harm he "might have suffered by any actions Mr. Sprayberry took regarding the MHA was through your job," Plaintiff responded "Well, it was incidental, yes.  When you consider the totality of the circumstances, you know, it still was incidental."  (Pl. Dep. II, at 142:14-21).

In short, Plaintiff cannot show that Sprayberry's oversight decisions regarding the MHA caused him any personal and individual harm, and his derivative and incidental injuries from these decisions do not provide him standing.  See Pagan, 448 F.3d at 29.  Cf. Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 710-711 (11th Cir. 1984) ("Incidental or consequential injury ... does not give a plaintiff standing to complain that he has been injured...").  To the extent that the MHA wishes to object to Sprayberry's decisions that impacted it, such as denying its request to spend federal funds to investigate McInnish or requiring it to follow HUD procurement procedures, the MHA is the proper party to raise such challenges.[19]  See Pagan, 448 F.3d at 29.  This result is not changed simply because Plaintiff claims that Sprayberry was motivated by Plaintiff's race or speech when he made his oversight

---

[19]In this regard, it is notable that Plaintiff's contentions against the MHA include an assertion that the MHA should have appealed or ignored Sprayberry's decisions. (Pl. Dep. II, 263:5-22).  This contention solidifies that there is a third-party intermediary between Plaintiff and HUD.  Cf. Lujan, 504 U.S. at 562 ("when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ... 'substantially more difficult' to establish.").

decisions.[20]  See id. (holding plaintiff lacked standing to assert First Amendment and Equal

Protection claims when employer was harmed because of plaintiff's speech); Guides, Ltd. v. The

Yarmouth Group Property Mgmt., Inc., 295 F.3d 1065, 1072-1073 (10th Cir. 2002) (holding

corporation, and not employee, had standing to raise claim that defendant had refused to contract

with corporation because of employee's race); Potthoff v. Morin, 245 F.3d 710, 717-718 (8th

Cir. 2001) (holding employer, and not employee, had standing to assert constitutional claims

against agency that terminated employer's lease because of employee's speech).

## II.    Defendant Sprayberry Is Protected By Qualified Immunity.

Even if Plaintiff had standing, this Court should grant summary judgment to Sprayberry

because he is protected by qualified immunity.[21]  See Harlow v. Fitzgerald, 457 U.S. 800, 818

(1982).  Qualified immunity completely protects federal officials sued in their individual

capacities for actions taken while performing their jobs unless their conduct violates clearly

established constitutional rights that a reasonable official in their position would have known.

See id.; Gray v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006); Vinyard v. Wilson, 311 F.3d

1340, 1346 (11th Cir. 2002).  The purpose of qualified immunity is to allow government

officials to carry out their duties without the fear of personal liability or harassing litigation.  See

Malley v. Briggs, 475 U.S. 335, 341 (1986); Bashir v. Rockdale County, 445 F.3d 1323, 1327

---

[20]Plaintiff, for example, does not obtain standing to challenge anything Sprayberry does –
such as issuing an October 31, 2005, letter to the MHA ten months after Plaintiff's contract with
the MHA ended – merely by declaring that Sprayberry was trying to discriminate against him when
taking an action that only impacted the MHA.  (Pl. Dep. II, 204:10-14, 74, 212:18-21, Ex. 74).

[21]Even under the most liberal application of standing, Plaintiff would at most have standing
to challenge Sprayberry's decisions regarding the MHA that indirectly affected him financially.
This would at most include only his claims that Sprayberry: (1) allowed the MHA to pay him a
lower hourly rate than other MHA attorneys; (2) failed to authorize the MHA in March 2005 to pay
Plaintiff's invoices for $25,585 in legal fees that Plaintiff spent investigating McInnish; and (3)
failed to "approve" the MHA's December 2004 premature vote to award a new contract to Plaintiff,
subject to HUD approval.  (2nd Amend. Comp.  ¶¶ 15, 16, 17, 18).  Sprayberry raises qualified
immunity to these claims, as well as all the other claims in Plaintiff's Second Amended Complaint.

(11th Cir. 2006). The immunity is "an entitlement not to stand trial or face the other burdens of litigation," and it protects "from suit all but the plainly incompetent or one who is knowingly violating the federal law." See Saucier v. Katz, 533 U.S. 194, 200 (2001) (citation and quotation omitted); Williams v. City of Jacksonville, 341 F.3d 1261, 1267 (11th Cir. 2003)

Once a defendant shows that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred, the plaintiff bears the burden of showing that qualified immunity is not appropriate. See Gray, 458 F.3d at 1303. The Supreme Court has adopted a two-part test for analyzing whether an official is entitled to qualified immunity. See id. The court should first determine whether the plaintiff has even shown the violation of a constitutional right. See Saucier, 533 U.S. at 200; Tinker v. Beasley, 429 F.3d 1324, 1326-1327 (11th Cir. 2005). If a plaintiff shows a violation of a constitutional right, then the court must determine "if the right was clearly established." See Saucier, 533 U.S. at 200. As set forth below, Sprayberry is entitled to qualified immunity because: (A) he was operating within his discretionary authority; and (B) Plaintiff cannot show that Sprayberry violated any of his constitutional rights; (C) much less any clearly established constitutional rights.

### A.    Sprayberry Acted Within His Discretionary Authority.

As an initial matter, Sprayberry was undisputedly acting in his discretionary authority as HUD's Director of Public Housing for Alabama when he took the actions that are the subject of Plaintiff's Second Amended Complaint. (2nd Amend. Comp. ¶¶ 14-18). A federal official acts within his discretionary authority when his actions were "(1) undertaken pursuant to the performance of his duties; and (2) within the scope of his authority." See Gray, 458 F.3d at 1303. Notably, the inquiry is not whether it was within the authority of the official to take an allegedly illegal action. See id. at 1304; Sims v. Metropolitan Dade County, 972 F.2d 1230, 1236 (11th Cir. 1992). Instead, the sole question is whether "the act complained of, if done for a

proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." See Harbert Intern., Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998).

In this case, Sprayberry was at all times acting as HUD's Director of Public Housing for Alabama when he took the actions Plaintiff challenges in this lawsuit. (Sprayberry Dec. ¶¶ 1-6). HUD provides federal funds to PHAs and maintains oversight authority to ensure that the PHAs comply with HUD statutes and regulations. See Brown, 784 F.2d at 1537; Ronsonet v. Carroll, 113 F. Supp. 2d 1009, 1011 (S.D. Miss. 2000). See also Stewart v. San Francisco Housing Auth., 1996 U.S. Dist. LEXIS 11874, at *9 (N.D. Ca. 1996) ("The ACC is the mechanism by which federal funds are provided to the state housing agency and by which the state agency agrees to comply with HUD requirements."). Sprayberry, as HUD's Director of Public Housing for Alabama, is responsible for ensuring that PHAs in Alabama follow HUD regulations and do not mismanage or abuse HUD programs or federal funds. (Sprayberry Dec. ¶¶ 1-6; Harmon Dec. ¶¶ 1-6; Poteete Dec. ¶ 2). Since Sprayberry's job duties include oversight of the MHA's use of federal funds and its compliance with HUD regulations, he was easily acting within the limits of his job duties when he made the decisions challenged in this lawsuit.[22] See Harbert Intern., Inc., 157 F.3d at 1283 (when defendants' job duties included processing and deciding claims for compensation submitted by contractors, they were acting within discretionary authority when they denied plaintiff's claims regardless of reasons behind actions).

**B.     No Violation of Any Constitutional Rights.**

---

[22]Indeed, Plaintiff admits in his Complaint that Sprayberry was acting within the scope of his discretionary authority when he alleges that Sprayberry was "using his authority" as Director of the Office of Public Housing for HUD to carry out the actions that Plaintiff challenges in this lawsuit. (2nd Amend. Comp. ¶ 14). This assertion, by itself, is sufficient to establish that Sprayberry was acting within, or reasonably related to, the outer perimeters of his official duties. See Powers v. CSX Transp., Inc., 105 F. Supp. 2d 1295, 1306 (S.D. Ala. 2000) (allegation that defendant used powers of office sufficient to establish he was acting within discretionary authority).

This Court should grant summary judgment to Sprayberry because Sprayberry did not violate Plaintiff's constitutional rights. See Saucier, 533 U.S. at 200. If a plaintiff does not show that a federal official violated his constitutional rights, then the plaintiff's claims fail as matter of law and there is no need for further inquiry into qualified immunity. See id. at 201. In deciding whether a constitutional violation has been shown, the court must focus on the personal conduct of the individual official being sued.[23]   See Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir. 2003). Plaintiff alleges that Sprayberry discriminated against him because of his race in violation of the Fifth and Thirteenth Amendments, violated his property rights under the Fifth Amendment, and violated his free speech rights under the First Amendment. (2nd Amend. Comp. ¶¶ 3, 15-18, 20, 22). As set forth below, his claims fail as a matter of law.

**1.    Race Discrimination (Fifth Amendment).**

This Court should grant summary judgment on Plaintiff's Fifth Amendment Equal Protection claims because he has failed to show that he was subjected to any race discrimination.[24]   Plaintiff, who is African-American, alleges that Sprayberry did not treat him the same as white persons and discriminated against him due to his race when he "refused" to pay Plaintiff a higher hourly rate than Plaintiff agreed to be paid in his contract with the MHA, did not approve the MHA's expenditure of federal funds to pay him attorney fees he had spent

---

[23]As an aside, Plaintiff makes the conclusory allegation in his Complaint that Sprayberry took various actions as part of a "conspiracy" with McInnish and Long. (2nd Amend. Comp. ¶ 15). The evidence is undisputed that Sprayberry did not talk to these individuals about his actions, and he made no decisions based on their input. (Sprayberry Dec. ¶ 40). Plaintiff's "conspiracy" allegations are thus frivolous and irrelevant.

[24]While Plaintiff makes no reference to Equal Protection in his Complaint, the Supreme Court has read an equal protection component into the Fifth Amendment's Due Process Clause that prohibits race discrimination and mirrors the Equal Protection Clause of the Fourteenth Amendment. See Davis v. Passman, 442 U.S. 228, 234 (1979); Jackson v. State Bd. of Pardons & Paroles, 331 F.3d 790, 792 n.1 (11th Cir. 2003). The same analysis applies to race discrimination claims under either Amendment. See Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975).

investigating McInnish, and "overruled" the MHA Board's 2003 vote to award him a new contract. (2nd Amend. Comp. ¶¶ 15-18; Pl. Dep. II, 38:20-39:19).  To assert an Equal Protection claim under the Due Process Clause of the Fifth Amendment, a plaintiff must show that: (1) the defendant treated him differently from similarly-situated persons; and (2) the defendant treated him differently in order to intentionally discriminate against him due to his race.  See Sweet v. Secretary, Dep't of Corrections, 467 F.3d 1311, 1318-1319 (11th Cir. 2006); Strickland v. Alderman, 74 F.3d 260, 264 (11th Cir. 1996); Jackson v. City of Auburn, 41 F. Supp. 2d 1300, 1308 (M.D. Ala. 1999) (Thompson, J.).  Plaintiff cannot make either showing.

### a.    There were no similarly-situated persons treated differently.

The first reason that Plaintiff's Fifth Amendment discrimination claim fails as a matter of law is because Plaintiff cannot show that Sprayberry treated him differently from any similarly-situated persons.  See Smart v. Shalala, 9 F.3d 921, 924 (11th Cir. 1993) ("the preliminary step in equal protection analysis is to determine whether persons who are similarly situated are subjected to disparate treatment").  To make this showing, a plaintiff must identify another person who is similar "in all relevant respects" and was treated more favorably.  See Campbell v. Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006); Panama City Med. Diagnostic, Ltd. v. Williams, 13 F.3d 1541, 1545 (11th Cir. 1994).  Plaintiff cannot meet this burden.

As an initial matter, Plaintiff cannot show that Sprayberry treated him differently from any similarly-situated attorneys in relation to the hourly rate Plaintiff agreed to be paid in his contract with the MHA.  (2nd Amend. Comp. ¶ 17).  Plaintiff alleges that McInnish agreed to pay other attorneys contracting with the MHA a higher hourly rate than paid to Plaintiff and that

Sprayberry must have been involved in the decision because of HUD's general oversight role.[25] (Pl. Dep. II, 25:19-33:17).  It is undisputed, however, that the MHA was not under HUD procurement review when Plaintiff contracted with the MHA to serve as Board Counsel for the 2003-2004 term in January 2003.  (Pl. Dep. II, 18:15-19; Sprayberry Dec. ¶¶ 9-10).  HUD, therefore, did not review and concur in any of the MHA's RFPs for legal services for the 2003-2005 term, its selection processes, the contracts the MHA entered into with law firms, or the hourly rates that law firms agreed to accept from the MHA.  (Sprayberry Dec. ¶¶ 9-10; Poteete Dec. ¶ 4).   These decisions were made solely by the MHA, without any involvement by Sprayberry.  (Sprayberry Dec. ¶ 10).  Plaintiff's argument that the MHA's decision to pay him a certain hourly rate is somehow "imputed" to HUD and thus to Sprayberry, (Pl. Dep. II, 31:12-32:20), lacks factual and legal support.[26]  See e.g., Dalrymple, 334 F.3d at 995 (Bivens liability cannot be premised on respondeat superior or vicarious liability).  Since Sprayberry had no role in setting hourly rates for Plaintiff or anyone else, Plaintiff cannot show differential treatment. See Daniels v. Lutz, 407 F. Supp. 2d 1038, 1047 (E.D. Ark. 2005) ("Summary judgment on an equal protection claim is appropriate when a plaintiff fails to offer specific evidence of incidents in which they were treated differently than others who were similarly situated").

---

[25]Plaintiff's testimony regarding this claim is full of conjecture, speculation, and hearsay, including but in no way limited to his admission that "I'm making some assumptions here," and his speculative assumptions  "if Mr. Sprayberry denied it," "in my mind, [McInnish] was speaking on behalf of the local housing authority and on behalf of HUD," and "if the process was the same then." (Pl. Dep. II, 25:19-20, 32:5-20, 32:21-33:2, 33:16-17).

[26]Plaintiff's claim that McInnish told him the contracts were subject to HUD approval,  (Pl. Dep. II, 17:17-18:14), is inadmissible hearsay to the extent Plaintiff attempts to offer an out-of-court statement of a third party for the truth of its contents.  See Fed. R. Evid. 801 & 802.  Moreover, Plaintiff never asked Sprayberry to increase the hourly rate that he agreed to be paid by the MHA, and he has nothing but speculation and conjecture that Sprayberry had any role in the hourly rate that Plaintiff agreed to accept from the MHA (or for that matter, that Sprayberry could have done anything to change his hourly rate).  (Pl. Dep. II, 19:2-8, 20:9-11, 30:16-19).

Plaintiff also fails to show that Sprayberry treated him differently from any similarly-situated persons in relation to his invoices to the MHA for legal services. (2nd Amend. Comp. ¶ 16). Plaintiff attempts to make this showing by arguing that other MHA contract attorneys did not have their bills scrutinized by HUD. (Pl. Dep. II, 77:9-79:18). These other law firms, however, were not similarly situated to Plaintiff because the subject matter of their work was different than the subject matter of Plaintiff's work. Specifically, Plaintiff was the <u>only</u> MHA attorney who submitted invoices to the MHA seeking payment for work that HUD had consistently and repeatedly told the MHA could not be federally-funded. (Pl. Dep. II, at 45:12-23, 73:20-74:4). Indeed, Plaintiff admits that he was the only MHA attorney who conducted an investigation into McInnish's actions. (Pl. Dep. II, 48:8-49:7, 79:19-81:7). He further admits that HUD authorized the MHA to pay all his legal fees except those related to any investigation into McInnish. (Pl. Dep. II, 79:19-81:7). In short, Plaintiff cannot show that Sprayberry allowed the MHA to use federal funds to pay other contract attorneys to investigate McInnish. <u>See</u> <u>E &</u> <u>T Reality v. Strickland</u>, 830 F.2d 1107, 1114 (11th Cir. 1987) ("Different treatment of dissimilarly situated persons does not violate the Equal Protection Clause").

Finally, Plaintiff cannot show that Sprayberry treated him differently from any similarly-situated persons in relation to his efforts to obtain a new contract with the MHA. (2nd Amend. Comp. ¶ 18). Plaintiff alleges, in various ways, that Sprayberry "overruled" the MHA Board's December 21, 2004, vote to award him a contract. (2nd Amend. Comp. ¶¶ 15, 18). The undisputed evidence establishes that the MHA asked HUD to review and approve the selection of two law firms that it prematurely voted to hire at its December 2004 Board meeting: Plaintiff's law firm for a general legal service position and Holloway & Moxley, LLC for an evictions and collection position. (Pl. Dep. I, 35:8-36:14, Ex. 2; Pl. Dep. II, 101:15-102:3, 108:2-7, 119:11-23; Poteete Dec. ¶¶ 17-21; Sprayberry Dec. ¶ 31). Sprayberry, relying solely on

his staff's determination that the MHA had not adequately documented and supported its selection as required by HUD procurement guidelines, did not concur in either of the MHA's premature selections.  (Sprayberry Dec. ¶¶ 31-32; Poteete Dec. ¶¶ 17-21).  Moreover, HUD requested that the MHA apply a fair, impartial, and objective evaluation criteria to all the law firms upon re-evaluation.  (Poteete Dec. ¶¶ 17-21, Ex. C).   There is simply no evidence that Sprayberry treated Plaintiff differently from the other law firms seeking to represent the MHA during the 2005-2006 time period.  See Sweet, 467 F.3d at 1319.  Instead, the undisputed evidence is that Sprayberry treated similarly-situated firms identically. (Sprayberry Dec. ¶ 32).

In sum, Plaintiff bears the burden of providing specific evidence showing that Sprayberry treated him differently from another contract attorney who was similarly-situated in all relevant respects.  See Campbell, 434 F.3d at 1314.  Since he has failed to satisfy this burden for any of his race discrimination claims, they all fail as a matter of law.  See Sweet, 467 F.3d at 1319 ("[plaintiff's] equal protection claim necessarily fails first because he has not shown that he was treated differently from other, similarly-situated [persons].").

**b.     Plaintiff has no evidence of intentional race discrimination.**

Plaintiff's Fifth Amendment Equal Protection claims also fail as a matter of law because Plaintiff cannot show that he was subjected to any differential treatment because of his race.  See E & T Reality, 830 F.2d at 1114 ("even arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause"); Jackson, 41 F. Supp. 2d at 1310.  To make this necessary showing, a plaintiff must offer evidence that a defendant's conduct was deliberately based on the plaintiff's race.  See Sweet, 467 F.3d at 1318-1319; E & T Reality, 830 F.2d at 1114; Powell v. City of Montgomery, 56 F. Supp. 2d 1328, 1333 (M.D. Ala. 1999) (Thompson, J.); Jackson, 41 F. Supp. 2d at 1310.  Plaintiff completely lacks any such evidence.

As an initial matter, Plaintiff cannot even show that Sprayberry was aware of Plaintiff's race at the time of the challenged decisions. (Pl. Dep. II, 19:9-17, 20:9-11). Plaintiff admits he never met Sprayberry. (Pl. Dep. II, 13:23-14:4). Furthermore, while Plaintiff opines that McInnish may have told Sprayberry Plaintiff's race, he admits that he has no evidence that any such conversation took place. (Pl. Dep. II, 19:9-20:11). In fact, the undisputed evidence is that neither Sprayberry nor his staff in Birmingham, who were simply reviewing paper correspondence from the MHA, knew Plaintiff's race. (Sprayberry Dec. ¶ 39; Poteete Dec. ¶ 27; Harmon Dec. ¶ 22). Plaintiff's failure to show this basic knowledge defeats his claim because common sense dictates that "a decision-maker cannot have been motivated ... by something unknown to him." See Brungart v. BellSouth Teles., Inc., 231 F.3d 791, 799 (11th Cir. 2000).

Nevertheless, even if Plaintiff could show (contrary to the evidence) that Sprayberry knew his race, such knowledge by itself does nothing to show discrimination. Indeed, Plaintiff's entire discrimination case is based on the flawed theory that: (a) I am African-American; and (b) everything that happened to me was because I am African-American. (Pl. Dep. II, 53:3-54:19). Plaintiff's unsupported speculation in this regard is not even close to satisfying his burden of showing intentional discrimination. See Serben v. Inter-City Manu. Co., Inc., 36 F.3d 765, 766 (8th Cir. 1994) ("mere membership in the protected class does not permit an inference of [race] discrimination."). See also Crawford v. Medina Gen. Hosp., 96 F.3d 830, 836 (6th Cir. 1996) (rejecting as false syllogism plaintiff's reasoning that "A) my [supervisor] hates me; B) I am female; C) my [supervisor] hates me because I'm female").

In any event, Sprayberry has offered extensive and legitimate, non-discriminatory reasons for the actions that Plaintiff challenges in this lawsuit and Plaintiff cannot show that they are pretext for discrimination. See Jackson, 41 F. Supp. 2d at 1313. First, Sprayberry had no role in setting the hourly rate Plaintiff agreed to be paid in his contract with the MHA.

(Sprayberry Dec. ¶¶ 9-10).  Second, Sprayberry did not approve the payment of Plaintiff's invoice for $25,585 that he billed the MHA in March 2005 for investigating McInnish because the MHA never obtained the necessary prior approval to spend federal funds to investigate McInnish.[27]  (Sprayberry Dec. ¶ 28, Ex. H; Poteete Dec. ¶¶ 15-16; Harmon Dec. ¶ 17).  Finally, Sprayberry required the MHA to re-evaluate the attorney responses to the attorney RFPs in January 2005 because his staff informed him that they could not determine that the MHA had followed HUD and MHA procurement guidelines in the evaluation and selection process.[28]  (Poteete Dec. ¶¶ 17-21; Harmon Dec. ¶¶ 18-19; Sprayberry Dec. ¶ 32, Ex. I).  Sprayberry did not instruct the MHA never to contract with Plaintiff, and Sprayberry had no role in the MHA's subsequent conclusion, on re-evaluation that another firm was more qualified than Plaintiff's firm.  (Poteete Dec. ¶ 22; Sprayberry Dec. ¶ 32, Ex. I; Harmon Dec. ¶ 19).

In sum, Plaintiff cannot show that Sprayberry knew his race, much less that Sprayberry intentionally discriminated against him due to his race.  For this reason, as well as because Plaintiff was not treated differently from similarly-situated persons, Plaintiff's Fifth Amendment Equal Protection claims fail as a matter of law.  See Jackson, 41 F. Supp. 2d at 1310 ("Proof of racially discriminatory intent or purpose is required to show a violation" of equal protection).

---

[27]As discussed supra in section I, Plaintiff lacks standing to challenge Sprayberry's decision regarding the MHA's requests to use federal funds for certain purposes.  See Pagan, 448 F.3d at 30.  In any event, Sprayberry did not authorize the MHA to spend any federal funds to investigate McInnish because he could not determine that the expenditure of such funds was reasonable or necessary.  (Sprayberry Dec. ¶¶ 21-29; Poteete Dec. ¶¶ 8-16; Harmon Dec. ¶¶ 7-12).

[28]Notably, Sprayberry treated the MHA's initial selection of the firm of Holloway & Moxley for an eviction and collection contract the same as it treated the MHA's selection of Plaintiff's firm for general legal services.  (Poteete Dec. ¶¶ 17-25; Sprayberry Dec. ¶¶ 32, 34).  The name partners of Holloway & Moxley are both white.  (Pl. Dep. II, 119:12-20).  The fact that black and white firms were treated the same further undermines any conclusory allegations by Plaintiff of race discrimination.  See Brown v. American Honda Motor Co., 939 F.2d 946, 952 (11th Cir. 1991) ("[i]t is difficult to hold that a practice which affects applicants of all races in the same manner is actually designed to conceal a racially discriminatory motive.").

2.    **Race Discrimination (Thirteenth Amendment).**

Plaintiff's race discrimination claims under the Thirteenth Amendment fail as a matter of law because he has not shown that he was subjected to slavery or involuntary servitude.  See Channer v. Hall, 112 F.3d 214, 217 & n.5 (5th Cir. 1997).  Plaintiff bases his Thirteenth Amendment claim on the same allegations as his Fifth Amendment claims – i.e., his claims that Sprayberry discriminated against him in relation to his hourly rates, his legal fees for his McInnish investigation, and his proposed new contract with the MHA.  (2nd Amend. Comp. ¶¶ 3, 16-18, 22; Pl. Dep. III, 150:5-15). The Thirteenth Amendment provides that "neither slavery nor involuntary servitude, except as punishment for crime ... shall exist within the United States" and that "Congress shall have power to enforce this article by appropriate legislation."  See Arnold v. Board of Educ., 880 F.2d 305, 315 (11th Cir. 1989).  This Amendment, even if it allowed a cause of action under Bivens, can only be used to challenge racial discrimination in slavery or involuntary servitude.[29]  See Powers, 105 F. Supp. 2d at 1302-03.  See also Crenshaw v. City of Defuniak Springs, 891 F. Supp. 1548, 1556 (N.D. Fla. 1995) ("While neither the Supreme Court or the Courts of Appeal have decided the extent to which a direct cause of action exists under the Thirteenth Amendment, district courts have uniformly held that the amendment does not reach forms of discrimination other than slavery or involuntary servitude").  Accordingly, Plaintiff's claims fail as a matter of law because he was not enslaved or subjected to involuntary servitude.  See Powers, 105 F. Supp. 2d at 1302-1303.

To show slavery or involuntary servitude under the Thirteenth Amendment, a plaintiff must show that he was physically restrained, threatened with the use of physical restraint or injury, or coerced by threat of legal process.  See Jenkins v. Trustees of Sandhills Comm.

---

[29]The Eleventh Circuit has not decided whether plaintiffs can pursue Bivens claims under the Thirteenth Amendment.  See Arnold, 880 F.2d at 315 n.12; Powers, 105 F. Supp. 2d at 1302.

College, 259 F. Supp. 2d 432, 440 (M.D. N.C. 2003). Plaintiff has not shown, and cannot show, that Sprayberry physically restrained him, threatened him with the use of physical restrain or injury, or coerced him by threat of legal process. Accordingly, he has not shown that he was subjected to slavery or involuntary servitude in violation of the Thirteenth Amendment. See id.; Powers, 105 F. Supp. 2d at 1303 ("plaintiff, who does not allege that [he] was subjected to involuntary labor, can maintain no direct cause of action under the Thirteenth Amendment"). Moreover, as discussed supra, Plaintiff has no evidence of race discrimination. Accordingly, this Court should grant summary judgment on these claims. See Powers, 105 F. Supp. 2d at 1303.

### 3.    Fifth Amendment Due Process (property).

Plaintiff's Fifth Amendment property-right claims fail as a matter of law because he cannot satisfy the required elements of such claims. See Greenbrier Village, L.L.C. v. Mountain Brook City, 345 F.3d 1258, 1262-1264 (11th Cir. 2003). Plaintiff alleges that his Fifth Amendment property rights were violated when Sprayberry denied the MHA approval to use federal funds to pay Plaintiff's invoice for fees charged investigating McInnish and when Sprayberry allegedly "overruled" the MHA's December 2004 vote to award him a new contract subject to HUD approval.[30] (2nd Amend. Comp. ¶¶ 15, 16, 18, 22). To state a Fifth Amendment procedural due process claim, a plaintiff must show that (1) he had a property interest protected by the Fifth Amendment; and (2) he was deprived of that property interest by governmental

---

[30]Notably, during his deposition, Plaintiff stated that his due process claim solely related to his failure to be paid for the work he allegedly performed investigating McInnish. (Pl. Dep. III, 148:13-149:2). Accordingly, Sprayberry submits that Plaintiff has waived any due process claim regarding his potential 2005-2006 contract, to the extent he ever meant to assert such a claim.

action without due process of law.[31]  See Greenbrier Village, L.L.C., 345 F.3d at 1264; Bank of Jackson County v. Cherry, 966 F.2d 1406 (11th Cir. 1992); Callaway v. Block, 763 F.2d 1283, 1290 (11th Cir. 1985).  Plaintiff cannot make either showing.

### a.    No Protected Property Interest.

The first reason that this Court should grant summary judgment on Plaintiff's due process claim is because he had no protected property interest in being paid from federal funds to investigate McInnish or to any contract with the MHA that was "subject to HUD approval."  A property right protected by the Fifth Amendment must be created and defined "by existing rules or understandings that stem from an independent source" such as federal or state law that "secure certain benefits" and "support claims of entitlement to those benefits."  See Hardison v. Cohen, 375 F.3d 1262, 1268 (11th Cir. 2004).  To show a property interest protected by the Fifth Amendment, "a person ... must have more than an abstract need or desire for it.  He must have more than a unilateral expectation to it.  He must, instead, have a legitimate claim of entitlement to it."  See Board of Regents v. Roth, 408 U.S. 564, 577 (1972) (emphasis added).  Indeed, the Eleventh Circuit has noted that the "the hallmark of a protected property interest is 'an individual entitlement grounded in ... law, which cannot be removed except for cause.'"  See Callaway, 763 F.2d at 1290 (emphasis added).  Moreover, a legitimate claim of entitlement arises only after a property interest has been received or granted, and it cannot be based on a mere expectation or a

---

[31]While the Fifth Amendment's Due Process Clause has both substantive and procedural components, Plaintiff's claim can only be a procedural due process claim because substantive due process claims do not apply to property rights.  See Greenbrier Village, LLC, 345 F.3d at 1262.  Moreover, while Plaintiff references "taking without just compensation" in his Complaint, (2nd Amend. Comp. ¶ 16), the Just Compensation Clause of the Fifth Amendment relates to government action taking private property for public use, and the property rights covered by it are much narrower than those protected by the Due Process Clause.  See Corn v. City of Lauderdale Lakes, 95 F.3d 1066, 1075 (11th Cir. 1996).  This Clause has no applicability in this case, and even if it did, such a claim would fail because Plaintiff lacks any protected property interest.  See id.

hope that something will happen in the future.  Cf. Lyng v. Payne, 476 U.S. 926, 942 (1986) ("We have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the ... Fifth Amendment...").

In the present case, Plaintiff, as a contract employee with the MHA, did not have a legitimate "entitlement" to be paid unlimited federal funds by the MHA to conduct an investigation into McInnish.[32]  It is undisputed that HUD had oversight authority over the MHA's use of federal funds.  See Brown, 784 F.2d at 1537.  Furthermore, the regulations and guidelines used by HUD to evaluate PHA requests for expenditures required that PHA costs for professional services be reasonable in relation to the services rendered, be necessary and reasonable for the administration of public housing program, and be supported by documentation.  (Sprayberry Dec. ¶¶ 2-6; Poteete Dec. ¶ 6; Harmon Dec. ¶ 6).  It is further undisputed that HUD, which had placed the MHA on procurement review and required prior approval for it to spend any federal funds, denied the MHA's request to spend federal funds to investigate McInnish on December 9, 2004. (Sprayberry Dec. ¶¶ 21-24, Ex. D; Harmon Dec. ¶¶ 7-12).  Plaintiff himself admits that Sprayberry, from the beginning, had consistently indicated that he was not going to authorize payment from federal funds for any invoices for any investigation into McInnish.  (Pl. Dep. II, at 45:12-23, 73:20-74:4).  Plaintiff, therefore, cannot claim a legitimate entitlement to be paid in federal funds for unauthorized work he performed for the MHA.  Cf. Bank of Jackson Cty. v. Cherry, 980 F.2d 1362, 1366 (11th Cir. 1993) ("no citizen has a 'right' ... to do business with the government.")  Indeed, if the rule were otherwise, then federal oversight would be rendered meaningless and every contractor working for a federally-funded entity would essentially be issued an unconditional key to the U.S. Treasury.

---

[32]Notably, the issue is not whether the MHA had a property interest in the federal funds, but whether plaintiff, as a MHA contract employee, had a property interest in being paid by federal funds.  As discussed, supra, Plaintiff has no standing to litigate for MHA.  (Pl. Dep. III, 99:6-11).

Furthermore, Plaintiff did not have a property interest in a potential contract that was prematurely and conditionally awarded "subject to HUD approval." (Pl. Dep. II, 100:18-102:3). On November 18, 2004, HUD placed the MHA on procurement review and required that the MHA submit, for prior approval, all RFPs and all proposed selections. (Pl. Dep. II, 94:20-95:2; Sprayberry Dep. 59:9-14, Ex. 3; 60:17-21; 61:3-62:11, 70:5-10, 71:2-9; Sprayberry Dec. ¶¶ 17-18; Harmon Dec. ¶¶ 3-5, 18-19). Accordingly, until HUD approved the MHA's RFP for general legal services and the selection process and gave its concurrence, the MHA had no authority to enter into any contract involving federal funds and any such contract would be null and void. (Sprayberry Dec. ¶ 31; Harmon Dec. ¶ 18). Plaintiff thus had no legitimate entitlement to a new contract with the MHA, issued without HUD approval and in violation of HUD's procurement review. See Bailey v. City of Lawrence, 972 F.2d 1447, 1449 (7th Cir. 1992); Whalen v. City of Atlanta, 539 F. Supp. 1202, 1205 (N.D. Ga. 1982). At best, therefore, Plaintiff had a unilateral expectation that he might receive a contract with the MHA, and such a unilateral expectation is not an entitlement protected by the Constitution. See Clark Construction Co. v. Pena, 930 F. Supp. 1470, 1487-1488 (M.D. Ala. 1996) (holding that bidder for contract with state agency, subject to federal agency approval, did not have property interest in contract but only a unilateral expectation). See also Bannum, Inc. v. Ashland, 922 F.2d 197, 200-201 (4th Cir. 1990) (contract subject to third party approval of conditions did not give plaintiff a protected property interest).

In sum, Plaintiff's Fifth Amendment property claims fail as a matter of law because he did not have any constitutionally-protected property interests in being paid in federal funds by the MHA for unauthorized work or in being awarded a new contract subject to HUD approval. See Greenbrier Village, L.L.C., 345 F.3d at 1266-1267; Clark Construction Co., 930 F. Supp. at 1487-1488. This Court should thus grant summary judgment on these claims. See Greenbrier Village, L.L.C., 345 F.3d at 1266-1267.

### b.    Adequate post-deprivation remedies.

Furthermore, even assuming <u>arguendo</u> that Plaintiff had a protected property interest and did not receive adequate pre-deprivation notice and opportunity to be heard, this Court should still grant summary judgment because he was provided adequate post-deprivation process.[33]  <u>See</u> <u>McKinney v. Pate</u>, 20 F.3d 1550, 1562-63 (11th Cir. 1994) (en banc); <u>Rodriquez-Mora v. Baker</u>, 792 F.2d 1524, 1527 (11th Cir. 1986).  In <u>McKinney</u>, the Eleventh Circuit explained that since a procedural due process violation does not occur unless and until the government fails to provide an adequate, post-deprivation remedy, the existence of such a remedy constitutes a complete bar to the assertion of a due process claim.  <u>See</u> <u>McKinney</u>, 20 F.3d at 1562-63.  Plaintiff, therefore, must show that existing post-deprivation remedies, whether utilized or not, were inadequate to cure any alleged procedural flaws.  <u>See</u> <u>Cotton v. Jackson</u>, 216 F.3d 1328, 1333 (11th Cir. 2000) (per curiam); <u>Rodriquez-Mora</u>, 792 F.2d at 1527.  Plaintiff cannot make this showing.

First, the United States has provided an adequate post-deprivation remedy for Plaintiff to challenge any alleged unauthorized and intentional deprivation of property in the form of a civil lawsuit for conversion under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 <u>et</u> <u>seq</u>.  <u>See</u> <u>Rodriquez-Mora</u>, 792 F.2d at 1526.  The FTCA is a limited waiver of sovereign immunity, and it provides the <u>exclusive</u> remedy for a plaintiff alleging injury from state law torts committed by a federal employee within the scope of his or her official duties.  <u>See</u> 28 U.S.C. §§

---

[33]Sprayberry submits that Plaintiff had adequate pre-deprivation due process.  Due process simply requires notice and opportunity to be heard.  <u>See</u> <u>Dusenbery v. United States</u>, 534 U.S. 161, 167 (2002).  Prior to Sprayberry's oversight decisions, Plaintiff was aware that his legal fees related to the investigation and his prospective contract for 2005-2006 with the MHA were both subject to HUD approval.  (Pl. Dep. I, 150:1021, 158:10-159:9; Pl. Dep. II, 88:1-90:18).  Plaintiff, therefore, had an opportunity to contact HUD or provide any information he felt was necessary regarding his attorney fees or contract before HUD made any decisions.  (Sprayberry Dep. 145:1-146:1, Ex. 17).

1346(b) & 2679(b)(1).[34]  The Eleventh Circuit has held that the existence of a post-deprivation remedy for conversion under the FTCA "will preclude a Fifth Amendment challenge" to a federal official's alleged taking of property without due process.  See Rodriquez-Mora, 792 F.2d at 1526.  Accord Bigbee v. United States, 359 F. Supp. 2d 806, 810 (W.D. Wis. 2005); Wolff v. Hood, 242 F. Supp. 2d 811, 818 (D. Or. 2002); Friedman v. Young, 702 F. Supp. 433, 437 (S.D.N.Y. 1988).  Accordingly, the existence of a possible remedy under the FTCA bars Plaintiff from claiming he was not afforded adequate process.  See Rodriquez-Mora, 792 F.2d at 1526.

Second, the Code of Federal Regulations provides a mechanism for a potential contractor who did not receive a contract with a PHA to raise challenges with the PHA or HUD.  See 24 CFR § 85.36(b)(12).  Plaintiff, as a disappointed bidder for a MHA contract, did not utilize an available mechanism for him to seek administrative review of his non-selection and raise any procedural due process or other challenges to his non-selection.  (Pl. Dep. II, 129:7-130:1).  Plaintiff has not shown that this administrative review scheme was inadequate.  Accordingly, he cannot now claim that his due process rights were violated.  See Cotton, 216 F.3d at 1331 ("If adequate ... remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on their failure to claim" they were "deprived of procedural due process.").

### 4.    Plaintiff's First Amendment Speech Rights Were Not Violated

Finally, this Court should grant summary judgment on Plaintiff's First Amendment claims because he did not engage in any constitutionally-protected speech and cannot show that Sprayberry took any retaliatory actions due to any such speech.  See Garcetti v. Ceballos, 126 S. Ct. 1951 (2006).  Plaintiff's First Amendment claim is based on an allegation that Sprayberry

---

[34]Plaintiff included such a claim in his original complaint, and on March 27, 2006, the Attorney General's designee filed a Certification that Sprayberry was acting within the scope of his federal employment relative to Plaintiff's allegations and the United States was substituted as a party.  Furthermore, Plaintiff's FTCA claim was dismissed on August 10, 2006, for lack of subject matter jurisdiction because Plaintiff had not exhausted his mandatory administrative remedies.

somehow retaliated against him because he spoke, in his capacity as MHA Board Counsel, at MHA Board meetings regarding investigations he was conducting for the MHA Board. (2nd Amend. Comp., ¶¶ 3, 15, 22; Pl. Dep. III, 79:18-81:18, 149:3-150:4). To establish a First Amendment retaliation claim, a plaintiff who is a public employee or contractor with a public entity must show that: (1) he engaged in constitutionally-protected speech; and (2) that the speech played a substantial or motivating role in a government's decision to take an adverse action against him. See Board of Commissioners v. Umbehr, 518 U.S. 668, 675-676 (1996); Akins v. Fulton County, 420 F.3d 1293, 1303 (11th Cir. 2005); Mize v. Jefferson County Bd. Of Educ., 93 F.3d 739, 742 (11th Cir. 1996). Moreover, even if a plaintiff meets his burden to demonstrate these elements, the defendant can still obtain summary judgment by showing that it would have made the same decision regardless of the plaintiff's speech. See Stanley v. City of Dalton, 219 F.3d 1280, 1292 (11th Cir. 2000). Plaintiff cannot satisfy any of these elements.

### a.   No Protected Speech.

As an initial matter, Plaintiff did not engage in any constitutionally-protected speech. See Garcetti, 126 S.Ct. at 1960. To determine if a plaintiff's speech is constitutionally protected, a court must first ask whether the plaintiff "spoke as a citizen on a matter of public concern." See id. at 1958; Umbehr, 518 U.S. at 675-676. If the plaintiff did not speak as a citizen on a matter of public concern, then he has "no First Amendment cause of action." See Garcetti, 126 S.Ct. at 1960. On this issue, the Supreme Court recently held that public employees who make statements pursuant to their official job duties do not speak as citizens for purposes of the First Amendment. See id. at 1957. The Court noted that "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." See id. at 1960. Indeed, since a public employee or contractor who speaks as part of his official duties is speaking as a government agent, this

holding is consistent with the rule that "government speech itself is not protected by the First Amendment." See NAACP v. Hunt, 891 F.2d 1555, 1556 (11th Cir. 1990).

In this case, Plaintiff engaged in no constitutionally-protected speech. He bases his First Amendment claim solely on alleged speech he made at MHA Board meetings, while performing his job as MHA Board Counsel, about investigations that the MHA Board had asked him to conduct in mid-2004 and in November 2004. (Pl. Dep. II, 77:17-78:10; Pl. Dep. III, 79:18-81:18, 138:18-140:2, 149:3-150:4). Since Plaintiff admits he made his statements as part of his job, he was not speaking as a private citizen and his speech as a government agent has no First Amendment protection. See Garcetti, 126 S.Ct. at 1960 ("Our precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in course of doing his or her job"); Deprado v. City of Miami, 446 F. Supp. 2d 1344, 1346 (S.D. Fla. 2006). See also Warner Cable Co. v. City of Niceville, 911 F.2d 634, 638 (11th Cir. 1990) ("[W]hen the ... speaker is the government, the speaker is not ... protected by the First Amendment."). Accordingly, this Court should grant summary judgment on Plaintiff's First Amendment claims. See Garcetti, 126 S.Ct. at 1960.

### b.    No Substantial or Motivating Factor.

Furthermore, assuming arguendo Plaintiff's alleged speech was constitutionally protected, he cannot show that it was a "substantial or motivating factor" in any of Sprayberry's decisions. See Mize, 93 F.3d at 742. To make this showing, Plaintiff must demonstrate there is a "substantial causal link" between his speech and an adverse action." See id. The Eleventh Circuit has noted that there is no single standard for this inquiry, and that the court must consider the record as a whole when making its decision including temporal proximity and whether asserted reasons for actions have been shown to be pretext. See Stanley, 219 F.3d at 1291 & n.20. At a minimum, a plaintiff must show that the decision-maker was aware of his protected

speech at the time of any challenged decisions.  See Clover v. Total Sys., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999).  Moreover, the Eleventh Circuit has noted that "[e]very act of expression is not equally as likely to draw a negative response...; for the link to be made, it must be reasonable to assume that [a decision-maker] had cause to retaliate."  See Mize, 93 F.3d at 745.

When the record is examined in this case, no reasonable person could conclude that Sprayberry was motivated by Plaintiff's "speech" in MHA Board minutes when he made the challenged decisions.  Plaintiff gives no details about the specifics of his alleged speech, other than to state that it related to investigations he was asked to conduct by the MHA Board and is in the MHA Board minutes where he speculates Sprayberry might have seen it.  (Pl. Dep. III, 143:4-7, 149:7-19).  Plaintiff, however, has no evidence that Sprayberry read the minutes, when Sprayberry might have read the minutes in relation to when he made challenged decisions, in what detail he might have read the minutes, or whether Sprayberry paid any attention to any comments made by Plaintiff about his investigations in those minutes.  See Brungart, 231 F.3d at 799.  See also Tharling v. City of Port Lavaca, 329 F.3d 422, 428 (5th Cir. 2003) ("It is axiomatic that a party cannot be 'substantially motivated' by a circumstance of which that party is unaware.").  Furthermore, the minutes are bereft of any speech by Plaintiff that would provide cause for Sprayberry to want to retaliate against Plaintiff; indeed, Plaintiff does not criticize HUD or Sprayberry in any Board minutes.  See Mize, 93 F.3d at 745.  Finally, as discussed supra in section II(B)(1)(b), Sprayberry has offered extensive evidence of legitimate reasons for the decisions Plaintiff challenges in this lawsuit, and Plaintiff cannot show that they are pretext for an unlawful motive.  See Goldstein v. The Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 358-359 (4th Cir. 2000).  As a result, Plaintiff cannot show that his speech was a substantial or motivating factor in any challenged decision.  See id.

      c.    **Sprayberry Would Have Taken Same Action Regardless of Plaintiff's Alleged Speech in Board Minutes.**

Finally, Plaintiff's First Amendment claims also fail because Sprayberry has shown that he would have taken the same actions regardless of any speech by Plaintiff. See Stanley, 219 F.3d at 1292-1293. A defendant is entitled to summary judgment if he establishes that a legitimate reason would have motivated him to make the same decision even absent a plaintiff's speech. See id. at 1293; Harris v. Shelby County Bd. of Ed., 99 F.3d 1078, 1086 (11th Cir. 1996); Marshall v. City of Cape Coral, 797 F.2d 1555, 1561 (11th Cir. 1986).

In this case, Sprayberry has offered legitimate reasons for all the decisions that Plaintiff challenges in this lawsuit in section II(B)(1)(b), supra. Furthermore, he has offered extensive evidence that every decision he made regarding the MHA was concurred in by two members of his staff, Harmon and Poteete, who agreed with him as to why the actions should be taken. (Sprayberry Dec. ¶ 6, 17, 23, 26, 28-29, 31-32, 40; Harmon Dec. ¶¶ 12, 16-19; Poteete Dec. ¶¶ 10, 12, 14, 17-21). Plaintiff has no evidence that Harmon and Poteete knew about any "speech" on his part when they concluded that every action Sprayberry was taking was the proper course for HUD to take in its oversight capacity over the MHA's use of federal funds. Accordingly, Sprayberry has shown that he would have made the same decisions absent any speech by Plaintiff. See Harris, 99 F.3d at 1086. For this reason as well, this Court should grant summary judgment to Sprayberry on Plaintiff's First Amendment claims. See id.

### C.    Qualified Immunity Has Not Been Overcome Because Plaintiff Has Not Shown the Violation of Any Clearly-Established Constitutional Rights.

Finally, assuming arguendo that Plaintiff could show that Sprayberry violated any of Plaintiff's constitutional rights, this Court should grant summary judgment because Plaintiff cannot show that any such rights were "clearly established" on the specific facts of this case. See Stanley, 219 F.3d at 1294-1295. Qualified immunity performs the important function of allowing government officials to perform their jobs without being intimidated by the threat of

lawsuits jeopardizing them and their families.  See Foy v. Holston, 94 F.3d 1528, 1534 (11th Cir. 1996).  The Eleventh Circuit has noted that "qualified immunity is the "usual rule" and that only in "exceptional cases will government actors have no shield against claims made against them in their individual capacities."  See Lassiter v. Alabama A & M Univ. Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994).  To overcome qualified immunity, a plaintiff must show that "it would be clear to a reasonable official that his ... conduct was unlawful in the situation he confronted."  See Saucier, 533 U.S. at 202.  This analysis turns on review of "the precise actions of each [defendant] and the precise information possessed by each [defendant] in order to determine whether a reasonable public official could have believed that his or her actions were lawful, in light of clearly established law."  See Dolihite v. Maughan, 74 F.3d at 1027, 1034, n.3 (11th Cir. 1996).  Under this standard, "if reasonable public officials could differ on the lawfulness of a defendant's actions, then the defendant is entitled to qualified immunity."  See Storck v. City of Coral Springs, 354 F.3d 1307, 1315 (11th Cir. 2003).

In most cases, the plaintiff, who bears the burden of showing qualified immunity is not appropriate, must point to preexisting case law that is factually similar in order to show that a government official had fair notice that his conduct violated a constitutional right.  See Willingham, 321 F.3d at 1301; Vinyard, 311 F.3d at 1350.  Qualified immunity is only overcome if a plaintiff demonstrates that "preexisting law dictates, that is truly compel[s], the conclusion for all reasonable, similarly-situated public officials that what [the defendant] was doing violated plaintiff's federal rights in the circumstances."  See Evans v. Stephens, 407 F.3d 1272, 1282 (11th Cir. 2005) (en banc).  Moreover, if a lawful motive exists for an official's action, then the official is entitled to qualified immunity regardless of the presence of any possible unlawful motive.  See Stanley, 219 F.3d at 1296; Foy, 94 F.3d at 1534-35.

In the present case, Plaintiff cannot identify <u>any</u> authority that would have clearly established to Sprayberry that a federal official, with his knowledge, violates the First, Fifth, or Thirteenth Amendment rights of a PHA's contract employee when he makes decisions regarding the PHA's use of federal funds and its compliance with procurement requirements.  <u>See</u> <u>Williams</u>, 341 F.3d at 1269-1270 (stressing qualified immunity must be decided "in light of the specific context of the case, not as a broad general proposition").  Sprayberry did not know Plaintiff's race or the race of other MHA contract attorneys when he made the decisions challenged in this case.  (Sprayberry Dec. ¶¶ 33, 39).  Furthermore, he relied upon his staff when making challenged decision, and they all agreed on the same course of action.  (Sprayberry Dec. ¶¶ 6, 29, 40).   No reasonable federal official, aware of the same facts as Sprayberry, would have known he was violating any First, Fifth, or Thirteenth Amendment rights of Plaintiff by not policing every hourly rate negotiated between the MHA and other parties.  No reasonable federal official, aware of the same facts, would have known that he was violating any First, Fifth, or Thirteenth Amendment rights of Plaintiff by refusing to allow the MHA to pay Plaintiff, a contract attorney, in federal funds for work that HUD had specifically and repeatedly advised the MHA could not be performed with federal funds.  No reasonable official, aware of the same set of facts, would have known that he was violating any First, Fifth, or Thirteenth Amendment rights of Plaintiff when he, in reliance upon his staff's review of the HUD and MHA procurement policies and his staff's conclusion that such policies had not been followed, rejected the MHA's initial procurement selections and made it comply with HUD and MHA procurement requirements.  In short, no reasonable official, in Sprayberry's position and with his knowledge, would have even had the slightest idea that any of his decisions impacted, in the least bit, any constitutional rights possessed by Plaintiff.  <u>See</u> <u>Vinyard</u>, 311 F.3d at 1350 (reiterating that "fair and clear notice to government officials is the cornerstone of qualified immunity").

In sum, absent the "fair and clear notice" to Sprayberry required by the law, Plaintiff cannot meet his burden of overcoming Sprayberry's defense of qualified immunity. See Vinyard, 311 F.3d at 1350. Accordingly, Sprayberry is entitled to summary judgment because he is protected by qualified immunity from all Plaintiff's claims. See id. See also Foy, 94 F.3d at 1534 ("If objective observers cannot predict – at the time the official acts – whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages.").

## CONCLUSION

For the foregoing reasons, this Court should grant Defendant Sprayberry's Motion for Summary Judgment in its entirety, dismiss with prejudice all Plaintiff's claims in his Second Amended Complaint against Sprayberry, and award Sprayberry his costs in this action.

Respectfully submitted this 5th day of January, 2007.

LEURA G. CANARY
United States Attorney

By:     s/James J. DuBois
        JAMES J. DUBOIS
        Assistant United States Attorney
        Georgia Bar No. 231445
        United States Attorney's Office
        Post Office Box 197
        Montgomery, AL 36101-0197
        Telephone: (334) 223-7280
        Facsimile: (334) 223-7418
        E-mail: james.dubois2@usdoj.gov

Counsel for Defendant Sprayberry

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel for Plaintiff, Defendant Mcinnish, Defendant Long, and Defendant MHA.

s/James J. DuBois
Assistant United States Attorney