

DEFENDANT'S EXHIBIT

20

*Montgomery*
**HOUSING**
*Authority*

C. MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET ♦ MONTGOMERY ♦ ALABAMA ♦ 36104-3006
(334) 206-7200 ♦ (334) 206-7222 Fax ♦ MHAToday.org

CLIFFORD HOLMES
CHAIRMAN

## MEMORANDUM

April 23, 2004

STRICTLY CONFIDENTIAL

TO:         BOARD OF COMMISSIONERS
FROM:     C. MICHAEL MCINNISH
RE:         EXECUTIVE SESSION
CC:         TERRY DAVIS

The Board of Commissioners has accomplished many things during the past several years. Because of your active support and participation, we have accomplished much and are currently held in high regard by other housing authorities, our peers, our associations, and others. We have representation on numerous national boards and committees, work closely with state groups, participate in state, regional and national groups, and stay up-to-date on our policies and procedures. We have made great strides in providing housing and our community reputation is much improved. We are operating in accordance with law, regulations and our policies; we have broken ground on the most innovative public housing redevelopment effort this city has ever experienced; we have brought deserved attention to the housing authority's historical significance in the city; and most importantly we have made major changes in our operations that have proven to better serve our families, both in Section 8 and public housing.

And, as I expected when accepting your appointment, there have been many hurdles that together we have successfully cleared to get to where we are today. Whenever any question or allegation arose, I answered each promptly and with honesty, integrity and complete openness. I have always, and will continue to address every allegation head-on. I accepted this appointment for the right reasons - because I felt I had the knowledge and capabilities to lead this housing authority in the right direction for the sake of our residents. And, I have always assumed that the Board of Commissioners has confidence in me since it first appointed me as Interim during a time when this housing authority was faced with some very difficult challenges - and then as the executive director to continue the positive path we had begun together.

I am, therefore, very concerned about the many allegations made during the Executive Session about my actions and intentions. I will be more than willing to address any of these allegations and/or concerns you may have, but I believe I should be entitled to advance notice so I can prepare a proper response.

McInnish 201



THOMAS TAYLOR, Vice-Chair          RICHARD N. BOLLINGER          JOHN F. KNIGHT Jr.          ANNE B. UPCHURCH
BETTIE BARNETT                             LUAN LONG                          RON DRINKARD                DAVID S. BARLEY, II

1

Unfortunately, one of the greatest hurdles I have personally had to combat is my race. I have been publicly criticized for being the Director because of my race. I have been reviewing my desk top book and some of the following are listed: I received a lot of criticism from some Ministers in the community because of my race; a commissioner has allegedly made statements that I should not be serving our residents because of my race; one commissioner told me that I did not know who I was "messing with." As I have stated to several of you, I will not condone any discrimination against any of our residents, our staff, or myself. I have repeatedly had to endure racial issues concerning my ability to lead this housing authority and race should not be an issue in our city about leadership ability.

I am convinced that I must respond in writing to several of the issues raised during the Executive Session this past Tuesday night, and once again lay out the circumstances leading to all decisions and actions taken to hopefully clarify the situation:

- We received notice in March that Councilman Nuckles was considering action whereby the City Council would vote on the appointing authority for our Board. I happened to see Rev. Nuckles at a Leadership Montgomery meeting and asked him if we could talk at some point on this issue. I did not hear from him and subsequently learned that same day that he was going to introduce a resolution relating to Board appointments at the next Council meeting. He did, but the resolution did not receive sufficient votes to proceed at that council meeting and would be brought up again at the next meeting of the council. At this point I received notice that the resolution included language to remove all mayoral appointments to our Board. It was only at this time I began to consider action due to the dire repercussions this could have on our operations, service to our residents, and possibly our funding from HUD.

- I felt it necessary at this point to seek advice from our MHA Attorney Chuck Stewart about the removal issue and asked that he research this as a part of his regular retainer contract. I then prepared a report, and presented it to you at the March Board meeting. I explained the situation and a resolution was passed to seek a court opinion (declaratory judgment) to determine two issues: can members be removed and who has appointment power? It is, and has always been our position that we are not concerned with who appoints our Board, as long as each appointment is valid and legal. But with two conflicting state laws and two conflicting Attorney General's opinions on the issue, it was obvious that we needed final resolution of these issues and, therefore, I brought the issues to you. We had a roll call vote and the resolution passed.

- The City Council passed a resolution that purported to remove those persons appointed by the Mayor from the board. The activities of the housing authority could be in jeopardy and required reports would not be verifiable as action of an official board. This situation would certainly disrupt the status of the housing authority and could put at great risk our reports, status and possibly funding. However, nothing was filed at that time, as the resolution would not become official until signed by the Mayor. On Friday, April 9, 2004, the Mayor vetoed the resolution. Still nothing had been filed pursuant to your resolution.

McInnish 202

2

- On Saturday, April 10, the *Montgomery Advertiser* reported Rev. Nuckles as saying he would quickly override the veto and the resolution would be passed. At that point, it was obvious that the board and operations of the housing authority could be adversely affected. Since I was scheduled to be leaving on Easter for Washington, I had discussed the case with Mr. Stewart during that prior week and we also discussed alternatives. Mr. Davis was sent copies of emails, and a copy of a draft petition (complaint) for his review. This was one full week before it was filed. On the following Monday, Mr. Davis sent an email stating he had reviewed the complaint and had several suggestions and ideas for the petition. We then scheduled a conference call to discuss the issues and strategy. I left the HUD building in Washington to participate in the conference call and it was my opinion we were successful in our efforts to implement the petition in accordance with the approval we received from HUD and in accordance with your resolution. Several drafts were exchanged between Mr. Stewart, his associates and Mr. Davis over the next several days.

- While still in Washington, I asked that a meeting be scheduled with Mr. Barley and Ms. Long at her office Friday morning, as they were commissioners who had been appointed by the Mayor. Mr. Davis and Mr. Stewart indicated they could be there. Another meeting with Ms. Barnett and Mr. Holmes was scheduled at my office. Mr. Drinkard was not available until after 4:00 on Friday. I received a message that Mr. Taylor had called and said to disregard the message. I sent him an email asking if he called and got no response. I also had a message to call Ms. Upchurch and this message was not returned. I apologize for this, but I was extremely busy at the HUD building and simply forgot to return the call. I always try to return calls and am almost always available by cell phone and email, so this occurrence I deeply regret. I left the HUD offices in Washington and went straight to the airport and returned home at 11:00 p.m. on Thursday evening.

- After our meeting with Ms. Long and Mr. Barley, Mr. Davis and Mr. Stewart made several changes to the petition, and we then left for the housing authority. Mr. Davis and I met with Ms. Barnett and Mr. Holmes at the housing authority. Afterwards, the final paperwork was prepared and Mr. Davis took it to the courthouse to present to the Judge. It took several hours to get the case before the Judge. In the interim, I called Mr. Drinkard's office and left a message with the receptionist to try to call him and get him a message that we were going to file and to call me if he had any questions. He did return my call after 5:00, but I did not get the message until Monday, as I had turned off the cell phone for the weekend.

- On Friday, I wrote each member of the City Council a letter explaining the reasons for the petition and sent them a copy of the papers, a copy of the Supreme Court Case, and a list of accomplishments made by the board. I mailed these to their home addresses so each would receive it over the weekend, and sent each board member a copy of the same material. The petition was filed on that Friday because the City Council had announced a work session on Monday morning and we wanted to give them advance notice of the suit and the Court Order prior to that meeting so they

would not be "ambushed" by a Court Order. I saw several of the council members at the ball games on Friday and Saturday night and again expressed the fact that our petition was not done in an adversarial manner, but was intended to simply get a court ruling as to the question of removal. <u>Nothing was filed to have a determination of who appoints</u>, as the next appointments don't occur until June.

- On Tuesday, it was reported that the Council was going to override the veto and withdraw the removal order. This would have possibly made the petition moot, but we decided we needed a final answer, as without a final determination, the resolution could be revived at another time. Notwithstanding allegations made in the executive session, I never said to dismiss the petition. The fact is that I had told our attorney (Stewart) that we needed a final answer. Therefore, Mr. Davis and I do agree about this matter and we have no conflict.

- In executive session, this case was discussed, but many allegations were made against me that I consider to be an attack on my character. It should be noted that the AG opinion was issued while Wiley Thomas was the Director and before HUD even came to Montgomery to begin their review. The whole issue arose because the City Council would not appoint a resident to the board as required by law. We were in jeopardy of losing funding because of this refusal. It is also important to note that none of the three appointees made by the Mayor voted for my appointment.

If any evidence exists to support the allegations that I "misrepresent things to the Board," that I am "responsible for the AG opinion giving the Mayor the appointment power," that the appointment issue was raised by me only so I "could be named Executive Director," etc., I would appreciate the opportunity to review and respond in an appropriate manner. The facts obviously show that none of this is true and I fail to understand the reason for this attack on my character. I sincerely hope that we can resolve any and all issues that we may have in a conducive manner as this will assuredly help us to continue to conduct the business of housing and to better serve our residents. The integrity of the Board/Authority relationship is vital to our success and must be in place for the sake of our residents and staff.

I met with Mr. Davis and Mr. Stewart Wednesday afternoon to discuss the future implications of our petition. I told Mr. Davis that I would have to request further authorization from HUD for the amendment to the lawsuit to include the appointment powers, in compliance with the HUD Litigation Manual. This will take approximately two weeks, based on prior experience. Mr. Davis indicated to me that his concern was that he was not kept informed ab initio of the lawsuit status. I have committed to him that I will forward him all information, issues, board resolutions and other materials so that he can adequately represent you in the future. I am making copies of the Litigation Manual for Mr. Davis, and we will continue to comply with these rules and regulations.

Please let me know if you have any questions or need any further clarification. It is my intent to continue to work closely with you, the board attorney, our residents, our staff, and our community. I will be more than willing to discuss any of these issues with you so that

we can move forward in our efforts to provide housing and make improvements to our housing authority.

I keep a quotation on my desk to which I refer on a regular basis:

"On some positions, cowardice asks the question, is it expedient?
And then expedience comes along and asks the question, is it politic?
Vanity asks the question, is it popular?
Conscience asks the question, is it right?

There comes a time when one must take the position that it is neither safe nor politic nor popular, but he must do it because conscience tells him it is right." —Dr. King from his last SUNDAY SERMON PREACHED AT THE Washington National Cathedral on March 31, 1968. He was assassinated four days later.

I sincerely feel that it is necessary to protect the Montgomery Housing Authority, its programs and its residents. With all of the conflicting statements, laws, opinions, and assertions, it was necessary in my opinion to bring the suggestion to you that we seek a court opinion. I know this was not a popular, safe nor politic action, but it is right to take such actions.

I will keep you informed on future developments in this case.

Footnote: I will be in Birmingham on Monday through Wednesday of next week at the AAHRA/HUD Spring Workshop. As the Chairperson of the AAHRA Education Committee, I am in charge of the workshop with more than 400 registrants. I will be addressing the entire group on Tuesday about the Harvard study and will be teaching two sessions that day on the new policies we have just implemented. On Wednesday we are hosting a HUD official from Washington who will be discussing the new Audit Procedures. I will be doing a training session for our Section 8 Landlords on Wednesday evening. You are welcome to attend that meeting if you would like. Contact June Belle, 206-7110, if you need more information on this.