

U. S. Department of Housing and Urban Development
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, Alabama 35203-5301

October 31, 2005

Mr. Richard Bollinger
Acting Chairperson
Montgomery Housing Authority
167 Lakeforest Drive
Montgomery, Alabama 36104

Dear Mr. Bollinger:

SUBJECT: ACC Violations

    On November 16, 2004, at a regularly scheduled meeting, the Board of Commissioners of the Montgomery Housing Authority (Board) went into Executive Session. After the Executive Session ended, the Board approved Resolution No. 5266 to suspend Mr. Mickey McInnish, Executive Director, until further notice, with pay, pending a hearing. No reason for the suspension was given nor was the suspension discussed in the Executive Session. On December 24, 2004, Mr. McInnish received a certified letter from the Board's Attorney, Mr. Terry Davis, that contained ten charges that had not been seen or approved by the Board. Subsequent to the suspension, on January 4, 2005, Mr. McInnish filed a Charge of Discrimination against the Board based on a claim that at least two Board members, Mr. John Knight and Ms. Bettie Barnett, discriminated against him because of his race. The Board eventually decided to reach a settlement with Mr. McInnish if he would agree to retire from the Montgomery Housing Authority and drop the discrimination complaint.

    In an effort to determine the validity of Mr. McInnish's discrimination charges, we performed an independent review of the Housing Authority of the City of Montgomery's (herein referred to as the "Authority") Board of Commissioners. The Authority operates under an Annual Contributions Contract (ACC) and other regulatory agreements executed by HUD for its various programs. Such agreements provide detailed requirements for programs, operations, housing, equal employment opportunities, and other Authority matters. Section 4, Mission of the HA, of the ACC contains the following: "The HA shall at all times develop and operate each project solely for the purpose of providing decent, safe, and sanitary housing for eligible families in a manner that promotes serviceability, economy, efficiency, and stability of the projects, and the economic and social well-being of the tenants." Our objective was to review the actions of the Authority's Board of Commissioners for allegations of ACC violations under Section 12, Civil Rights Requirements Parts (A) and (B), and to determine if the Board individually and/or collectively violated other provisions of the ACC.

DEFENDANT'S EXHIBIT 14

To accomplish our objective, we reviewed applicable HUD program requirements, the City and County of Montgomery Personnel Board Rules and Regulations, and other equal employment requirements. We also interviewed various persons including HUD officials, other Housing Authority Executive Directors, a former Board Commissioner, Authority staff and other City officials. Additionally, we reviewed various records, memos, board minutes, correspondence, and EEOC supporting documentation maintained by the Birmingham Field Office. Our review generally covered the initial appointment of Mr. McInnish as interim Executive Director in February 2002 until his suspension in November 2004. We extended our review to include post-events related to Mr. McInnish's suspension.

The Authority is a non-profit corporation created under the Housing Act of 1937 and its primary mission is to provide decent, safe, and affordable housing; to increase homeownership; to support community development; and to increase access to affordable housing free of discrimination. A nine-member Board of Commissioners is appointed to govern the Authority. The Board has a responsibility to the Department of Housing and Urban Development (HUD), the employees of the Authority, and primarily to the residents, to ensure that the Montgomery Housing Authority acts responsibly and in accordance with all applicable legal requirements.

The Authority falls under the Montgomery City and County Personnel Board supervision for employment matters, including personnel issues for merit appointees. The Personnel Rules and Regulations, Section 12, Rights to Review and Appeal, entitles employees to a hearing before any "demotion, dismissal or suspension as to any charges which might cause the employee to be dismissed, demoted, or suspended." You failed to afford Mr. McInnish the opportunity for a hearing. Annual performance evaluations are normally the mechanism used to measure job performance, or the lack thereof. There was no evidence from Mr. McInnish's prior job performance evaluations that reflect insubordination or poor management, the reasons ultimately given by the Board's attorney to suspend him. Although the charges allegedly stemmed from violations committed over several years, we found no evidence of such violations in the Board's official minutes or in Mr. McInnish's annual evaluations prior to his suspension.

Additionally, it appears that certain Authority Board Commissioners exhibited a racial animus against Mr. McInnish. We interviewed several persons who heard certain Commissioners refer to Mr. McInnish in a racial manner and referred to his inability to effectively manage the Authority because of his race. The Authority's residents are predominantly African-American, while Mr. McInnish is Caucasian. Commissioner John Knight was heard on several occasions referring to Mr. McInnish's race in a derogatory manner. For instance, during a July 24, 2002 radio broadcast, Commissioner Knight was heard making reference to Mr. McInnish's race and the need for the Authority to have an African-American Executive Director. In like manner, during a November 2003 NAHRO conference, Authority Residential Commissioner, Bettie Barnett, was quoted as referring to Mr. McInnish's skin color as the basis for him not being fully successful at the Authority. We noted in the official November 16, 2004 Board Executive Session minutes that Commissioners Knight and Barnett initiated and seconded the motion to suspend Mr. McInnish, respectively. This gives the appearance that racial animus contributed to Mr. McInnish's suspension.

NOV 04 2005 17:32 FR                                    334 TO 2790362         P.04/04

The Authority's Board of Commissioners violated the ACC provision for nondiscrimination. Specifically, ACC Section 12, Civil Rights Requirement, requires that housing authorities shall not discriminate against any employee or applicant because of race, color, religion, sex, disability, age, or national origin. Additionally, the provisions require that all housing authorities shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to race, color, religion, sex, disability, age, or national origin. However, it appears the Board intentionally disregarded such provisions by suspending Mr. McInnish without proper cause and in doing so, caused financial loss to the Authority, thereby violating Section 4 of the ACC. From the time Mr. McInnish was suspended on November 16, 2004 to date, the Authority has paid him in excess of $157,000, including benefits and salary. These funds have been paid without receiving any benefit and without HUD's approval. When one includes the legal fees involved, considerable additional expense has been incurred as a result of the Board's actions. It is clear to HUD that the actions of the Board were not justified by the facts and caused undue hardship for the residents, the Authority, and Mr. McInnish.

As early as April 2004, Mr. McInnish complained to the Board about the discrimination against him, yet the Board took no action. Given the facts, the Board's suspension of Mr. McInnish was not justifiable in view of his job performance. Commissioners are given the responsibility to perform the necessary job evaluations and to take corrective actions as necessary. Such an approach in this instance could have resolved the issue without protracted controversy and expensive litigation. However, the Board of Commissioners took an approach that violated federal requirements as well as the Board's own policy.

Under the provisions of the ACC and HUD regulations, HUD has remedies available to address the Board's apparent violations of Sections 4 and 12 of the ACC. These include sanctions ranging from a Limited Denial of Participation (LDP) to an indefinite debarment, and declaring the Montgomery Housing Authority in default of the ACC. However, before exercising any of the options available, HUD elected to give the Board an opportunity to provide evidence that you consider exculpatory or mitigating. Please provide a response to me by November 11, 2005.

Sincerely,

R. Edmond Spraybery

R. Edmond Spraybery
Director
Office of Public Housing

Cc: Charles W. Jinright
    Lane Boggs
    All Commissioners

FROM                                    (THU)SEP 21 2006 3:20/ST. 3:18/NO. 6390103262 P 4