IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TERRY G. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:05-cv-1235-MHT |
| | ) | |
| R. EDMOND SPRAYBERRY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT McINNISH'S RESPONSE TO PLANTIFF'S INTERROGATORIES TO DEFENDANTS C. MICHAEL McINNISH, HOUSING AUTHORITY OF THE CITY OF MONTGOMERY, ALABAMA AND LUAN LONG

COMES NOW, Defendant C. Michael McInnish (hereinafter "Defendant McInnish"), and responds to Plaintiff's Interrogatories as follows:

### GENERAL OBJECTIONS

1. Defendant McInnish objects to any and all discovery requests to the extent that they are vague, overly broad, unduly burdensome, harassing and not calculated to lead to the discovery of admissible evidence.

2. Defendant McInnish objects to any and all discovery requests to the extent that they seek information protected from discovery by any privilege, including the attorney/client privilege, the attorney-work product doctrine or any other applicable privilege or immunity.

3. Defendant McInnish objects to any and all discovery requests to the extent that they require Defendant McInnish to prepare Plaintiff's case, and to determine what

1

Plaintiff should deem relevant to, supportive of or pertinent to certain claims and allegations; as such, the discovery requests are not a proper method of discovery.

4.  Defendant McInnish objects to any and all discovery requests that are not reasonably limited in time and/or scope.

These "General Objections" are applicable to and incorporated into each of Defendant McInnish's responses, infra, as if specifically stated therein. The stating of specific objections to a particular request shall not be construed as a waiver of Defendant McInnish's "General Objections." Unless otherwise specifically stated, Defendant McInnish's objections to each discovery request applies to the entire request, including each and every subsection and/or subpart of the request.

## INTERROGATORIES

### INTERROGATORY NO. (1):

For each person providing answers to these interrogatories, please state the name, title and address.

**RESPONSE: C. Michael McInnish c/o Sabel & Sabel, P.C., 2800 Zelda Road, Suite 100-5, Montgomery, Alabama 36106.**

### INTERROGATORY NO. (2):

Please state in detail and with specificity the process for selection of attorneys to perform legal services for 2003 and 2004.

**RESPONSE: Defendant McInnish refers Plaintiff to his Initial Disclosures, Exhibits 13, 14, 48, 50, 61 (McInnish 273-294), 62 (McInnish 294-295) and 63 (McInnish 296-301). The**

2

Montgomery Housing Authority ("MHA") sent out a Request for Proposal ("RFP") in August/September 2002 for work to be performed in 2003/2004. Defendant McInnish invited the MHA Board to review the responses to the RFPs. The RFPs then were delivered to the Personnel Committee of the Board. The Personnel Committee reviewed the RFPs and prepared a resolution to hire Terry G. Davis of Davis & Hatcher as the Board attorney, to hire Bradley Arant Rose & White, LLP ("Bradley Arant") as the MHA attorney, and to hire John Holloway's firm as the collection/eviction attorney. The resolution was adopted by the Board. Accordingly, contracts were entered between MHA and the three law firms.

**INTERROGATORY NO. (3):**

Please describe in detail and with specificity the process utilized for determining what hourly rate would be paid to attorneys by the Montgomery Housing Authority.

**RESPONSE:**   To the best of my recollection, the Holloway firm was paid a set fee of $75.00 per eviction. This included the entire eviction process. MHA did most of the paperwork in these cases, but a fee for filing of $35.00 and a court appearance fee were paid to the best of my recollection. The MHA has the applicable records and can provide a more accurate answer. Davis & Hatcher and Bradley Arant Rose & White included their requested rates in the responses to the RFP. Plaintiff's RFP requested a monthly retainer fee of $1,500.00, hourly rate of $185.00 (in court $195.00) for Plaintiff, and $150.00 (in court $160.00) for his associates. Plaintiff also stated that his "hourly rate and monthly retainer are negotiable." (*See* Exhibit 61, p. 292 of Defendant McInnish's Initial Disclosures.) The Board authorized me to negotiate with Plaintiff. In a conversation with Plaintiff, I explained that board meetings are normally one to two hours per month and

3

that preparation for the board meeting would probably take no more than an hour. I also said that I had charged $90.00 per hour when I performed the same job for MHA. Plaintiff and I agreed upon an hourly rate of $175.00 to be paid for work done by Plaintiff's firm and a $1,000.00 per month retainer fee. Plaintiff seemed satisfied with the agreement. Plaintiff was paid in accordance with the agreement for over a year without complaint. I also had a conversation with Charles Stewart of the Bradley Arant firm about reducing the hourly rates contained in his firm's RFP. He said that the rates were firm prices, but he did agree to reduce the retainer request from $1,500 to $1,000 per month. He stated that he would make every effort not to exceed that amount. I performed a substantial amount of legal work in-house without referring it to the Bradley Arant firm. Bradley Arant also donated some of its time. Race was never discussed in any conversations regarding attorney fees or otherwise and was not a factor in setting hourly rates. Further, the Bradley Arant firm is not an all white firm. The Board passed a resolution to hire Bradley Arant, and Plaintiff and Bradley Arant entered into contracts with MHA accordingly. Monthly fees increased upon the filing of the lawsuit about the appointment of commissioners to the MHA Board – an unusual and unanticipated circumstance. This lawsuit was filed after a resolution was passed by the Board to commence the proceedings. Plaintiff had a representative at the board meeting when this resolution was passed and no criticism was made either at that meeting or before Plaintiff filed the lawsuit.

### INTERROGATORY NO. (4):

Please describe in detail and with specificity your discussions regarding hourly rates with:

4

    (a)    Charles Stewart

    (b)    Terry Davis

**RESPONSE:** Defendant McInnish incorporates his response to Interrogatory No. 3, above.

**INTERROGATORY NO. (5):**

Please provide a list of each legal matter, along with a brief description of each matter handled by Charles Stewart or any member of the law firm of Bradley, Arant, Rose and White, LLP, between January 1, 2000 and December 31, 2004.

**RESPONSE:** Defendant McInnish objects to this Interrogatory to the extent that it is directed to him. Defendant McInnish further objects to the extent that the request is overly broad and unduly burdensome. Defendant McInnish further objects because an answer to this Interrogatory requires reference to records not in his custody or control and seeks information more easily obtained from other sources. Without waiving the objection, Defendant McInnish states as follows: I would refer matters which I believed to involve policy issues to Plaintiff. For example, when Chief Reggie Davis of the MHA Investigations Unit requested an opinion about a legal issue for the MHA police officers, I referred the inquiry to Plaintiff. After Plaintiff failed or refused to respond to the inquiry, it was referred to Bradley Arant, which responded by the next day. I cannot recall the details, but I referred another policy issue to Plaintiff which involved seeking an opinion about compliance with the Code of Federal Regulations. Plaintiff did not respond and the matter was later sent to Bradley Arant and a timely response was received. Bradley Arant handled a number of personnel hearings for MHA. If a lawsuit was filed against MHA, notice was sent to the MHA insurer. Bradley Arant would provide legal work related to these lawsuits and its billings would go directly to the insurer. Without insurance company

records and Bradley Arant billings to the insurance company, I am unable to create the list of legal matters requested.

## INTERROGATORY NO. (6):

Please produce and make available for copying and inspection each contract for legal services performed on behalf of the Montgomery Housing Authority between January 1, 2000 to the present date.

**RESPONSE:**  **Defendant McInnish objects to this request to the extent that these contracts are MHA records and the request should be directed to it.  Without waiving the objection, Defendant McInnish states as follows:  Other than documents provided in the Initial Disclosures, there are no responsive documents in my possession.**

## INTERROGATORY NO. (7):

Please describe your efforts in obtaining approval of the Board of Commissioners and HUD to obtain authorization to file a lawsuit against the City Council of the City of Montgomery regarding appointment of Commissioners.

**RESPONSE:**  **I brought the issue to the MHA Board's attention when Board member, John Knight, whose term was about to expire, sought and obtained an Attorney General's Opinion reversing a prior Attorney General's Opinion which had given the Mayor the power to appoint MHA board members rather than the City Council.  The Mayor had made five appointments to the MHA Board, including the appointment of an MHA resident, which is a HUD requirement.  I was concerned because it was unclear where the appointment power lay.  There are two conflicting attorney general opinions and two conflicting state laws pertaining to the subject.  Uncertainty as to the legal standing of the board members could affect MHA operations and funding by HUD, and consequently,**

6

MHA's ability to function. I had no interest in which entity, the Mayor or the City Council, was finally declared to be the appointing authority. My interest, as MHA Executive Director, was only that the actions of the Board be legally binding. When I received word that the Montgomery City Council planned to remove the MHA board members appointed by the Mayor, MHA had to act quickly to prevent disruption of its operations. I brought a resolution to the Board and it was adopted. Plaintiff's firm was represented at the board meeting and no objection was made to the resolution. I wrote a letter to HUD in reference to the appointment power issue to keep them informed and to follow the HUD Litigation Manual. Plaintiff filed a lawsuit against the City Council and obtained a temporary restraining order. He was involved in drafting the lawsuit, meetng with me and board members, and attempting to negotiate a settlement of the case. MHA had $10,000 that could be approved for payment of attorney fees regarding such a lawsuit. I had to go to HUD to request additional money once Plaintiff became involved and two attorneys were working on the case. I could not pay either firm until I had HUD's approval. I also refer Plaintiff to my Initial Disclosures, Exhibits 25-29, 31, 33-38, 43-48, 50, 61-83.

### INTERROGATORY NO. (8):

Please describe in details and with specificity each and every discussion you had with representatives of the Housing Authority Insurance Group regarding employment of counsel and litigation involving appointment of Commissioners in 2003 and 2004.

RESPONSE:  When a lawsuit is filed against MHA, the procedure is to have the MHA staff notify the insurer to determine if there is coverage. In the litigation involving appointment of commissioners in 2003 and 2004, that procedure was followed. MHA sent a

letter to the insurer after the City of Montgomery filed a counterclaim and asked if there was coverage. Plaintiff was the person who originally said that the City of Montgomery might file a Quo Warranto action. Plaintiff made this statement before he filed the suit. I do not recall discussions with the insurer about the litigation involving the appointment of commissioners during 2003 and 2004. From time to time, I have received telephone calls from Stephanie Warner about the status of various cases, including the commissioner case. I did notify Warner prior to filing the initial lawsuit in that case that it would be filed. I also told her that if the City filed a counterclaim that I would come to the insurer to determine if there was coverage. I can remember no other specifics of the conversation. Once the insurance company designated Mr. Stewart as its attorney in that case, I recall no further conversations with the insurer about the case.

**INTERROGATORY NO. (9):**

Please produce and make available for copying and inspection any contract with Scott B. Smith, Timothy Cummins or Tammy Turner Brown to perform legal services between April 1, 2004 and July 28, 2004.

**RESPONSE:** All documents Defendant McInnish has in his possession or under his control which may be responsive to this request have been produced in his Initial Disclosures.

**INTERROGATORY NO. (10):**

Please produce and make available for copying and inspection each invoice for legal services performed on behalf of the Montgomery Housing Authority between January 1, 2000 and December 31, 2004.

**RESPONSE:**   All documents Defendant McInnish has in his possession or under his control which may be responsive to this request have been produced in his Initial Disclosures.

## INTERROGATORY NO. (11):

Please provide for copying and inspection each and every email, letter, report or written communication from C. Michael McInnish to R. Edmond Sprayberry or Barbara Etheridge between January 1, 2004 and December 31, 2004.

**RESPONSE:**   All documents Defendant McInnish has in his possession or under his control which may be responsive to this request have been produced in his Initial Disclosures.

## INTERROGATORY NO. (12):

Please describe in detail and with specificity the process for obtaining approval of the Regional Director, specifically R. Edmond Sprayberry, regarding contracts of counsel to perform legal services.

**RESPONSE:**   Because of actions that occurred at MHA before I became Executive Director, HUD, for a time, required approval for all MHA contracts. This requirement extended into the period of time after I became Executive Director. After HUD became confident in my management abilities, the requirement was relaxed, and I was never asked to provide approval for contracts of counsel for legal services. It is my understanding that HUD began to again scrutinize MHA contracts at a point after I was suspended as Executive Director.

## INTERROGATORY NO. (13):

Please describe in detail and with specificity, each and every conversation and communication between C. Michael McInnish and R. Edmond Sprayberry or Barbara Etheridge between November 1, 2004 and December 31, 2005.

RESPONSE: **On November 26, 2004, I attended the funeral of Mr. Sprayberry's father. I went through the receiving line and stated that I was sorry to hear about his Dad. In December of 2004, I attended a State Housing Authority Director's Banquet. My singing group was performing at the event. I saw Mr. Sprayberry and we exchanged the usual pleasantries. On April 19, 2005, I attended a Housing Authority workshop in Birmingham. I saw Mr. Sprayberry and we exchanged greetings. In July 2005, I attended the AAHRA summer convention. Again, Mr. Sprayberry was in attendance and we exchanged greetings. I provided him a copy of a program that I was presenting at the event concerning project-based accounting and management. On October 25, 2005, I attended a Housing Authority fall workshop where Mr. Sprayberry and I exchanged greetings. Pursuant to MHA's request and as part of the Settlement Agreement (McInnish Initial Disclosures, Exhibit 145). I met with Mr. Sprayberry and asked that he approve the Settlement Agreement. There may have been an email preceding that meeting stating that I was on my way to meet with him.**

## INTERROGATORY NO. (14):

Describe in detail and with specificity, each and every conversation and communication between C. Michael McInnish and Lu Ann Long between November 15, 2004 and December 31, 2005.

**RESPONSE:**  On November 15, 2004, I met with Ms. Long and other commissioners at Tulane Court to do a walk-through. The only other time I saw Ms. Long during that time period was at a CVS store on Vaughn Road on or about late December 2004 or early January 2005. I went to CVS to pick something up and saw Ms. Long and we exchanged pleasantries. I greeted Ms. Long, she responded and then stated that perhaps we should not talk. I stated that she was my friend and I just wanted to say "Hello" to her. We had no substantive conversation.

**INTERROGATORY NO. (15):**

Describe in detail and with specificity, each and every conversation or communication between C. Michael McInnish and Richard Bollinger between November 15, 2004 and December 31, 2005.

**RESPONSE:**  On November 15, 2004, I met with Mr. Bollinger together with other commissioners at Tulane Court for a walk-through. On November 17, 2004, the day after I was suspended by the MHA Board, Mr. Bollinger called me to state that he was sorry and that he did not know it was going to happen. To the best of my recollection, Mr. Bollinger called me after the December 2004 MHA board meeting, but before I received any charges against me from the Board. He stated he called to check on me. I stated that I have not received any charges. I do not specifically recall further details of the conversation. I saw Mr. Bollinger regularly on Fridays at the Rotary Club meetings. Generally, we exchanged pleasantries. However, when I was Executive Director we would often discuss MHA operational matters. I do remember explaining "project phase conversions" to him and speaking to him about some of the MHA contracts that were in process. We discussed other Housing Authority business from time to time, the details of which I do not recall. I

11

do not recall any conversations related to attorney fees We also at times played golf together and obviously would converse, but I do not remember the details.

## INTERROGATORY NO. (16):

Please produce and make available for copying and inspection an and all written communications from R. Edmond Sprayberry relating to the Board of Commissioners' action on December 21, 2004 to employ Terry G. Davis as legal counsel.

**RESPONSE:** Defendant McInnish objects to the Interrogatory as it is better directed to other parties. Defendant McInnish was suspended from his position as Executive Director at the time. Without waiving the objection, any documents related to this matter in the possession of Defendant McInnish would be contained in his Initial Disclosures.

## INTERROGATORY NO. (17):

Please state whether payment or invoice submitted by Charles Stewart or any attorney performing legal work was withheld for any reason for at least five (5) months. If your answer to this interrogatory is in the affirmative, please provide the following:

    (a)    A detailed explanation for the delay in payment;

    (b)    A copy of each invoice submitted.

**RESPONSE:** Defendant McInnish objects to this Interrogatory as it is better directed to other parties. MHA or its insurer will more likely have the necessary documentation from which to provide an answer. Without waiving the objection, Defendant McInnish states as follows: I could not pay Plaintiff or Mr. Stewart without HUD approval regarding the litigation about the appointment of commissioners after two attorneys began work on behalf of MHA and it became clear that the MHA budget would have to be amended to provide such payment. Without a review of all relevant documents, I am without sufficient

12

information to admit or deny that any invoice submitted by attorneys were withheld for five months or more. I can say that I never delayed payment for legal work without having a legitimate, non-discriminatory reason for doing so. Please see my response to Interrogatory 7 containing references to my Initial Disclosures for related information.

## INTERROGATORY NO. (18):

Please state in detail and with specificity, why the Board of Commissioners authorized Terry Davis to conduct an inquiry into legal services being performed on behalf of the Montgomery Housing Authority.

**RESPONSE:** Defendant McInnish objects to Interrogatory No. 18 to the extent that the question should be directed to the Board of Commissioners as to if or why such an inquiry was authorized. Without waiving the objection, I do recall that there was an executive session of the Board on or about July 20, 2004, initiated by Plaintiff, at which he falsely stated that he had not been involved in a lawsuit against the Montgomery City Council even though he had filed the lawsuit. I am not aware of what occurred before or after that meeting or any resolution authorizing the Plaintiff to conduct the inquiry. I do know that Plaintiff came to my office and in a hostile manner requested that I provide him with all bills and documents regarding attorney fees. In Defendant McInnish's Initial Disclosures, Exhibit 61, the issue of attorney fees are discussed and Exhibit 62 contains Plaintiff's questions concerning attorney fees. I responded to Plaintiff's questions in my Initial Disclosures, Exhibit No. 63. My Initial Disclosures, Exhibits 65-82, contain related information.

13

## INTERROGATORY NO. (19):

Please produce and make available for copying and inspection copies of any and all questions submitted by Terry G. Davis and responses from C. Michael McInnish regarding an inquiry relating to legal services being performed on behalf of the Montgomery Housing Authority.

**RESPONSE: See response to Interrogatory No. 18.**

## INTERROGATORY NO. (20):

Please list in detail and with specificity each conversation between C. Michael McInnish and Terry G. Davis regarding the Board's inquiry relating to legal services being performed on behalf of the Montgomery Housing Authority.

**RESPONSE: See response to Interrogatory No. 18. In addition to the information contained in the documentation referred to above, I remember Plaintiff coming to my office in a hostile manner requesting all bills and documents regarding attorney fees. He claimed he was going to submit a report to the Board, but I am not aware of any written results of the investigation provided to the Board. Plaintiff did not like the answers I was giving him, because I insisted that we had to follow HUD guidelines and get its approval in order to pay Plaintiff's bills. He made some pejorative statements about me. The gist of Plaintiff's conversation with me and the apparent cause of his anger centered on the delay in payment of his attorney fees. As the documentation demonstrates, I explained to Plaintiff, on a number of occasions, the reasons that HUD approval was required.**

## INTERROGATORY NO. (21):

Please state whether C. Michael McInnish had authority from each member of the Board of Commissioners to file a lawsuit against the Montgomery City Council regarding appointment

14

of Commissioners. If your answer to this interrogatory is in the negative, please explain your answer fully providing detail and specificity.

**RESPONSE: I was authorized by Board resolution to file a lawsuit against the Montgomery City Council regarding appointment of commissioners. Plaintiff's associate was present at the meeting and had no objection. Plaintiff raised no objection while he was being consulted by Mr. Stewart and raised no objection before he filed the lawsuit.**

**INTERROGATORY NO. (22):**

Please provide for copying and inspection each and every rule, regulation, procedure or process relied upon by C. Michael McInnish for soliciting and contracting attorneys to provide legal services on behalf of the Montgomery Housing Authority. Please include any HUD regulation or Code of Federal Regulations.

**RESPONSE: Defendant McInnish objects to this request to the extent it seeks documents equally accessible to Plaintiff. Without waiving the objection, Defendant McInnish refers Plaintiff to the HUD Litigation Handbook ("Litigation Guide") and the RFPs sent out by MHA contained in the Defendant McInnish's Initial Disclosures.**

**INTERROGATORY NO. (23):**

Please provide for copying and inspection any and all correspondence, emails, documents or communication, whatever with any person, that is not subject to the attorney-client privilege, relating to the settlement terms of the settlement of the employment claim of C. Michael McInnish against the Housing Authority of the City of Montgomery, Alabama.

**RESPONSE: See Defendant McInnish's Initial Disclosures, Exhibit 145.**

**INTERROGATORY NO. (24):**

Please state in detail and with specificity all the terms of the settlement terms of the employment claim of C. Michael McInnish against the Housing Authority of the City of Montgomery, Alabama, including the payment of attorney fees, continued payments by the Montgomery Housing Authority, time credited toward retirement or any other terms.

**RESPONSE:** **See Defendant McInnish's Initial Disclosures, Exhibit 145.**

**INTERROGATORY NO. (25):**

Please state in detail and with specificity the sources of all payments of funds relating to the terms of the settlement of the employment claim of C. Michael McInnish against the Housing Authority of the City of Montgomery, Alabama. Please include the following:

      (a)     The name of the funding agency, entity or company.

      (b)     The name of the executive or executives who approved the payment.

**RESPONSE:** **MHA and its insurer. The check for attorney fees came from the insurer. Defendant McInnish has insufficient information to state the name or names of the executive or executives who approved payment.**

**INTERROGATORY NO. (26):**

Please state in detail and with specificity any and all involvement by R. Edmond Sprayberry to the terms of the settlement of the employment claim of C. Michael McInnish against the Housing Authority of the City of Montgomery, Alabama. Please include any or approval given or objections raised.

**RESPONSE:** **After the agreement was reached and as part of the agreement, I met with Mr. Sprayberry as per my response to Interrogatory No. 13. MHA attorneys asked that I cooperate to in attempting to obtain that approval and to deliver a copy of the agreement.**

16

Thereafter, I met with Mr. Sprayberry and gave him a copy of the Settlement Agreement.

I asked him to approve the settlement. I am aware that my attorney wrote to Mr.

Sprayberry seeking his approval of the Settlement Agreement. The reason we approached

Mr. Sprayberry is that the attorneys involved in settlement negotiations thought, at the

time, that the HUD Litigation Guide required HUD approval of any settlement.

Respectfully submitted this the 13th day of July, 2006.

M. Wayne Sabel (SAB002)
Maricia Woodham (BEN050)
Mark W. Sabel  (SAB004)
Sabel & Sabel, PC
Attorneys for the Defendant
C. Michael McInnish

**SABEL & SABEL, PC**
Hillwood Office Center
2800 Zelda Road, Ste. 100-5
Montgomery, Alabama 36106
Telephone:    (334) 271-2770
Facsimile:    (334) 277-2882

17

I, C. Michael McInnish, state that the foregoing is true and correct to the best of my knowledge, information and belief.

_____
DEFENDANT C. MICHAEL McINNISH

SWORN TO AND SUBSCRIBED before me this 13th day of July, 2006.

_____
NOTARY PUBLIC
My Commission Expires: 5-2-09

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the following counsel of record by facsimile and by placing a copy of same in the United States Mail, postage prepaid and properly addressed, this 13th day of July, 2006.

Dwayne Brown, Esq.
Law Office of Dwayne L. Brown, PC
Post Office Box 230205
Montgomery, Alabama 36123-0205

Dorman Walker, Esq.
Balch & Bingham
Post Office Box 78
Montgomery, AL 36101

Charles A. Stewart, III, Esq.
Bradley Arant Rose & White, LLP
401 Adams Avenue, Suite 780
Montgomery, AL 36104

18

Michael Cohan, Esq.
Hill, Hill, Carter, Franco, Cole & Black
Post Office Box 116
Montgomery, AL 36101-0116

James DuBois, Esq.
U. S. Attorney's Office
Post Office Box 197
Montgomery, AL 36101

M. Wayne Sabel

19