IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TERRY G. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:05-cv-1235-T |
| | ) | |
| R. EDMOND SPRAYBERRY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM BRIEF IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT OF C. MICHAEL MCINNISH

COMES NOW Defendant C. Michael McInnish (hereinafter "McInnish"), in his individual capacity, and pursuant to Federal Rule of Civil Procedure 56, submits this Memorandum Brief in support of his Motion for Summary Judgment. Because there is no genuine issue as to any material fact, McInnish is entitled to summary judgment. Defendant McInnish's brief relies upon the facts, grounds and authority stated herein, the jointly filed and supplemental evidentiary submissions submitted contemporaneously with this brief, and McInnish's motion for summary judgment filed herewith.

## I.    INTRODUCTION

### A.    CONTEXTUAL BACKGROUND

On November 30, 2001, the Defendant Housing Authority of the City of Montgomery, Alabama ("MHA") was required by Defendant United States Department of Housing and Urban Development ("HUD") to obtain prior HUD approval of all MHA procurement actions due to serious irregularities found by a HUD audit. DEX 124. At the time, McInnish was widely recognized for his expertise in public housing issues. In

order to get out of trouble with HUD, which provides almost all of its funding, the MHA forced the retirement of its Executive Director, and hired McInnish as Interim Executive Director to replace him.  By February 27, 2002, McInnish had satisfied HUD that the MHA was in compliance with HUD requirements, its policies strengthened, and its operations enhanced.  As a result, HUD sanctions requiring procurement review were removed.  DEX 127 (February 27, 2002 Letter from Mark Heatom (HUD) to McInnish).

Thereafter, the opposition to a Caucasian MHA Executive Director surfaced and McInnish became reluctant to accept the position on a permanent basis because of it.  He was encouraged to take the position and agreed to do so.  DEX 130 (McInnish 016)(6-12-02 Letter from McInnish to the MHA Personnel Committee).  On June 25, 2002, McInnish was made permanent Executive Director.  DEX 131 (Memo from MHA Chairman Holmes to Employees).  Shortly thereafter he infuriated one powerful Board member when he uncovered a slush fund at the MHA and reported it to HUD.  DEX 135 (9-11-02 Letter re County Commission Account) and DEX 136 (9-12-02 Memo from McInnish to MHA Board).  Soon several African American members of the Board began to attack McInnish on the basis of race.

Nevertheless, McInnish performed his job on an exceedingly high level and in 2003 was voted Alabama Executive Director of the year.  DEX 104 (7-30-03 Memo from McInnish to Taylor re Award).   On April 23, 2004, his performance rating was satisfactory and he received a raise.  DEX 138 (MHA Employee Performance form).  On the same day, McInnish was forced to make a written race discrimination complaint to the Board.  McInnish complained that he was "repeatedly" subjected to racial discrimination.  DEX 20 (McInnish 201-202).  Meanwhile, The Montgomery Chamber of

Commerce was pushing for the MHA to sell the Riverside Heights Housing Project to the City of Montgomery and the U.S. Air Force without regard to the best interests of the MHA residents.  The Chamber was vigorously represented by at least one white MHA Board member.  The Board member feared that McInnish was an obstacle to the sale because the interests of the MHA residents were his priority.  Yet he made every effort to facilitate the sale within HUD guidelines which require that the interests and needs of the residents take precedence over those of the Chamber, the City, the Air Force or any other third party.

On November 16, 2004, McInnish was placed on administrative leave without notice and with no reason given.  Lemuel Boggs was named Interim Executive Director.  DEX 46 (McInnish 603-605) (Minutes of 11-16-04 MHA Board Meeting).  This action was initiated by two African American Board members that had made negative comments about McInnish's race.  When HUD officials sought to learn the reason for McInnish's suspension, the Board Chairman refused to provide HUD the information.  DEX 48 (11-17-04 Letter from Taylor to Sprayberry); DEX 49 (11-18-04 Letter from Sprayberry to Taylor); DEX 56 (1-14-05 Letter from Sprayberry to Taylor).  HUD was forced to require a  prior review of all MHA procurement transactions.  DEX 68.  (11-18-04 Letter from Sprayberry to Boggs).

Plaintiff Terry G. Davis ("Plaintiff" or "Davis") was Board counsel and deeply involved in the effort to terminate McInnish's employment.  He launched an investigation of McInnish after McInnish was suspended and made ten baseless charges of misconduct against him.  McInnish immediately refuted all the charges.  DEX 47 (McInnish 676-681) (Response to Charges).  On January 4, 2005, McInnish filed an EEOC charge of race

discrimination and retaliation against the MHA and its Board. In the charge he described the adverse actions taken against him by the Plaintiff and two African American Board members. DEX 55 (McInnish's EEOC charge). Because of the refusal by MHA to provide requested information or follow HUD litigation guidelines, HUD was unable to approve MHA's request for funds to finance the investigation of McInnish. DEX 58 (1-27-05 Letter from Sprayberry to Boggs).

Eventually, McInnish and MHA reached a settlement of the issues between them. McInnish retired and received substantial benefits. (DEX 200) (settlement agreement). The road to settlement was rocky because after McInnish and the MHA through Plaintiff had agreed to the settlement terms, subject to HUD approval, the MHA Board Chairman demanded that HUD not approve the settlement unless it simultaneously approved a $65,000 fund for Plaintiff's benefit. DEX 59 (2-3-05 Letter from Taylor to Sprayberry); DEX 61 (2-9-05) Letter from Sabel to Plaintiff). HUD refused to approve a settlement because no reason was given by MHA as to why McInnish should not be reinstated. Nevertheless, the matter settled without HUD approval. All charges against McInnish were dismissed and he withdrew his EEOC charge against the MHA. DEX 200.

On October 31, 2005, HUD issued a report as a result of its investigation of the MHA. HUD found that certain MHA Board members "exhibited racial animus against Mr. McInnish" by referring to him in a racial manner and by referring to "his inability to effectively manage the Authority because of his race." One Board member referred to McInnish's skin color, white, as the reason that he could not be successful and another stated that the MHA needed an African American Executive Director. HUD found that the MHA had violated McInnish's civil rights. HUD found that the Board took no action

in the face of McInnish's complaints about discrimination and that its action to suspend him "was not justifiable in view of his job performance." DEX 74 (10-31-05 Letter from Sprayberry to Bollinger).

It is in this context that Plaintiff has filed this lawsuit claiming that McInnish discriminated against him. Plaintiff wants McInnish to pay for the time Plaintiff spent investigating McInnish after McInnish had left the MHA on administrative leave. Plaintiff's case is baseless and without any evidence to support it. Plaintiff's case does not deserve a trial due to the total lack of evidence or legal support and fails as a matter of law.

### B.    PLAINTIFF'S ALLEGATIONS

In his Second Amended Complaint, Plaintiff presents four causes of action: "Breach of Contract" (First Cause of Action); "Race Discrimination and Due Process" (Second Cause of Action); "Conspiracy" (Third Cause of Action); and Race Discrimination and Constitutional Violations" (Fourth Cause of Action). (Second Amended Complaint at pp.8-10). Plaintiff's First Cause of Action is a state law contract claim based on Defendant's alleged "refusal to pay Plaintiff for services rendered as general counsel" for the Montgomery Housing Authority. Plaintiff alleges breach of a written contract with the MHA and, alternatively, "damages under a theory of quantum meriut." He alleges that he is owed $25,000 plus interest, court costs, and attorney's fees under this cause of action.

Plaintiff's Second Cause of Action alleges that "Defendants actions constitute discrimination by reason of race and in violation of Plaintiff's rights guaranteed under the due process clause and property rights of the Fifth Amendment, First Amendment, and

the Thirteenth Amendment to the Constitution of the United States and 42. U.S.C. §1983." Pursuant to this cause of action, Plaintiff requests that the Court order "Defendants to employ plaintiff in the position of general counsel for the MHA plus award back pay, punitive damages in the amount of $500,000, plus costs, attorney's fees…" (Second Amended Complaint, pp.8-9).

Plaintiff's Third Cause of Action claims that "Defendant Sprayberry, McInnish and Long conspired against Mr. Davis in violation of his rights under the Federal Tort Claims Act." Plaintiff demands $25,000 in compensatory damages, costs and attorney's fees under this cause of action. (Second Amended Complaint, p. 9)

Plaintiff's Fourth Cause of Action alleges that "Sprayberry's actions constitute intentional discrimination by reason of race and in violation of Plaintiff's rights guaranteed by the due process clause and property rights of the Fifth Amendment, First Amendment and Thirteenth Amendment to the Constitution of the United States and 42 U.S.C. §1983." (Second Amended Complaint, p. 9). According to Plaintiff's deposition testimony, this cause of action is directed at Defendant Sprayberry and its reference to 42 U.S.C. §1983 is merely duplicative of the Second Cause of Action as to other Defendants. Deposition of Terry G. Davis (Davis Depo) Vol. III, p.146, l.17-18). Therefore, this cause of action will not be addressed by McInnish.

In addition to the four causes of action alleged by Plaintiff, the Second Amended Complaint references the "Equal Pay Act" as a basis for this Court's jurisdiction in this case. (Second Amended Complaint p. 11). Plaintiff alleges in the body of the Second Amended Complaint that Defendants McInnish and Sprayberry "violated Plaintiff's constitutional rights to equal pay." As the Equal Pay Act applies to gender

discrimination, these are confusing allegations and McInnish declines to guess at their meaning. This Second Amended Complaint is Plaintiff's third complaint.

B.     The Race Discrimination Claim, Due Process Claim, and First Amendment Claim

In his second cause of action, Plaintiff claims that he has been discriminated against based on his race, African American, and that his rights have been violated under the "due process clause and property rights of the Fifth Amendment, First Amendment, and, Thirteenth Amendment and 42 U.S.C. §1983."

Plaintiff alleges a series of actions on the part of Sprayberry, allegedly in a conspiracy with McInnish and Long, which allegedly violate Plaintiff's due process and property rights. (Second Amended Complaint, ¶¶s 10-15). Strangely, none of the numerous allegations constitutes actionable harm to Plaintiff. Plaintiff alleges McInnish was suspended as Executive Director on November 16, 2004, because he withheld information from the MHA Board to prevent the City of Montgomery from purchasing the Riverside Heights Housing Development and that he made an undisclosed trip to Washington, D.C. (Second Amended Complaint ¶10). Plaintiff alleges that on November 17, 2004, Plaintiff was directed to investigate McInnish by the MHA Board chairman. Id. at ¶11. Plaintiff alleges that on December 23, 2004, he made 10 charges of misconduct against McInnish, a recommendation was made to terminate McInnish's employment, and a disciplinary hearing date was set. Id. at ¶12.

Plaintiff alleges that on November 17, 2004, upon information and belief, McInnish contacted Sprayberry to solicit his assistance because he had been suspended. Plaintiff alleges Sprayberry asked Board chairman Taylor why McInnish was suspended. Taylor referred Sprayberry to Davis, but Sprayberry did not contact Davis. Id. at ¶13.

Plaintiff alleges that Sprayberry and McInnish are friends and that McInnish has influence with HUD. Plaintiff alleges that Sprayberry conspired with McInnish "to both use their influence with HUD to violate Plaintiff's constitutional rights and impede the investigation of McInnish and terminate the MHA's and Davis' presentation of charges against McInnish." Id. at ¶14.

Plaintiff alleges that on November 18, 2004, at the urging of McInnish and Long, Sprayberry began a series of punitive, retaliatory, and illegal actions in violation of the U.S. Constitution against Plaintiff designed to impede and terminate his investigation of McInnish. Plaintiff alleges that Sprayberry conspired with Long and McInnish to violate his due process and property rights. Plaintiff alleges that Sprayberry's actions include (a) the immediate withdrawal of local authority from the MHA to make fiscal and procurement decisions; (b) interference with MHA's authority to take disciplinary action against the Executive Director; (c) the interference with Mr. Davis' right to present his findings; (d) ordering special Board meetings be called to reconsider the suspension of McInnish; (e) collaborating with Long and McInnish to frustrate the efforts of the Board to have a disciplinary hearing for McInnish; (f) (sic) by wrongfully refusing to authorize payment of legitimate fees and expenses in relation to the investigation of McInnish "in an effort to deter Plaintiff's freedom of speech and continuing to investigate and present charges at the scheduled disciplinary hearing on behalf of the MHA"; (g) by requiring that MHA terminate the services of Plaintiff before the disciplinary hearing could be held; (h) interfering with MHA business by overrunning (sic) MHA's decision on December 21, 2004 to continue the employment of Plaintiff as General Counsel for MHA so the investigation and presentation of charges against McInnish could continue; (i) by

refusing to recognize the employment of a hearing officer appointed to conduct the disciplinary hearing of McInnish or pay his expenses (j) forcing MHA to "employ new counsel, a white lawyer to serve as its local counsel"; (k) improperly communicating with and providing McInnish with confidential MHA information; (l) directing MHA to hire a new hearing officer and refusing to approve the contract of the hearing officer initially employed because of his race (African American); (m) by imposing excessive oversight procedures and interfering with day to day operations of MHA; (n) forcing the involuntary termination of Mr. Davis' services, without due process, as counsel for MHA, all in violation of his Fifth Amendment rights, by wrongfully refusing to authorize just compensation for services including covering a five (5) month period; (o) on March 15, 2005, Sprayberry denied Plaintiff's claim for fees pursuant to a valid contract with the MHA; on October 31, 2005, Sprayberry prepared a false, misleading and inaccurate report to discriminate and retaliate against Plaintiff. Id. at ¶15.

Plaintiff alleged that McInnish and Sprayberry discriminated against Plaintiff based on race and "violated his constitutional rights to equal pay and to be treated the same as white citizens under the Thirteenth Amendment by refusing to pay him at the same hourly rate paid white attorneys working for MHA with less qualifications than Plaintiff for the same work. Plaintiff alleges that the payments to white attorneys were authorized by and approved by McInnish and Sprayberry, and white attorneys were paid $270 per hour for senior attorneys and $240 per hour for junior attorneys while Plaintiff, an African American attorney, was paid $175 per hour. Id. at ¶17.

Almost none of Plaintiff's allegations are true (McInnish's Answer to Second Amended Complaint doc. 95) and Plaintiff has woefully insufficient evidence to support

his allegations. The vast majority of the allegations suggest no injury in fact to Plaintiff. He seems to assert that oversight by of the MHA's activities by HUD, resulted from the actions of McInnish and Long, and provides him with a cause of action. However, Plaintiff has no standing to make any claim on behalf of the MHA.

Of Plaintiff's numerous allegations, only a few can be said to refer to Plaintiff: his assertion that Sprayberry wrongfully refused to pay his fees and expenses in relation to his investigation of McInnish; Sprayberry's alleged decision on December 21, 2004, to "overrun" MHA's decision to continue to employ Plaintiff; forcing the MHA to employ a white lawyer; forcing the involuntary termination of Plaintiff's services, without due process, in violation of his Fifth Amendment rights, by wrongfully refusing to authorize payment of past compensation for a five month period; and denying Plaintiff's claim for fees pursuant to a contract with MHA. None of these allegations involves any action by McInnish. Plaintiff has no evidence of any conspiracy between McInnish and Sprayberry or Long. (See "*infra*" Depos of Davis, McInnish, Sprayberry, and Long).

All fees incurred and presented to the MHA by Davis before McInnish's suspension on November 16, 2004, were paid. McInnish was not involved with any decision to terminate Plaintiff's employment or to deny payment to Plaintiff of fees incurred through his investigation of McInnish. McInnish was not involved in the hiring of any attorney after McInnish's suspension on November 16, 2004. McInnish did negotiate on behalf of the MHA the terms of the 2003-2004 fee contract with Plaintiff after Plaintiff was selected for the position by the MHA Board. Although Plaintiff claims race discrimination in that his hourly rate was less than a white attorney at another law firm, he makes no monetary claim because of it. He is seeking payment of a bill he

presented to MHA in the amount of $25,000 for work performed for the MHA in November and December 2004.  Plaintiff claims that the $25,000 for those services is the property he was deprived of by McInnish.  The invoices for those services were not even presented to the MHA until March 2005, long after McInnish was suspended and had no authority or ability to pay it.

Plaintiff has testified that he believes he was retaliated against because of statements he made as Board counsel at Board meetings that were critical of McInnish.  Plaintiff is unable to be specific about the statements he made or the adverse actions taken by McInnish as a consequence of these statements.

C.     The Conspiracy Claim

This is a claim that McInnish, Sprayberry and Long conspired against Plaintiff to violate his rights under the Federal Tort Claims Act ("FTCA").  Plaintiff admits he did not comply with the prerequisites for filing a claim under the FTCA.  Plaintiff's claims against the federal Defendants were dismissed.  Plaintiff has moved to dismiss his case against Defendant Long.  McInnish is not subject to the FTCA.  This claim is patently frivolous.

**II.     STATEMENT OF SUMMARY JUDGMENT FACTS**

A.     The State Law Contract Claim

The Montgomery Housing Authority ("MHA") is a municipal agency of the City of Montgomery receiving 90+% of its funding from HUD.  The MHA has a Board of Commissioners ("the Board") appointed by elected officials of the City of Montgomery, Alabama.  The Board makes policy decisions for the MHA, hires the Executive Director,

and reviews and approves other MHA actions.  The Executive Director is not a member of the Board.

McInnish became general counsel for MHA on or about 1988.  McInnish, who is white, was paid $90 per hour for his work as general counsel.  He was not paid a monthly retainer fee.  Deposition of Michael C. McInnish ("McInnish Depo") p.23:l.2-8; p.40:l.20-22; p.41:l.5-9.  In 2001, HUD performed an audit and an investigation of MHA under a previous Executive Director and found serious and numerous irregularities in the handling of contracts.  HUD became concerned about MHA procurement issues. Id.p.30:l.2-7; p.31:l.1-4; p.32:l.12-22.  As a result, HUD ordered MHA to request approval from HUD before making procurement decisions, awarding contracts, or issuing Requests for Proposals (RFPs).  Id.p.38:l.13-16; p.46:l.19-23.

McInnish was appointed Executive Director of MHA in February 2002, and made permanent Executive Director in June 2002.  Id.p.28:l.22-23, p.29:l.1-2.  By April or May 2002, McInnish had taken actions that restored HUD's confidence in MHA and it was released from the requirement of HUD approval for procurement related issues. Id.p.44:l.3-6.  McInnish was never asked to obtain HUD approval for contracts for legal services.  DEX 201 (McInnish's Response to Plaintiff's Int. #12).

After his appointment as Executive Director, McInnish continued to perform the legal work of general counsel as part of his job as Executive Director.  There was no provision in place for awarding contracts for legal work.  McInnish Depo p.49:l.4-11. Because McInnish was busy with the requirements of his job as Executive Director, it became obvious that MHA needed separate legal counsel.  Some Board members came up with the idea of hiring three law firms:  a Board counsel to attend board meetings and

handle issues that may arise at board meetings, a counsel to handle collections and evictions, and a general counsel to handle all other legal work.  Id.p.51:l.12-23; p.53:l.12-14.

In order to implement the Board's wishes, McInnish requested some sample RFPs that were used by other housing authorities.  Id., p. 53:l.7-18.  The board decided which law firms would be appointed to the board counsel, general counsel and eviction/collection positions.  Id.p.56:l.6-10.  The RFP for the board counsel position issued on October 7, 2002 for work to be performed in 2003-2004.  The RFP for the general counsel position issued at the same time for 2003-2004.  Id.p.62:l.3-7; p.64:l.5-9; PEX1 (McInnish 033).  The RFP for the Board counsel position estimated that Board counsel would prepare for and attend Board meetings once per month and possibly some Board committee meetings.  The estimated time was 4-8 hours per month.  RFP dated October 7, 2002, DEX 1 (McInnish 033).  The RFP for the MHA attorney position was to "represent the MHA in general legal matters."  The position included research, answering inquires and providing memoranda.  This was estimated to take 4 to 8 hours per month. See DEX 1 (McInnish 032-033) (10-2-02 RFP) and DEX 26 (July 22, 2004, Memo to Davis from McInnish).  After McInnish had more information about the hours required, he informed the Board that the board counsel position would require an estimated two to three hours per month only.  McInnish Depo p.71:l.18-20; p.77:l.6-20.

The three RFPs were mailed to law firms and responses were reviewed and evaluated by McInnish and several Board members.  Bradley, Arant, Rose & White, LLC ("Bradley Arant") and Davis & Hatcher, LLC applied for the general counsel position and Davis & Hatcher also applied for the board attorney position.  McInnish Depo

p.62:l.12-14.  McInnish told the Board when the RFPs went out and when the RFPs were

due back.  The board members were invited by McInnish to come to the MHA office to

review the responses to the RFPs.  The RFP responses were opened in the presence of

McInnish, the Chairman of the Board, and the MHA director of personnel.  Over a

several week period, various Board members reviewed the numerous RFP responses.

The RFP responses were then given to the Personnel Committee of the Board.  The

Personnel Committee reviewed the RFPs and the responses and made the

recommendation to the Board at the December 2002 board meeting as to which firms to

hire for each position.  The Personnel Committee prepared a Resolution for the Board to

hire Davis & Hatcher, LLC as Board attorney, "to attend all Board meetings and be

available to answer any questions the Board may have."  The Board selected Bradley

Arant as MHA attorney for general legal work "to represent the Authority in all legal

matters," and Holloway, Elliot & Moxley, LLP to be MHA's collections and evictions

attorney.  DEX 201 McInnish's Response to Plaintiff's Int. #2).  DEX 26(July 22, 2004

Memo from McInnish to Davis); DEX 24 (December 2002 Board minutes).  The full

Board  had the RFP response of each firm which contained the hourly rate and

compensation information for their review.  McInnish made no recommendation to the

Board as to what firms to hire.  The selection of the firms was by the Board.  Bradley

Arant and Davis and Hatcher were awarded contracts by the Board.  McInnish Depo

p.65:l.22-23, p.66-67; p.68:l.7-9; p.96:l.8-22; DEX 201 (McInnish Response to Plaintiff's

Int. #2); (McInnish Response to Plaintiff's Int. #3); DEX1 (McInnish 053).

        McInnish negotiated the contract documents with the selected firms pursuant to

Board authorization.  McInnish Depo p.68:l.10-11.  Davis and Hatcher's RFP response

requested an hourly rate for Davis of $185 ($195 in court) and requested a $1,500 per month retainer.  Thereafter, McInnish had a conversation with Davis in which they negotiated the fee.  In the conversation Davis and McInnish discussed how much time would be involved and McInnish estimated two to three hours.  McInnish told Davis that he (McInnish) had worked for MHA for years performing the combined functions of Board counsel and MHA counsel at $90 per hour.  They also discussed lowering the monthly retainer to $1,000.  McInnish and Davis agreed upon an hourly rate of $175 and a monthly retainer of $1,000 to cover the first three hours of work.  As the hourly rate would only come into play after three hours of work, Davis could receive a much higher hourly rate than $175.  McInnish Depo p.71:l.11-23; p.72:l.1-10.  McInnish negotiated with no other attorney for the position of Board counsel.  McInnish told Davis that a number of attorneys performed some legal work for other housing authorities for $175 per hour.  DEX 201 (McInnish Response to Plaintiff's Interrogatory No. 3.).

Davis & Hatcher's response to the RFP clearly stated that the hourly rates and the retainer were negotiable.  DEX 1 (McInnish 032) (10-31-02 Response to RFP).  Davis meant by that statement that he was willing to reduce his hourly rate and retainer.  Deposition of Terry G. Davis ("Davis Depo") Vol. 1 p.29:l.13-20.  Davis expected McInnish to negotiate.  Davis testified, "I would expect him to negotiate."  Id.p.30:l.6.  Davis acknowledged that he was paid an effective rate of $333 per hour for the first three hours of work.  Id.p.30:l.1-4.  Davis has no evidence that he was competing against any other attorney for the Board counsel position.  Id.p.34:l.9-13.  Davis knew that Bradley Arant through Charles Stewart, as general counsel, handled a different category of legal work than did Davis as Board counsel.  Davis rejected work that he believed should be

handled by Stewart.  DEX 62 (7-12-04 Letter from Davis to McInnish rejecting legal

work).  At the time he signed the fee contract with MHA, he was satisfied with its terms.

Id.p.34:l.19-23.  Davis never complained about the amount that he was paid under the

contract.  He submitted a discounted rate to MHA and never complained about it.

Id.p.224:l.13-20.  Davis offered to negotiate his rates before he spoke to McInnish.  Davis

Depo Vol. III p.116:l.18-23; p.117:l.1-5.  DEX 1 (McInnish 031)   As a result of the

negotiations, a contract was executed between the MHA and Davis & Hatcher, LLC for

the period from January 6, 2003 through December 31, 2004.

Davis is an employee of Terry G. Davis, P.C.  Terry G. Davis, P.C. is a principal

in Davis & Hatcher, LLC.  Davis  Depo Vol. I p.12:l.7-8.  Davis & Hatcher, LLC is the

party to the "Attorney Employment Agreement" with the Montgomery Housing

Authority, executed February 18, 2003.  Neither Davis nor McInnish are parties to the

contract.  DEX 1 (McInnish 053).

McInnish also negotiated contract terms with Charles Stewart of Bradley, Arant,

Rose & White, LLC ("Bradley Arant") regarding the general counsel position, a different

job than the one Davis had been selected for by the Board.  Stewart's hourly rate was

$270 and he requested a $1,500 monthly retainer fee.  The hourly rate would only come

into play after the first three hours of legal work.  McInnish told Stewart that MHA could

not pay a $1,500 retainer and could only pay $1,000.  Stewart agreed to reduce the

monthly retainer to $1,000.  McInnish told Stewart that he thought that his hourly rate

was high and they talked back and forth.  McInnish told Stewart that Bradley Arant's fee

proposal in the RFP response did not have a negotiation clause in it.  Stewart stated his

firm would not agree to reduce its hourly rates, but agreed to try to limit his hours the

best he could so as not to exceed the $1,000 per month.  McInnish Depo p.73; p.74:l.1, 10-12; p.75:l.1-12; p.76:l.15-23; p.77:l.1; Deposition of Charles Stewart ("Stewart Depo") p.28:l.14-17.

In fact, Bradley Arant only billed the $1,000 monthly retainer during the term of the contract for ordinary legal work as general counsel.  Therefore, Stewart's effective rate would fluctuate depending on how much work was performed each month.  If he had 20 hours of work in a month, his rate would be shown as less than $100 per hour.  If he had three hours of work, his rate would be shown as $333 per hour.  This is because Bradley Arant billed only $1,000 per month plus expenses regardless of the amount of time logged by counsel.  Stewart Depo p.30:l.8-23; p.31:l.1-15.  MHA would be billed $1,000 even if Bradley Arant had $3,000 in time.  Id.p.68:l.7-16.  PEX 1 to Stewart's Depo (MHA 00187-00195; 00126-00175, 00063-00125) (Portions of composite exhibit containing invoices produced by Bradley Arant).  Davis does not consider Bradley Arant's hourly rates unreasonable.  Davis Depo Vol. II p.229:l.10-13.  Bradley Arant donated some of its time to MHA and McInnish continued to perform some in-house legal work without referring it to Bradley Arant.  McInnish's Response to Plaintiff's Int. #3.

The only exception to Bradley Arant's adherence to the $1000 retainer limit had to do with an unanticipated and unusual lawsuit between MHA and the Montgomery City Council over the right to appoint and remove MHA Board members.  Monthly billings increased after the lawsuit was filed by Plaintiff pursuant to a MHA Board resolution. DEX 201 (McInnish's  Response to Plaintiff's Int. #3.).

In April 2004, Bradley Arant billed for 51 hours spent by Stewart on the litigation at $270 an hour.  That litigation was the only time Bradley Arant billed an hourly rate. Stewart Depo p.31:l.117-19; p.33:l.9-13; Plaintiff's Exhibit 7 to McInnish Depo.  This was after the MHA advised Stewart that in regard to the City Council litigation it had authority to pay Bradley Arant above the retainer amount.  Bradley Arant opened up a separate matter to bill at its established hourly rate in the City Council litigation. Id. p.62: l. 3-10.  This litigation was an exceptional circumstance.  Bradley Arant billed MHA directly for a period of time, but soon the Housing Authority Insurance Group agreed to pay Bradley Arant's bills for the City Council litigation.  Stewart Depo. p.65:l.20-23; p.66:l.1-4; p.67:l.20-22; p.68:l.5.

Davis & Hatcher never billed at its hourly rate of $175, but only $1,000 per month for three hours of work or less, with the exception of the City Council litigation matter.  DEX 4 (Billings from Davis to MHA 1/03-4/04).  During that period Davis & Hatcher billed only the retainer of $1,000 per month. Davis Vol. I  p.44:l.23; p.45:l.1-16.

McInnish had budget concerns when he negotiated the contracts with Bradley Arant and Davis & Hatcher.  These two firms had been selected by the Board.  At some point, the MHA legal budget became $30,000 per year.  MHA had $10,000 that could be approved for payment of attorney fees for the City Council litigation.  McInnish had to go to HUD to request additional money once Plaintiff became involved and two attorneys were working on the case.  McInnish could not pay either firm until he had HUD's approval.  DEX 28 (7-13-04 McInnish to Davis re Budge); DEX 31 (8-9-04 Letter from McInnish to Davis re Budget revision); DEXs 32, 38, 41, 42 & 43 (Budget problems re attorney fees); McInnish Depo p.58:l.12-14; p.59:l.1; p.74:l.12.

Race was never discussed in any conversation about attorney fees or otherwise by McInnish and was not a factor in setting hourly rates. McInnish negotiated rates of $90 per hour and $120 per hour with Caucasian attorneys for MHA contract legal work during the same time frame as Davis held the position of Board attorney. DEX 204 (McInnish's Declaration with attachments). McInnish never spoke to Defendant Sprayberry or Defendant Long regarding the negotiation of hourly rates. Further, the Bradley Arant firm is not an all-white firm. McInnish's Response to Plaintiff's Int. #3; McInnish's Declaration 7.

On November 16, 2004, McInnish was placed on administrative leave with pay pending an investigation. McInnish Depo Vol. I p.48:l.15-22; p.118:l.22-23; p.119:l.1-9; p.121:l.14-21; DEX 46 (McInnish 603-605). (Minutes of November 2004 Board Meeting.) McInnish was given no reason for his suspension. Id.p.122:l.21-23; p.123:l.1-9. McInnish never returned to the MHA after November 16, 2004. He filed an EEOC charge against MHA alleging race discrimination and retaliation for his complaints to MHA about race discrimination. Davis and several Board members were named in the charge. DEX 55. The case Settlement Agreement was executed on July 27, 2005, and McInnish retired from MHA. DEX 200.

When McInnish left the MHA on November 16, 2004, all outstanding bills for legal work performed by Bradley Arant and Davis & Hatcher had been paid, including work done on the City Council litigation. McInnish Depo p.94:l.21-23; p.95:l.1-3. The invoices for legal work allegedly performed by Davis & Hatcher through December 31, 2004 and upon which Plaintiff's case is based, was not billed to MHA until March 3, 2005. DEX 202 (Plaintiff's Response to Sprayberry's Int. #s 9 & 11 (Exhibit 1).). Davis

Depo. Vol. II  p.41; p.42l.7-8.   Before McInnish was suspended, all of Davis' bills were approved.  The unpaid invoices are solely related to time Davis spent investigating McInnish.  Davis Depo Vol. II p.42l.12-19; p.80:l.18-23; p.81:l.1.  The $25,000 now claimed by Davis as his wrongfully taken property is the amount Sprayberry allegedly disallowed from Davis & Hatcher's November-December 2004 invoice.  DEX 64; Davis Depo Vol. III p.17:l.3-6.  The MHA contract with Davis and Hatcher expired December 31, 2004.  Id. p.81:l.13-23; p.82:l.1-4.  The legal expenses billed by Plaintiff for the investigation of McInnish were found by Sprayberry to be unreasonable and unnecessary to the administration of federal housing programs.  DEX 203 (Sprayberry's Response to Plaintiff's Int. #23).  All fees claimed due by Davis involves  his "investigation" of McInnish during the months of November and December 2004.  McInnish was never presented with the billing and had no opportunity to review or authorize payment.

At the MHA Board meeting on December 21, 2004, Davis discussed with the Board a new legal services contract for the period 2005-2006, after his 2003-2004 contract expired.  Davis was selected as the sole MHA attorney.  Davis had responded to the RFP by asking for $270 per hour because that is what Bradley Arant's response to the RFP requested for Stewart when it was selected as MHA general counsel in 2003-2004.  That is how Davis determined his rate. DEX 2 (12-21-04 Minutes of MHA Board Meeting); Davis Depo Vol. I p.36, 37:l.1-3, 12-18.

Davis confirmed that his rates were negotiable and that once the Board appointed him as sole MHA counsel, he and the interim Executive Director, Lemuel Boggs, would negotiate.  The Board authorized Boggs to negotiate with Davis because McInnish had been suspended.  Davis Depo Vol. I p.38; p.39; p.40:l.1-6.  Davis had no problem with

Boggs using the negotiation procedure McInnish used in 2002 for negotiating the fee contract with Davis.  Davis recommended to the Board the same procedure for negotiations with himself in 2004.

In the contract negotiations with Boggs, Davis agreed to reduce his hourly rate from $270 to $200 per hour and to reduce his retainer to $1,000.  DEX 3 (1-7-05 Letter from Davis to Boggs); Davis Depo Vol I p. 41:l.21-23; p.42:l.1-15.  Another firm, Hill, Hill, Carter, Franco, Cole and Black ("the Hill Firm") was hired at the rate of $175 per hour.  The Hill Firm submitted the low bid.  Davis Vol. III p.268:l.9-13; p.269:l.4-6, 11-12.

Defendant Sprayberry is Director, Office of Public Housing, Birmingham Field Office of HUD.  As Director of the Office of Public Housing, he has oversight of 147 housing authorities in the State of Alabama, including the MHA.  He has a staff of 21 employees that he supervises, including two subordinate supervisors.  The 147 housing authorities are funded by HUD in order to provide housing to low income families and individuals.  As recipients of HUD funding, these housing authorities are required to comply with HUD rules and regulations, as well as all other applicable Federal, state, and local laws and regulations.  Defendant Sprayberry's duties include ensuring that these housing authorities comply with applicable rules and regulations, expend federal funds only for necessary and legitimate purposes of administering federal housing programs, and provide decent, safe, and sanitary housing to low-income families and individuals. DEX 203 ("Defendant Sprayberry's Objections & Responses to Plaintiff's Interrogatories"),  "Response to Int. #2"); Deposition of R. Edmund Sprayberry ("Sprayberry Depo") p.15 l. 19-21; p.17:l.1-2; p.19:l.12-17.

After McInnish was placed on administrative leave in November 2004, and Boggs was named Interim Executive Director, McInnish had no authority to take any action on behalf of MHA or influence any of its decisions. Nevertheless, the Plaintiff claims that McInnish "collaborated" with Defendants Long and Sprayberry to impede his investigation of McInnish by preventing MHA from awarding a contract to Plaintiff for 2005-2006 and to deny payment of a $25,000 billing for the time he spent investigating McInnish after McInnish left MHA. Davis admits that this work was done and invoice submitted after McInnish was placed on administrative leave. DEX 64 (Davis & Hatcher's invoices for November and December 2004). This is the bill which reflects Davis' claim in this case and for which Davis seeks payment. Davis claims Sprayberry refused to pay him and thereby denied him his property. DEX 63, para 16.

Davis was not privy to any communications between McInnish and Long, McInnish and Sprayberry or Sprayberry and Long. He must rely on their respective responses to his discovery requests and their deposition testimony to show the alleged "collaboration" between them. Davis spoke to Sprayberry on one occasion in May 2004. No racial comments or comments about Davis' race were made by Sprayberry. Davis Vol. II p.8:l.23; p.9:l.1-2; p.23; p.10:l.1-13. Davis has no evidence that Sprayberry knew the race of the attorneys working for MHA. He knows of no conversation between Sprayberry and McInnish. Id. 20:9-11. The only evidence Davis purports to show Sprayberry's knowledge of his hourly rate is a May 3, 2004 letter. DEX 24; Davis Depo. Vol. II p.22 l.6-14; p.21-22; p.23:l.4-5. Davis has no evidence that Sprayberry saw the letter. Id.p.23:l.15-18; p.24:l.17. Davis had been working at MHA for 16 months when the letter was written. Id.p.26:l.20-23; p.27:l.1-7.

Davis never asked Sprayberry or anyone at HUD to raise his hourly rate. Id.p.30:l.20-21. Davis never met Sprayberry. Sprayberry had no knowledge of the hourly rates being paid by the MHA to Davis or Stewart for services rendered in the City Council litigation. Sprayberry's Response to Plaintiff's Request for Admissions, No. 10, p. 6. Sprayberry Depo p.114l.2-5; p.117l.9-15. Davis has the "opinion" that Sprayberry had knowledge of his race because of the conversation he had with Sprayberry in May 2004. Davis Depo Vol. II p.49:l.15-19; p.50:l.1-17; p.51:l.6-10. He tried to call Sprayberry once and thinks he left a message on Sprayberry's voicemail, but he is not sure. Davis Vol. II p.74:l.5-16, 16-19. According to Sprayberry, he has never met or spoken to Davis and did not know his race until Davis filed this lawsuit. He also did not know Stewart's race. Sprayberry Depo. p. 20 lns. 2-23;21:1-4. DEX 203 (Sprayberry's Response to Plaintiff's Int. #22, p. 18.).

Davis has no evidence that Sprayberry and McInnish had conversations about McInnish's suspension or disciplinary hearing at any point. Davis relies on Sprayberry's report of October 31, 2005, DEX 74, to allege that McInnish and Sprayberry communicated. According to Davis, Sprayberry made reference in his report to information Davis saw in McInnish's MHA personnel file. He does not know how it occurred, but according to Davis, information in the personnel file of McInnish ended up with Sprayberry. Davis Vol. II p.154:l.20-23; p.155:l.1-3, 16; p.156:l.14-23.

On November 17, 2004, Sprayberry contacted Taylor to inquire why McInnish was suspended. Taylor refused to provide that information. For the next seven to eight weeks, Sprayberry had several conversation with Taylor seeking specifics about McInnish's suspension, but Taylor refused to provide the information. Sprayberry

discussed with Taylor the reasons HUD required procurement review for all MHA actions.  DEX 203 (Sprayberry's Response to Plaintiff's Int. #s 12 & 16.).

McInnish did not contact Sprayberry on November 16, 2004, or shortly thereafter about his suspension.  McInnish saw him at Sprayberry's father's funeral the day after Thanksgiving, November 26, 2004.  McInnish was not alone when he spoke to Sprayberry to offer his condolences.  He went through a receiving line with a group of people and stated he was sorry to hear about his Dad.  DEX 201 (McInnish's Response to Plaintiff's Int. #s 13 & 26).  Sprayberry Depo p.37 l.6-12; p.38:l.4-10.    They did not talk about the suspension.  McInnish saw Sprayberry at the fall annual convention in December 2004. McInnish attended a State Housing Authority Director's Banquet because his singing group was invited to perform at the event.  McInnish and Sprayberry exchanged the usual pleasantries.

On April 19, 2005, McInnish attended a Housing Authority workshop in Birmingham.  He and Sprayberry exchanged greetings.  In July 2005, McInnish and Sprayberry exchanged greetings at the AAHRA summer convention.   McInnish provided Sprayberry a copy of a program that he was presenting at the event concerning project-based accounting and management.  On October 25, 2005, McInnish and Sprayberry exchanged greetings at a Housing Authority fall workshop. As to the charges filed against Mcinnish, Sprayberry never called him about them and McInnish never called Sprayberry or spoke to him about the charges.  Other than his father's funeral, Sprayberry did not speak to McInnish until after the Board and McInnish agreed on a settlement of their claims.  Sprayberry saw McInnish when his musical group played in December 2004, but did not speak to him.   Sprayberry Depo p.122 l.9, 12, 18-23; p.123 l.7-13.   McInnish

spoke to Sprayberry in the fall of 2005.  This was after the settlement agreement between McInnish and MHA had been signed.  As part of the settlement agreement, McInnish agreed to seek Sprayberry's approval of the agreement if so requested by MHA.  MHA did make the request and McInnish complied by asking Sprayberry to approve the settlement.  Mr. Sprayberry did not approve the settlement.  DEX 71 (2-17-05 Letter from Sprayberry to Taylor); DEX 72 (6-13-05 Letter from Sprayberry to Barley); McInnish Depo p.124 l.14-23; p.125; p.126:l.1-7; p.127:l.1-5; p.131:l.18-23; p.132; p.133:l.1-6; Sprayberry Depo p.41l.8-23; p.42:l.1, 13-16;  Sprayberry Depo. p. 41 l. 8-23; 42:1, 13-16; 44:16-20, 45:9-23, 46:1-18; 48:11-13; 21-22; 49:1-16, 17-23; 50:1; 107:19-23; 108:13-14, 19-23; 109: 18, 23; 110: 1-17; 111:11-14, 17.  Sprayberry had no personal relationship with McInnish that influenced his actions in reference to the MHA.  Id. 68:8-12, 16.  DEX 203 (Sprayberry's Response to Plaintiff's Int. #s 5 & 35.).

From November 16, 2004 to February 2005, Sprayberry had no meetings with McInnish to discuss his situation.  Sprayberry did attend the annual meeting in July 2005 and a workshop in October 25, 2006.  He did not recall a meeting with McInnish on those occasions.  He does not recall any meeting with McInnish.  Neither he or McInnish mentioned settlement of his case until it had been approved by the Board.  After Board approval, he received a letter from McInnish asking HUD to approve the settlement.  McInnish may have personally met with him to seek approval of the settlement after the Board approval, but he does not recall it.  He never shared with McInnish any correspondence or information that the MHA provided to him.  Sprayberry Depo p.107:l.19-23; p.108:l.13-14; p.109:18, 23; p.110:l.1-17; p.111:l.11-14,17; DEX 201 (McInnish's Response to Plaintiff's Interrogatory No. 26); DEX 203 (Sprayberry's

Response to Plaintiff's Int. #s 13 & 26.). Sprayberry disapproved the agreement and objected to the settlement. McInnish and the MHA settled without HUD approval. Sprayberry had no involvement with the terms of the settlement. DEX 203 (Sprayberry's Response to Plaintiff's Int. #s 38, 39, and 40.).

Neither Sprayberry or HUD counsel Barbara Etheridge had knowledge of the hourly rates of MHA attorneys. Defendant Long went on the MHA Board in 2002 and went off the Board in October 2005. Deposition of Luan Long ("Long Depo") p.14l.22-23; p.15:l.2-3. Long did not know Davis & Hatcher was not paid for the time Davis claims until the current lawsuit was filed. Id. p.16:l.6-9; p.13.

Long does not know Sprayberry. She has never met him. Id., p. 18 lns.17-21. Sprayberry contacted her by phone at her office on November 17, 2004, the day after McInnish was suspended. He asked if she knew what happened. She told him that she had not been present at the November 16th executive session or when the Board went back to the regular meeting and did not know what happened. Id.p.19l.8-20; p.22:l.13-20.; Sprayberry Depo p.56:l.3-20.

Long had no other conversation with Sprayberry until sometime in December 2004. She called him to get advice about how to call a special meeting of the Board. Long Depo p.27:l.3-23; p.28:l.5-8, 17-21; p.76:l.18-23; p.77:l.1-5, 23; p.78:l.1-12. Long does not remember discussing Davis' pay rate with anyone. Id.p.35:l.10-11.

On November 18, 2004, Sprayberry sent a letter to MHA requiring that relevant documents be submitted to HUD for review and concurrence prior to conducting RFPs or awarding contracts . DEX 68 (11-18-04 Letter from Sprayberry to Boggs). Sprayberry Depo. p.60 l. 2-20.

Long remembers evaluating the attorney RFPs for the contract period 2005-2006. Three firms applied and she felt they were all "eminently qualified." For that reason and MHA's budget problems with legal fees, she felt that the amount of money requested by the applicants should be given a little more weight than other criteria. Davis submitted an hourly rate of $270. There were qualified applicants willing to perform the job for substantially less. The Hill Firm submitted a proposal for an hourly rate of $175. DEX 2 (12-21-04 Board minutes). Nevertheless, the Board selected Davis. Long Depo. p. 47 lns. 5-23; 49:12-14; 50:13-22; 51:1,21-22. Because Davis in his proposal said his rates were negotiable, she thought that it would be good to negotiate. Id. p. 53:2-6.

Sprayberry did not refuse to approve the December 21, 2004 action of the Board to employ Plaintiff as counsel nor did he approve the hiring of the Hill Firm as MHA counsel for 2005-2006. DEX 202 (Sprayberry's Response to Plaintiff's Request for Admissions #s 17, 18.). DEX 203 (Sprayberry's Response to Plaintiff's Int. #s 28, 32.). HUD did not approve or disapprove the hiring of Davis for 2005-2006. Sprayberry Depo p.119:l.14-22. HUD's objection had to do with issues and concerns about MHA's methodology and its documentation of the RFPs. Id.p.120:l.12-17. HUD does not approve the awarding of contracts. HUD did not block Davis from being hired. Sprayberry does not know why Davis was not hired. Sprayberry Depo p.138:l.17-23; p.139:l.1, 9-10, 13, 16-17; p.140:l.3-7, 12-18; p.141: l. 4-5; p.142: l.12-16. Sprayberry had instructed MHA that all RFPs and procurement actions come through HUD's office. It was because of these instructions that MHA sought HUD approval after the vote to hire Davis. Id.p.144:l.7-19.

The Attorney Employment Agreement with Davis was the result of an RFP which had not been approved by HUD as per its instructions to MHA.  DEX 69 (1-12-05 Letter from Sprayberry to Boggs); DEX 70 (Letter from Sprayberry to Boggs/RFP requirements).  MHA was advised that any fees incurred prior to the execution of an approved agreement are not eligible for payment, that the current contract with Davis expired on December 31, 2004, and expenses incurred after that date are ineligible for payment.  Id.   Sprayberry Depo. p.156:l. 19-23; p. 157.  Because the RFP which precedes a contract had not been approved by HUD and because review and approval must precede the award of the contract, HUD recommended that the contract not be executed.  Id.  158:8-13.

Sprayberry did not require MHA to reevaluate candidates for the attorney contract for 2005-2006.  The MHA asked Sprayberry if HUD would provide some technical expertise in reviewing RFPs.  He contacted HUD's Atlanta procurement office and asked if anyone was available to help the MHA.  HUD did not require a second evaluation or deny the MHA's request to hire Davis. Sprayberry did not review the evaluations. Sprayberry Depo p.232:l.2-23; p.233:l.15-16, 19; p.236:l.6-12; p.238:l.2-3.

After November  16, 2004, when McInnish was suspended, Long had no conversation with him about it.  She only saw McInnish once while she was on the Board after he was suspended.  She saw him in the Spring of 2005.  She had no discussions with McInnish regarding his situation in December 2004 or January 2005.  She had no discussion with McInnish regarding his situation at any time.  Long Depo p.68:l.13-23; p.69:l.4-11.

On November 15, 2004, McInnish met with Long and other MHA Board members at Tulane Court housing project to do a walk-through. The only other time he saw Long between November 15, 2004 and December 31, 2005 was at a CVS store on Vaughn Road in Montgomery on or about late December 2004 or early January 2005. McInnish went to CVS to pick something up and saw Long. They exchanged pleasantries. McInnish greeted Long, she responded and then stated that perhaps they should not talk. McInnish stated that she was his friend and he just wanted to say "Hello" to her. There was no substantive conversation. DEX 201 (McInnish Response to Plaintiff's Int. #14.).

Long as a Board member supported the settlement of McInnish's case against MHA, together with other Board members, because she believed a lawsuit would be expensive and it was in the best interest of MHA and its residents to settle. Long Depo p.21:l.3-21. It was not her understanding that Sprayberry did not approve Davis' hiring for 2005-2006, but that there was a problem with the selection process. Sprayberry questioned the way the evaluations were done. Id., p.80:l.23; p.81:l.1-6; p.83:l.1-2. The process had to be redone and Long was not involved in the evaluation. Id. p.84:l.6-7; p.85:l.11.

The MHA did not accept either Davis & Hatcher's or Bradley Arant's proposals for employment as counsel for MHA for the period 2005-2006. "(Response to Plaintiff's Request for Admissions by Defendant The Housing Authority of the City of Montgomery", (Response #17). Sprayberry did not refuse to approve any action by the Board to hire Plaintiff as MHA counsel for 2005-2006. DEX 202 (Defendant Sprayberry's Response to Plaintiff's Request for Admissions #17) and DEX 203

(Sprayberry's Response to Plaintiff's Int. #28 & 32).  Sprayberry had no knowledge of the hourly rates being paid by MHA to Plaintiff or to Stewart for services rendered in the City Council litigation of May 2004.  DEX 202 "(Sprayberry's Response to Plaintiff's Request for Admissions #10.).  Sprayberry does not approve or disapprove of payment of legal fees to contractors.  He deals with housing authorities.  Fees are not billed to HUD. He is concerned with the procurement issues, that contracts are followed, and obtaining necessary information.  In response to the requests for payment of those Davis & Hatcher invoices for the McInnish investigation, which were unpaid, HUD requested additional information from MHA which was never provided.  Sprayberry Depo p.22:l.12-18; p.23:l.4-10, l.15-23.

A letter from Sprayberry to Boggs dated 12-19-04 (PEX 10 to Sprayberry's Depo), written by Sprayberry's staff references Davis & Hatcher's billings for October, November & December 2004.  The letter sought additional information regarding $3243 of the October bill.  Sprayberry did not review the bill.  He does not know if it was paid or not.  He did not evaluate the October fee requests to determine if it was reasonable. He did not review lawyer bills.  Ms. Poteete and Ms. Harmon, Sprayberry's subordinates, work on fee requests in Montgomery.  Sprayberry Depo p.88:l.7, 14-16; p.89: l.3-18; p.90:l.4-23; p.91:l.2-9, 16-20).

 By letter dated December 9, 2004,  Sprayberry denied the request  of Thomas Taylor, Chairman of the MHA Board for $35,000 for legal costs to investigate McInnish Id.p.96:l.2-23; p.97:l.1-2.  Sprayberry still had received no reason for McInnish's suspension.  Id.p.99:l.9-10.  This was a projected cost to do legal work.  HUD did not disapprove.  HUD requested additional information before the estimate could be

approved.  HUD was attempting to determine if the estimate was reasonable relative to the services to be performed.  Id.p.102:l.20-23; p.103:l.1-4, l.11-18.  HUD would not approve a budgetary amount until MHA provided information HUD needed. Id.p.102:l.20-23.

## STANDARD OF REVIEW

Summary judgment "<u>shall</u> be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added). Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Hairston v. Gainesville Sun Publ'g Co</u>., 9 F.3d 913, 918 (11th Cir. 1993).

To avoid summary judgment when the legitimacy of a decision is at issue, the plaintiff must produce sufficient evidence for a reasonable fact-finder to conclude that each of the defendant's proffered non-discriminatory reasons is pretextual. <u>Chapman v. AI Transp</u>., 229 F.3d 1012, 1024-25 (11th Cir. 2000) (en banc). The plaintiff's subjective beliefs or conclusory allegations of discrimination, without more, are insufficient to raise an inference of discrimination in the face of lawful reasons for the challenged action. <u>Mayfield v. Patterson Pump Co</u>., 101 F.3d 1371, 1376 (11th Cir. 1996). "If [the plaintiff's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 249-50 (1986).

The Eleventh Circuit has recognized that "the summary judgment rule applies in …discrimination cases just as in other cases" and that summary judgment awards for defendants in discrimination cases "are not rare." <u>Chapman</u>, 229 F.3d at 1025-26; <u>Early</u>

v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Catrett,  477 U.S. at 327 (*quoting* Fed. R. Civ. P. 1).

**ARGUMENT**

## I.    SUMMARY JUDGMENT IS WARRANTED ON THE CLAIMS CONTAINED IN DAVIS' FIRST CAUSE OF ACTION.

### A.    Davis Cannot Sustain A Breach of Contract Claim.

Plaintiff's breach of contract claim fails as a matter of law because he has failed to produce evidence sufficient to state a claim upon which relief may be granted. Plaintiff alleges in his First Cause of Action that "Defendants' refusal to pay Plaintiff for services rendered as general counsel constitutes breach of contract."  (Comp. at ¶19).  To state a breach of contract claim, Plaintiff must allege and prove "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages."  See, e.g., Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98, 99 (Ala. 1995).

Plaintiff cannot prevail in part because he cannot prove the existence of any binding contract between himself and McInnish.  This is because Plaintiff is not a party to any contract with McInnish.  The sole contract at issue, if any, exists between a non-party corporation (not the Plaintiff personally) and the Montgomery Housing Authority.  There is no privity of contract.  As a general rule, the "government consents to be sued only by those with whom it has privity of contract."  See First Harford Corp. Pension Plan & Trust v. Untied States, 194 F.3d 1279 (Fed. Cir. 1999) (citation and quotation omitted).

33

Accordingly, Plaintiff's breach of contract claim cannot survive summary judgment.  <u>See</u> <u>id</u>.

      **B.**     <u>**Davis Cannot Sustain A Quantum Meruit Claim.**</u>

The only way Davis could possibly make a claim for quantum meruit is to claim that Defendants must pay him for the time he worked after McInnish had been suspended.  Davis is not entitled to this pay, and certainly not from McInnish, including because McInnish had no authority to make such payments.  It was the MHA Board, not McInnish, who denied payment.  There is no evidence that McInnish had anything to do with convincing any other Defendant to decline payment, but even if he had, McInnish would not be liable under a theory of quantum meruit.

McInnish never refused to pay the "reasonable value" of "services rendered" by Davis, <u>see</u> <u>Hendrix, Mohr & Yardley, Inc. v. City of Daphne</u>, 359 So.2d 792, 795 (Ala. 1978), though if he had so refused the MHA as recipient of the purported benefit, not McInnish, would have been liable.  Davis was always paid for his work when McInnish worked for the MHA, so no quantum meruit claim can arise against McInnish.  <u>Brannan</u> <u>& Guy, P.C. v. City of Montgomery</u>, 828 So.2d 914, 920 (Ala. 2002).

Davis' claim additionally fails because under Alabama law, the existence of an express contract precludes quantum meruit recovery.  <u>Id</u>. at 921.  To the extent there was an express contract here, it would control, although the Plaintiff could not benefit from the contract to which he was not a party.  Moreover, McInnish cannot be held liable to Davis for work Davis may have done for MHA after McInnish's departure.

Furthermore, the Defendant MHA has indicated it has reached a monetary settlement with Plaintiff. Such a settlement would moot any arguable claim Davis advances under a quantum meruit theory, as well as the state contract theory.

### C.  McInnish Is Entitled To Immunity From All State Claims.

Given that Davis' claims target actions taken by McInnish pursuant to his official duties and performed in good faith for the benefit of the MHA, McInnish should not be held liable under state law theories. See Ex Parte Cranman, 792 So.2d. 392 (Ala. 2000); Carpenter v. Tillman, 2006 WL 1875461 (Ala. 2006). Davis' claims are premised on the assumption that McInnish was involved in discretionary acts, but Davis has produced no evidence that McInnish acted in bad faith, with malice or willfulness. Wright v. Wynn, 682 So.2d 1, 2 (Ala. 1996). McInnish is entitled to immunity.

### II.  SUMMARY JUDGMENT IS WARRANTED ON ALL CLAIMS CONTAINED IN DAVIS' "SECOND CAUSE OF ACTION."

### A.  Davis Cannot Sustain A First Amendment Claim.

Davis' First Amendment claim is conclusively foreclosed by the recent Supreme Court decision of Garcetti v. Ceballos, 126 S. Ct. 1951 (2006). Ceballos was a government attorney who spoke on matters pursuant to his official duties, thus rendering him not a citizen for First Amendment purposes. Id. at 1960. The Court held that when those working for a public entity "make statements pursuant to their official duties, [they] are not speaking as citizens for First Amendment purposes." Id. The fact that Davis' alleged speech was made pursuant to his official responsibilities and duties stripped such alleged speech of First Amendment protection. Id.

Similarly, any alleged speech by Davis could not be "fairly characterized as constituting speech on a matter of public concern."  Chesser v. Sparks, 248 F.3d 1117, 1122 (11th Cir. 2001) (citations and quotations omitted).  Even though Chesser spoke on a legal issue relating to FLSA compliance, she was denied First Amendment protection and the defendant was granted qualified immunity.  Chesser, 248 F.3d at 1123-24 (declining to find a clearly established constitutional right to inform one's supervisor of the requirements of the law).  As was the case in Chesser, there is no clearly established law holding that Davis' alleged speech constituted speech on a matter of public concern.

In addition, Davis can not satisfy the second prong of the well-known balancing test set forth in Pickering v. Board of Education, 391 U.S. 563 (1968).  As this Circuit has explained: "Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful."  Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323 (11th Cir.1989).  Davis cannot make the extraordinary showing that *Pickering* balancing of his purported speech would inevitably lead to the conclusion that the alleged action taken against him was unlawful.  *Chesser*, in fact, shows that the balancing test would weigh against Davis.

Furthermore, there is no evidence that Davis' alleged speech played any part in any relevant decision.  More importantly, there is no evidence that McInnish took any action against Davis based on his alleged speech.  In fact, McInnish had no ability to take such action against Davis during the time frame for which Davis complains.  Davis' First Amendment claim fails, and Davis can present no clearly established law demonstrating

36

that he is entitled to First Amendment protection. McInnish is entitled to summary judgment and qualified immunity.

### B.    Davis Cannot Sustain A Thirteenth Amendment Claim.

The Thirteenth Amendment provides no independent cause of action. Indeed, the Civil Rights Act of 1866 was enacted to provide a method for its enforcement. Because Davis merely advances a bare bones claim under the Thirteenth Amendment, he advances no claim at all. Bray v. RHT, Inc., 748 F. Supp. 3 (D.D.C. 1990), judgment aff'd, 976 F.2d 45 (D.C. Cir. 1992) (Thirteenth Amendment to United States Constitution does not give rise to independent cause of action; to enforce rights guaranteed under Thirteenth Amendment plaintiff must invoke statutes enacted by Congress for enforcement of such rights, such as § 1981); *see also* Bascomb v. Smith Barney Inc., 1999 WL 20853 at 6 (S.D.N.Y.1999); Matthews v. Freedman, 128 F.R.D. 194, 202 n. 2 (E.D.Pa.1989)(citing cases), *aff'd,* 919 F.2d 135 (3d Cir.1990). The Eleventh Circuit has addressed such a claim at least twice but in each instance disposed of the claim on other grounds, obviating a holding as to whether a cause of action exists directly under the Thirteenth Amendment. *See* Arnold v. Board of Education, 880 F.2d 305, 309, 315 & n. 12 (11th Cir.1989) ("[w]hether a claim may be brought directly under the thirteenth amendment remains undecided"; the claim was properly dismissed because the plaintiff claimed involuntary servitude but alleged nothing to indicate the services were performed involuntarily); Terry Properties, Inc. v. Standard Oil Co., 799 F.2d 1523, 1534, 1536 (11th Cir.1986) (after noting in dictum that private defendants "may also be liable directly under the Thirteenth Amendment as it absolutely prohibits the practice of slavery," upholding a

defense judgment on the grounds that no badge or incident of slavery was established).

In the event that the Court were to consider an independent Thirteenth Amendment claim, Davis' dearth of evidence of discrimination falls far short of stating a Thirteenth Amendment claim.  Davis can produce no evidence that is anywhere near "comparable to the odious practice the Thirteenth Amendment was designed to eradicate."  Terry Properties, Inc., 799 F.2d at 1536 (quoting City of Memphis v. Greene, 451 U.S. 100, 128 (1981)).

As explained in detail in the factual background, supra, there is simply no evidence of racial discrimination, there is no evidence Davis was treated worse than anyone similarly situated, and there is no evidence that McInnish harmed Davis in any way.

### 1.    The Plaintiff Cannot Prove a *Prima Facie* Case of Discrimination when McInnish Took No Adverse Action Against Davis.

Plaintiff cannot establish a *prima facie* case of race discrimination for many reasons, including that McInnish did not deny him the fees that form the core of Davis' complaint.  The denial of Davis' fees was not discriminatory, but even if it were, there is no evidence McInnish had anything to do with such denial.  It is undisputed that McInnish had been suspended by the MHA and had no ability to act on Davis' fees. Sprayberry testified that he reviewed Davis' fees without input from McInnish.  There is no evidence to the contrary, conclusively demonstrating that summary judgment should be granted.  Plaintiff, therefore, cannot prove a prima facie case for this claim.  Schultz v. Burlington Northern Railroad, 115 F.3d 1407, 1413 (1997).  See also Culley v. Trak Microwave Corp., 117 F.Supp. 2d 1317, 1322 (M.D. Fla. 2000).

McInnish never took any adverse employment action against Davis. McInnish cannot be held liable for accepting Davis' investigation to "negotiate" his hourly rate, a rate Davis voluntarily accepted. Davis cannot claim that he was similarly situated to the Bradley Arant firm, nor can he show that his rate of pay was set for any non-business related reason. Of course, McInnish cannot be held liable for any action taken against Davis after McInnish was unjustly suspended in November 2004.

2.      **The Plaintiff Cannot Prove that Any Action Allegedly Taken Against Him Was Discriminatory.**

Even if Plaintiff were able to establish a *prima facie* case for his claims, summary judgment is proper because he cannot show that the reasons for negotiating his pay rate or denying him fees were discriminatory or otherwise pretextual. Very simply, Plaintiff has no evidence of race-based comments or discriminatory treatment, to demonstrate a discriminatory motive. In the absence of such evidence, Plaintiff might argue the reasons for the denial of fees in this case are pretextual because he says he deserved them. As the following analysis of the evidence will show, Plaintiff cannot show that the decision at issue was otherwise pretextual.

a.)      *The Plaintiff Has No Evidence of Race-Related Comments.*

First, Plaintiff has no evidence of race-based comments. There is <u>no evidence</u> that any race related statements or comments were made by a decisionmaker or anyone else at MHA, which would show or even suggest that MHA even considered Plaintiff's race in making the decisions at issue in this case. More importantly, there is no evidence Defendant McInnish made any race-related comments. <u>Compare</u> <u>Mencer v. Hammonds</u>, 144 F.3d 1056 (11th Cir. 1988) (upholding summary judgment despite the presence of race-related comments).

**b.)      *The Plaintiff Has No Evidence of Disparate Treatment.***

Second, Plaintiff has no evidence of disparate treatment.  Plaintiff has <u>no evidence</u> to show that McInnish or any decisionmaker treated Plaintiff any differently than anyone else similarly situated.  Similarly, Plaintiff has no evidence to show that McInnish has ever discriminated against anyone during any of his many dealings with Davis or other law firms, much less during any interaction that is relevant to this case.

**c.)      *The Plaintiff Has No Evidence of Pretext.***

Plaintiff's entire case is limited to the allegations that negotiating his hourly rate and denying his fees were discriminatory.  However, Plaintiff is simply unable to produce any evidence showing McInnish's actions were discriminatory or that any action taken was pretextual.   The Eleventh Circuit "requires a strong showing in disparity in qualifications in order for an inference of discrimination to lie."  <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1187 (11th Cir. 2001).  Davis cannot begin to show that he was more qualified than the Bradley Arant law firm or that he could as rapidly, efficiently and effectively handle the broad range of legal issues Alabama's largest law firm could handle.  <u>Campbell v. Rainbow City</u>, 434 F.3d 1306, 1314 (11th Cir. 2006) (comparator must be similar in "all relevant respects").  Davis certainly cannot show that he was somehow substantially more qualified than the Bradley Arant attorneys, or that no reasonable person would dispute the disparity in their qualifications.  Because Davis cannot show that his job and his services were "nearly identical" to those of the Bradley Arant law firm, his evidence fails to carry his burden set forth in <u>Nix v. WLCY Radio</u>, 738 F.2d 1181 (11th Cir. 1984).

As noted, even if Davis could produce some attenuated evidence of discrimination, he cannot show that <u>McInnish</u> discriminated against him. McInnish was not even working for the MHA when Davis' fees were denied.

There can be no doubt but that any arguable or theoretical independent cause of action under the Thirteenth Amendment has not been set forth in clearly established law. There is simply no way that a reasonable official in McInnish's position could be expected to know that his alleged misdeeds could possibly constitute a violation of the anti-slavery provisions of the Thirteenth Amendment. There is no case law that even remotely suggests that negotiating a voluntarily accepted pay structure with a contract attorney (who, among other things, is a professional negotiator) could constitute a Thirteenth Amendment violation. This is especially true given that it was Davis who invited the negotiation by indicating his pay was "negotiable" on his application. Similarly, McInnish cannot be held liable, and must be granted immunity, for the denial of payments to Davis after McInnish was suspended. Summary judgment must be entered in McInnish's favor on all race claims.

### C.    Davis Cannot Sustain A Fifth Amendment Due Process Claim.

The Fifth Amendment's Due Process Clause constrains the actions of federal, rather than state, actors. <u>See</u> <u>Barron v. The Mayor and City Council of Baltimore</u>, 7 Pet. 243, 8 L.Ed. 672 (1833) (Marshall, C.J.) ("the fifth amendment must be understood as restraining the power of the general government, not as applicable to the States;" "We are of opinion that the [just compensation] provision in the fifth amendment [is] intended solely as a limitation on the exercise of power by the government of the United States,

and is not applicable to the legislation of the States."). Because McInnish was not a federal employee and did not act on behalf of the federal government, there can be no Fifth Amendment Due Process claim against McInnish.[1]

Although Davis' Complaint does not specify whether he attempted to bring a substantive or a procedural due process claim, it is clear the he can prove neither and would clearly be entitled to qualified immunity in either instance. The principles of McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994), cert. den., McKinney v. Osceola County Bd. of County Com'rs, 513 U.S. 1110 (1995), foreclose any recovery under the due process clause.

### 1.    Davis Cannot Prevail on a Substantive Due Process Claim.

Davis has brought a due process claim based on the Fifth Amendment rather than the Fourteenth Amendment, meaning among other things that he can advance no substantive due process claim grounded in an incorporation theory. Planned Parenthood v. Casey, 505 U.S. 833, 847 (1992) ("The Due Process Clause…incorporates most of the Bill of Rights against the States."). Likewise, there are no cases that would remotely suggest that McInnish took any action against Davis that would "shock the conscience." County of Sacramento v. Lewis, 523 U.S. 833 (1998). Indeed, Plaintiffs' Complaint ties his due process claim to a deprivation of "property rights," and there is nothing in the record that would support a substantive due process claim. Collins v. City of Harker

---

[1] The Eleventh Circuit has adopted a heightened pleading standard that applies to claims of constitutional violations brought against public officials. See Oladeinde v. City of Birmingham, 963 F.2d 1481, 1485 (11th Cir. 1992). This standard requires a plaintiff to provide "some specificity" in the facts when pleading a claim against an official in his individual capacity. See GJR Invest., Inc. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998). Accordingly, a court should render judgment against a plaintiff when a plaintiff fails to adequately plead the violation of a constitutional right. See Chesser v. Sparks, 248 F.3d 1117, 1122 (11th Cir. 2001).

Heights, 503 U.S. 115, 125 (1992) (demonstrating the extreme difficulty of shocking the judicial conscience).

### 2.    Davis Cannot Prevail on a Procedural Due Process Claim.

To prevail on a procedural due process claim, Plaintiff has to show that McInnish deprived him of a property interest.  As discussed above, McInnish did not deprive Davis of any protected interest.  McInnish had no authority to pay Davis once he was no longer working for MHA.  Yet Plaintiff testified that his due process claim related solely to the denial of his fees for work done after McInnish was unjustly removed from his position. (Davis Dep. III, p.148, ln.13-p.149, ln.2).  Additionally, Davis had no property interest in avoiding a negotiation regarding his compensation; indeed, it was Davis who voluntarily offered that his proposed hourly rate was negotiable.

Courts generally do not find protected property interests in contract and pay disputes so that they can avoid turning an ordinary breach of contract claim into a § 1983 claim.  Medical Laundry Serv. v. Board of Trustees, 906 F.2d 571, 573 (11th Cir. 1990); Dover Elevator Co. v. Arkansas State Univ., 4 F.3d 442, 446 (8th Cir. 1995) (declining to recognize a due process claim based on breach of contract); see also Lujan v. G & G Fire Sprinklers, 532 U.S. 189 (2001) (assuming without deciding that government subcontractor had property interest in payments due under contract, availability of breach of contract action satisfied procedural due process).  Similarly, this Circuit has held that a plaintiff had no property interest in redeveloping city property since the governing statute allowed the city broad discretion in choosing the community redeveloper.  Key West Harbor Development Corp. v. Key West, 987 F.2d 723, 727-29 (11th Cir. 1993).

Moreover, it is clear that McInnish took no action that deprived Davis of anything, much less of a constitutionally protected property interest. McInnish was not involved in denying Davis' fees. Davis clearly has no constitutional right to a non-negotiated fee. To the extent Davis advances such a claim, McInnish merely accepted Davis' voluntary invitation to "negotiate" and attempted to make the most financially sound deal he could for HUD. There is no due process claim here, but even if there were, there is no clearly established law demonstrating that McInnish's actions were plainly unlawful.

Relatedly, the <u>McKinney</u> court made clear that the appropriate remedy for a procedural due process violation is "equitable: for instance, in an employment case, the claimant typically seeks reinstatement and a properly conducted pre-termination hearing." <u>McKinney v. Pate</u>, 20 F.3d at 1557; <u>see also</u> <u>North Florida Educ. Development Corp. v. Woodham</u>, 942 F. Supp. 542, 550 (N.D. Fla. 1996). But to the extent Davis requests damages for a due process violation, such request is in the nature of remedying the deprivation of a substantive right, a deprivation that Davis did not suffer. <u>Id</u>. As noted, Davis cannot prove a substantive due process claim. Even if Davis could prove a procedural due process claim, which he cannot, Davis can receive no relief from McInnish. Moreover, Davis has been offered adequate remedies for his hypothesized deprivations. McInnish is entitled to qualified immunity and the entry of summary judgment is in his favor.

## D.    **Defendant McInnish Is Protected By Qualified Immunity.**

Once it is established that the Plaintiff has stated a claim and that the Defendant was acting within his discretionary authority,[2] the Court then considers whether the contours of the constitutional right allegedly violated were "clearly established."

### 1.    **The Eleventh Circuit's Requirements as to What Constitutes "Clearly Established Law" Remain Demanding.**

In making as assessment of whether the defendant's particular conduct was clearly established as being violative of constitutional dictates, the reviewing court must examine the state of law at the time the alleged deprivation occurred.  See Rodgers v. Horsley, 39 F.3d 308, 311 (11th Cir. 1994); Adams v. St. Lucie County Sheriff's Dep't, 962 F.2d 1563, 1578 (11th Cir. 1992) (Edmondson, J., dissenting), rev'd and reasoning of original dissent adopted, 998 F.2d 923 (11th Cir. 1993) (en banc).

Not only must the "clearly established" law pre-date the subject incident, the law must be relatively "fact specific" and "so particularized" that it would have been obvious or "apparent" to the defendant that his actions were unlawful.  See Rodgers, 39 F.3d at 311; Hansen v. Soldenwagner, 19 F.3d 573, 575 (11th Cir. 1994) (both reversing denial of qualified immunity).  As the Eleventh Circuit has explained, "[a] plaintiff cannot rely on … 'broad legal truisms' to show that a right is clearly established …. 'If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'"  Kelly v. Curtis, 21 F.3d 1544, 1550 (11th Cir. 1994) (reversing denial of qualified immunity as to some defendants) (quoting Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1992)).  While the facts of prior cases establishing the law in a

---

[2] There appears to be no dispute that any decisions McInnish made or actions he undertook were pursuant to his official authority.  See O'Ferrel v. United States 998 F. Supp. 1364, 1369 (M.D. Ala. 1998) (describing the "discretionary authority" aspect of qualified immunity as a "low hurdle to clear" for defendants).

particular context need not be identical, they must be at least "materially similar." Adams, 862 F.2d at 1575 (Edmondson, J., dissenting) (*approved en banc*, 998 F.2d 923). This case law must "dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Lassiter, 28 F.3d at 1150; see also Denno v. School Bd. of Volusia County, Fla., 218 F.3d 1267, 1270 (11th Cir. 2000).

### 2.    Plaintiff Cannot Show That McInnish Violated Clearly Established Law.

Davis must show that the law was developed in such a precise and "concrete way" that "all reasonable government actors" in McInnish's circumstances would have known that his actions were constitutionally infirm.  In Mencer v. Hammonds, 144 F.3d 1056 (11th Cir. 1998), the court was presented with the opportunity to discuss qualified immunity in the context of discrimination claims.  The court reversed the district court's denial of qualified immunity reasoning that the evidence of intent to discriminate was so slight that no reasonable jury could have found intent to discriminate nor would a reasonable person have known that his actions amounted to discrimination.  See Mencer, 144 F.3d at 1071.  Just as in Mencer, the evidence of intentional discrimination on the part of McInnish is so slight (it is in fact non-existent) that he should be protected by qualified immunity.   No reasonable jury would believe – given the overwhelming evidence refuting Plaintiff's claims – that McInnish's actions were racially motivated. Further, applying the fifth principle of Lassiter, even if McInnish were motivated by animus, which he denies, he is still entitled to qualified immunity if an objectively

reasonable officer, acting without racial or speech-based animus, would have acted in the same manner.  Cf. Foy v. Holston, 94 F.3d 1528 (11th Cir. 1996).

It was objectively reasonable to attempt to negotiate a lower compensation package to protect scarce funds needed to run the MHA, especially when Davis had invited such negotiation by stating on his application that his requested $185/hour fee was negotiable.  It was also reasonable to value Davis' services differently from those provided by Bradley, Arant- the state's largest law firm.  Clearly, Davis' position could not be viewed as "nearly identical" to that of Bradley Arant, as required by Nix v. WLCY Radio, 738 F.2d 1181 (11th Cir. 1984).  The Board selected the two firms to perform entirely different legal tasks.  No reasonable person could question that all McInnish's actions were taken in the best interest of the MHA.

In the instant case, Davis lacks evidence of discrimination, or of any constitutional violation.  No reasonable person in McInnish's position would have known that his conduct with respect to Plaintiff constituted intentional discrimination or a constitutional violation.  Therefore, McInnish is entitled to qualified immunity as to Plaintiff's claims under § 1983.

### III.    SUMMARY JUDGMENT IS WARRANTED ON THE FTCA CLAIM CONTAINED IN DAVIS' "THIRD CAUSE OF ACTION."

Undaunted by the obstacle of statutory language, Davis purports to state a claim for "conspir[acy]" under the Federal Tort Claims Act ("FTCA").  A cursory reading of the statute shows it to be totally inapplicable to any potential claims against McInnish.  If it did apply, as Davis contends, there would be no other claims that could be brought against McInnish, and McInnish would be entitled to its immunity protections.

Although the statute provides no basis for bringing Davis' "conspir[acy]" claim, much less one untethered to any specific violation of any protected right, it is clear that Davis cannot present any admissible evidence of a conspiracy.  In order to establish a conspiracy claim, the plaintiff must initially prove "an agreement between two or more persons to deprive him of his … rights." <u>Dickerson v. Alachua County Commission</u>, 200 F.3d 761 (11th Cir. 2000).  Davis' conspiracy allegations which are based on hypothesis, conjecture, and rank speculation, utterly fail to establish that there was any agreement between any of the parties to deprive Davis of any conceivably protected right.  No right was violated and no agreement existed.  The intra-corporate conspiracy doctrine is a further bar to recovery in this case, since a corporation or governmental entity cannot conspire with itself.  <u>Id</u>.  Moreover, even had McInnish reached some agreement with Sprayberry,[3] which he did not, he had no ability to take any action whatsoever in furtherance of such conspiracy since he had been suspended prior to the denial of Davis' fee request.

Furthermore, as the United States has explained, since Plaintiff has not complied with the administrative claim requirements of the FTCA before filing this lawsuit, any FTCA claims must be dismissed for lack of jurisdiction.  The FTCA, as a limited waiver of sovereign immunity, is explicit in setting forth the requirements for invoking a court's jurisdiction to hear tort claims.  <u>See</u> 28 U.S.C. § 2675(a).  A plaintiff must present a written administrative claim to the agency whose activities gave rise to the claim and have the claim finally denied before filing a lawsuit.  <u>See</u> <u>McNeil</u>, 508 U.S. at 111-113;

---

[3] Defendant Long has been dismissed by Plaintiff on the basis that there was no evidence to implicate her in any conspiracy or wrongdoing against Davis.  <u>See</u> Davis Motion to Dismiss Long.

see also <u>Ivey v. United States</u>, 873 F. Supp. 663, 669 (N.D. Ga. 1995) (dismissing FTCA claim when plaintiff failed to file administrative claim with HUD).

The FTCA features unforgiving administrative filing requirements that Davis has not fulfilled.  He knows he has not fulfilled them, yet he has refused to dismiss this frivolous claim.  McInnish is entitled to summary judgment.

## **CONCLUSION**

For the foregoing reasons, Defendant McInnish respectfully requests that the Court grant this Motion in its entirety and grant summary judgment on all claims in favor of McInnish.

Respectfully submitted this the <u>5th</u> day of January, 2007.


<u>/s/ M. Wayne Sabel</u>
M. Wayne Sabel (SAB002)
Mark Sabel (SAB004)
Maricia Woodham (BEN050)
Attorneys for Defendant McInnish


OF COUNSEL:
SABEL & SABEL, P.C.
Hillwood Office Center
2800 Zelda Road; Suite 100-5
Montgomery, AL  36106
Telephone:  (334) 271-2770
Facsimile:  (334) 277-2882

## CERTIFICATE OF SERVICE

I do hereby certify that on the 5th day of January, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Dwayne Brown, Esq.
5925 Carmichael Road
Post Office Box 230205
Montgomery, Alabama  36123-0205
E-Mail:  dbrown@dbrownatty.com

Ernestine S. Sapp
Gray, Langford, Sapp, McGowan, Gray and Nathanson
P.O. Box 830239
Tuskegee, AL
E-Mail:  esapp@glsmgn.com

Dorman Walker
Balch & Bingham LLP
105 Tallapoosa Street, Suite 200
Montgomery, AL  36104
E-Mail:  dwalker@balch.com

Charles A. Stewart, III
Angela R. Rogers
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, Alabama  36104
Email:  cstewart@bradleyarant.com
Email:  arogers@bradleyarant.com

Leura Garrett Canary
James J. DuBois
U.S. Attorneys Office
P.O. Box 197
Montgomery, AL  36101
Email:  Leura.canary@usdoj.gov
Email:  james.dubois2@usdoj.gov

Michael J. Cohan
Randall C. Morgan
Hill, Hill, Carter, Franco, Cole & Black
Post Office Box 116
Montgomery, AL  36101
Email:  mcohan@hillhillcarter.com
Email:  rmorgan@hillhillcarter.com

Respectfully submitted this the 5th day of January, 2007.


/s/ M. Wayne Sabel
M. Wayne Sabel (SAB002)
Mark Sabel (SAB004)
Maricia Woodham (BEN050)
Attorneys for Defendant McInnish


OF COUNSEL:
SABEL & SABEL, P.C.
Hillwood Office Center
2800 Zelda Road; Suite 100-5
Montgomery, AL  36106
Telephone:  (334) 271-2770
Facsimile:  (334) 277-2882