IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| TERRY G. DAVIS ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No.: 2:05cv1235MHT |
| ) | |
| ) | |
| R. EDMOND SPRAYBERRY, et al. ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS MCINNISH AND SPRAYBERRY'S MOTIONS FOR SUMMARY JUDGMENT**

Comes Now, Plaintiff Terry G. Davis, by and through the counsel and hereby submits this Memorandum Brief in Response to Motions for Summary Judgment filed by Defendants C. Michael McInnish and R. Edmond Sprayberry.

Plaintiff in this action seek redress against Defendants C. Michael McInnish and R. Edmond Sprayberry for violations of his equal protection rights (race), due process rights (property), and freedom of speech rights under the First, Fifth, and Thirteenth Amendments to the United States Constitution. Plaintiffs further seek relief pursuant to 42 U.S. C 1983 and claims a Bivens cause of action (Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971)

**A.**

**STATEMENT OF THE FACTS**

On October 31, 1992, Plaintiff, an African-American citizen, submitted a response to a Request for Proposals (RFP) for legal services from the Housing Authority of the City of Montgomery, Alabama (MHA). Plaintiff learned of the RFP from Clifford Holmes, who

1

at the time, was serving as chairman of the MHA Board of Commissioners. Defendant Holmes told Plaintiff that MHA wanted to hire an African-American attorney to serve as general counsel for the Board because it had never done so. (Davis Vol. I. pp. 18-20) Following the submission of his proposal, Plaintiff met with Defendant C. Michael McInnish, who was serving as the executive director for MHA. The hourly rate proposed by Plaintiff to do the work was $185 /hr for out-of-court and $195/hr for in-court. (PX-1 ) Defendant McInnish informed Plaintiff that the Board had only authorized him to pay attorneys working for MHA $175 /hr. He further indicated that $175 was all he would be able to agree to. Taking Defendant McInnish at his word and relying on his representation, Plaintiff agreed to become counsel for the MHA Board of Commissioners and executed a contract at $175 /hr.

Charles Stewart and members of the law firm of Bradley, Arant, Rose and White also responded to the RFP and were hired by McInnish. Defendant McInnish, however agreed to pay Defendant Stewart $270 /hr, Scott B. Smith $240 / hr and Timothy Cummins $180 /hr. These individuals are all white males with less years of experience and qualifications than Plaintiff. (McInnish Res. to Plaintiff's Req. for Adm. #5, PX 29) (PX 2 ) Defendant McInnish says they paid Stewart's firm the higher rates because their firm refused to negotiate or reduce its fees. (McInnish Brief pp16-16) Board members were kept in the dark and unaware that McInnish was paying Plaintiff a lower rate than Stewart and members of his law firm. (Davis pp.33-34) (PX 2, Interrog. Related to Plaintiff's Res to Def. McInnish's Req. for Adm. PX 30) Former Board member Bettie Barnett testified that the MHA Board was not aware that McInnish was paying Plaintiff less than Charles Steward and that the Board had not authorized a difference in rates paid to attorneys. She further testified that she was "outraged" when she learned Plaintiff was being paid less. Other members of the board were concerned as well. (PX 31 Barnett pp. 126-

2

129) Plaintiffs is an African-American and Charles Stewart is white and Defendant McInnish was acting on his own and without Board authority when he paid Plaintiff a lower rate than Charles Stewart .(PX 31 Barnett pp. 156-158)

In April 2004, the MHA Board directed Plaintiff to conduct an inquiry of its executive director, C. Michael McInnish, regarding why certain information was not transmitted to the Board and why Board Counsel [ Plaintiff ] was not kept informed as to all legal matters involving the Montgomery Housing Authority. The Board also wanted to know why Charles Stewart, who also did legal work for MHA, reported to and answered to Defendant McInnish and not the Board. It was during this investigation, when it was discovered that Defendant McInnish was paying significantly higher hourly rates to Mr. Stewart and members of his law firm as compared to rates paid to Mr. Davis. For several months in 2004, Defendant McInnish attempted to intimidate Plaintiff by scrutinizing his invoices in "microscopic detail". (PX 2A) McInnish would ask Plaintiff to explain why he spent more than one hour researching a particular matter, or whether work was performed on a certain day. Defendant McInnish would also ask Plaintiff to re-submit and re-calculate his invoices. McInnish would also delay payment or make a partial payment on Davis' invoices. McInnish also questioned whether a document was filed in court in a timely manner after McInnish learned from Mr. Stewart that the pleading had not been filed. What Defendant McInnish did not know or learn from Mr. Stewart was that Plaintiff had obtained an extension from the court because the parties were discussing settlement of the case.    (PX 2, PX 2-A )  (Davis Vol. I. pp. 188-197) Plaintiff complained to the Board about the treatment he was receiving from McInnish. Subsequent to his complaint, Plaintiff was instructed to submit his invoices to the Chairman of the Board who would review and authorized them for payment. (PX 3)    Defendant McInnish testified that he never questioned any invoice

of Mr. Stewart and never marked up or scrutinized invoices from Mr. Stewart and his law firm. (Stewart pp. 48-49)

Defendants Sprayberry (HUD Region IV Director) and McInnish have denied that Sprayberry has any knowledge of rates paid by McInnish and the MHA to Plaintiff and Charles Stewart. (McInnish 127, p. 23) However, a letter to Sprayberry from McInnish dated May 3, 2004 confirms that Sprayberry was provided with the contract of both Plaintiff and Stewart. (PX 4) Discussion between Sprayberry and McInnish is further confirmed in a subsequent email from McInnish dated May 13, 2004. (PX 5 ). Moreover, all contracts for legal services as well as language of the meeting of the Board provide that the contract is subject to HUD approval. (PX 6) (Davis Vol. II. pp. 34-37)

On or about September 10, 2004, MHA Board Chairman Thomas Taylor became aware that McInnish was not moving forward with the Board of Commission's informal commitment to facilitate the sale of Riverside Heights as long as there was compliance with HUD regulations and residents displaced. McInnish, as was all parties involved, knew that time-was-of-the-essence and the transaction by the MHA Board had to be completed by the end of December 2004. Chairman Taylor there after authorized Plaintiff to conduct an inquiry into the status of the Riverside Heights project. The chairman also directed Mr. McInnish to provide him a full status report. Plaintiff's findings were presented to the board of commissioners at a regular meeting on November 16, 2004. The findings included a report that among other things, that McInnish had not reported to and in fact concealed from the board that in a meeting McInnish had on September 24, 2004, with the Mayor of the City of Montgomery, that the Mayor had made a formal offer to purchase Riverside Heights for $12 million. (PX 7)

At the November 16, 2004 meeting, the Housing Authority for the City of Montgomery voted by a vote of 6 to 1 to suspend, with pay, its executive director Defendant C. Michael McInnish, pending an investigation into his activities as executive director. McInnish's suspension was also based upon the fact that he had made an undisclosed trip with board member Richard Bollinger, to Washington DC at the expense of the Montgomery Housing Authority. The Board, directed Plaintiff to conduct a full investigation into the activities of Defendant McInnish as executive director. (PX 7) Four of the six commissioners who voted in favor of suspension were African-American and two were white. (Sprayberry pp. 69)

On December 15, 2004, Plaintiff Davis presented his findings to interim executive director and on December 23, 2004, ten (10) charges were presented against Defendant McInnish. Among the charges against McInnish, were concealing material information from the Board necessary for it to adequately perform its duties; insubordination; failure to perform duties in a satisfactory manner; showing favoritism to an employee; and excessive absences from work and misconduct. Based upon the evidence presented by Davis to the interim executive director, a recommendation was made to terminate the employment of C. Michael McInnish as executive director and a disciplinary due process hearing was set. (PX 8)

Chairman Taylor notified Defendant Sprayberry of Defendant McInnish's suspension on November 17, 2004, the day following the suspension and communicated with Sprayberry by letter regularly.(PX 18) Immediately upon learning of McInnish's suspension, Sprayberry began efforts to impede the investigation of McInnish. Sprayberry refused several requests from the Board chairman to come to Montgomery and further refused to contact General Counsel for information regarding the investigation. Defendant Sprayberry sought to retaliate against the MHA by immediately placing total procurement restrictions on the MHA without cause, without

an investigation and without an explanation. Sprayberry received a call from Jill West about McInnish's suspension. (Sprayberry 53-61)  Sprayberry refused to authorize the expenditure of any expenses associated with the investigation of former executive director McInnish. Defendant McInnish had become a close friend of Defendant Sprayberry.  Defendant Sprayberry often requested McInnish to serve on various national committees and conduct various seminars at HUD-related events for employees and commissioners around the country. McInnish was further known to have considerable influence within the U.S. Department of Housing and Urban Development.

In a letter dated November 22, 2004, MHA Board Chairman, Thomas Taylor responded to Defendant Sprayberry's initial efforts to punish MHA by informing him regarding the injustice of his actions. (PX 9)  On December 1, 2004, Chairman Taylor wrote a conciliatory letter and requested approval of Plaintiff's expenses not to exceed $35,000.  (PX 10)   However, Taylor's request was rejected by Sprayberry who stated " we cannot determine if the costs are eligible, reasonable and within the 'scope of services' of the Attorney Employment for Mr. Davis."  Defendant Sprayberry continued to get MHA to relent in its presentation of charges against McInnish by calling Chairman Taylor and "chastising" him for having acted against McInnish. In a letter dated January 3, 2005, Chairman Taylor wrote Defendant Sprayberry and confirmed that he "chastised" him.  Taylor also stated that Sprayberry had threatened to attend the meeting, but sounded as though he would be there to support Defendant McInnish (PX 11).

At every turn Defendant Sprayberry used his authority to impede the investigation of McInnish and the presentation of charges in support of a recommendation of termination. The MHA Board followed its Personnel Policy and the policies of the Montgomery City County Personnel Board.  It was this process, Defendant Sprayberry continuously sought to disrupt and

6

personally inject himself into for the benefit of McInnish. Defendant Sprayberry's interference with the MHA's Board's effort to discipline its executive director was extraordinary and unprecedented. Sprayberry even recommended his own process, which would have the MHA Board abandon due process procedures. He suggested that MHA call a special meeting to review the charges and if it was satisfied with McInnish's explanation, put him back to work. (PX 12)

Chairman Taylor approved payment of Plaintiff's invoice for services rendered relating to the investigation of Defendant McInnish. (PX 13) However, Defendant Sprayberry refused to allow the payment to be made and disapproved total expensed in the amount of $25, 923.38. (PX 14)

On December 21, 2004 to re-employ Plaintiff before his current contract expired. (PX 15). However, Defendant Sprayberry's unilaterally reversed the MHA's formal decision to re-employ Plaintiff as counsel when he disapproved the MHA vote. Despite the fact that the investigation was ongoing and Plaintiff had the lead role in the preparation and presentation of evidence to support the charges, Sprayberry decided that Plaintiff should not be re-employed and instructed the MHA not to execute his contract. ( Davis Vol III pp. 46–53) Defendant Sprayberry, during his deposition initially denied that he singularly blocked the MHA's action to rehire Plaintiff. However, when he was presented with a letter he signed dated January 12, 2005, instructing the MHA not to execute Plaintiff's contract, Sprayberry recanted his testimony. (Sprayberry pp. 139, 142, 156-158 (PX- 15-A)

Defendant Sprayberry's actions against Plaintiff continued even after blocking MHA's effort to rehire Plaintiff. Sprayberry forced MHA to change its evaluation process and create a new process to insure that Plaintiff and his firm would not score highest in the process. (Davis

7

Vol. III. pp.49-52 ) Plaintiff and his firm previously scored highest among firms that were evaluated for the two-year contract scheduled to begin January 1, 2005 though December 31, 2006, using the same process that had been used in previous years. (PX 16,17,18)   However, Defendant Sprayberry required MHA to use a person, George B. Chabot, from the HUD Atlanta Regional Office, Region IV to create the new evaluation process. (PX 19) According to an email from an employee in the MHA office to Defendant Sprayberry's office, the new evaluation process had never been taught at any HUD conferences and was not a part of the HUD Procurement Manual. (PX 20)  Plaintiff scored lowest under the new process when the same three firms were re-evaluated. (PX 21)

Following Plaintiff's involuntary resignation as MHA counsel, Defendant Sprayberry's continued interference in disciplinary proceedings involving Defendant McInnish included forcing MHA to disregard sitting hearing officer, Fred Bell, an African-American attorney. Mr. Bell had been previously selected as the hearing officer from among three firms who submitted responses to a request for proposal. (PX 22) (Davis Vol. II. 165-170)  MHA nor Sprayberry communicated with Mr. Bell to inform him of any decision though he had been selected and had ruled on two motions filed in the proceeding.  Defendant Sprayberry on several occasions set the requirement that the hearing officer selected had to be satisfactory to Defendant McInnish. (PX 23, 24).  David Barley, who had become chair of the Board by June 20, 2005 and on that date wrote Defendant Sprayberry expressing his serious concern with allowing an employee facing charges to participate in the selection of the hearing officer.  Chairman Barley wrote:

> "The second paragraph of your May 24, 2005 letter raised a major issue that is somewhat troubling and potentially problematic.  In the last sentence of this paragraph you asked us to provide you with 'proof that Mr. McInnish has been or is being included in the selection process for a hearing officer.  Our RFP process and personnel policies, as approved by HUD, are intended to be fair and impartial, but neither give

8

> a subject employee a role in selecting a hearing officer. To grant such a privilege to Mr. McInnish would be in conflict with the policy and expose us to potential litigation from every employee that has been through this process to date (potentially hundreds of employees)." (PX 25)

Defendant Sprayberry's retaliation against MHA and Plaintiff is further evident from an official letter dated October 31, 2005, sent by Defendant Sprayberry to MHA in which Sprayberry makes knowingly false administrative findings against the MHA Board of Commissioners. (PX 26) For example Sprayberry wrote on page 3: "<u>As early as April 2004, Defendant McInnish complained to the Board about discrimination against him, yet the Board took no action</u>." However, McInnish never filed a complaint of discrimination with the MHA Board. In his deposition, when Defendant Sprayberry was presented with the April 23, 2004 memo he claimed was the *complaint* "about discrimination", Sprayberry refused to provide an answer to the question about his finding being "in error". (PX 27, Sprayberry pp. 195-201) McInnish's strongest ally on the MHA Board, former defendant LuAn Long, even testified that the April 23, 2004 documents referred to by McInnish and Sprayberry was, in fact, not a complaint and that McInnish has not filed a complaint with the MHA Board alleging racial discrimination. (Long pp. 29-31) Former commissioner Bettie Barnett also testified that McInnish never filed a complaint of discrimination with the MHA board. (PX 31 Barnett 100-101). Another example of a false finding is Sprayberry's statement on the second page of PX 26, where Sprayberry wrote: "<u>You failed to afford Defendant McInnish the opportunity for a hearing</u>." The record is replete with examples of the difficulty MHA was having affording Defendant McInnish a hearing because of Sprayberry. He actually informed the MHA Board Chairman that he would be attending the hearing, which was scheduled for January 19, 2005. (See, PX 11)

9

Former Commissioner Barnett testified that McInnish frequently used his relationship with Sprayberry to get what he wanted at MHA. When ever McInnish was questioned about anything, he would respond that "the talked to Ed Sprabyerry". (PX 31 Barnett pp. 120-122)

The invoice for expenses of MHA's General Counsel which Defendant Sprayberry refused to approve, relating to the investigation of former executive director McInnish, totaled $25, 923.38. During his deposition, Defendant Sprayberry refused to answer the question that his approval was not required for expenditures of less that $100,000 by a local housing authority with a private attorney as provided in the HUD Litigation Handbook 1530.1, Rev 5, Ch.3.3 (3) <u>Litigation Services Contract With Private Attorneys</u>. (PX 28)

## B.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure allows for the granting of summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c ). Pursuant to Rule 56(c ), summary judgment is only appropriate where "there is no genuine issue as to *any* material fact and . . . the moving party is entitled to judgment as a matter of law. *Id.* (emphasis added). The moving party bears the initial burden of showing, by reference to the materials on file, that there are no genuine issues of material fact that should be decided at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991: *Brown v. Manning*, 764 F.Supp. 183, 186 (M.D. Ga. 1991). The applicable substantive law identifies the material facts and

proper standard of proof.[1] Evidence and inferences are to be viewed in the light most favorable to the nonmoving party. See *Matsushita Electric Industrial Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986); *Rollins v. TechSouth, Inc.,* 833 F. 2d 1525, 1528 (11th Cir. 1987) (quotations omitted). A dispute is regarded as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."' *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). Only when reasonable minds could not differ to the import of the evidence is summary judgment proper. *Id.* At 250-51. Ambiguities and reasonable inferences are to be viewed in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654**, 655, 82 S. Ct. 993, 994 (1962).**

C.

DISCRIMINATION

Section 1983: Substantive Due Process and Equal Protection Claims.

Plaintiff alleges that defendants exercised adverse employment decisions against him for arbitrary and capricious reasons in violation of his right to due process and equal protection under the law pursuant to 42 U.S.C. §§ 1983 and 1985 (3). In stating a claim under § 1983, it is essential that plaintiff produce sufficient evidence to establish discriminatory intent and purpose in defendants' conduct. Lee v. Conecuh County Board of Education, 634 F.23 959, 962 (11th Cir. 1981). Although the court cannot dismiss actions by employer that "absent any other explanation it is more likely than not that those actions were bottomed on impermissible considerations, "Lee, 634 F.2d at 962, the plaintiff must come forward with more evidence than his bare allegations. See Rule 56(e), Fed. R. Civ. P. Because this matter is before the court for consideration of defendants' assertion of qualified immunity, plaintiff must produce evidence

which would show that defendants knew or reasonably should have known that their actions toward plaintiff were irrational and arbitrary.

The gravamen of plaintiff's § 1983 claim is that he was subject to various arbitrary employment decisions implemented by the Board. Specifically, plaintiff alleges that defendants .

The plaintiff brings his claims under Title VII and 42 U.S.C. § 1983. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is the predicate for the plaintiff's claim for recovery under § 1983.[4] An employee may sue his or her public employer under both Title VII and § 1983 when the § 1983 violation rests on a claim of infringement of rights guaranteed by the United States Constitution. Richardson v. Leeds Police Department, 71 F.3d 801, 805 (11th Cir. 1995); see also Lightner v. City of Ariton, Alabama, 884 F. Supp. 468, 470-71 (M.D. Ala. 1995) (DeMent, J.).

### D.

### First Amendment Claim

Public officials sued in their individual capacities are not entitled to immunity from suit if their actions violated a clearly established constitutional right of the plaintiff. Holloman v. Harland, 370 F.3d 1252 (11th Cir. 2004). The contours of a public employee's constitutional right not to be subjected to an adverse employment action because of the employee's speech are clearly established. A First Amendment violation exists if "(1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; …(3) the speech played a substantial part in the adverse employment action;"and (4) the employer cannot show that it would have made

---

[4] The Equal Protection Clause provides the plaintiff "a right to be free from racial discrimination." Busby v. City of Orlando, 931 F.2d 764, 775 (11th Cir. 1991) (citing Washington v. Davis, 426 U.S. 229, 239-41 (1976).

12

the same decision in the absence of the protected speech. <u>Cook v. Gwinnett County Sch. Dist.</u>, No. 04-12914 at 10-11, slip op. (11th Cir. June 29, 2005). "The first two elements" of this four-part <u>Pickering-Connick</u> test are "questions of law designed to determine whether the employee's speech is protected by the First Amendment," while the second two elements go to the question of proximate cause. <u>Beckwith v. City of Daytona Beach Shores</u>, 58 F.3d 1554, 1564 (11th Cir. 1995).

E.

Due Process

Due process protections are implicated only when an employee has a legitimate property interest in continued employment. <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532 (1985); <u>Board of Regents v. Roth</u>, 408 U.S. 593, 602 (1972). Property interests, however, are not created by the Constitution itself.

> Rather, they are created and their dimensions are defined by existing rules and understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

<u>Id.</u> At 577.

Thus, an employee may obtain a property interest in employment by a formal policy, or by "mutually explicit understandings" which may be implied under the circumstances of employment. <u>Perry v. Sindermann</u>, 408 U.S. 564, 577 (1972). It is important to note, however, that to have a property interest in a benefit, an individual must have more than "an abstract need or desire for it" or a "unilateral expectation of it". <u>Roth</u>, 408 U.S. at 577. There must be a legitimate expectation of interest in continued employment.

13

**Qualified Immunity**

Plaintiff seeks to impose personal liability and monetary damages against each of the defendants. Plaintiff alleges that Defendants McInnish and Sprayberry engaged in conduct that they knew or should have known violated his rights under the first and fourteenth amendments.

The qualified immunity defense shields government officials performing discretionary functions from liability "insofar as their conduct does not violate the clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In evaluating the actions of government officials claiming qualified immunity, the court must employ an objective-reasonableness test: could a reasonable official have believed that his or her actions were lawful in light of the clearly established law and the information the official possessed at the time of the challenged conduct. Id..; Hutton v. Strickland, 919 F. 2d 1531, 1537 (11th Cir. 1990). Under the objective reasonableness test, the court must first determine whether the applicable law as clearly established. Harlow, 457 U.S. at 818; Hutton, 919 F.2d at 1538. "Clearly established" means that "the contours of the (violated) right must be sufficiently clear that a reasonable official would know that what he is doing violates the right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Under this standard, qualified immunity is available to protect "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

To defeat a qualified immunity defense, the plaintiff bears the burden of showing that the "legal norms allegedly violated by the defendant were clearly established at the time of the

challenged action or, . . . the law clearly proscribed the actions defendant took." Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir. 1989) quoting Mitchell v. Forsyth, 472 U.S. 511, 528 (1985). In determining whether the plaintiff meets this burden, the court is guided by the Eleventh Circuit's direction in Nicholson v. Georgia Dept. of Human Resources, 918 F.2d 145 (11th Cir. 1990):

> In satisfying this burden, the plaintiff cannot point to sweeping propositions of law and simply posit that those propositions are applicable. Instead, the plaintiff must draw the court's attention toward a more particularized and fact-specific inquiry. Under this inquiry, the plaintiff need not point to one or more cases that resolved the precise factual issues at issue in his or her case. [A]lthough the standard is fact-specific, it is not one of factual rigidity. Rather, the plaintiff need only show that there existed sufficient case law establishing the contours of his or her constitutional rights such that the unlawfulness of the defendant's conduct would have been apparent to a reasonable official in the same circumstances ad possessing the same knowledge as the defendant.

Id. At 147 (citations omitted).

If the plaintiff satisfies his initial burden and shows that the rights that defendants' conduct allegedly violated were established at the time of defendants' conduct, the court must then determine whether the plaintiff has adduced evidence sufficient to create a genuine issue of fact as to whether defendants actually engaged in conduct that violated clearly established law. Rich v. Dollar, 941 F.2d 1558, 1564 (11th Cir. 1988). See also Stewart v. Baldwin County Board of Education, 908 F.2d 1499, 1503 (11th Cir. 1990). As demonstrated by the facts, Defendant McInnish clearly had to know that he was violating Plaintiffs right not to be discrimininated against by reason of his race when he, on his own paid Plaintiff $175 / hour for his services and paid Charles Stewart, a white male, $270/ hour. Further Stewart was never subjected to the type of scrutiny in submitted his invoice as was Plaintiff. Defendant Sprayberry was also aware of the rates, but more particularly was aware that Plaintiff had the right to be paid for the services he rendered and a failure to authorize payment was a violation of Plaintiff's rights to due process. Defendant Sprayberry action in refusing to permit MHA to re-hire Plaintiff was also a

15

violation of Plaintiff's rights not to be discriminated against by reason of his race.  Sprayberry's requirement that MHA change its evaluation process is clear evidence of intent to discriminate against Plaintiff.  Defendants Sprayberry's actions also give rise to a Bivens claim.

Finally, the standing issue raised by defendants has been waived under Federal Rule 9 of Federal Rules of Civil Procedure.  Where defendants failed to raise as an affirmative defense a plaintiffs standing to sue under a contract, that defense is waived.

Respectfully submitted,


/s/ Dwayne Brown_____
Dwayne Brown
ASB-9396-B59D
Attorney for Plaintiff
**Law Office of Dwayne L. Brown, PC**
Post Office Box 230205
Montgomery, Alabama 36123-0205
Telephone: (334) 277-3757
Fax:  (334) 277-3613
E-Mail: dbrown@dbrownatty.com


/s/ Terry G. Davis_____
Terry G. Davis, Esq.,
 ASB-1565-A64-T
**Davis & Hatcher, L.L.C.**
4183 Carmichael Road, Suite B
Montgomery, Alabama 36106
Telephone:  (334) 270-0592
Fax        :  (334) 270-0362

OF COUNSEL:

Hon. Ernestine S. Sapp
**Gray, Langford, Sapp, McGowan, Gray & Nathanson**
P.O. Box 830239
108 Eastside Street
Tuskegee, Alabama 36083-0239
Telephone: (334) 727-4830
Fax: (334) 727-5877

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served upon the following by placing the same in the U.S. Mail, first class, postage prepaid, properly addressed as follows on this the 26th day of January, 2007.

M. Wayne Sabel, Sr., Esq.
Sabel & Sabel
Hillwood Office Center
2800 Zelda Road, Suite 100-5
Montgomery, AL 36106

Dorman Walker, Esq.
Balch & Bingham
Post Office Box 78
Montgomery, AL 36101

Charles A. Stewart, III, Esq.
Bradley Arant Rose & White, LLP
401 Adams Avenue, Suite 780
Montgomery, AL 36104

Micheal Cohan, Esq.
Hill, Hill, Carter, Franco, Cole & Black
Post Office Box 116
Montgomery, AL 36101-0116

James DuBois, Esq.
U.S. Attorney's Office
Post Office Box 197
Montgomery, AL 36101

/s/Terry G. Davis
 Of Counsel