# Exhibit # 19



**U. S. Department of Housing and Urban Development**
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, Alabama 35203-5301



February 18, 2005

Mr. George B. Chabot
Contract Specialist
U. S. Department of Housing and Urban Development
George Office
Administrative Service Center 2 – Atlanta Contracting Division
Five Points Plaza
40 Marietta Street
Atlanta, GA 30303-2806

Dear Mr. Chabot:

I would like to express my sincere thanks to you for your willingness to serve on the procurement panel to evaluate a Request for Proposal (RFP) at the Montgomery Housing Authority on Tuesday, February 15, 2005.

Your knowledge of the federal procurement regulations and experience in evaluating RFPs was most beneficial to the Montgomery Housing Authority. The staff has expressed their thanks for your help and support and the additional knowledge they learned from your visit.

Again, thank you for your professionalism and dedication to this Department and the programs we support. If I can be of assistance to you, please do not hesitate to contact me at (205) 731-2630 extension 1101.

Sincerely,

RES 2·18·2005

R. Edmond Sprayberry
Director
Office of Public Housing
Birmingham Office.

cc:
Ms. Norma S. Cannon, Director, Contracting Division, 4AAC

X -1162
LSØ(kunje)e

www.hud.gov          espanol.hud.gov

**SPRAY-0624**

THE HOUSING AUTHORITY OF THE CITY OF MONTGOMERY, ALABAMA

RECOMMENDATION FOR CONTRACTOR AWARD
Date: February 15, 2005

REQUEST FOR PROPOSAL: LEGAL REPRESENTATION SERVICES IN GENERAL LEGAL
MATTERS

RECOMMENDED NAME:

In accordance with HUD Regulation 24 CFR 85.36(b)(8), the MHA released
REQUEST FOR PROPOSAL (RFP) LEGAL REPRESENTATION SERVICES IN GENERAL
LEGAL MATTERS. We received three responses 1) Davis, Hatcher &
Parchman, LLC, 2) Bradley Arant Rose & White LLP and 3) Hill, Hill,
Carter, Franco, Cole & Black, PC. In accordance with the evaluation
criteria stated in the RFP, a three member Evaluating Committee
evaluated each proposal.

The legal firm who received the greatest number of points during the
evaluation process was Brady Arant Rose & White LLP. The legal firm of
Hill, Hill, Carter, Franco, Cole & Black PC is considered to be the
most reasonable in price. Both firms possess the ability to perform
successfully the services of Attorney for representation in general
legal matters. Therefore, it is the Evaluations Panels recommendation
that the best value for MHA is to choose Hill, Hill, Carter, Franco,
Cole & Black PC.

Therefore, in accordance with 24 CFR 85.36(b)(8), we request the MHA
Board of Directors "To consider a resolution approving/authorizing the
Montgomery Housing Authority to award the Contract for Legal services
of the Authority for Legal Representation in General Legal Matters for
a period of two years, effective February 15, 2005 through December 31,
2006, to Hill, Hill, Carter, Franco, Cole & Black PC the legal firm as
recommended by the Evaluation Committee, contingent to HUD approval."

CONFIDENTIAL

## EVALUATION PANEL NARRATIVE OF AWARD DECISION

**REQUEST FOR PROPOSAL:**
> LEGAL REPRESENTATION SERVICES IN GENERAL LEGAL
> MATTERS

**PANEL MEMBERS**
**Chairperson:**
> Georgianna Wigginton, Procurement/Contract Administrator

**Evaluation Panel:**
> Maxine M. Sledge, Director Public Housing
> George Shabot, HUD Procurement/Contract Specialist

**Evaluation Panel met:**
> Tuesday, February 15, 2005 at 10:30 AM
> MHA Administrative Conference Room
> 1020 Bell Street
> Montgomery, Alabama

An independent panel of three (3) persons who individually scored the proposals according to the factors for award in the RFP independently evaluated proposals.

**Narrative:**

1) Davis, Hatcher & Parchman, LLC, Proposal was incomplete did not go into detail, availability hard to reach, qualifications 2. no method of providing services, experience listed generally, staffing only 2 people, No lead base paint experience, did not mention anything about being prompt with services. Price was higher $1500.00 per month retainer and 270.00 per hour, and on number 7 only 1 firm listing for experience HA.
Individual Scores 37 39 43 Totaling 39.66

2) Bradley Arant Rose & White LLP
Excellent firm with excellent qualifications, but his price was $2000.00 per month with 6 to 10 hours work, 275.00, 295.00, 245.00, and 250.00 per hour.
No landlord tenant experience, listed 7 attorneys with only two in Montgomery
Individual scores 66 68 63 Total 65.66

3) Hill, Hill, Carter, Franco, Cole & Black, PC.
Excellent firm with excellent qualifications, but only gave general responses to list of clients, 1000.00 month, 175.00 165.00 150.00 per hour.
Individual scores 61, 60, 58, Total Score 59.66

We the Evaluating Panel concur that even though Hill, Hill, Carter, Franco, Cole & Black, PC were not awarded the most points and that Bradley Arant Rose & White LLP and Hill, Hill, Carter, Franco, Cole & Black, PC. They were within 5 points of each other. We had to evaluate price to present MHA a fair and economical evaluation.
Therefore, we offer the best and most economical attorney firm to serve MHA as legal representation is Hill, Hill, Carter, Franco, Cole & Black, PC

CONFIDENTIAL

*Hill Hill Carter (6*
*Franco Ce*
*& Blank F*

# EVALUATION OF RFP, MHA ATTORNEY

60
61
58

**DATE EVALUATED:** 2/5/05

**I. Evidence of the Legal Firms ability to perform the legal representation outlined in Section C 1-9.**

4 pts ea

**MAXIMUM POINTS ASSIGNED**    35

1.    Description of services to be provided and method of providing services.    **4**

2.    Qualifications of the firm in Landlord-tenant relations, Federal Housing Laws, policy drafting and interpretation, administrative law, applicable Federal Regulations, and business law, personnel issues (EEOC, FLSA, COBRA, retirement, termination/due process, etc). He or she must be a member of the bar in good standing in the state and federal courts.    **3**

3.    Identify each person who will be assigned to work with the HA, their role in the assignment, and include a resume of their experience and qualifications as well as the number of years experiences listed for each individual. *need HA exp.*    **2**

4.    Employer-employee relations and personnel issues, including EEOC, FLSA, COBRA, retirement, termination/due process, workers' compensation laws, FMLA, ADA, employment law, OSHA, personnel policy and administration, and other related areas.    **3**

5.    Hourly rate and/or monthly retainer. (State both in rates per hour and in retainer)    *1000 mo*
*150 hr*
*65*
*175*

6.    General experience in housing issues, such as lead paint, insurance coverage, research capabilities and experience, and general legal issues.    **2**

7.    Specific experience representing a public housing authority in legal issues, *need # yr. exp.* including description of issues (regulatory, policy drafting and interpretation). Include a list of all housing authorities represented.    *NONE LISTED but MHA*    **1**

8.    Availability of attorney to staff and board.    **4**

9.    Ability of firm to provide prompt service in all areas described above.    **4**

CONFIDENTIAL

# Exhibit # 22

BEFORE THE BOARD OF COMMISSIONERS FOR THE
MONTGOMERY HOUSING AUTHORITY

MONTGOMERY HOUSING )
    AUTHORITY )
     )
    Petitioner, )
     )
vs. )    Case No.:  001-2004
     )
C. MICHAEL McINNISH )
     )
    Respondent. )

## APPOINTMENT OF HEARING OFFICER

    In accordance with *Section 2.8 of the Personnel Policy Manual of the Housing Authority of the City of Montgomery,* I hereby appoint Attorney Fred F. Bell to serve as a hearing officer to conduct and issue a ruling on the disciplinary hearing involving C. Michael McInnish. Mr. Bell shall have full authority to conduct the hearing as he deems appropriate. He shall also have full authority to accept or reject the recommendation for termination and dismissal. Any decision rendered by Mr. Bell is final.

    This hearing and action taken as a result of same, shall not affect the employee's rights, if any, which he may have for appeal or review under any personnel regulations or statues.

    Done this the _18_ day of January, 2005.

                                Lane Boggs
                                Interim Executive Director

## CERTIFICATE OF SERVICE

I do hereby certify that on this 14th day of January 2005 a copy of the foregoing was served upon the following counsel:

Terry G. Davis, Esq.
Davis, Hatcher & Parchman, Esq.
4183 Carmichael Road, Suite B
P.O. Box 230907
Montgomery, Alabama 36123-0907

M. Wayne Sabel, Esq.
Sabel & Sabel
2800 Zelda Road
Suite 100-5
Montgomery, Alabama 36106

by depositing same in the United State Mail, postage prepaid and by Fax.

# Exhibit # 23



U. S. Department of Housing and Urban Development
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, Alabama 35203-5301

MAY 24 2005

Mr. Lemuel E. Boggs
Interim Executive Director
Montgomery Housing Authority
1020 Bell Street
Montgomery, AL 36104-3056

SUBJECT: Award for Hearing Officer

Dear Mr. Boggs:

This letter serves as a reminder of our letter dated February 17, 2005, that stated that the Board must ensure that the hearing officer selected to preside over Mr. McInnish's hearing be unbiased and acceptable to both parties. Our letter dated March 11, 2005, requested proof that the hearing officer selected is acceptable to both the Board and to Mr. McInnish.

On April 12, 2005, we provided approval to the PHA to issue a Request for Proposals for a hearing officer. Please provide this office with the status of the Request for Proposals and proof that Mr. McInnish has been or is being included in the selection process.

If I can be of assistance in this or other matters, please contact me immediately.

Sincerely,

R. Edmond Sprayberry
Director
Office of Public Housing

cc: Board of Commissioners



C. MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET ◆ MONTGOMERY ◆ ALABAMA ◆ 36104-3006
(334) 206-7200 ◆ (334) 206-7222 Fax ◆ MHAToday.org

CLIFFORD HOLMES
CHAIRMAN



May 3, 2004

Hon. Barbara Ethredge
Chief Counsel
U.S. Dept. of Housing and Urban Development
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, AL 35203

RE: MHA DECLARATORY JUDGMENT

Dear Ms. Ethredge:

Please find enclosed a copy of a letter sent to me by the attorney for the board of commissioners about the action we have filed to determine whether a board member can be removed and as amended to include who has appointment power. A copy of the answer has also been enclosed for your review.

The court has set a hearing for June 30, 2004. I will continue to keep you informed as the case progresses.

When this case was filed, I did not anticipate fees in excess of $10,000.00. I informed the MHA attorney of the limitations and he proceeded with that information. At our April board meeting, the attorney who attends board meetings discussed the case with the board and he, at their request, is now very actively involved in the case. He has submitted a bill for services in excess of $8,000.00. Therefore, the total is now above the $10,000 limit. We procured their services through competitive proposals and both have contracts for retainers and hourly rates. I sent Mr. Sprayberry an email on the 13th of May about this issue.

I am working on authorizing payment to the two attorneys based upon our contracts with them for retainers and a hourly rates for work in excess. The attorneys were selected by competitive procurement. I am enclosing a copy of their contracts for your review. Please let me know if any additional information is required.

Thank you for your help and assistance.

Sincerely,

C. Michael McInnish
Executive Director

THOMAS TAYLOR, Vice-Chair
BETTIE BARNETT

RICHARD N. BOLLINGER
LUAN LONG

JOHN F. KNIGHT Jr.
RON DRINKARD

ANNE B. UPCHURCH
DAVID S. BARLEY, II

## Mickey McInnish

From:
Sent:
To:
Subject:

Mickey McInnish [mmcinnish@mhatoday.org]
Thursday, May 13, 2004 6:59 AM
Ed Sprayberry (ed_sprayberry@hud.gov)
COMMISSIONER RELATIVE JOB APPLICATION. ATTORNEY'S FEES

Dear Mr. Sprayberry:

I discussed an issue with you at the Spring Workshop relating to the possible hire of the son of a Commissioner. Mr. Clifford Holmes is the current chairperson of our board. His son has applied through City/County Personnel for employment as a Maintenance Mechanic. He was deemed elilgible through that agency and has been interviewed by our staff. The HUD Ethics Manual has a provision that states in part under Part A that "...neither the HA... May enter into any contract, subcontract, or arrangement in connection with a project under this ACC in which any of the following classes of people has an interest, direct or indirect, during his or her tenure or for one year thereafter: Any present or former member or officer of the governing body of the HA, or any member of the officer's immediate family...." I have talked with both of our attorneys and they believe a son is a member of the "immediate family" whether or not he is supported by the father nor lives with him.

Please let me know if you believe it would be any violation to hire this person. I would want to notify the board of the hiring next Tuesday if you think it is lawful under current law and ethics provisions.

Secondly: As you are aware, we are in the midst of a Declaratory Judgment Action to determine whether or not a commissioner can be removed by the city council and who has the appointment power of commissioners. The legal research has been extensive. We have contracts with two law firms, one representing the housing authority and one representing the board of commissioners. The majority of the research and the drafting of the complaint were done by the authority attorney. The board attorney was included and was instructed by members of the board to be very active in the lawsuit. Both law firms were selected after proper procurement and are paid by monthly retainer and by hourly rates after the retainer has been earned. The litigation expenses have exceeded $10,000.00 and we hope the case has settled.

Since the procurement has been followed and we have followed the reporting requirements under the Litigation Manual, I would like to authorize the payment of the legal bills. It appears the costs of the trial court action will be approximately $20,000.00. If an appeal is needed, we will follow the Litigation Reporting Requirements. If you have any thoughts about this issue, please let me know at your earliest convenience. The board attorney is requesting his money.

Thank you. If needed, I can be reached by email or by phone at 334-799-4406.

Mickey McInnish
Montgomery Housing Authority
1020 Bell St.
Montgomery, AL 36104
Direct Line 334-206-7107
Cell Phone 334-799-4406
Direct Fax 334-206-7119

1

# Exhibit # 24

U. S. Department of Housing and Urban Development
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, Alabama 35203-5301



June 13, 2005

Mr. David S. Barley, II
Chairman, Board of Commissioners
Montgomery Housing Authority
3830 Strathmore Drive
Montgomery, AL 36104

SUBJECT: Review of April 26, 2005, Board Meeting Minutes

Dear Mr. Barley:

This acknowledges receipt of the April 26, 2005, Board Meeting Minutes and the agenda for the May 17, 2005, annual meeting. In reviewing the minutes of the Board meeting, we noted Board Resolution 5319 in which the PHA resolved that counsel was "authorized to continue with settlement negotiations, including the mediation scheduled for May 16, 2005, and everything else that was discussed in Executive Session."

Please be reminded that this office must approve any settlement offers with respect to Mr. Michael McInnish, including any leave payments, before an offer is made. Additionally, our letter of May 24, 2005, requested the status of the Request for Proposals for a hearing officer. To date, we have not received an update on this issue or on a scheduled date for Mr. McInnish's hearing with the Board.

Funds were approved in the PHA's budget for the Executive Director's salary, however, the Board's failure to provide a hearing for Mr. McInnish in a timely manner and the decision to allow him to continue suspension with pay over this extended period of time (approximately seven months to date) could constitute a misuse of program funds and a breach of the ACC. The PHA's Personnel Policy allows other employees to be suspended for no more than five days without the benefit of a formal hearing before the Executive Director and addresses only suspension without pay. The Personnel Policy does not address employees suspended with pay.

According to Guidebook 7510.1, PIH Low-Rent Technical Accounting Guide, "funds are provided by HUD to the PHA for a particular program or purpose. In each instance, the use of the funds is governed by the program regulations, the program budget which constitutes the approved plan for expenditures of those funds, and the applicable cost principles of OMB Circular A-87." Section 201 of the Annual Contributions Contract (ACC) requires the PHA to "at all times" operate solely for the purpose of providing decent, safe, and sanitary dwellings in

such manner as to promote serviceability, *efficiency*, economy and stability. Section 406 requires all costs incurred to be *necessary* for the operation of the PHA in this manner. It is the Board's responsibility to ensure that all expenditures are in compliance with Federal laws.

We are requesting that you provide us with a timeline of the required actions in bringing this situation to a speedy resolution. The timeline should include anticipated dates for selection of the hearing officer and for scheduling and the completion of a hearing. Please provide this information no later than June 27, 2005.

Please share this letter with each of the other members of your Board of Commissioners as soon as possible. Should you have any questions, please do not hesitate to contact me at (205) 731-2630, extension 1101.

Sincerely,

R. Edmond Sprayberry
Director
Office of Public Housing

cc:
Mr. Lemuel E. Boggs
Interim Executive Director

# Exhibit # 25



# HOUSING
*Authority*

CHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET ♦ MONTGOMERY ♦ ALABAMA ♦ 36104-3006
(334) 206-7200 ♦ (334) 206-7222 Fax ♦ MHAToday.org

DAVID S. BARLEY, II
CHAIRMAN

June 20, 2005

Mr. R. Edmond Sprayberry
Director
Office of Public Housing,
Region IV, Birmingham Office
Medical Forum Building, Suite 900
950 22nd Street, North
Birmingham, AL 35203 - 5301



SUBJECT:   Award for Hearing Officer

Dear Mr. Sprayberry:

We greatly appreciate your assistance in approving the RFP for a Hearing Office for this personnel matter. While we are working expeditiously to resolve this matter in a fair and equitable manner, we are also urgently trying to address other critical matters like unit vacancy rates, quality of life, and self sufficiency policies, REAC, Harvard Study Recommendations and others.

I am in receipt of your May 24, 2005, letter to Mr. Boggs, Interim Executive Director, regarding the above referenced. After reviewing the content of your letter, Mr. Boggs was advised that it would be more appropriate if I responded to it. Regarding the RFP, as a result of pending discussions in search of the fairest, most expeditious and the least costly means of resolving this issue, during our April meeting we asked Mr. Boggs to postpone the issuance of the RFP.

The second paragraph of your May 24, 2005 letter raised a major issue that is somewhat troubling and potentially problematic. In the last sentence of this paragraph you asked us to provide you with "proof that Mr. McInnish has been or is being included in the selection process" for a hearing officer. Our RFP process and personnel policies, as approved by HUD, are intended to be fair and impartial, but neither gives a subject employee a role in selecting a hearing officer. To grant such a privilege to Mr. McInnish would be in conflict with this policy and expose us to potential litigation from every employee that has been through this process to date (potentially hundreds of employees). I agree that Mr. McInnish's suspension has lasted too long and immediate closure is needed – as such it is one of my highest priorities. I will provide you with a further update after our next meeting.



RICHARD N. BOLLINGER, Vice-Chair
ANNE B. UPCHURCH

THOMAS TAYLOR
BETTIE BARNETT

LUAN LONG
RON DRINKARD

JOHN F. KNIGHT, Jr.

Your assistance in this matter is greatly appreciated and we look forward to a long and productive relationship with your office. I am looking forward to meeting with you within the next few days, ideally next week. In the interim, if you would like additional information please feel free to call me at 334-220-7368.

Sincerely,

David S. Barley II
Board Chairman

cc:   **MHA Commissioners**
Lemuel E. Boggs, Jr., Interim Executive Director
Randal Morgan, Attorney-at-Law, Hill, Hill, Carter, Franco, Cole & Black, PC
Michael J. Cohan, Attorney-at-Law, Hill, Hill, Carter, Franco, Cole & Black, PC
Cindy S. Yarbrough, Field Office Director-HUD, Birmingham.

SPRAY- 0286

# Exhibit # 26



U. S. Department of Housing and Urban Development
Birmingham Office
Region IV
Medical Forum Building, Suite 900
950 22ⁿᵈ Street, North
Birmingham, Alabama 35203-5301

October 31, 2005

Mr. Richard Bollinger
Acting Chairperson
Montgomery Housing Authority
167 Lakeforest Drive
Montgomery, Alabama 36104



Dear Mr. Bollinger:

SUBJECT:  ACC Violations

      On November 16, 2004, at a regularly scheduled meeting, the Board of Commissioners of the Montgomery Housing Authority (Board) went into Executive Session. After the Executive Session ended, the Board approved Resolution No. 5266 to suspend Mr. Mickey McInnish, Executive Director, until further notice, with pay, pending a hearing. No reason for the suspension was given nor was the suspension discussed in the Executive Session. On December 24, 2004, Mr. McInnish received a certified letter from the Board's Attorney, Mr. Terry Davis, that contained ten charges that had not been seen or approved by the Board. Subsequent to the suspension, on January 4, 2005, Mr. McInnish filed a Charge of Discrimination against the Board based on a claim that at least two Board members, Mr. John Knight and Ms. Bettie Barnett, discriminated against him because of his race. The Board eventually decided to reach a settlement with Mr. McInnish if he would agree to retire from the Montgomery Housing Authority and drop the discrimination complaint.

      In an effort to determine the validity of Mr. McInnish's discrimination charges, we performed an independent review of the Housing Authority of the City of Montgomery's (herein referred to as the "Authority") Board of Commissioners. The Authority operates under an Annual Contributions Contract (ACC) and other regulatory agreements executed by HUD for its various programs. Such agreements provide detailed requirements for programs, operations, housing, equal employment opportunities, and other Authority matters. Section 4, Mission of the HA, of the ACC contains the following: "The HA shall at all times develop and operate each project solely for the purpose of providing decent, safe, and sanitary housing for eligible families in a manner that promotes serviceability, economy, efficiency, and stability of the projects, and the economic and social well-being of the tenants." Our objective was to review the actions of the Authority's Board of Commissioners for allegations of ACC violations under Section 12, Civil Rights Requirements Parts (A) and (B), and to determine if the Board individually and /or collectively violated other provisions of the ACC.

To accomplish our objective, we reviewed applicable HUD program requirements, the City and County of Montgomery Personnel Board Rules and Regulations, and other equal employment requirements. We also interviewed various persons including HUD officials, other Housing Authority Executive Directors, a former Board Commissioner, Authority staff and other City officials. Additionally, we reviewed various records, memos, board minutes, correspondence, and EEOC supporting documentation maintained by the Birmingham Field Office. Our review generally covered the initial appointment of Mr. McInnish as interim Executive Director in February 2002 until his suspension in November 2004. We extended our review to include post-events related to Mr. McInnish's suspension.

The Authority is a non-profit corporation created under the Housing Act of 1937 and its primary mission is to provide decent, safe, and affordable housing; to increase homeownership; to support community development; and to increase access to affordable housing free of discrimination. A nine-member Board of Commissioners is appointed to govern the Authority. The Board has a responsibility to the Department of Housing and Urban Development (HUD), the employees of the Authority, and primarily to the residents, to ensure that the Montgomery Housing Authority acts responsibly and in accordance with all applicable legal requirements.

The Authority falls under the Montgomery City and County Personnel Board supervision for employment matters, including personnel issues for merit appointees. The Personnel Rules and Regulations, Section 12, Rights to Review and Appeal, entitles employees to a hearing before any "demotion, dismissal or suspension as to any charges which might cause the employee to be dismissed, demoted, or suspended." You failed to afford Mr. McInnish the opportunity for a hearing. Annual performance evaluations are normally the mechanism used to measure job performance, or the lack thereof. There was no evidence from Mr. McInnish's prior job performance evaluations that reflect insubordination or poor management, the reasons ultimately given by the Board's attorney to suspend him. Although the charges allegedly stemmed from violations committed over several years, we found no evidence of such violations in the Board's official minutes or in Mr. McInnish's annual evaluations prior to his suspension.

Additionally, it appears that certain Authority Board Commissioners exhibited a racial animus against Mr. McInnish. We interviewed several persons who heard certain Commissioners refer to Mr. McInnish in a racial manner and referred to his inability to effectively manage the Authority because of his race. The Authority's residents are predominantly African-American, while Mr. McInnish is Caucasian. Commissioner John Knight was heard on several occasions referring to Mr. McInnish's race in a derogatory manner. For instance, during a July 24, 2002 radio broadcast, Commissioner Knight was heard making reference to Mr. McInnish's race and the need for the Authority to have an African-American Executive Director. In like manner, during a November 2003 NAHRO conference, Authority Residential Commissioner, Bettie Barnett, was quoted as referring to Mr. McInnish's skin color as the basis for him not being fully successful at the Authority. We noted in the official November 16, 2004 Board Executive Session minutes that Commissioners Knight and Barnett initiated and seconded the motion to suspend Mr. McInnish, respectively. This gives the appearance that racial animus contributed to Mr. McInnish's suspension.

The Authority's Board of Commissioners violated the ACC provision for nondiscrimination. Specifically, ACC Section 12, Civil Rights Requirement, requires that housing authorities shall not discriminate against any employee or applicant because of race, color, religion, sex, disability, age, or national origin. Additionally, the provisions require that all housing authorities shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to race, color, religion, sex, disability, age, or national origin. However, it appears the Board intentionally disregarded such provisions by suspending Mr. McInnish without proper cause and in doing so, caused financial loss to the Authority, thereby violating Section 4 of the ACC. From the time Mr. McInnish was suspended on November 16, 2004 to date, the Authority has paid him in excess of $157,000, including benefits and salary. These funds have been paid without receiving any benefit and without HUD's approval. When one includes the legal fees involved, considerable additional expense has been incurred as a result of the Board's actions. It is clear to HUD that the actions of the Board were not justified by the facts and caused undue hardship for the residents, the Authority, and Mr. McInnish.

As early as April 2004, Mr. McInnish complained to the Board about the discrimination against him, yet the Board took no action. Given the facts, the Board's suspension of Mr. McInnish was not justifiable in view of his job performance. Commissioners are given the responsibility to perform the necessary job evaluations and to take corrective actions as necessary. Such an approach in this instance could have resolved the issue without protracted controversy and expensive litigation. However, the Board of Commissioners took an approach that violated federal requirements as well as the Board's own policy.

Under the provisions of the ACC and HUD regulations, HUD has remedies available to address the Board's apparent violations of Sections 4 and 12 of the ACC. These include sanctions ranging from a Limited Denial of Participation (LDP) to an indefinite debarment, and declaring the Montgomery Housing Authority in default of the ACC. However, before exercising any of the options available, HUD elected to give the Board an opportunity to provide evidence that you consider exculpatory or mitigating. Please provide a response to me by November 11, 2005.

Sincerely,

R. Edmond Sprayberry
Director
Office of Public Housing

Cc: Charles W. Jinright
Lane Boggs
All Commissioners

# Exhibit # 27

Case 2:05-cv-01235-MFM-TFM Document 48-4 SEALED Filed 12/09/2007 Page 24 of 40



C. MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET ◆ MONTGOMERY ◆ ALABAMA ◆ 36104-3000
(334) 206-7200 ◆ (334) 206-7222 Fax ◆ MHAToday.org

RECEIVED
APR 2 6 2004
Per

CLIFFORD HOLMES
CHAIRMAN

## MEMORANDUM

April 23, 2004

**STRICTLY CONFIDENTIAL**

TO:       BOARD OF COMMISSIONERS
FROM:   C. MICHAEL MCINNISH
RE:       EXECUTIVE SESSION
CC:       TERRY DAVIS

The Board of Commissioners has accomplished many things during the past several years. Because of your active support and participation, we have accomplished much and are currently held in high regard by other housing authorities, our peers, our associations, and others. We have representation on numerous national boards and committees, work closely with state groups, participate in state, regional and national groups, and stay up-to-date on our policies and procedures. We have made great strides in providing housing and our community reputation is much improved. We are operating in accordance with law, regulations and our policies; we have broken ground on the most innovative public housing redevelopment effort this city has ever experienced; we have brought deserved attention to the housing authority's historical significance in the city; and most importantly we have made major changes in our operations that have proven to better serve our families, both in Section 8 and public housing.

And, as I expected when accepting your appointment, there have been many hurdles that together we have successfully cleared to get to where we are today. Whenever any question or allegation arose, I answered each promptly and with honesty, integrity and complete openness. I have always, and will continue to address every allegation head-on. I accepted this appointment for the right reasons - because I felt I had the knowledge and capabilities to lead this housing authority in the right direction for the sake of our residents. And, I have always assumed that the Board of Commissioners has confidence in me since it first appointed me as Interim during a time when this housing authority was faced with some very difficult challenges - and then as the executive director to continue the positive path we had begun together.

I am, therefore, very concerned about the many allegations made during the Executive Session about my actions and intentions. I will be more than willing to address any of these allegations and/or concerns you may have, but I believe I should be entitled to advance notice so I can prepare a proper response.



THOMAS TAYLOR, Vice-Chair
BETTIE BARNETT

RICHARD N. BOLLINGER
LUAN LONG

JOHN F. KNIGHT, Jr.
RON DRINKARD

ANNE B. UPCHURCH
DAVID S. BARLEY, II

Unfortunately, one of the greatest hurdles I have personally had to combat is my race. I have been publicly criticized for being the Director because of my race.  I have been reviewing my desk top book and some of the following are listed:  I received a lot of criticism from some Ministers in the community because of my race; a commissioner has allegedly made statements that I should not be serving our residents because of my race; one commissioner told me that I did not know who I was "messing with." As I have stated to several of you, I will not condone any discrimination against any of our residents, our staff, or myself.  I have repeatedly had to endure racial issues concerning my ability to lead this housing authority and race should not be an issue in our city about leadership ability.

I am convinced that I must respond in writing to several of the issues raised during the Executive Session this past Tuesday night, and once again lay out the circumstances leading to all decisions and actions taken to hopefully clarify the situation:

- We received notice in March that Councilman Nuckles was considering action whereby the City Council would vote on the appointing authority for our Board. I happened to see Rev. Nuckles at a Leadership Montgomery meeting and asked him if we could talk at some point on this issue. I did not hear from him and subsequently learned that same day that he was going to introduce a resolution relating to Board appointments at the next Council meeting. He did, but the resolution did not receive sufficient votes to proceed at that council meeting and would be brought up again at the next meeting of the council. At this point I received notice that the resolution included language to remove all mayoral appointments to our Board. It was only at this time I began to consider action due to the dire repercussions this could have on our operations, service to our residents, and possibly our funding from HUD.

- I felt it necessary at this point to seek advice from our MHA Attorney Chuck Stewart about the removal issue and asked that he research this as a part of his regular retainer contract. I then prepared a report, and presented it to you at the March Board meeting. I explained the situation and a resolution was passed to seek a court opinion (declaratory judgment) to determine two issues:  can members be removed and who has appointment power? It is, and has always been our position that we are not concerned with who appoints our Board, as long as each appointment is valid and legal. But with two conflicting state laws and two conflicting Attorney General's opinions on the issue, it was obvious that we needed final resolution of these issues and, therefore, I brought the issues to you. We had a roll call vote and the resolution passed.

- The City Council passed a resolution that purported to remove those persons appointed by the Mayor from the board.  The activities of the housing authority could be in jeopardy and required reports would not be verifiable as action of an official board. This situation would certainly disrupt the status of the housing authority and could put at great risk our reports, status and possibly funding. However, nothing was filed at that time, as the resolution would not become official until signed by the Mayor. On Friday, April 9, 2004, the Mayor vetoed the resolution.  Still nothing had been filed pursuant to your resolution.

- On Saturday, April 10, the *Montgomery Advertiser* reported Rev. Nuckles as saying he would quickly override the veto and the resolution would be passed. At that point, it was obvious that the board and operations of the housing authority could be adversely affected. Since I was scheduled to be leaving on Easter for Washington, I had discussed the case with Mr. Stewart during that prior week and we also discussed alternatives. Mr. Davis was sent copies of emails, and a copy of a draft petition (complaint) for his review. This was one full week before it was filed. On the following Monday, Mr. Davis sent an email stating he had reviewed the complaint and had several suggestions and ideas for the petition. We then scheduled a conference call to discuss the issues and strategy. I left the HUD building in Washington to participate in the conference call and it was my opinion we were successful in our efforts to implement the petition in accordance with the approval we received from HUD and in accordance with your resolution. Several drafts were exchanged between Mr. Stewart, his associates and Mr. Davis over the next several days.

- While still in Washington, I asked that a meeting be scheduled with Mr. Barley and Ms. Long at her office Friday morning, as they were commissioners who had been appointed by the Mayor. Mr. Davis and Mr. Stewart indicated they could be there. Another meeting with Ms. Barnett and Mr. Holmes was scheduled at my office. Mr. Drinkard was not available until after 4:00 on Friday. I received a message that Mr. Taylor had called and said to disregard the message. I sent him an email asking if he called and got no response. I also had a message to call Ms. Upchurch and this message was not returned. I apologize for this, but I was extremely busy at the HUD building and simply forgot to return the call. I always try to return calls and am almost always available by cell phone and email, so this occurrence I deeply regret. I left the HUD offices in Washington and went straight to the airport and returned home at 11:00 p.m. on Thursday evening.

- After our meeting with Ms. Long and Mr. Barley, Mr. Davis and Mr. Stewart made several changes to the petition, and we then left for the housing authority. Mr. Davis and I met with Ms. Barnett and Mr. Holmes at the housing authority. Afterwards, the final paperwork was prepared and Mr. Davis took it to the courthouse to present to the Judge. It took several hours to get the case before the Judge. In the interim, I called Mr. Drinkard's office and left a message with the receptionist to try to call him and get him a message that we were going to file and to call me if he had any questions. He did return my call after 5:00, but I did not get the message until Monday, as I had turned off the cell phone for the weekend.

- On Friday, I wrote each member of the City Council a letter explaining the reasons for the petition and sent them a copy of the papers, a copy of the Supreme Court Case, and a list of accomplishments made by the board. I mailed these to their home addresses so each would receive it over the weekend, and sent each board member a copy of the same material. The petition was filed on that Friday because the City Council had announced a work session on Monday morning and we wanted to give them advance notice of the suit and the Court Order prior to that meeting so they

would not be "ambushed" by a Court Order. I saw several of the council members at the ball games on Friday and Saturday night and again expressed the fact that our petition was not done in an adversarial manner, but was intended to simply get a court ruling as to the question of removal. <u>Nothing was filed to have a determination of who appoints</u>, as the next appointments don't occur until June.

• On Tuesday, it was reported that the Council was going to override the veto and withdraw the removal order. This would have possibly made the petition moot, but we decided we needed a final answer, as without a final determination, the resolution could be revived at another time. Notwithstanding allegations made in the executive session, I never said to dismiss the petition. The fact is that I had told our attorney (Stewart) that we needed a final answer. Therefore, Mr. Davis and I do agree about this matter and we have no conflict.

• In executive session, this case was discussed, but many allegations were made against me that I consider to be an attack on my character. It should be noted that the AG opinion was issued while Wiley Thomas was the Director and before HUD even came to Montgomery to begin their review. The whole issue arose because the City Council would not appoint a resident to the board as required by law. We were in jeopardy of losing funding because of this refusal. It is also important to note that none of the three appointees made by the Mayor voted for my appointment.

If any evidence exists to support the allegations that I "misrepresent things to the Board," that I am "responsible for the AG opinion giving the Mayor the appointment power," that the appointment issue was raised by me only so I "could be named Executive Director," etc., I would appreciate the opportunity to review and respond in an appropriate manner. The facts obviously show that none of this is true and I fail to understand the reason for this attack on my character. I sincerely hope that we can resolve any and all issues that we may have in a conducive manner as this will assuredly help us to continue to conduct the business of housing and to better serve our residents. The integrity of the Board/Authority relationship is vital to our success and must be in place for the sake of our residents and staff.

I met with Mr. Davis and Mr. Stewart Wednesday afternoon to discuss the future implications of our petition. I told Mr. Davis that I would have to request further authorization from HUD for the amendment to the lawsuit to include the appointment powers, in compliance with the HUD Litigation Manual. This will take approximately two weeks, based on prior experience. Mr. Davis indicated to me that his concern was that he was not kept informed ab initio of the lawsuit status. I have committed to him that I will forward him all information, issues, board resolutions and other materials so that he can adequately represent you in the future. I am making copies of the Litigation Manual for Mr. Davis, and we will continue to comply with these rules and regulations.

Please let me know if you have any questions or need any further clarification. It is my intent to continue to work closely with you, the board attorney, our residents, our staff, and our community. I will be more than willing to discuss any of these issues with you so that

we can move forward in our efforts to provide housing and make improvements to our housing authority.

I keep a quotation on my desk to which I refer on a regular basis:

"On some positions, cowardice asks the question, is it expedient?
And then expedience comes along and asks the question, is it politic?
Vanity asks the question, is it popular?
Conscience asks the question, is it right?

There comes a time when one must take the position that it is neither safe nor politic nor popular, but he must do it because conscience tells him it is right."
__Dr. King from his last SUNDAY SERMON PREACHED AT THE Washington National Cathedral on March 31, 1968. He was assassinated four days later.

I sincerely feel that it is necessary to protect the Montgomery Housing Authority, its programs and its residents. With all of the conflicting statements, laws, opinions, and assertions, it was necessary in my opinion to bring the suggestion to you that we seek a court opinion. I know this was not a popular, safe nor politic action, but it is right to take such actions.

I will keep you informed on future developments in this case.

*Footnote: I will be in Birmingham on Monday through Wednesday of next week at the AAHRA/HUD Spring Workshop. As the Chairperson of the AAHRA Education Committee, I am in charge of the workshop with more than 400 registrants. I will be addressing the entire group on Tuesday about the Harvard study and will be teaching two sessions that day on the new policies we have just implemented. On Wednesday we are hosting a HUD official from Washington who will be discussing the new Audit Procedures. I will be doing a training session for our Section 8 Landlords on Wednesday evening. You are welcome to attend that meeting if you would like. Contact June Belle, 206-7110, if you need more information on this.*

# Exhibit # 28

PLAINTIFF'S
EXHIBIT
28



**U.S. Department of Housing and Urban Development**
Office of General Counsel

SPECIAL ATTENTION OF:                    TRANSMITTAL for Handbook No.: 1530.1 REV-5
All Associate General Counsel
All Regional Counsel                            Issued: May. 18, 2004

1.  **This transmits:**
    Handbook 1530.01 REV-5, Litigation Handbook

2.  **Summary:**
    This revised handbook entirely updates and reorganizes the previous version and
    describes in much more detail the responsibilities of the Office of General Counsel
    for handling and monitoring litigation in which HUD or a HUD official is a party.
    It also describes the responsibilities and duties of Program officials and HUD
    employees with respect to such litigation. Among other things, it includes
    information about the role of HUD officials in influencing the Department's
    litigation position, what a HUD employee should do when served with a summons
    or subpoena, and how the filing of a lawsuit affects the conduct of the Department's
    programs. In addition to covering litigation in which the Department or a
    Department employee is a party, the handbook covers litigation in which a
    Department-funded entity such as a Public Housing Authority is a party.

3.  **Filing Instructions.**

    **Remove:**                                               **Insert:**
    Handbook 1530.1 REV-4                                Litigation Handbook
    dated May 8, 1981, and all changes              1530.1 REV-5
                                                                       dated May 18, 2004

                              Richard A. Hauser
                              General Counsel

CR: Distribution: W-3-1, R-1, R-2, R-3-2, R-3-3, R-6, R-7, R-8, R-9, SPECIAL (Direct by CR)

Exhibit 128

[Search] [Prev List] [Doc List] [Next List] [First Doc] [Prev Doc] [Curr Doc] [Next Doc] [Last Doc] [Bottom] [Next Hit] [Help] [Text Only]

*Litigation*

*Directive Number:* [Prev Hit][Next Hit]1530.1

Click Here or type Alt-k for MS Word version of all the Chapters

Click Here or type Alt-p for PDF version of all the Chapters

CHAPTER 3.  OFFICES OF REGIONAL AND OTHER FIELD COUNSEL

3-1. INTRODUCTION

a. FUNCTION OF CHAPTER

This Chapter describes the functions and responsibilities of the Offices of Regional Counsel, and Chief Counsel/Chief Attorney with regard to Litigation.

b. GENERAL LITIGATION RESPONSIBILITIES OF REGIONAL AND OTHER FIELD COUNSEL

The primary responsibility for performing litigation functions in Field Offices resides in the Office of Regional Counsel unless explicitly delegated by the General Counsel or Regional Counsel to Chief Counsel/Chief Attorney.

In carrying out the litigation function, Regional Counsel shall:

(1) As authorized, recommend to DOJ the initiation of cases;

(2) Handle directly, and assist Headquarters attorneys in handling, Federal Party Litigation;

(3) Monitor non-Federal Party Litigation in the jurisdiction of the Regional Office relating to issues of interest to HUD;

(4) Maintain a docket of all Federal Party Litigation and the Non-Federal Party Litigation which he/she is following; the Regional Counsel shall use the Legal Assessment of Workload System (LAWS) for such purpose;

(5) Accept service on behalf of Field Office employees sued in an official capacity (see Section 1-4b), forwarding the documents immediately to the Associate for Litigation;

(6) Act upon requests by Field Office employees sued in an individual capacity for representation by the Department of Justice (see Section 1-5(d);

(7) Act upon subpoenas or court demands for disclosure of information by documents or testimony (see Sections 1-4c, 1-6); .

(8) Approve the legality of issuance of subpoenas pursuant to the Fair Housing Act, 42 U.S.C. 3611 (see 67 F.R. 44234, July 1, 2002);

(9) Respond to, or refer to the Associate for Litigation for

response, any inquiry concerning a matter in litigation (see Sections 1-3c(2) and 2- 5e); and

(10) Perform such other duties as are necessary and appropriate.

Chief Counsel/Chief Attorney may be called upon by the Offices of General Counsel or Regional Counsel to perform functions in connection with litigation, such as drafting affidavits for Field Office officials and assisting in gathering the facts, selection of witnesses, and appearance at hearings.

3-2. PROCESSING FEDERAL PARTY LITIGATION

a.  CASES WHERE REGIONAL COUNSEL HAS PRINCIPAL RESPONSIBILITY

(1)  DEFENSIVE LITIGATION -- Where Regional Counsel has principal responsibility for handling defensive Federal Party Litigation, he/she shall follow the procedures described in Section 2-4, making the following substitutions where appropriate:  "Regional Counsel" for "Associate," "Regional Director" for "Assistant Secretary" and "Regional Office" for "Headquarters."

If Regional Counsel needs assistance from Headquarters, he/she may contact the Headquarters program staff directly.

Procedures for initiating Affirmative Litigation must be followed with respect to filing counterclaims, cross claims, or third party complaints.

Regional Counsel shall furnish to the Associate monitoring the case a copy of any litigation report.

(2) AFFIRMATIVE LITIGATION

(a) Initiation

As authorized, the Regional Counsel may initiate Affirmative Litigation without prior approval of the General Counsel for Category A cases in the Hauser memorandum (Appendix 3).

(b)  Recommendation

When Regional Counsel believes that Affirmative Litigation should be initiated, for which he/she is not authorized to initiate, he/she shall send his/her recommendation, including reasons, to the Litigating Associate with a copy to the Program Associate.

Regional Counsel shall have principal responsibility for handling this Affirmative Litigation where the Litigating Associate so indicates.

(c) OIG Referrals

OIG referrals to DOJ for initiation of civil litigation shall be handled in accordance with the MOU between OIG and OGC approved by the Secretary on April 3, 2003.

(3)  INTERVENTION AND AMICUS -- When Regional Counsel believes that the Department should file a complaint in intervention or brief amicus curiae, he/she shall send his/her recommendations, including reasons, to the Associate General Counsel for Litigation.  See Section 2-8.

3-3. MONITORING NON-FEDERAL PARTY LITIGATION

a. REPORTING BY HUD ASSISTANCE RECIPIENTS

When Regional Counsel receives from a HUD Assistance Recipient a Complaint which he/she believes is likely to have a significant impact on the operation or activity involved, he/she shall request the recipient to furnish subsequent documents to permit him/her to follow the case. See Section 5-2b. If at any point the Regional Counsel determines that HUD's interest requires active participation or advice to the recipient, he/she shall provide it, consulting the Program Associate when necessary.

Regional Counsel shall respond to requests for appropriate assistance from counsel for a HUD assistance recipient and shall render such assistance as he/she deems appropriate under the circumstances.

b. DUTIES AND RESPONSIBILITIES - PUBLIC HOUSING AGENCY LITIGATION

In the case of litigation involving a PHA program, project or activity funded under an Annual Contributions Contract with HUD, the PHA must receive Regional Counsel's concurrence before taking the actions described below.

(1) INITIATION OF LITIGATION -- If the PHA requests authority to institute litigation, Regional Counsel shall review the agency's reasons. The Regional Counsel shall concur unless he/she finds that such action would be frivolous as a matter of law, contrary to Departmental policy, or not cost-beneficial. See attached Procurement of Legal Services by Public Housing Agencies (Notice PIH 2003-24 (HA), issued September 26, 2003, (Appendix 6)) and the following Addendum to Engagement Agreement:

ADDENDUM TO ENGAGEMENT AGREEMENT

1. The [name of Public Housing Agency] (PHA) and [name of legal service individual or firm] (LSP) engaged to provide professional legal services to the PHA in connection with (briefly and precisely describe the nature, scope and limits of the legal services to be provided by the LSP] agree that the provisions of this Addendum to the Engagement Agreement are hereby incorporated into PHA and LSP's engagement agreement as if they had been set forth at length therein.

2. During the pendency of the legal services engagement, LSP shall not, without HUD approval, represent any officer or employee of PHA, in her/his individual capacity, in connection with potential civil liability or criminal conduct issues related to PHA operations.

3. LSP has an obligation not to, and shall not, interfere with, disrupt, or inappropriately delay or hinder any authorized monitoring, review, audit, or investigative activity of HUD (including the Office of Inspector General), the General Accounting Office (GAO), or the officers and employees of HUD and GAO. Any and all representation by LSP cannot be inconsistent with the foregoing obligation. Specifically, LSP shall not deny access to HUD, GAO, or the officers and employees of HUD and GAO, to PHA records in response to document demands by HUD, GAO, or the officers and employees of HUD and GAO, notwithstanding possible discovery privileges that would otherwise be available to PHA. HUD requires public housing agencies to provide HUD, GAO, or the officers and agents of HUD and GAO, with "full and free" access to all their books, documents, papers and records. See 24 CFR. §85.42(e)(1); HUD Handbook 7460.7 REV-2, §1-2(B)(2).

4. PHA and LSP shall make available for inspection and copying, by

HUD (including the Office of Inspector General), GAO, and the officers and employees of HUD and GAO, all invoices, detailed billing statements, and evidence of payment thereof relating to LSP's engagement. Such records constitute "PHA records" and are subject to section 3, above.

5. If HUD or PHA determines that LSP is violating any provision of this Addendum to the Engagement Agreement, it shall timely notify LSP of such violation. LSP will have 48 hours following its receipt of the notice of violation to cease and desist from further violation of the addendum. If LSP fails to adequately cure the noticed violation within 48 hours: (A) HUD, in its discretion, may demand that PHA terminate the professional legal services engagement for breach, or, henceforth, satisfy all costs associated with the engagement with non-Federal funds; and/or (B) PHA, in its discretion, may terminate the professional legal services engagement for breach. Additionally, HUD may sanction LSP pursuant to 24 CFR. Part 24.

6. Should any part, term, or provision of this Addendum to the Engagement Agreement be declared or determined by any court of competent jurisdiction to be illegal or invalid, the validity of the remaining parts, terms, and provisions shall not be affected.

Date:     [Enter date]


_____     _____
[Enter name of PHA Exec. Dir.]          [Enter name of LSP key
partner]

          Regional Counsel shall not concur in any proposal to utilize project or program funds to pay the costs of litigation against the United States or any department or agency thereof.

(2) DEFENSE OF LITIGATION -- Regional Counsel shall not approve expenditure of program funds for a PHA's defense if he/she finds that the PHA has clearly violated HUD requirements or is otherwise at fault.

In this connection, Regional Counsel shall not approve the use of program funds to defend against cases brought by the United States or HUD under the Fair Housing Act.

However, in such cases he/she may authorize the limited use of program funds for the PHA's defense to facilitate settlement or obtain judicial definition of the required relief.

          If, after giving original approval, Regional Counsel determines that an agency is barred from using program funds, he/she may withdraw approval of future expenditures by notifying the PHA with a brief statement of the basis for his/her action.

          In such an event, Regional Counsel may approve the continuation of representation on a limited basis as described above.

(3) LITIGATION SERVICES CONTRACTS WITH PRIVATE ATTORNEYS -- With the exception of litigation involving a PHA in the section 8 program, PHAs must obtain the concurrence of Regional Counsel in litigation services contracts with private attorneys where the fee is expected to exceed $100,000. Upon receiving a request for concurrence, if Regional Counsel is satisfied that paragraph (2) above is satisfied, he/she shall concur in a request received from the PHA for approval of a contract of litigation services if he/she is also satisfied that: the contract contains adequate protections against fraud and abuse; the contract contains all mandatory provisions for professional service contracts for the

program or activity giving rise to the litigation; and the amount of the fee is reasonable. A fee will be considered reasonable if it does not exceed the rates prevailing in the same or similar localities for the same or similar services or the PHA can demonstrate special circumstances that require payment of a higher fee. Regional Counsel's concurrence signifies that the attorneys fee under the contract is an allowable project expense, but it is not a certification that there are sufficient project funds available to cover the fee.

Regional Counsel shall retain in the appropriate litigation file the data considered by him/her in acting upon a fee proposal, such as compilations of HUD approved fees for litigation counsel or data concerning payments made to counsel by other clients. Contracts calling for payment on a per hour or per diem basis, or a combination of both, are required to contain at least an estimated maximum total for budget purposes. Any contract calling for an estimated maximum fee in excess of $100,000 will be forwarded with Regional Counsel's recommendation to the Program Associate. See Section 2-3f(3).

Lump sum fee proposals will be approved only where the issues are uncomplicated, extensive preparation probably is not required, and any trial that may ensue probably will not be lengthy.

Successive increases in such contracts in excess of the amounts described above require approval by the Regional Counsel, or Associate General Counsel for Assisted Housing and Community Development, respectively, as applicable.

Requisitions for payment of fees under a litigation contract may be reviewed by Regional Counsel prior to payment.

(4) APPEALS -- Regional Counsel shall confer with the appropriate Program Official and concur in a PHA's request to appeal an adverse decision after consultation with appropriate HUD officials unless he/she finds that an appeal would be frivolous as a matter of law, contrary to Departmental policy, or not cost-beneficial. See Sections 2-3f(2) and 5-3b. If the adverse decision includes an order affecting a HUD-assisted project or activity, Regional Counsel shall promptly convey that information to the appropriate Program Officials and advise them as to the restraints upon the PHA.

(5) SETTLEMENTS -- Regional Counsel is authorized to approve a proposal for settlement with the concurrence of the appropriate Program Official and without referral to the Program Associate where the amount of the settlement, including fees and costs, will not exceed $500,000. (Cost includes any reduction in the agency's claim against the opposing party as well as any payment by the agency to the opposing party.)

If Regional Counsel receives adequate documentation of the settlement proposal and determines that the settlement is routine, he/she shall approve it unless he/she finds it is contrary to Departmental policy or not cost-beneficial. When Regional Counsel approves a settlement, he/she shall document the basis for approval in the litigation file and shall forward a copy of that document to the Program Associate.

Approval of any settlements in which the PHA's cost would exceed $500,000 or which have significant impact on policy, legal precedent, Departmental programs or other matters of vital interest to the Secretary and/or Assistant Secretaries require the concurrence of the Program Associate. See generally Section 2-3f(2). Regional Counsel shall, with the concurrence of the appropriate Program Official, prepare a memorandum to the

Program Associate evaluating the proposal and setting forth his/her recommendations. The Program Associate will advise Regional Counsel whether or not to concur in the proposed settlement, and Regional Counsel will communicate the Department's determination to the PHA.

3-4. REGIONAL OFFICE RECORDS.

Regional Counsel shall maintain a docket for all cases which his/her Office is handling. Such docket shall contain all of the information as described in Section 2-2c(1); the Regional Counsel shall use the Legal Assessment of Workload System (LAWS) for such purposes. Regional Counsel shall maintain a docket of Non-Federal Party Litigation that the office is following which contains the same information as is required for Federal Party Litigation for which he/she has principal responsibility; the Regional Counsel shall use LAWS for this purpose also. Regional Counsel shall maintain litigation files for court papers separate from those for correspondence for each case. Disposition of these records shall be in accordance with HUD Handbook 2225.

3-5. REPORTING BY REGIONAL COUNSEL

Chapter 4 describes the requirements for reporting by Regional Counsel to the General Counsel concerning litigation. In addition, Regional Counsel shall report to the appropriate Program Associate important events in Non-Federal Party Litigation that he/she is monitoring.

[Search] [Prev List] [Doc List] [Next List] [First Doc] [Prev Doc] [Curr Doc] [Next Doc] [Last Doc] [Top] [Prev Hit] [Help]

http://www.hudclips.org/sub_nonhud/cgi/nph-brs.cgi?d=OGCH&s1=(1530.1)[no]&op1=A...   12/14/04