
DEFENDANT'S EXHIBIT

37

# MONTGOMERY HOUSING AUTHORITY

*C. MICHAEL MCINNISH*
*EXECUTIVE DIRECTOR*
*334-206-7187*
*Fax: 334-206-7119*

FAX TRANSMISSION COVER SHEET

**Date:**   October 15, 2004

**To:**      *THOMAS TAYLOR (Chairperson), LUAN LONG (Vice Chairperson)*

**Fax:**     261-1502 AND 263-0032

**Re:**      *BOARD AGENDA ADDITIONS*

**Sender**   *C. MICHAEL MCINNISH*

*YOU SHOULD RECEIVE __7__ PAGE(S), INCLUDING THIS COVER SHEET. IF YOU DO NOT RECEIVE ALL THE PAGES, PLEASE CALL 334-206-7187.*

I am sending this facsimile to both of you as you are the elected officers of the board and are responsible for the conduct of the board meeting.

I have completed the board packets and agenda revisions as requested. I am attaching a copy hereto. Needless to say, I am quite concerned about the two items which request investigations of me being brought up at the open meeting in front of visitors and a multitude of staff. I have attached to my director's report a letter and several memos which have been sent out in the past about the travel issue. I feel that these issues are being raised in an effort to embarrass me in front of staff and are retaliatory in nature. On September 23, 2004, I sent Ms. Barnett a letter, a copy of which is attached hereto, and which is self explanatory. She had been complaining about children who allegedly lived in Riverside who pulled up her flowers. I had made several requests to her to write down her complaint and that we would follow-up on the complaint as we do for other residents. She simply refuses to do that and refuses to cooperate in following up on the complaint.

Prior to that, I had written her a letter about her outstanding travel airplane ticket which she has to repay. I am attaching a copy of that letter to this also. She came to the office and signed a repayment agreement on June 18 for $282.50. The first payment was due in July. She has made two payments and is two months behind. She has told the Manager at Riverside to take the charge off of her bill and that I said she does not have to pay. The Manager tried to do this but accounting caught it and put it back on her bill. She has paid nothing for September and

October. If it was lawful, I would gladly pay this for her just to help her out. However that would be very inappropriate.

I met with Ms. Barnett and her resident council on September 30 and listened to their concerns and suggestions. We started work on some of the issues that very day.

I hope that the board meetings will not become a public spectacle used for embarrassment and humiliation purposes. I certainly welcome inquiries which are done in a professional manner and have always been open to discussing issues with board members upon request. I must admit that I am not looking forward to the ridicule and embarrassment of having these items read in front of staff who are required to be at the board meeting. If the press asks any questions, I will be very prepared to present my side of the story to them.

Relating to Mr. Davis' bill. I have not had time today to finish my review in that I have been busy trying to compile data relating to these two new board issues. There are several questions that I will raise in a letter to both of you relating to the bill. For instance: In July he told me he had gotten some sample job evaluations and given them to Mr. Taylor to review. Yet, he has billed us for 7 hours in August and September for compiling this data. He spent one hour reviewing a one paragraph change in the lease. He spent a large amount of time working on a draft order for the court and then, according to my information, did not file it in a timely manner. He billed us for time, including a telephone call to Mr. Taylor, on September 16, which was the day of the hurricane. I will have a draft of a proposed letter to send to him by next Wednesday.

Please let me know if you have any questions. I will see you on Tuesday at the board meeting.

The information contained in the following transmission is privileged and confidential. It is intended for the sole use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telefacsimile in error, please immediately notify us by telephone collect and return the original transmission to us by U.S. Postal Service. We will reimburse you for the expense of same.

McInnish 441

*The Housing Authority of the City of Montgomery, Alabama*

## AMENDED AGENDA
## Regular Monthly Meeting of the Board of Commissioners
Tuesday, October 19, 2004 at 5:00 P.M.
at the Riverside Heights Training Facility at 1020 Bell Street
Montgomery, Alabama 38104

1.    **CALL TO ORDER**

2.    **APPROVAL OF AMENDED AGENDA**

Offered by_____ Seconded by _____

**APPROVAL OF MINUTES**

3.    Approval of the minutes of the regular monthly meeting of the Board of Commissioners of the Montgomery Housing Authority held on September 21, 2004.

Offered by _____ Seconded by _____

4.    **AUTHORITY REPORTS**
       Presentation by:  Maxine Sledge

5.    **DIRECTOR'S REPORT**

       **UNFINISHED BUSINESS** – None

       **NEW BUSINESS**

6.    To consider a resolution approving and authorizing a 3% Cost of Living increase for employees of the Montgomery Housing Authority, retroactive to October 1, 2004, contingent to City County Personnel Board approval. (Note: This item tabled at September 21, 2004 board meeting.)

Offered by _____ Seconded by _____

7.    To consider a resolution accepting the Request For Qualification evaluation report for Financial and Technical advisement services to the Montgomery Housing Authority in regard to disposition/demolition/redevelopment proposals of housing properties and approval to award the contract for these services to the party named therein.

McInnish 442

Offered by _____ Seconded by _____

Continued...2

*The Housing Authority of the City of Montgomery, Alabama*

## AMENDED AGENDA
## Regular Monthly Meeting of the Board of Commissioners
Tuesday, October 4, 2004 at 5:00 P.M.
at the Riverside Heights Training Facility at 1020 Bell Street
Montgomery, Alabama 36104

Page 2..

8.  To consider a resolution authorizing the write-off and disposition miscellaneous obsolete scrap items, of no real value, as per list attached, in accordance with the Authority's Disposition policy.

    Offered by _____ Seconded by _____

9.  To consider a resolution authorizing the write-off of un-collectible and vacated accounts from the books of the Montgomery Housing Authority's Conventional Housing program for the month of May 2004.

    Offered by _____ Seconded by _____

10. To consider a resolution authorizing the Administrative committee to investigate the absences of the Executive Director from the MHA office and the frequent travel for the past twelve months not related to the day-to-day performance of his duties as Executive Director.

    Offered by _____ Seconded by _____

11. To consider a resolution authorizing the Administrative committee to investigate whether the Executive Director is investigating and addressing complaints of Resident-Commissioner Barnett and other residents regarding safety concerns and disorderly tenants.

    Offered by _____ Seconded by _____

12. COMMITTEE REPORT(S), IF ANY.

13. PUBLIC COMMENTS (FROM SIGN-UP SHEET, IF ANY)

14. EXECUTIVE SESSION

15. ADJOURNMENT

McInnish 443

DEFENDANT'S
EXHIBIT

40

# Montgomery
# HOUSING
## Authority

C. MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET ♦ MONTGOMERY ♦ ALABAMA ♦ 36104-3006
(334) 206-7200 ♦ (334) 206-7222 Fax ♦ MHAToday.org

THOMAS TAYLOR
CHAIRMAN

October 19, 2004

Hon. Terry G. Davis
Davis & Hatcher, LLC
4183 Carmichael Road, Suite B
Montgomery, AL 36106

Dear Mr. Davis:

I have had an opportunity to review your bill submitted for September and have a few questions about the statement for which I need your response. This letter is not meant to cast doubt on you or your time keeping, but the following are issues that I need to document further for the file.

9-15    Reviewed and organized documents regarding Board request on legal work performed by three law firms employed by the Board; Preparation of draft report to board. On August 2 and August 24 you had entries that you reviewed my letter and a prior letter. The total pages of these letters appear to be 8 pages. You charged us for writing a letter to me (1 page) and a letter to Mr. Stewart (1 page). The total billed for that date was 3.5 hours. On August 24 you charged us 2.75 hours for reviewing my response and responding to Mr. Stewart. My files indicate two total pages for this entry.
You have now charged an additional 2 hours for September. Can you give some more information as to why this took so long to accomplish?

9-17    You charged us 3.0 hours for reviewing the City County Rules, Federal Regulations and Compiling Data for the Director Evaluation. On August 6 you billed us for 4 hours for compiling data on the same subject. On July 20 you called me to say that the board was wanting to do an evaluation on me and that you had compiled some data from the internet to give to them, which you brought (to the best of my recollection) to the board meeting that evening. The questions are these: What part of the CFR was pertinent to the work? What portions of the City County Policy did you have to review other than the short section on the evaluation? How did it take 3 more hours to compile data that we had already paid for 4 hours to perform? What additional information did you compile after the packet done in July?

9-16    We were billed 1.4 hours for reviewing the board packet and a telephone conference with Mr. Taylor. In addition, we were billed 2.75 hours for reviewing hearing notes, telephone conference with city attorney, preparation of summary and draft proposed order to Court. The questions are these: Did you ever file a proposed Order with the Court? (My recollection is that you called Mr. Stewart



LUAN LONG, Vice-Chair        RICHARD N. BOLLINGER        JOHN F. KNIGHT Jr.        ANNE B. UPCHURCH
BETTIE BARNETT              CLIFFORD HOLMES             RON DRINKARD             DAVID S. BARLEY, II

McInnish 518

Exhibit 118

on the day it was due and asked if the Judge would give you until that Friday to get your Order filed. You indicated you had a few suggestions for the Order and Mr. Stewart actually filed the Order after speaking with you while you were in Birmingham.) Are you positive that you spoke with Mr. Taylor and the city attorney? (This was the day of the hurricane. The city was closed and phones were out of service in a lot of areas. Mr. Taylor was not at work that day.)

9-1,2,6  We were billed for 12.75 hours for preparation for trial. It was my understanding that all issues were briefed and ready for court some time earlier. It was also my understanding that Mr. Stewart and the city attorney were going to take the lead in the case. Please verify that it took this additional time for you to prepare with the role you were going to take in the trial.

9-29  You billed us for 4.75 hours for reviewing the final order (7 pages), writing a memo to the board (1 page) and making telephone calls to board members. Did it take this much time to do those items?

Please respond to this letter at your earliest possible convenience. Again, the purpose of this letter is to clarify the times, as they seem to be more and longer than I would have imagined. I am having a check written for the remainder of the bill and will have any additional time paid after your response and my review of the response with some members of the board.

Thank you for your prompt response to this letter. If you have any questions or would like to discuss these issues, please do not hesitate to contact me.

Sincerely,


C. Michael McInnish
Executive Director

CC: Board Chair and Vice Chair

McInnish 519

2

Law Offices
# Davis & Hatcher, L.L.C.
ATTORNEYS AND COUNSELORS
P.O. Box 230907
Montgomery, Alabama 36123-0907

ry G. Davis
4) 270-0592
—Mail Address:
t.davis@DHLAW1.com

C. Michael McInnish
Montgomery Housing Authority
1020 Bell Street
Montgomery  AL  36104-3056
United States

Attn: C. Michael McInnish

Montgomery Housing Authority

Writer's Offices:
4183 Carmichael Road, Suite B
Montgomery, Alabama 36106
Facsimile: (334) 279-0362
Page: 1
10/05/04
Account No: 21-00
Statement No: 360

*(handwritten: 10/18/04 Please see note on last page — Pay # 2451.75 with finte notice —)*

## Fees

|  | Rate | Hours |
|---|---|---|
| **09/01/04** TGD Preparation for final hearing; reviewed stipulation of facts; researched and analyzed brief of the City Council, reviewed case law on Quo Warranto actions (Montgomery Housing Authority vs. City Council) | 175.00 | 4.00 |
| **09/02/04** TGD Continued preparation for final hearing; telephone conference with Walter Byars; preparation of argument for trial; researched and reviewed amended brief of Mayor and City of Montgomery (Montgomery Housing Authority vs. City of Montgomery) | 175.00 | 4.75 |
| **09/06/04** TGD Preparation for final hearing; researched and reviewed final brief and exhibits of Montgomery Housing Authority (Montgomery Housing Authority vs. City Council) | 175.00 | 4.00 |
| **09/07/04** TGD Preparation for final hearing (Montgomery Housing Authority vs. City Council) | 175.00 | 2.50 |
| **09/08/04** TGD Conference with clients, preparation for final hearing, reviewed briefs and arguments, telephone conference with Walter | | |

C. Michael McInnish

Page:  2<br>
10/05/04<br>
Account No:  21-00<br>
Statement No:     360

Montgomery Housing Authority

|  | | Rate | Hours |
|---|---|---|---|
| | Byars, telephone conference with Chuck Stweart (Montgomery Housing Authority vs. City Council of Montgomery) | 175.00 | 5.50 |
| 09/15/04 | | | |
| TGD | Reviewed and organized documents regarding Board request report on legal work performed by three law firms employed by the Board; Preparation of draft report to board (General) | 175.00 | 2.00 |
| 09/16/04 | | | |
| TGD | Reviewed Board packet, reviewed minutes; telephone conference with Mr. Taylor (General) | 175.00 | 1.40 |
| TGD | Reviewed hearing notes; telephone conference with City Attorney; preparation of summary and draft proposed order for submission to circuit court; (Montgomery Housing Authority vs. City Council) | 175.00 | 2.75 |
| 09/17/04 | | | |
| TGD | Researched rules and regulations of the Montgomery City/County Personnel Board; researched and reviewed federal regulations for administrative personal; compiled data for MHA Administrative Committee (General) | 175.00 | 3.00 |
| 09/20/04 | | | |
| TGD | Meeting with Administrative Committee (General) | 175.00 | 1.50 |
| 09/21/04 | | | |
| TGD | MHA Board meeting (General) | 175.00 | 1.50 |
| 09/23/04 | | | |
| TGD | Reviewed e-mail messages, responded to Mickey regarding construction contract; reviewed and analyzed Report on Job Probress and | | |

McInnish 521

C. Michael McInnish

Montgomery Housing Authority

|  | Rate | Hours |  |
|---|---|---|---|
| Conformance by Bargainer Davis Simms; reviewed Field Observation Reports; telephone conference with Mr. Thomas (General - Tullane Court Construction Contract) | 175.00 | 2.00 | |
| '04 GD Preparation of status report for Barbara Etheridge (Montgomery Housing Authority vs. City Council) | 175.00 | 0.80 | |
| 04 GD Reviewed and analyzed final order of the court on authority city council to appoint members of the MHA board; telephone conference with Mr. Taylor; telephone conference with City Attorney; preparation of memo to Board members; telephone conferences with Board members (Montgomery Housing Authority vs. City Council) | 175.00 | 4.75 | |

Terry G. Davis

                                                       40.45   7,078.75

For Current Services Rendered

                                                       40.45   7,078.75

Recapitulation

| ekeeper | Hours | Rate | Total |
|---|---|---|---|
| ry G. Davis | 40.45 | $175.00 | $7,078.75 |

## Expenses

| 4 Office Copies (147 @ .25) | 36.75 |
|---|---|
| Total Expenses | 36.75 |
| Total Current Work | 7,115.50 |
| Balance Due | $7,115.50 |

:hael McInnish

Page: 4
10/05/04
Account No: 21-00
Statement No:    360

omery Housing Authority

.chael McInnish

omery Housing Au

>nformance by Ba:
.mms; reviewed F:
:ports; telephone
. Thomas (Genera
urt Construction

?paration of sta*
:bara Etheridge
ising Authority
.ncil)

iewed and analyz<
:he court on auth
icil to appoint n
board;  telephon
: Mr. Taylor; tel
erence with City
aration of memo
ers; telephone c<
d members (Montg<
>rity  vs.  City (

' G. Davis

urrent Services |

5

avis

*Hold until further notice as respons*

*64 hours    x " 175   =   4663.75*

*Pay   " 2451.75*

Copies (147 @ .2

Expenses

Current Work

: Due

Terry G. Davis

C. Michael McInnish

Montgomery Housing Authority

Page: 4
10/05/04
Account No: 21-00
Statement No: 360

Hold until funder notice al reporei

26.64 hora    x " 175 = 4663.75

Pay    # 2451.75

Terry G. Davis

McInnish 524

C. Michael McInnish

Montgomery Housing Authority

Page: 4
10/05/04
Account No:  21-00
Statement No:    360

Hold until further notice as required

26.64 hours   x 175 = 4663.75

Pay  $2451.75

Terry G. Davis

McInnish 525

DEFENDANT'S
EXHIBIT

45



C. MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET • MONTGOMERY • ALABAMA • 36104-3006
(334) 206-7200 • (334) 206-7222 Fax • MHAToday.org

THOMAS TAYLOR
CHAIRMAN

November 15, 2004

Mr. Thomas Taylor, Chairman        **VIA HAND DELIVERY AND/OR FACSIMILE**
% Montgomery Advertiser

## RE: YOUR DIRECTIVE RELATING TO RIVERSIDE HEIGHTS

Dear Mr. Taylor:

I received your letter on Friday of last week wherein you directed me to provide you with a complete written report on the status of discussions with the City, Air Force, HUD and anyone else regarding the Riverside disposition. Below is my initial response and information as per your directive.

After initial discussions and upon request, I wrote a letter to the Mayor on November 4, 2003, describing our financial needs for replacement housing for Riverside. The total I submitted was $24,485,000.00. This was the base figure from which we worked. After several discussions, the amount was increased to 30 million to be needed, as land would have to be acquired and other costs would be charged. A follow up letter was written on November 6, 2003, after having met with the Mayor. Thus, from the outset of this negotiation, we have been using the above figures for the disposition exchange of Riverside 6-4. Our plan was to replace the 421 units we presently have with 274 units. Our discussions with HUD centered on replacement of bedrooms, not units. This was all outlined in the letter.

Over the next several months, meetings and discussions were had with various persons, including Ed Sprayberry, Ken Groves, Paul Hankins, officials from the Air Force, and others. I received many phone calls from Todd Strange on behalf of the Chamber. Several persons allegedly went to Washington to meet with Sen. Shelby and staff, and other governmental officials. I was not invited to this meeting. We were all working on the need for $30 million dollars to do our project.

Plans evolved and the funding was to come as follows: $12 million from the city, $15 million from HUD, and $3 million from the state. This would take care of our needs and we worked toward that goal. The City put together a presentation



LUAN LONG, Vice-Chair
BETTIE BARNETT

RICHARD N. BOLLINGER
CLIFFORD HOLMES

JOHN F. KNIGHT Jr.
RON DRINKARD

ANNE B. URQUHART

McInnish 540

which was given in Washington and the report was that the project was progressing. I was not invited to this meeting either. Meetings were held with residents. Meetings were held where our board was invited. Meetings were held by the modernization committee. You attended several of these meetings to the best of my recollection.

Senator Shelby came to Montgomery and stated to a large breakfast group that his priority was to get the residents of Riverside new housing. Needless to say, we were all elated that our dream was coming true and was getting nearer to fruition. I introduced myself in the hallway to the Senator after this meeting and numerous community leaders congratulated the MHA on our project. An article appeared in the next morning's newspaper about this meeting. I received a call from Mr. Willie Jones that the Secretary of HUD was coming to Montgomery. Plans were made for the meeting, protocol was discussed and schedules were changed to accommodate this visit. The visit was cancelled at the last minute. I ran into Senator Shelby at the airport. I again thanked him for his support and he told me to let him know if there were any problems. Thus, we were still moving strongly ahead with our plans to dispose of Riverside 6-4 and replace the units as outlined hereinabove.

Soon thereafter, the news of changes in the plans arose. No longer were we going to receive the 15 million from HUD through the Senator's office and the 3 million from the state was planned for improvements to Bell Street. That left us with 12 million dollars from the city as the only funding which may be available.

A visit was scheduled for several HUD officials to come to Montgomery from Washington to discuss the project and tour our facilities. I met with an Assistant Secretary and a staffer from Sen. Shelby's office on August 4. It was while at dinner that the rumors were confirmed: no money as originally planned and we would have to do a mixed finance arrangement for the plan to succeed. We discussed this process and other issues. On August 5, a large meeting was held with these officials and other officials. The entire discussion was on mixed financing and Section 8 possibilities if this project was to succeed. Again, all that was discussed was the disposition of Riverside 6-4. After the meeting, I asked one of the Assistant Secretaries if I could meet with him and others after I had a chance to learn more about mixed financing, he said of course.

I began to read and study mixed financing. I called several of my friends who were involved in the recent bond pool, real estate development and housing authority mixed finance deals. I went back through prior seminar notebooks and began review of the Mixed Finance Guidebook. I called a former PHA director who started the bond pool and who did a lot of mixed finance at the Jefferson County Housing Authority. His name is Eric Strong. I scheduled an appointment to meet with him to discuss how to get into mixed finance and what issues needed to be raised to be fiscally responsible. He gave me a lot of help.

I went to Washington and spent the day at headquarters meeting with Asst Sec. Russell and at least three other Asst. Secretaries about bond issues, mixed financing, Section 8 replacement issues and other issues about the new project. They all were very helpful and gave me a lot of information about the process and feasibility. They suggested several web sites for me to visit and gave me the names of several housing authorities that had been through this process. We also discussed the need for a financial consultant to help us with our feasibility studies, suggest financing alternatives, etc. With all of this information, I began the next phase.

I worked on developing an RFP and a list of possible consultants for the financial consultant. I met with representatives from the city to discuss the RFP and sent it out to over 30 consultants. The city agreed to consider paying the costs of the consultant either directly or through reimbursement. The Mayor asked that he be able to review the responses and evaluate them. I agreed. I later ate dinner with the Mayor and discussed the future of the disposition. He indicated that the City was firm with a $12 million dollar offer.

Responses were received to the RFP. They were evaluated by several persons and copies were furnished to the City as requested. The recommendation was to hire CENSEO, Inc. as the consultant. This joint recommendation was presented to our board at the October board meeting and passed with one nay vote. Also at that board meeting, a proposed letter from the Mayor was distributed and several suggestions were made for amendments to the letter. It was also discussed that the $12 million dollar offer was for the entire Riverside property, not just Riverside 6-4. Therefore we moved from $30 million for a portion of Riverside to $12 million for the entire property. I sent communications to the city about the changes and the consultant. I scheduled a meeting with Ken Groves and Paul Hankins for last Friday afternoon to discuss the consultant, the letter and the future. We agreed to meet with the consultant this week and agreed to have a meeting on December 8 at 5:00 at the MHA training room to present the entire project, timeline, and issues that need to be resolved at the December board meeting. We also discussed having the attorneys begin drafting the agreement as per our discussion.

I do not have all names of persons with whom I have discussed this project. The main people are Ken Groves, Paul Hankins, Mayor Bright, Ed Sprayberry and the HUD officials who came to Montgomery. Their phone numbers are as follows:

| | |
|---|---|
| Groves: | 241-2712 |
| Hankins: | |
| Bright: | 241-2004 |
| Sprayberry: | 205-205-731-2630 |
| Headquarters: | 202-708-1112 |
| Jones: | 262-1199 |

BELOW ARE THE DATES OF MEETINGS THAT ARE REFLECTED ON MY
CALENDAR OR JOURNAL. THEY DO NOT INCLUDE MANY PHONE CALLS
TO AND FROM INDIVIDUALS OR TIMES THAT I HAVE ASKED QUESTIONS
FROM VARIOUS INDIVIDUALS ABOUT THE PROCESS.

## 2003:

| | |
|---|---|
| Oct 30 | Meeting at C of C about project |
| Nov 4 | Letter to Mayor about needs for replacement housing |
| Nov 6 | Letter to Mayor as requested |
| Nov 13 | Letter from Mayor to AF |
| Nov 17 | Meeting with Groves and others |
| Nov 18 | Board meeting with resolution.  Issue about Maxwell Heights |
| Nov 19 | Notice to board of meeting |
| Dec 1 | Meeting at Mayor conference room |
| Dec 12 | TC with Willie Jones about issues |

## 2004

| | |
|---|---|
| Jan. 20 | Meet at city hall |
| Jan 30 | Memo to board about meeting on Feb 2. |
| Feb 2 | Meeting with Groves and others |
| Mar 11 | TC with R. Drinkard |
| Mar 15 | Mod Committee |
| Mar 17 | Breakfast meeting.  Shelby announced intent |
| Mar 17 | Introduced myself to Shelby after meeting, thanked him |
| Mar 18 | Review article in newspaper, draft letter to editor |
| Mar 19 | Op Ed in newspaper, several TC's |
| Mar 23 | Heard from Willie Jones, HUD Secretary to visit, rescheduled Washington trip to be in attendance |
| Mar 31 | Riverside resident meeting to discuss plans, presentation |
| April 2 | Saw Shelby at airport.  Met his grandchildren.  Thanked him for his support of Riverside project.  He said to let him know if problems arose with program. |
| April 7 | Meeting at Cleveland Ave Y, discuss HUD visit agenda and protocol |
| April 8 | Email to Ed Sprayberry |
| May 12 | Communication from AF Real Estate organization. |
| May 20 | Groves called.  Congress ok with project |
| May 26 | Luncheon.  Discussed project with Chamber. |
| June 1 | Letter to Groves (Copy to board) |
| June 2 | Meet with Groves and others |
| June 29 | Met with resident council to answer questions about project |
| June 29 | Memo to board |
| June 30 | Memo to file about meeting |
| July 6 | Met with Groves staff to discuss some funding possibilities |

| | |
|---|---|
| July 12 | Communication from AF about environmental study |
| July 15 | Meet with Groves and others |
| July 15 | Mod committee. |
| July 16 | Staff scheduled interviews |
| End of July | AF in to do first portion of environmental study. Met with them on 30th. |
| August 4 | Meet with Sec. Russell and staffer from Shelby. No money from HUD, will have to do mixed financing. |
| August 5 | Meet with HUD Asst Sec, city officials, HUD officials, community leaders, Chamber members, YMCA staff. Toured facilities. Discussed mixed financing issues and plans. |
| August 6 | Memo to board about meetings with HUD and city about project |
| August 9 | Called Bham to get phone number of bond pool person, called and made appointment with Eric Strong |
| August 9 | Email with HUD about project. |
| August 10 | Response from Rodins Ainars at HUD about disposition |
| August 10 | Meet with Eric Strong about mixed financing, project based, got update on new possibilities and strategies. |
| August 11 | Meet with Groves and others. |
| August 13 | Meet with Groves. Continued work on RFP issues. |
| August 13 | Work on alternative plan for modernization of entire MHA properties to present to board. |
| August 17 | Presented report to board about modernization issues and possibilities, especially if Riverside not feasible. |
| August 20 | Reviewed the Mixed Finance Guidebook to prep for meeting with HUD. |
| August 23 | Meet with Assistant Secretaries of HUD on project. Discussed mixed financing, bond issues, Section 8 replacement, got information on similar projects, web sites for sample RFP's. |
| August 24 | Began review of new information, meeting on plans with resident council as relates to five year and annual plans. |
| August 25 | Meet with Groves and others |
| August 27 | Meet with Groves and others |
| | Prepare RFP for Financial Consultant |
| Sept 1 | Meeting about Fannie Mae Express, modernization money |
| Sept. | Dinner with Mayor, discussed opportunities and project, discussed RFP, he asked to have copy to review. |
| September | Review RFP's, copy to Mayor's office |
| Sept 30 | Meet with Riverside resident council |
| October 19 | Recommended RFP award to board, voted on |
| October 19 | Reviewed letter from myself and Mayor with Board, suggestions made by board for revisions |
| October 20 | Memos to Groves, communication with Drinkard and others. |
| October 25 | Attended training seminar on mixed financing, bond pool, modernization express loans, etc. |

McInnish 544

October 28    Letter to Mayor about project and meeting about financial
              consultant
Nov 10        Director Report sent with issue of letter outlined
Nov 12        Meet with Groves and others
Nov 12        Receive directive letter from Chairman
Nov 13        Reviewed file, work on response
Nov 15        Letter to board as per directive
Nov 15        Memo to board about next two meetings
Nov 18        Meeting with Censeo, Groves and Hankins to discuss scope and
              contract. (SCHEDULED)
Dec 8         Meeting with Groves, Hankins and others with interested board
              members about entire project  (SCHEDULED)

I trust that this letter adequately addresses your directive. I have consistently
asked board members to call me or otherwise communicate with me if they have
any questions. I have talked to several board members who had questions about
this project and will continue to be open with members of the board. I have
made no secret that I have met with certain officials about this matter. I have met
with numerous people to get information which will help the board reach a
decision about the entire issue. That is part of my job. Some issues to discuss
will be: approximately one-fourth to one-third loss of subsidy; the disposition of
the entire Riverside area in lieu of only 6-4; the loss of our maintenance and
administrative buildings; debt service for any bond issue we have to undertake;
effect on other modernization efforts as was outlined at the August board
meeting; income stream as a result of management fees instead of subsidy; and
the future effect of Section 8 program cuts. I have always tried to keep the best
interest of the housing authority and its residents at the top of the list of priorities.
The decision that the board will make will be one of the most important decisions
ever made by the board, in that the effect will have long-lasting consequences.

I was shocked at your claim that "the board has received very little information
about the project", but hopefully this letter will serve as a reminder of the
numerous discussions and communications that we have had throughout the
process, as well as the continuous board modernization committee involvement
in the project. I trust that it will provide the requested insight into the status of the
project.

There will be a meeting on December 8, 2004, at the Training Facility for anyone
interested in reviewing the past history, the current plans, and the needed action
to be taken. We will need to have a resolution on the December board agenda
concerning this matter. The meeting on the 8th will be at 5:00 p.m. and will be
conducted by Paul Hankins, Ken Groves and myself. I hope that all board
members will attend this meeting so that all can be discussed and all questions
can be addressed. It would be a good idea if you were to call a Special Board
Meeting for that date and time so the minutes would be made and the meeting

would be official. Please let me know if you would like to do that, as appropriate notice will have to be given.

I will be happy for Mr. Davis to get any information he may need to review the matter, my actions, and other issues. He can pick up the file at a mutually convenient time. I will follow your instruction to provide him any information he requests as you have assigned him to meet with the City Officials to get an update on what is going on.

Please let me know if you need any further information or clarification.

Sincerely,

G. Michael McInnish

CC:    Board of Commissioners
       Terry G. Davis

# REFERENCES IN MINUTES TO RIVERSIDE HEIGHTS DISPOSITION

1. **Minutes of Meeting March 18, 2003:**

**Item No. 3 on Addendum** to Agenda, to consider a resolution authorizing the Montgomery Housing Authority to send out a Request For Proposal (RFP) for an appraisal of Riverside Heights AL 6-1, 6-4 and 6-7 based on the respective properties highest and best use. Mr. McInnish informed the board that he has received information that there is currently an appraisal being done by the Corp. of Engineers for Riverside Heights AL 6-4. There had been some talk about Riverside earlier for which an initial appraisal had been done but it did not consider "best use." As such, the Authority is asking that an appraisal be done for the Riverside Height properties to include highest and best use. It is estimated that it will cost less than $10,000.00.

Commissioner Drinkard offered the following motion and moved its adoption:

## RESOLUTION NO. 5054

BE IT RESOLVED by the Board of Commissioners of The Housing Authority of the City of Montgomery, Alabama that authorization is hereby given for the Montgomery Housing Authority to send out a Request For Proposal (RFP) for an appraisal of Riverside Heights AL 6-1, 6-4 and 6-7 based on the respective properties highest and best use.

Seconded by Vice-Chairman Bollinger.

The Chairman called for a vote.

At this point the question raised by Commissioner Knight was why the Authority needed an appraisal to be done at this time. Mr. McInnish stated that the question that has come up recently is what is the property worth. We do not know. The first appraisal was $12 million. Mr. Charles Bailey, Modernization Coordinator clarified that the first appraisal was done about four years ago and included the apartments. What the Authority is seeking this time is to find out what 52 acres at this location worth. Commissioner Drinkard stated he felt that the Authority should know what the land is worth so that it could make a comparison. Secondly, looking at the property down town that recently sold for more money than anyone expected, it would be prudent to know what this property is worth. He felt that if an opportunity that presented itself, the Authority should cease the chance to sell and rebuild new single-family dwellings to better serve its residents. Commissioner Taylor pointed out that an appraisal is a time sensitive document and he felt that we should get an

McInnish 547

appraisal if there is a buyer. Vice-Chairman Bollinger
stated that the City's offer was still out there but the
$12 million dollars was too low. Commissioner Long pointed
out that if we were to get an appraisal now and depending
on how long the City takes with its plan for the
Riverfront, this property could be worth much more.
Commissioner Upchurch felt it unwise to get an appraisal
before an offer is made as once the value is known the
offer might not be more than that. The Chairman asked for a
vote on the motion on the floor.

Commissioner Knight then offered a motion to table the
motion on the floor, as follows:

RESOLUTION NO. 5055

BE IT RESOLVED that the Board of Commissioners of The
Housing Authority of the City of Montgomery, Alabama that
Resolution No. 5054 authorizing a Request For Proposal
(RFP) for an appraisal of Riverside Heights AL 6-1, 604 and
6-7 be and is hereby tabled.

The motion was seconded by Commissioner Taylor, voted
on and passed by the board.

**Committee Reports:** Vice-Chairman Bollinger, as
Chairperson of the Modernization Committee informed the
board that the modernization committee will be meeting at
1:30 P.M. on March 19, 2003 in the Central Office
Conference Room and will be discussing several issues. He
invited the members of the board to attend this meeting if
they could. The Chairman asked if there were any more
committee reports.

## 2. Minutes of Meeting April 15, 2003:

Chairman Holmes proceeded to the **Addendum to the
Agenda**, **Item No. 1**, under **New Business**, to consider a
resolution authorizing the Executive Director to request an
appraisal of the Riverside Heights properties, to be done
in conjunction with the Task Force of the Chamber of
Commerce, at a cost to the Authority not to exceed $5,000.

The Executive Director explained that Mr. Todd
Strange, who is on the Task Force of the Chamber of
Commerce had called him and expressed interest in getting
an appraisal on the Riverside Heights properties. They had
met and discussed on equally dividing the cost. The
suggestion was to get to know the cost of both commercial
residential and multi-residential use. The Authority would
get to choose the appraiser.

Commissioner Upchurch inquired if the Chamber of
Commerce was interested in the Riverside Heights property.
Mr. McInnish clarified that it was a group represented by

the Task Force of the Chamber of Commerce who is interested in this property.

Commissioner Davis offered the following motion and moved its adoption:

### RESOLUTION NO.5063

BE IT RESOLVED by the Board of Commissioners of The Housing Authority of the City of Montgomery, Alabama that the Executive Director is hereby authorized to request an appraisal of the Riverside Heights properties, to be done in conjunction with the Task Force of the Chamber of Commerce, at a cost to the Authority not to exceed $5,000. Vice-Chairman Bollinger seconded the motion. The Chairman asked is there were any questions.

Commissioner Upchurch further inquired if the Chamber would be willing to pay the entire cost. The Executive Director explained the outcome of the discussion was to have a mutual appraisal.

Commissioner Knight sought clarification if the appraisal would on the highest and best use of the property and if the Chamber of Commerce is the party interested in purchasing the property. Mr. McInnish confirmed that the appraisal would be based on the highest and best use and then requested Commissioner Drinkard to address the latter part of the question. Commissioner Drinkard explained that it is his understanding that he believes that it is the Task Force representing a group that may be interested in possibly acquiring the property. He stated that he felt as he did the last time when he recommended an appraisal; if there is anything we can do to enhance the living conditions for our residents with new and better housing, the board needs to give it some consideration. Commissioner Knight concurred stating that regardless of the appraisal, the board's position should be that the bottom line for the housing authority is to do what is in the best interest the people who live in public housing. Upgrading public housing stock should be a primary concern. There being no further questions or comments, the Chairman called for a vote. The motion was voted on and passed by the board.

Chairman Holmes addressed **Agenda Item No.10** and asked if there were any Committee Reports.

3. **Mnutes of Meeting July 15, 2003:**

**Agenda Item No. 20, Committee Reports.** Chairman Holmes asked if there were any Committee reports to the Board. Commissioner Bollinger, Chairman of the Modernization Committee updated the Board on the appraisal of the Riverside Heights that was to be done jointly with Todd

Strange's group. He presented a site map he had prepared showing potential development prospects for this property that can serve as a good visual to get a developer more interested. Commissioner Upchurch asked if the appraisal had been done. Commissioner Bollinger informed her that it had not yet been done. Charles Bailey, Modernization Coordinator at the Montgomery Housing Authority explained that the problem is that there are three qualified MAI appraisers in Montgomery. One of the firms is already under contract with the Army Corp. of Engineers to appraise AL 6-4 for the Military and therefore felt it would be conflict; Mark Barrs indicated that he did not think he could do this particular appraisal and Bob Enslen, who appraised the land for the ball park for the City, recommended that the Authority get together for what it thought may be "best use." This is the reason for doing a visual of what we consider "best use." Commissioner Drinkard inquired as to whether this is the appraisal that was initially agreed upon. Mr. McInnish confirmed that it was and explained that the resolution passed by the board was that the Authority pick the appraiser and then go to the Montgomery Chamber of Commerce for their approval and the costs, up to $10,000 would be equally divided. Mr. Bailey stated that given that Mr. Enslen is the only one of the three local appraisers who may be interested, it was felt that the Authority should approach him again with this visual and see what he can do for us. Commissioner Upchurch asked if we knew how the appraisal is being approached by the party who is doing it for the Army Corp. of Engineers. Mr. Bailey said that they would not tell and he understood this. Commissioner Bollinger pointed out that when this was last approached, nothing was offered. Instead they gave estimates on what it would take to fix the units and came up with what the land was worth. With the visual, a developer may look at what it would cost to demolish, back that cost out, and then look at the possibility of what could be built back, considering the theme of what is going to happen between Maxwell Air Force Base and downtown Montgomery. This concluded the Modernization Committee report to the board.

4. **Minutes of Meeting November 18, 2003**

Chairman Holmes then addressed **Agenda Item No. 11**, *to consider a resolution authorizing the Montgomery Housing Authority to enter into an Agreement with the City of Montgomery and the U.S. Air Force for the disposition of Riverside Heights Al 6-4, contingent to HUD approval and in accordance with HUD rules and regulations.* The Executive

McInnish 550

Director requested Commissioner Bollinger, Chairperson of the Modernization Committee to address the board. Commissioner Bollinger stated that he was invited to attend a meeting held jointly by the City, the Chamber of Commerce and the Maxwell AFB. There have been three such meetings and Commissioners Long and Barnett and Mr. McInnish have each attended to find out what these meetings were about. The discussions were about property evaluation of Riverside Heights. They have also discussed the needs of Maxwell, the needs of the tenants and have asked if the Authority would be willing to work with them. He had recommended that they meet with the entire board and not just a few. This would enable the board to hear collectively where they were coming from and how it would benefit our resident. The Board was informed that they had invited the Board to attend a meeting in the Mayor's Conference room at one o'clock on December 1, 2003. Commissioner Knight spoke to this and asked that this board take the position that the tenants will be this board's first priority. He stated that the other proposition that has been on the table is to transfer the tenants to Maxwell Heights. He is opposed to this. He understood that this property is valuable to the City and to Maxwell but not at the expense of the tenants. He felt the board might like to consider developing the property by itself. Commissioner Bollinger and Mr. McInnish confirmed that in all discussions it had been made clear that the Authority is not interested in Maxwell Heights. HUD has also been kept informed. Mr. McInnish explained the figures and the proposal made that would replace old housing stock with new housing. Commissioner Bollinger pointed out that the Air Force cannot sell land but can move land. Chairman Holmes asked if the board had a decision on this. Commissioner Bollinger reiterated that all that he has told them is that the Authority would be willing to work with them. Mr. McInnish also pointed out that this is not an agreement to purchase but is an agreement to work with the City. Commissioner Barley offered his comments and recommended that the Authority work out a long-range plan as to what it would like to see happen with public housing in the City. He would like to see smaller housing developments that will improve the quality of life for the tenants. The Executive Director pointed out that they are looking at scattered sites. At this point Chairman Holmes acknowledged Councilman Knuckles (who was getting ready to leave), thanked him for attending and invited him back to future meetings. Thereafter, Commissioner Knight offered the following motion:

RESOLUTION NO. 5141

BE IT RESOLVED by the Board of Commissioners of The Housing Authority of the City of Montgomery, Alabama that Agenda Item No. 11 be amended whereby the Montgomery Housing Authority is authorized to talk/discuss with the City of Montgomery and Maxwell AFB on the disposition of Riverside Heights AL 6-4.

The motion was seconded by Commissioner Barley, voted on and passed by the Board this eighteenth day of November 2003.

5.  **Minutes of Meeting December 16, 2003**
Chairman Holmes then addressed **Agenda Item No. 6,** *Report by Commissioner Bollinger, on status of proposed disposition of Riverside Heights AL 6-4,* under "Unfinished Business."

Commissioner Bollinger briefly updated the Board on the meetings with the City and Maxwell Air Force base. The City continues to look at properties for redevelopment. The MHA has made it clear that it is not interested in Maxwell Heights. The Board had also asked Mr. Ken Groves of the City Planning department to discuss with Maxwell AFB on a different configuration of property requested and for a comprehensive plan of the entire area to be developed. There will be a follow-up meeting at City Hall on January 6, 2004 at 11:00 A.M. With the permission of the Chair, Commissioner Bollinger presented the modernization committee report at this time.

6.  **Minutes of Meeting March 16, 2004**
Chairman Holmes addressed **Agenda Item No. 13,** *Committee Reports,* and asked if there were any reports from the committees. Commissioner Bollinger, Chairperson for the modernization committee stated that he would like to update the board on the status of Riverside Heights. He distributed some documents to the board. He informed the board that the City had come up with a proposal that they have taken to Washington, DC to the Alabama delegation to discuss and to find out if they would support this proposal. After returning from their second meeting, the Alabama delegation has agreed to help us come up with the monies to do some modernization work for Riverside Heights if we sell. One of the things asked for is about $30 million. It is hoped that $15 million will come from HUD in Washington, $12 million from the City of Montgomery and $3 million from the State of Alabama. He pointed out to the board that the areas shown in the diagrams given to them is

just what was presented to the delegation in Washington and none of this is yet decided on. Everything seems to be moving well and at this point they would like to like to meet again with the residents at Riverside Heights AL 6-4 in the next two weeks to keep them informed and to get some more input from the residents themselves. There is a lot of positive feedback and it would be a tremendous solution for our residents. Commissioner Barnett (resident commissioner at Riverside Heights) asked that consideration be given to looking at properties all around the city. She would like to know that they have looked north, south, east and west for locations. Commissioner Bollinger requested her input on locations. He further pointed out that there are several nice places that they have looked at and that the City has also expressed their willingness to work out transit routing to accommodate the locations that will be selected. He further asked he would be glad to keep the city informed of any sites that any one would like to recommend for this project. Commissioner Barley stated that the concept of having smaller developments spread throughout the city is a good one and while he understood that nothing has been finalized yet, he would like to see some closure on the site locations. The Executive Director pointed out that anything that we may look at has to be approved by the Fair Housing division. Chairman Holmes said that there are several things that are yet to be dealt. Commissioner Bollinger encouraged the board to attend these meetings. It was further clarified that the City had done what they were asked to do and it has also been agreed that the replacement will be on bedroom size for bedroom size. Vice Chairman Taylor inquired why Cedar Park is not in the mix. Mr. McInnish responded stating that this is property that we own and we can do something else with in the future. Commissioner Bollinger also explained that the modernization committee is working with the City on another project for $1.5 million that he brought to the board a few months ago to help build some single family dwellings on this land. We hope that it will be in their May funding. Mr. McInnish explained that the discussion at the time was to build some single family homes on this land to help move Family Self-Sufficiency and Home Ownership program graduates into and to also have some assisted living units in the mix. This has been put on the back burner for now. Commissioner Bolligner asked if there were any other questions. There were none.

7.  **Minutes of Annual Meeting May 18, 2004**

9. **Funding** — It appears that housing authorities are not expected to receive any increase in funding and there is a drastic reduction in Section 8 funding that has been proposed. Given this scenario, it would not be feasible to contemplate modernization of Riverside Heights due to the financial burden. Commissioner Barley requested an update on Riverside Heights and Maxwell discussions. Mr. McInnish advised that not much has changed except that the original date mentioned for this project was June but this has now moved to August. This concluded the Director's Report to the Board.

## 8. Minutes of Meeting August 17, 2004

Mr. Bailey then referenced the last two sheets of the handouts and pointed out that if the Maxwell AFB/City of Montgomery exchange were to take place and the Montgomery Housing Authority were to gain 200 brand new apartments it would reduce the total number of units to 2200. This would also reduce vacancies to 105 in excess of the 3% and the MHA would then receive approximately $8.2 million if the exchange were to take place. Also, included in this, if the MHA were to demolish every other unit at Trenholm Court, for a total of 120 units, this would reduce the total number of units to 2211. The MHA would still receive $8.2 million.

Mr. Bailey went on to explain the last scenario that he called the "Trenholm Alternative." What the MHA would like to do, in the event current discussions between Maxwell AFB, the City of Montgomery and the Montgomery Housing Authority do not come to fruition, is to take 167 one-bedroom units at Riverside Heights and convert them into two, three and four bedroom units for a total unit count of 337 units and also completely demolish Trenholm Court. This would reduce the total number of housing units to 2115 and also reduce vacancies to eighty-five vacancies over 3%. The bottom line is that the MHA could actually have a budget of approximately $700,000-$1,000,000 more than the budget it is currently operating under with five hundred fewer units. Upon concluding his presentation to the board Mr. Bailey asked if there were any questions. Commissioner Barley stated that he had several questions but would prefer to discuss this later to get a better understanding of what is involved. Commissioner Upchurch concurred with Commissioner Barley. Mr. Bailey reiterated that the MHA currently operated on a $7.2 million budget (Operating Fund). As a consequence of the Harvard Operating Cost study, the Montgomery Housing Authority's operating

fund is expected to actually increase but housing authorities will no longer receive funding in excess of 3% for vacant units. Commissioner Upchurch inquired about what prompted the Harvard Cost Study. The Executive Director explained that this Study started in 1990 when Harvard was given the task of undertaking a study of what it would cost to operate public housing. This was a very comprehensive study and was done nationwide. Eight of the Montgomery Housing Authority's housing developments were included in this study. Subsequently, upon completion of the Harvard cost study, a Negotiated Rule Making Committee was formed, on which he was invited to serve. This committee met in Washington, DC and worked on the rule and negotiated the figures of the Harvard Cost Study. At this point, the Harvard Cost Study results are with the Department of Housing & Urban Development's legal division and will then go the Office of Management and Budget (OMB). The numbers presented to the board are the last figures that were published by the Negotiated Rule Making Committee. Mr. McInnish concluded by stating that these proposals were just scenarios that had been put together for their review and input and would enable the Modernization Committee to have some information to work with when they meet. The Executive Director also stressed to the board the importance of making their decisions in the next two/three months because HUD will be in to take their snapshot of this Authority some time in June of 2005 based upon which the Authority would be funded. He also pointed out that at this time, vacancies may not appear to be high, but this is because HUD Birmingham have agreed not to count the zero and one-bedroom units against us since they are unmarketable. However, with the implementation of the Harvard Cost study this exclusion will no longer be available and all vacancies, except those in modernization or those under repairs with the insurance company, will no longer receive subsidy.

Commissioner Knight then sought clarification and asked if through the Harvard Cost study the operating cost would be increased but units would be decreased.

Mr. McInnish responded that what Mr. Bailey has explained is that if we were to reduce units, we would receive more than what we currently receive because first, the operating cost per unit is increased and second, we would have less vacancies – the Harvard Cost study dictates that vacancies in excess of 3% would not be funded. The Executive Director also pointed out that what HUD would go by is the snapshot it takes in June, for example, one

scenario presented in Washington was vacancies on June 1 could be at 25% and in July 1 occupancy could be at 100% but funding for the next year would be on the snapshot of the housing authority taken on June 1. Further, the funding cycle will also change from October-September to January-December with a snapshot taken every June to arrive at operating subsidy to be funded. Commissioner Knight then asked if this information is also available on the Internet to which the Executive Director responded in the affirmative and directed him on how to get to the site. He also offered to make a hard copy available to him, if needed and explained that the figures that are available in Appendix D and E, if he recalls correctly, are inflated because the Negotiated Rule Making Committee had managed to get HUD to take the 1990 figures and build in an inflation factor.

Chairman Taylor sought clarification in that he was of the opinion that there was a shortfall in funding expected. Mr. McInnish explained that the shortfall is expected in Section 8 funding and public housing is expected to be funded at 93%. The Harvard Cost study does not go into effect until possibly next October. The Harvard Cost study, once HUD legal division has completed its review, will go to the OMB for their review and then on to a Congressional Committee and back to HUD. It is predicted that the rule will not be published until February or March.

## 9. Minutes of Meeting October 19, 2004

Mr. McInnish then read aloud a Letter of Intent that he had received from the Mayor and stated that he would need board approval for him to sign this. He asked if anyone would like to discuss this at this time or hold it over to be addressed under Committee Reports. The Chairman then opened the meeting up to discussion. Chairman Knight requested a copy of this letter. Mr. McInnish informed him that he had just received it before coming to the meeting and would be glad to read it for him again. He did. Commissioner Knight expressed concern that the letter only mentioned Maxwell Air Force Base and did not mention or refer to the tenants of Riverside Heights. If the board is required to concur with this, there ought to be something in the letter as to what is going to be done relative to the residents of Riverside Heights. In his opinion, it is the job of the board to look out for the tenants. Chairman Taylor asked if the letter had already gone out from the Mayor's office. Mr. McInnish confirmed that the letter had only gone out to him as it required his signature and he

would not be signing it without first bringing it to the board. Chairman Taylor also inquired if this letter from the Mayor is in anyway linked to the agenda item for the approval of the Financial & Technical advisement services. Mr. McInnish informed the board that it is linked to it indirectly because the Financial & Technical advisement service would provide for someone to advise the Authority on mixed financing, how best the Authority could leverage its funds, what they could do to get hopefully a nine percent tax credit. It was at HUD's suggestion that this has been done.

Commissioner Drinkard stated that the way he would interpret the letter is that the City would buy the property and what they do with it would be up to them; what would be up to the Authority is to make sure that the deal is appropriate that provides improved housing. He confirmed his agreement with Commissioner Knight, in that, the it is the board's job to ensure that this deal provides improved housing for the tenants. Commissioner Bollinger also pointed out that initially the discussions were to do with just AL 6-4 and from his recollection from the last meetings that from an overall scale it went back to being just AL 6-4 which is all that it appeared they could afford. He then asked if it could in any way hurt the Authority if just Riverside Heights is named in the letter. Commissioner Drinkard stated that nothing is mentioned in the letter as to the price offered and if they were interested in purchasing all of it, he did not see the problem if the Authority would get new improved housing. Commissioner Long inquired if this was just a cog in the process. The Executive Director confirmed that he had no problem with asking that additional language to be added to clarify that the intent is to look out for the residents of Riverside Heights and as to specifying the property being eluded to this can be addressed by inserting "Riverside Heights or a portion thereof." Mr. McInnish stated that the purpose of the letter was just to show that the City and the Montgomery Housing Authority are ready to do this. Commissioner Barley then referenced earlier discussions when they had spoken of breaking down density. The Executive Director confirmed that the aspect of density remains in place and it was understood that the City would consider properties that suitably address this.

Thereafter, Commissioner Drinkard, with the permission of the Chair, offered the following motion and moved its adoption:

RESOLUTION NO. 5248

BE IT RESOLVED by the Board of Commissioners of The Housing Authority of the City of Montgomery, Alabama that the board hereby authorizes the Executive Director to sign the letter after incorporating appropriate language, hereinabove discussed by the board; and that the amended version of the letter be approved by the Chairman prior to his signing.

Vice-Chair Long seconded the motion.

Commissioner Knight asked that his name be included as he would like to see the amended version prior to the letter being signed.

Commissioner Holmes requested that the board be given a copy of the amended version, once it is signed.

Commissioner Knight further stated that if the Authority is to go down this path it is extremely important for everyone involved to insist, and he feels fairly certain that HUD is also going to insist, that every step we take is to the benefit of the tenants.

This said, the board voted and the motion was unanimously passed this nineteenth day of October 2004.

# MONTGOMERY HOUSING AUTHORITY

### C. MICHAEL MCINNISH
### EXECUTIVE DIRECTOR
### 334-206-7187
### Fax: 334-206-7119

## FAX TRANSMISSION COVER SHEET

**Date:**     November 15, 2004

**To:**     ~~ED SPRAYBERRY~~

**Fax:**

**Re:**     RIVERSIDE DISPOSITION PROJECT

**Sender**     C. MICHAEL MCINNISH

### YOU SHOULD RECEIVE  10  PAGE(S), INCLUDING THIS COVER SHEET.  IF YOU DO NOT RECEIVE ALL THE PAGES, PLEASE CALL 334-206-7187.

Attached is letter from Chairman and my response along with cover letter to you.  Please let me know your thoughts.  Thanks.


C. Michael McInnish

The information contained in the following transmission is privileged and confidential.  It is intended for the sole use of the individual or entity named above.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking any action in reliance on the contents of this telecopied information is strictly prohibited.  If you have received this telefacsimile in error, please immediately notify us by telephone collect and return the original transmission to us by U.S. Postal Service.  We will reimburse you for the expense of same.

DEFENDANT'S
EXHIBIT
139



C. MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET. ♦ MONTGOMERY ♦ ALABAMA ♦ 36104-3006
(334) 206-7200  ♦  (334) 206-7222 Fax  ♦  MHAToday.org

THOMAS TAYLOR
CHAIRMAN

## ADDENDUM TO DIRECTOR'S REPORT

October 15, 2004

Board of Commissioners.
Montgomery Housing Authority

Dear Members:

Two new agenda items are being placed on the agenda for the upcoming board meeting at the request of Ms. Barnett. They have to do with proposed investigations of me as Executive Director dealing with travel and with my lack of response to safety issues of the Resident Commissioner and other residents. The purpose of this letter is to again say that I am willing to meet with any of you to discuss any issues you have with me or with the housing authority.  .

It is a fact that I do travel on behalf of the MHA. I am a member of several committees which directly benefit our operations at the housing authority. On May 20 of this year, I met with Mr. Taylor who had some questions about how committee work helps the MHA. I sent him a memo, a copy of which is attached to this letter. I sent the board a memo on June 15, 2004 relating to the same subject. I outlined in this memo some information about costs and gave an outline of future meetings. There were no questions or responses to me from these memos. I gave a list of future meetings in my September director's report. I still am more than willing to meet with any of you to discuss any of these issues.

On June 9, I had a phone call from a person who wanted to inform me that a member of the board had been complaining about travel. Another person called on June 14 and said that two members of the board were trying to get rid of me. I called a third party to confirm this conversation. I met with Mr. Taylor that date and reviewed my committee work with him and told him of the rumors of several commissioners trying to get rid of me. I had another call from our attorney on June 15 saying that a board member had called him wanting to know about my contract. On June 18 I had another call that said the talk in the community was that one or more board members were out to get rid of me. On July 20, our attorney called me to say that he had been asked about an evaluation of me. He said he had downloaded some evaluations and given those to the board member. During the midst of all of these rumors and calls, an investigation was

LUAN LONG, Vice-Chair
BETTIE BARNETT

RICHARD N. BOLLINGER
CLIFFORD HOLMES

JOHN F. KNIGHT Jr.
RON DRINKARD

being conducted about why one law firm was getting more business than others, and other such questions. I promptly responded to all questions asked by the board and sent many memos to the board with the information. Needless to say, many work hours have been spent in answering allegations, writing memos answering questions, etc., since May of this year.

I have taken very little annual leave this year and currently have 324 hours of annual leave on the books. In addition, I have not taken my personal leave day. I will again lose leave that has been earned because it was not taken. While I am attending meetings, I am constantly available by email and promptly respond to emails and phone messages. All staff and commissioners have my access numbers and email addresses and I regularly get communications and take care of the business of the housing authority while attending these meetings.

I have been out of the office this year 12 work days for the Neg Reg meetings in Washington. I did not go to the other week of meetings and sent an alternate in my place. I missed six and one-half days this year for Task Force meetings. We revised the ACOP and other policies. MHA has adopted these policies. I have missed six and one-half days to attend housing authority insurance board and committee meetings. I did not attend the meeting in September. I have been taking courses sponsored by Rutgers called Executive Directors Education Program. These are intense courses and I have taken Ethics, Public Relations, Financial Management, Preparing for Change, Legal Issues and Maintenance Management. These courses are offered in conjunction with PHADA workshops, and I have not been able to stay for the workshops this year. I did stay for one set of committee meetings. I missed a week to attend the Fair Housing Conference. We are in the middle of doing our disability assessment and I have implemented many procedures to bring us in compliance with fair housing issues. I have taught several courses this year on commissioner training and personnel issues. Preparation and interaction with the participants has been an invaluable tool in keeping me up to date on these subjects which are common areas of discussion in my job.

I have not gone to many meetings that were scheduled, such as APHADA meetings in March and June, a Serc/Nahro committee meeting, PHADA annual meeting, Serc/Nahro meeting in June, and the annual NAHRO conference in July. I did go to do a presentation at this meeting, leaving on Friday and returning on Saturday, but did not attend the meetings and this was not on MHA time.

I have made several trips to HUD for meetings which all relate to the MHA either directly or indirectly. In fact, I was there for two days last week on business. I have made several trips to Birmingham where I left Montgomery in the late afternoon, attended meetings and returned the next morning. I have used my free hotel nights so there would be no charge to the MHA for these meetings.

I have tried to answer questions board members have raised in the past and particularly since May of this year. I promptly answered travel questions in May and June and have heard nothing until the agenda addition this week. Again, I will be more than willing to go through these items again with you and explain the unusual nature of the housing industry and the benefits I feel the MHA has because of our involvement in organizations. I will likewise look forward to meeting with the committee to review the issues Ms. Barnett has asked to be investigated.

If you have any questions or would like to review any of our documentation, please feel free to call me on Monday or Tuesday.

Sincerely,

C. Michael McInnish

McInnish 454

# MONTGOMERY HOUSING AUTHORITY

C. MICHAEL MCINNISH
EXECUTIVE DIRECTOR
334-206-7187
Fax: 334-206-7119

## MEMORANDUM

Date:     May 20, 2004

To:       THOMAS TAYLOR
From:     C. MICHAEL MCINNISH
Copy:

Subject:  ORGANIZATIONAL MEMBERSHIPS

---

Mr. Taylor:  I am currently a member of the following organizations:

**Member of the Claims Committee for Housing Authority Insurance**, the national insurance company representing housing authorities. I have been asked to be a member of the Underwriting Committee next year. This is our insurance company and I have been on the committee for over five years. It directly benefits our housing authority in many areas. Board and committee meetings are held quarterly. The company pays the MHA $350.00 for each meeting to offset my expenses.

**SERC/NAHRO Educational Committee.** This organization does training for commissioners, housing authority staff, and residents in the southeastern states. It is composed of other PHA directors and staff. This committee meets on the same day as the Legislative Committee and I attend both. These committees meet four times per year, two as committee meetings and two as part of semi-annual conferences. Our housing authority is a member of SERC/NAHRO and NAHRO.

McInnish 455

**SERC/NAHRO Legislative Committee.** This committee works to review new laws and proposed laws of congress relating to housing authorities. We draft position papers on legislative issues such as funding, Section 8 funding cuts, regulations, etc. This information is very important to the ongoing activities at the MHA. These two committees are composed of other housing authority directors and staff.

**PHADA Professional Development Committee.** PHADA is the Public Housing Authorities Directors' Association. It is a national organization. I serve on the Professional Development Committee which is charged with all training and programs at conferences. The committee is composed of PHA Executive Directors and some staff. We review current topics, formulate programs for educational training, and work to help better educate all housing authority staffs and commissioners. This committee meets four times a year in conjunction with the national meetings of PHADA.

**AAHRA: Member of HUD Task Force and Chairman of Education Committee.** The Alabama Association of Housing and Redevelopment Authorities is the statewide organization composed of housing authorities. I have served on the education committee for three years and was the chairman last year. This group works closely with the association and the HUD office on workshops for the state association, commissioners, annual convention, and other meetings. I rotate off of this board in July.

The **Task Force** is comprised of five members who write the policies for the state to use. We have written all of the policies currently in effect at our housing authority. This group meets three to four times per year, depending on new material received from HUD.

I have also given assistance to the **Scholarship Committee** while at other board meetings. There has been no special travel at all related to any assistance to this committee.

**APHADA.** The Alabama Public Housing Authorities Directors' Association meets quarterly. I try to attend at least two of these per year.

I feel that memberships and participation in these groups has been very eneficial to the Montgomery Housing Authority as we keep up with current

practices, current rules and regulations, and have a very good reputation among the organizations and other entities with whom we work. All of these groups are comprised of Executive Directors and other PHA staff. I would hope that we will continue to be able to participate in these organizations.

**NEG-REG COMMITTEE.** I was appointed by HUD Washington to this committee and have kept the board up to date on the activities. We have met three times since March and have one more week in June to meet. HUD reimburses the majority of the expenses for these trips.

McInnish 457

# MONTGOMERY HOUSING AUTHORITY
# MEMORANDUM

### C. MICHAEL MCINNISH
### EXECUTIVE DIRECTOR
### 334-206-7187
### 334-799-4406
### MMCINNISH@MHATODAY.ORG

June 15, 2004

TO:        BOARD OF COMMISSIONERS
FROM:    C. MICHAEL MCINNISH
RE:        COMMITTEES
CC:

I have been asked to outline the committees on which I serve on the state and national level. They are as follows:

**Member of the Claims Committee for Housing Authority Insurance,** the national insurance company representing housing authorities. I have been asked to be a member of the Underwriting Committee next year. This is our insurance company and I have been on the committee for over five years. It directly benefits our housing authority in many areas. Board and committee meetings are held quarterly. The company pays the MHA $350.00 for each meeting to offset my expenses.

**SERC/NAHRO Educational Committee.** This organization does training for commissioners, housing authority staff, and residents in the southeastern states. It is composed of other PHA directors and staff. This committee meets on the same day as the Legislative Committee and I attend both. These committees meet four times per year, two as committee meetings and two as part of semi-annual conferences. Our housing authority is a member of SERC/NAHRO and NAHRO.

**SERC/NAHRO Legislative Committee.** This committee works to review new laws and proposed laws of congress relating to housing authorities. We draft position papers on legislative issues such as funding, Section 8 funding cuts, regulations, etc. This information is very important to the ongoing activities at the MHA. These two committees are composed of other housing authority directors and staff.

McInnish 458

**PHADA Professional Development Committee.** PHADA is the Public Housing Authorities Directors' Association. It is a national organization. I serve on the Professional Development Committee which is charged with all training and programs at conferences. The committee is composed of PHA Executive Directors and some staff. We review current topics, formulate programs for educational training, and work to help better educate all housing authority staffs and commissioners. This committee meets four times a year in conjunction with the national meetings of PHADA.

**AAHRA: Member of HUD Task Force and Chairman of Education Committee.** The Alabama Association of Housing and Redevelopment Authorities is the statewide organization composed of housing authorities. I have served on the education committee for three years and was the chairman last year. This group works closely with the association and the HUD office on workshops for the state association, commissioners, annual convention, and other meetings. I rotate off of this committee in July.

The **Task Force** is comprised of five members who write the policies for the state to use. We have written all of the policies currently in effect at our housing authority. This group meets three to four times per year, depending on new material received from HUD.

I have also given assistance to the **Scholarship Committee** of AAHRA while at other board meetings. There has been no special travel at all related to any assistance to this committee.

**APHADA.** The Alabama Public Housing Authorities Directors' Association meets quarterly. I try to attend at least two of these per year.

Memberships and participation in these groups has been very beneficial to the Montgomery Housing Authority as we keep up with current practices, current rules and regulations, and have a very good reputation among the organizations and other entities with whom we work. All of these groups are comprised of Executive Directors and other PHA staff. I would hope that we will continue to be able to participate in these organizations.

**NEG-REG COMMITTEE.** I was appointed by HUD Washington to this committee and have kept the board up to date on the activities. We have met three times since March and have one more week in June to meet. HUD reimburses the majority of the expenses for these trips. These meetings are now concluded and the new regulation has been drafted. It is now being sent through the government channels for final publication.

My currently planned schedule for committee and organizational meetings through January 2005 is as follows:

| | |
|---|---|
| June 22-25 | HAI Board of Directors, Committee Meetings |
| July 26-29 | State Convention |
| Sept. 10-12 | Executive Director Training |
| Sept. 13-16 | HAI Annual Board and Committee Meetings |
| Oct. | Fall Workshop |
| Nov. 5-6 | SERC Committees (Conference following?) |
| Dec. 1-4 | HAI |
| Jan. 6-8 | Director Training/PHADA Committee Meetings (Conference following?) |

There will be two additional APHADA meetings, one of which is in Montgomery that MHA is hosting in December.

There will also be approximately two Task Force Meetings during the late summer or early fall. These will be scheduled as needed.

Should any member of the board have any questions or need further information about these committees, please do not hesitate to ask.

The MHA organizational memberships are as follows:

| NAME: | COST: | BEGAN: |
|---|---|---|
| PHADA | $2800 | Prior to 1988 |
| NAHRO | $4875 | Prior to 1988 |
| APHADA | $150 | Prior to 1988 |
| AAHRA | $950 | Prior to 1988 |
| ACCOUNTING | $100 | Prior to 1988 |
| PUBLIC RELATIONS | $85 | 2000 |
| CHAMBER | I Pay | 2004 |

*The Housing Authority of the City of Montgomery, Alabama*

## AMENDED AGENDA
## Regular Monthly Meeting of the Board of Commissioners
Tuesday, October 19, 2004 at 5:00 P.M.
at the Riverside Heights Training Facility at 1020 Bell Street
Montgomery, Alabama 36104

1.   **CALL TO ORDER**

2.   **APPROVAL OF AMENDED AGENDA**

   Offered by_____ Seconded by _____

   **APPROVAL OF MINUTES**
3.   Approval of the minutes of the regular monthly meeting of the Board of Commissioners of the Montgomery Housing Authority held on September 21, 2004.

   Offered by _____ Seconded by _____

4.   **AUTHORITY REPORTS**
   Presentation by:  Maxine Sledge

5.   **DIRECTOR'S REPORT**

   **UNFINISHED BUSINESS** -- None

   **NEW BUSINESS**
6.   To consider a resolution approving and authorizing a 3% Cost of Living increase for employees of the Montgomery Housing Authority, retroactive to October 1, 2004, contingent to City County Personnel Board approval. (Note: This item tabled at September 21, 2004 board meeting.)

   Offered by _____ Seconded by _____

7.   To consider a resolution accepting the Request For Qualification evaluation report for Financial and Technical advisement services to the Montgomery Housing Authority in regard to disposition/demolition/redevelopment proposals of housing properties and approval to award the contract for these services to the party named therein.

   Offered by _____ Seconded by _____

McInnish 461                    Continued...2

*The Housing Authority of the City of Montgomery, Alabama*

## <u>AMENDED</u> AGENDA
## Regular Monthly Meeting of the Board of Commissioners
Tuesday, October 4, 2004 at 5:00 P.M.
at the Riverside Heights Training Facility at 1020 Bell Street
Montgomery, Alabama 36104

**Page 2..**

8.    To consider a resolution authorizing the write-off and disposition miscellaneous obsolete scrap items, of no real value, as per list attached, in accordance with the Authority's Disposition policy.


Offered by _____ Seconded by _____

9.    To consider a resolution authorizing the write-off of un-collectible and vacated accounts from the books of the Montgomery Housing Authority's Conventional Housing program for the month of May 2004.


Offered by _____ Seconded by _____

10.   To consider a resolution authorizing the Administrative committee to investigate the absences of the Executive Director from the MHA office and the frequent travel for the past twelve months not related to the day-to-day performance of his duties as Executive Director.


Offered by _____ Seconded by _____

11.   To consider a resolution authorizing the Administrative committee to investigate whether the Executive Director is investigating and addressing complaints of Resident-Commissioner Barnett and other residents regarding safety concerns and disorderly tenants.


Offered by _____ Seconded by _____

12.   COMMITTEE REPORT(S), IF ANY.

13.   PUBLIC COMMENTS (FROM SIGN-UP SHEET, IF ANY)

14.   EXECUTIVE SESSION

15.   ADJOURNMENT


McInnish 462



MEMORANDUM

TO:        Superintendents/Office Manager

FROM:     Ira J. Haralson
          Director of Maintenance

SUBJECT:  Weekly Community cleaning schedule and tasks.

DATE:     SEPTEMBER 30, 2004

The Maintenance Department has been tasked to clean each community weekly. We decided to select one day each week and clean one community thoroughly utilizing all maintenance personnel. The only personnel who are exempt are the females, they will clean offices and community centers. Emergency personnel who are on call during each week will be on standby to respond to any emergency that may arise while everyone else is cleaning up. These calls will be monitored by Ms. Katie Lloyd and dispatched accordingly. You guys will be expected to be on site during the performance of these task to assist in supervising personnel. Once the clean - up is complete, all personnel will return to their assigned areas. There will be two working scenarios and they are as follows:

During GRASS CUTTING SEASON, employees will mow yards, weedeat throughout the community, rake and pickup trash, cut/trim shrubbery if necessary and edge.

During NON GRASS CUTTING SEASON, employees will rake and pickup trash, cut/trim shrubbery if necessary and edge.

The communities will be cleaned according to the following schedule:

WEEK OF SEP 27 ------------------------------------------------ RIVERSIDE HEIGHTS

WEEK OF OCT 4 -------------------------------------------------- GIBBS VILLAGE          McInnish 463



WEEK OF OCT 11 ------------------------------- TULANE/RICHARDSON TERRACE

WEEK OF OCT 18 ------------------------------- TRENHOLM COURT

WEEK OF OCT 25 ------------------------------- SMILEY COURT

WEEK OF NOV 1 ------------------------------- CLEVELAND/PATERSON COURT

WEEK OF NOV 8 ------------------------------- RIVERSIDE HEIGHTS

WEEK OF NOV 15 ------------------------------- GIBBS VILLAGE

WEEK OF NOV 22 ------------------------------- TULANE/RICHARDSON TERRACE

WEEK OF NOV 29 ------------------------------- TRENHOLM COURT

WEEK OF DEC 6 ------------------------------- SMILEY COURT

WEEK OF DEC 13 ------------------------------- CLEVELAND/PATERSON COURT

WEEK OF DEC 20 ------------------------------- RIVERSIDE HEIGHTS

WEEK OF DEC 27 ------------------------------- GIBBS VILLAGE

WEEK OF JAN 3 ------------------------------- TULANE/RICHARDSON TERRACE

WEEK OF JAN 10 ------------------------------- TRENHOLM COURT

WEEK OF JAN 17 ------------------------------- SMILEY COURT

WEEK OF JAN 24 ------------------------------- CLEVELAND/PATERSON COURT

WEEK OF JAN 31 ------------------------------- RIVERSIDE HEIGHTS

WEEK OF FEB 7 ------------------------------- GIBBS VILLAGE

WEEK OF FEB 14 ------------------------------- TULANE/RICHARDSON TERRACE

WEEK OF FEB 21 ------------------------------- TRENHOLM COURT

WEEK OF FEB 28 ------------------------------- SMILEY COURT

WEEK OF MAR 7 ------------------------------- CLEVELAND/PATERSON COURT

WEEK OF MAR 14 ------------------------------- RIVERSIDE HEIGHTS

WEEK OF MAR 21    ----------------------------- GIBBS VILLAGE

WEEK OF MAR 28    ----------------------------- TULANE/RICHARDSON TERRACE

McInnish 465

| Class | City/County | Sawyer |
|---|---|---|
| Executive Director | 16 | 16 |
| Asst. Executive Director | 14 | 15 |
| Modernization Coordinator | 11 | 11 |
| Director of Maintenance | 11 | 11 |
| Assistant Comptroller | 11 | 11 |
| Section 8 Director | 11 | 11 |
| Director of Public Housing | 11 | 11 |
| Procurement/Contract Admin. | 11 | 10 |
| Personnel Manager | 11 | 11 |
| Computer Operations Manager | 10 | 10 |
| Applications Development Mgr. | 10 | 9 |
| Director of Admissions | 9 | 9 |
| Assistant Section 8 Director | 9 | 8 |
| Assistant Public Housing Dir. | 9 | 8 |
| Risk Control Administrator | 8 | 8 |
| Maintenance Office Manager | 8 | 7 |
| Director of Public Relations | 7 | 10 |
| Construction Supervisor | 7 | 9 |
| Exe. Secretary/Admin. Asst. | 7 | 7 |
| Computer Operations Tech. | 7 | 7 |
| Computer Programmer | 7 | 8 |
| Maint. Superintendent | 7 | 8 |
| Buyer II | 7 | 6 |
| Accountant | 6 | 7 |
| Housing Manager | 6 | 6 |
| ome Ownership Coordinator | 6 | 6 |
| Admin. Secretary-Comptroller | 6 | 5 |
| Warehouse Supervisor | 6 | 6 |
| Community Worker | 6 | 6 |
| Housing Specialist II | 5 | 5 |
| FSS Coordinator | 5 | 5 |
| Buyer I | 5 | 5 |
| Division Secretary | 5 | 4 |
| Labor Foreman | 5 | 5 |
| Assistant Housing Manager | 4 | 4 |
| Stores Clerk | 3 | 3 |
| Account Clerk | 3 | 3 |
| Maintenance Clerk | 3 | 3 |
| Housing Specialist I | 3 | 3 |
| Clerk Typist II | 3 | 3 |
| Clerk II | 2 | 2 |
| Payroll Clerk | 3 | 3 |
| Chief Investigator | PS5 | PS5 |
| Investigator | PS1 | PS1 |
| HVAC Mechanic | S10 | S11 |
| Plumber | S10 | S11 |
| Electrician | S10 | S11 |
| Master Auto Mechanic | S10 | S11 |
| Maintenance Mechanic | S9 | S10 |
| ·intenance Aide | S6 | S6 |

McInnish 466

| Class | Recommendation |
|---|---|
| Executive Director | 16 |
| Asst. Executive Director | 15 |
| Modernization Coordinator | 11 |
| Director of Maintenance | 11 |
| Assistant Comptroller | 11 |
| Section 8 Director | 11 |
| Director of Public Housing | 11 |
| Procurement/Contract Admin. | 11 |
| Personnel Manager | 11 |
| Computer Operations Manager | 10 |
| Applications Development Mgr. | 10 |
| Director of Admissions | 9 |
| Assistant Section 8 Director | 9 |
| Assistant Public Housing Dir. | 9 |
| Risk Control Administrator | 8 |
| Maintenance Office Manager | 8 |
| Director of Public Relations | 10 |
| Construction Supervisor | 9 |
| Exe. Secretary/Admin. Asst. | 7 |
| Computer Operations Tech | 7 |
| Computer Programmer | 8 |
| Maint. Superintendent | 8 |
| Buyer II | 7 |
| Accountant | 7 |
| Housing Manager | 6 |
| Home Ownership Coordn. | 6 |
| Admin. Secretary-Comptroller | 6 |
| Warehouse Supervisor | 6 |
| Community Worker | 6 |
| Housing Specialist II | 5 |
| FSS Coordinator | 5 |
| Buyer I | 5 |
| Clerk IV | 5 |
| Labor Foreman | 5 |
| Assistant Housing Manager | 4 |
| Stores Clerk | 3 |
| Account Clerk | 3 |
| Maintenance Clerk | 3 |
| Housing Specialist I | 3 |
| Clerk Typist II | 3 |
| Clerk II | 2 |
| Payroll Clerk | 3 |
| Chief Investigator | PS5 |
| Investigator | PS1 |
| HVAC Mechanic | S11 |
| Plumber | S11 |
| Electrician | S11 |
| Master Auto Mechanic | S11 |
| Maintenance Mechanic | S10 |
| Intenance Aide | S6 |

McInnish 467

Rule VI, Sections 4 and 5

13

## Section 4:    Adoption of Plan

Upon receipt of the proposed pay plan, the Board may give opportunity to be heard to appointing authorities, employees and the general public.  After incorporation and modification, changes or amendments it considers desirable, the Board shall submit the plan to the governing bodies of the city and/or county, who, after making such changes as they deem necessary, resubmit it to the board, who shall accept or reject, and it shall take effect when approved.

## Section 5:    Adjustments at Time of Adoption

At a time designated by the Personnel Board after the official date of adoption of the Pay Plan, or revision thereto.

(a)    Employees whose rate of pay is less than the prescribed minimum rate for the class shall be increased to the prescribed minimum rate for the class with no change in anniversary date, except that the salary of an employee with less seniority will not be advanced beyond that of an employee with greater seniority in the same department.

(b)    Any employee whose present rate of pay is the same as a rate of the new range will be placed on the corresponding step of the new range, with no change in the employee's anniversary date.

(c)    Any employee whose present rate of pay is between any two rates of the new range, will be increased to the next higher rate, with no change in the employee's anniversary date.

(d)    Any employee who is at the top of the old pay range and has not received an anniversary increase for more than one year is eligible to be considered for an immediate one-step pay increase. The employee's previous anniversary date will be reinstated.

(e)    Regular employees whose pay is in excess of the maximum rate prescribed shall not be automatically reduced in pay but shall not receive any increase as long as they occupy positions for which the pay rate maximum is the same as, or less than, the pay rate currently received.  This provision shall not, however, prevent the application of service-wide blanket pay decreases or a decrease of any employee's pay for any valid reason recommended by the appointing authority.  No change in pay shall become effective until approved by the Personnel Director.

McInnish 468

| Grade | Steps | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A01 | Annual | 18,000 | 18,636 | 19,270 | 19,906 | 20,541 | 21,176 | 21,811 | 22,447 | 23,082 | 23,717 | 24,352 | 24,988 | 25,623 |
|  | Bi-Wkly | 692.30 | 716.73 | 741.15 | 765.50 | 789.04 | 814.46 | 838.89 | 863.34 | 887.77 | 912.19 | 936.62 | 961.06 | 985.50 |
|  | Hourly | 8.6538 | 8.9591 | 9.2644 | 9.5697 | 9.8755 | 10.1908 | 10.4861 | 10.7918 | 11.0971 | 11.4024 | 11.7077 | 12.0135 | 12.3186 |
| A02 | Annual | 18,091 | 20,697 | 21,402 | 22,108 | 22,813 | 23,519 | 24,225 | 24,930 | 25,636 | 26,341 | 27,047 | 27,752 | 28,458 |
|  | Bi-Wkly | 768.89 | 796.04 | 823.15 | 850.30 | 877.42 | 904.56 | 931.73 | 958.85 | 986.00 | 1,013.11 | 1,040.27 | 1,067.38 | 1,094.54 |
|  | Hourly | 9.6111 | 9.9505 | 10.2894 | 10.6286 | 10.9678 | 11.3072 | 11.6466 | 11.9855 | 12.3250 | 12.6639 | 13.0034 | 13.3423 | 13.6817 |
| A03 | Annual | 22,357 | 23,148 | 23,935 | 24,724 | 25,513 | 26,302 | 27,091 | 27,880 | 28,669 | 29,450 | 30,247 | 31,036 | 31,825 |
|  | Bi-Wkly | 859.89 | 890.23 | 920.58 | 950.92 | 981.27 | 1,011.62 | 1,041.96 | 1,072.30 | 1,102.66 | 1,133.00 | 1,163.34 | 1,193.70 | 1,224.04 |
|  | Hourly | 10.7486 | 11.1279 | 11.5072 | 11.8865 | 12.2659 | 12.6452 | 13.0245 | 13.4038 | 13.7832 | 14.1625 | 14.5418 | 14.9212 | 15.3005 |
| A04 | Annual | 24,092 | 24,978 | 25,867 | 26,757 | 27,740 | 28,620 | 29,520 | 30,406 | 31,291 | 32,177 | 33,062 | 33,948 | 34,834 |
|  | Bi-Wkly | 966.08 | 999.15 | 1,033.19 | 1,067.27 | 1,101.30 | 1,135.38 | 1,169.46 | 1,203.50 | 1,237.58 | 1,271.62 | 1,305.70 | 1,339.77 | 1,373.81 |
|  | Hourly | 12.0635 | 12.4694 | 12.9149 | 13.3409 | 13.7663 | 14.1923 | 14.6183 | 15.0438 | 15.4697 | 15.8952 | 16.3212 | 16.7471 | 17.1726 |
| A05 | Annual | 26,101 | 28,108 | 30,181 | 31,176 | 32,171 | 33,166 | 34,161 | 35,156 | 36,151 | 37,146 | 38,140 | 39,136 | 40,131 |
|  | Bi-Wkly | 1,004.27 | 1,122.54 | 1,160.81 | 1,199.09 | 1,237.34 | 1,275.62 | 1,313.89 | 1,352.15 | 1,390.42 | 1,428.70 | 1,466.96 | 1,505.23 | 1,543.50 |
|  | Hourly | 13.5534 | 14.0317 | 14.5101 | 14.9885 | 15.4668 | 15.9452 | 16.4235 | 16.9019 | 17.3903 | 17.8587 | 18.3370 | 18.8154 | 19.2938 |
| A06 | Annual | 31,851 | 32,768 | 33,685 | 36,002 | 36,119 | 37,226 | 38,335 | 39,470 | 40,587 | 41,704 | 42,821 | 43,938 | 45,056 |
|  | Bi-Wkly | 1,217.34 | 1,260.30 | 1,303.27 | 1,346.23 | 1,389.19 | 1,432.15 | 1,475.11 | 1,518.08 | 1,561.04 | 1,604.00 | 1,646.96 | 1,689.92 | 1,732.92 |
|  | Hourly | 15.2168 | 15.7538 | 16.2909 | 16.8279 | 17.3649 | 17.9019 | 18.4389 | 18.9760 | 19.5130 | 20.0500 | 20.5870 | 21.1240 | 21.6615 |
| A07 | Annual | 35,471 | 36,722 | 37,974 | 39,226 | 40,478 | 41,730 | 42,982 | 44,234 | 45,486 | 46,738 | 47,990 | 49,241 | 50,493 |
|  | Bi-Wkly | 1,364.27 | 1,412.38 | 1,460.54 | 1,508.70 | 1,556.86 | 1,605.00 | 1,653.15 | 1,701.30 | 1,749.46 | 1,797.62 | 1,845.77 | 1,893.89 | 1,942.04 |
|  | Hourly | 17.0534 | 17.6546 | 18.2567 | 18.8587 | 19.4606 | 20.0625 | 20.6644 | 21.2663 | 21.8683 | 22.4702 | 23.0721 | 23.6736 | 24.2755 |
| A08 | Annual | 39,818 | 41,037 | 42,438 | 43,038 | 45,234 | 46,234 | 46,433 | 48,032 | 49,431 | 50,830 | 52,228 | 53,626 | 55,025 |
|  | Bi-Wkly | 1,524.54 | 1,578.34 | 1,632.15 | 1,685.96 | 1,739.77 | 1,793.58 | 1,847.38 | 1,901.19 | 1,955.00 | 2,008.81 | 2,062.62 | 2,116.42 | 2,170.23 |
|  | Hourly | 19.0567 | 19.7293 | 20.4019 | 21.0745 | 21.7471 | 22.4197 | 23.0923 | 23.7649 | 24.4375 | 25.1101 | 25.7827 | 26.4553 | 27.1279 |
| A09 | Annual | 44,102 | 45,720 | 47,229 | 49,838 | 50,390 | 51,965 | 53,514 | 55,072 | 56,821 | 58,180 | 59,743 | 61,307 | 62,866 |
|  | Bi-Wkly | 1,696.54 | 1,758.46 | 1,818.42 | 1,878.42 | 1,938.30 | 1,998.27 | 2,058.23 | 2,118.15 | 2,178.11 | 2,238.08 | 2,298.00 | 2,357.96 | 2,417.92 |
|  | Hourly | 21.2317 | 21.9808 | 22.7303 | 23.4799 | 24.2288 | 24.9784 | 25.7279 | 26.4769 | 27.2264 | 27.9760 | 28.7250 | 29.4745 | 30.2240 |
| A10 | Annual | 49,016 | 50,744 | 52,474 | 54,204 | 55,934 | 57,664 | 59,394 | 61,124 | 62,854 | 64,584 | 66,314 | 68,044 | 69,773 |
|  | Bi-Wkly | 1,885.15 | 1,951.70 | 2,018.23 | 2,084.77 | 2,151.30 | 2,217.85 | 2,284.38 | 2,350.92 | 2,417.46 | 2,484.00 | 2,550.54 | 2,617.08 | 2,683.58 |
|  | Hourly | 23.5584 | 24.3962 | 25.2279 | 26.0596 | 26.8913 | 27.7231 | 28.5548 | 29.3865 | 30.2183 | 31.0500 | 31.8817 | 32.7135 | 33.5447 |
| A11 | Annual | 54,193 | 56,105 | 58,018 | 59,931 | 61,843 | 63,756 | 65,600 | 67,581 | 69,484 | 71,407 | 73,319 | 75,232 | 77,145 |
|  | Bi-Wkly | 2,084.34 | 2,157.89 | 2,231.46 | 2,305.04 | 2,378.59 | 2,462.15 | 2,525.73 | 2,599.27 | 2,672.85 | 2,746.42 | 2,819.96 | 2,893.54 | 2,967.11 |
|  | Hourly | 26.0543 | 26.9736 | 27.8933 | 28.6130 | 29.7322 | 30.6519 | 31.5716 | 32.4909 | 33.4106 | 34.3303 | 35.2495 | 36.1692 | 37.0889 |
| A12 | Annual | 60,308 | 62,628 | 64,850 | 66,791 | 68,922 | 71,084 | 73,166 | 75,248 | 77,440 | 79,580 | 81,720 | 83,844 | 86,073 |
|  | Bi-Wkly | 2,322.92 | 2,404.92 | 2,486.69 | 2,568.89 | 2,650.85 | 2,732.65 | 2,814.85 | 2,896.81 | 2,978.81 | 3,060.77 | 3,142.77 | 3,224.77 | 3,306.73 |
|  | Hourly | 29.0365 | 30.0615 | 31.0861 | 32.1111 | 33.1356 | 34.1356 | 35.1856 | 36.2101 | 37.2351 | 38.2596 | 39.2846 | 40.3096 | 41.3341 |
| A13 | Annual | 65,556 | 67,870 | 70,184 | 72,490 | 74,811 | 77,125 | 79,439 | 81,753 | 84,066 | 86,380 | 88,694 | 91,008 | 93,321 |
|  | Bi-Wkly | 2,521.38 | 2,610.38 | 2,699.38 | 2,788.38 | 2,877.38 | 2,966.34 | 3,055.34 | 3,144.34 | 3,233.30 | 3,322.30 | 3,411.30 | 3,500.30 | 3,589.27 |
|  | Hourly | 31.5173 | 32.6298 | 33.7423 | 34.8540 | 35.9668 | 37.0793 | 38.1918 | 39.3043 | 40.4163 | 41.5288 | 42.6413 | 43.7538 | 44.8659 |
| A14 | Annual | 74,724 | 74,285 | 76,707 | 79,310 | 81,880 | 84,361 | 86,612 | 88,444 | 91,978 | 94,607 | 97,038 | 90,070 | 102,701 |
|  | Bi-Wkly | 2,758.62 | 2,855.96 | 2,953.34 | 3,050.70 | 3,148.08 | 3,245.42 | 3,342.77 | 3,440.15 | 3,537.50 | 3,634.88 | 3,732.23 | 3,829.62 | 3,926.96 |
|  | Hourly | 34.4827 | 35.6996 | 36.9168 | 38.1337 | 39.3510 | 40.5678 | 41.7846 | 43.0012 | 44.2188 | 45.4361 | 46.6529 | 47.8702 | 49.0870 |
| A15 | Annual | 70,240 | 81,000 | 83,769 | 86,531 | 89,302 | 92,064 | 94,818 | 97,579 | 100,341 | 103,100 | 105,802 | 100,622 | 111,306 |
|  | Bi-Wkly | 3,009.46 | 3,115.70 | 3,221.89 | 3,328.11 | 3,434.30 | 3,540.54 | 3,646.77 | 3,752.96 | 3,859.19 | 3,965.38 | 4,071.62 | 4,177.85 | 4,284.04 |
|  | Hourly | 37.6183 | 38.9462 | 40.2736 | 41.6014 | 42.9288 | 44.2567 | 45.5846 | 46.9120 | 48.2399 | 49.5673 | 50.8952 | 52.2231 | 53.5505 |
| A16 | Annual | 68,072 | 81,000 | 92,700 | 95,849 | 99,008 | 101,907 | 105,200 | 108,085 | 111,144 | 114,203 | 117,262 | 120,321 | 123,380 |
|  | Bi-Wkly | 3,333.54 | 3,451.19 | 3,568.85 | 3,686.50 | 3,804.15 | 3,921.81 | 4,039.46 | 4,157.11 | 4,274.77 | 4,392.42 | 4,510.00 | 4,627.73 | 4,746.38 |
|  | Hourly | 41.6692 | 43.1399 | 44.6106 | 46.0813 | 47.5519 | 49.0226 | 50.4933 | 51.9639 | 53.4346 | 54.9053 | 56.3760 | 57.8466 | 59.3173 |

*Plan will be reviewed in 05*

McInnish 469

SERVICE MA... ...ANCE PAY PLAN
EFFECTIVE: ...CTOBER 13, 2003

Page 11

| Grade | Steps | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grade 1 | Annual | 18,000 | 18,635 | 19,270 | 19,905 | 20,541 | 21,176 | 21,811 | 22,447 | 23,082 | 23,717 | 24,352 | 24,988 | 25,623 |
|  | Bi-Wkly | 692.30 | 716.73 | 741.15 | 765.50 | 790.04 | 814.46 | 830.89 | 863.34 | 887.77 | 912.18 | 936.62 | 961.08 | 985.50 |
|  | Hourly | 8.6538 | 8.9691 | 8.2844 | 8.6687 | 9.8755 | 10.1808 | 10.4861 | 10.7916 | 11.0971 | 11.4024 | 11.7077 | 12.0135 | 12.3188 |
| Grade 2 | Annual | 18,703 | 19,303 | 20,023 | 20,083 | 21,343 | 22,003 | 22,663 | 23,323 | 23,983 | 24,643 | 25,303 | 25,064 | 26,024 |
|  | Bi-Wkly | 719.34 | 744.73 | 770.11 | 795.50 | 820.89 | 846.27 | 872.19 | 897.04 | 922.42 | 947.01 | 973.19 | 998.02 | 1024.000 |
|  | Hourly | 8.9918 | 9.3091 | 9.6284 | 9.9438 | 10.2811 | 10.5784 | 10.8857 | 11.2130 | 11.5303 | 11.8476 | 12.1649 | 12.4827 | 12.8000 |
| Grade 3 | Annual | 19,406 | 20,090 | 20,775 | 21,460 | 22,145 | 22,830 | 23,515 | 24,200 | 24,885 | 25,570 | 26,255 | 26,939 | 27,624 |
|  | Bi-Wkly | 746.38 | 772.70 | 799.04 | 825.38 | 851.73 | 878.08 | 904.42 | 930.77 | 957.11 | 983.46 | 1009.81 | 1036.11 | 1062.46 |
|  | Hourly | 9.3298 | 9.6587 | 9.9880 | 10.3173 | 10.6466 | 10.9760 | 11.3053 | 11.6346 | 11.9639 | 12.2933 | 12.6226 | 12.9514 | 13.2808 |
| Grade 4 | Annual | 20,108 | 20,810 | 21,520 | 22,228 | 22,947 | 23,657 | 24,367 | 25,076 | 25,786 | 26,496 | 27,206 | 27,915 | 26,625 |
|  | Bi-Wkly | 773.38 | 800.70 | 828.00 | 855.30 | 882.58 | 909.89 | 937.19 | 964.46 | 991.77 | 1019.08 | 1046.38 | 1073.66 | 1100.96 |
|  | Hourly | 8.6673 | 10.0067 | 10.3500 | 10.6913 | 11.0322 | 11.3736 | 11.7149 | 12.0560 | 12.3971 | 12.7385 | 13.0798 | 13.4207 | 13.7620 |
| Grade 5 | Annual | 20,811 | 21,546 | 22,280 | 23,015 | 21,749 | 24,484 | 25,219 | 25,953 | 26,688 | 27,422 | 28,157 | 28,891 | 29,626 |
|  | Bi-Wkly | 800.42 | 828.70 | 856.92 | 885.19 | 813.42 | 941.70 | 969.96 | 998.19 | 1026.46 | 1054.70 | 1082.96 | 1111.19 | 1139.46 |
|  | Hourly | 10.0053 | 10.3587 | 10.7115 | 11.0649 | 11.4178 | 11.7712 | 12.1245 | 12.4774 | 12.8308 | 13.1837 | 13.5370 | 13.8899 | 14.2433 |
| Grade 6 | Annual | 21,514 | 22,274 | 23,033 | 23,792 | 24,552 | 25,311 | 26,070 | 26,830 | 27,589 | 28,348 | 29,108 | 29,867 | 30,626 |
|  | Bi-Wkly | 827.46 | 856.70 | 885.89 | 915.08 | 944.30 | 973.50 | 1002.70 | 1031.92 | 1061.11 | 1090.30 | 1119.54 | 1148.73 | 1177.92 |
|  | Hourly | 10.3433 | 10.7087 | 11.0736 | 11.4385 | 11.8038 | 12.1688 | 12.5337 | 12.8990 | 13.2639 | 13.6288 | 13.9942 | 14.3591 | 14.7240 |
| Grade 7 | Annual | 22,217 | 23,002 | 23,766 | 24,570 | 25,354 | 26,138 | 26,992 | 27,706 | 28,491 | 29,275 | 30,059 | 30,843 | 31,627 |
|  | Bi-Wkly | 854.50 | 884.70 | 914.85 | 945.00 | 975.15 | 1005.30 | 1038.15 | 1065.62 | 1095.81 | 1125.96 | 1156.11 | 1186.27 | 1216.42 |
|  | Hourly | 10.6613 | 11.0587 | 11.4356 | 11.8125 | 12.1894 | 12.5663 | 12.9769 | 13.3202 | 13.6976 | 14.0745 | 14.4514 | 14.8284 | 15.2053 |
| Grade 8 | Annual | 24,085 | 24,935 | 25,785 | 26,635 | 27,485 | 28,335 | 29,185 | 30,035 | 30,865 | 31,735 | 32,585 | 33,435 | 34,205 |
|  | Bi-Wkly | 926.34 | 959.04 | 991.73 | 1024.42 | 1057.11 | 1089.81 | 1122.50 | 1155.19 | 1187.89 | 1220.58 | 1253.27 | 1285.96 | 1318.66 |
|  | Hourly | 11.5793 | 11.9880 | 12.3966 | 12.8053 | 12.2139 | 13.6226 | 14.0313 | 14.4399 | 14.8486 | 15.2572 | 15.6659 | 16.0745 | 16.4632 |
| Grade 9 | Annual | 26,202 | 27,210 | 28,138 | 29,065 | 29,093 | 30,921 | 31,848 | 32,776 | 33,703 | 34,631 | 35,559 | 36,488 | 37,414 |
|  | Bi-Wkly | 1010.05 | 1046.54 | 1082.23 | 1117.69 | 1153.59 | 1189.27 | 1224.92 | 1260.62 | 1296.27 | 1331.96 | 1367.66 | 1403.30 | 1439.00 |
|  | Hourly | 12.6256 | 13.0817 | 13.5379 | 13.9738 | 14.4197 | 14.8659 | 15.3115 | 16.7677 | 16.2034 | 16.6485 | 17.0957 | 17.6413 | 17.9875 |
| Grade 10 | Annual | 28,611 | 29,620 | 30,645 | 31,861 | 32,878 | 33,895 | 34,912 | 35,929 | 36,946 | 37,963 | 38,979 | 39,996 | 41,013 |
|  | Bi-Wkly | 1100.11 | 1147.23 | 1186.34 | 1225.42 | 1264.54 | 1303.66 | 1342.77 | 1381.89 | 1421.00 | 1460.11 | 1499.19 | 1530.30 | 1577.42 |
|  | Hourly | 13.8514 | 14.3404 | 14.8283 | 15.3178 | 15.8067 | 16.2957 | 17.8446 | 17.2236 | 17.7625 | 18.2514 | 18.7399 | 19.2268 | 19.7176 |
| Grade 11 | Annual | 31,670 | 32,788 | 33,906 | 35,023 | 36,141 | 37,259 | 38,377 | 39,494 | 40,612 | 41,730 | 42,848 | 43,965 | 45,893 |
|  | Bi-Wkly | 1218.08 | 1261.08 | 1304.08 | 1347.04 | 1390.04 | 1433.04 | 1476.04 | 1519.00 | 1562.00 | 1605.00 | 1648.00 | 1690.00 | 1733.96 |
|  | Hourly | 15.2260 | 15.7635 | 16.3010 | 16.8380 | 17.3755 | 17.9130 | 18.4505 | 18.9875 | 19.5250 | 20.0625 | 20.6000 | 21.1370 | 21.8745 |
| Grade 12 | Annual | 34,000 | 35,000 | 37,121 | 38,661 | 39,781 | 41,012 | 42,242 | 43,472 | 44,703 | 45,933 | 47,163 | 48,394 | 49,824 |
|  | Bi-Wkly | 1340.77 | 1388.06 | 1435.42 | 1402.73 | 1530.04 | 1577.38 | 1624.70 | 1672.00 | 1719.34 | 1766.66 | 1813.96 | 1861.30 | 1900.02 |
|  | Hourly | 16.7596 | 17.3510 | 17.9428 | 18.5341 | 19.1255 | 19.7173 | 20.3087 | 20.9000 | 21.4910 | 22.0832 | 22.6745 | 23.2663 | 23.6577 |

McInnish 470

PUBLIC S[ ] Y PAY PLAN
EFFECTIVE DAT[ ] OCTOBER 13, 2003

| Grade | STEPS | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PST | Annual | 28,013 | | | | | | | | | | | | |
| | Bi-Wkly | 1077.42 | | | | | | | | | | | | |
| | Hourly | 13.4678 | | | | | | | | | | | | |
| PS1 | Annual | 28,038 | 30,063 | 31,087 | 32,112 | 33,137 | 34,162 | 35,187 | 36,212 | 37,237 | 38,261 | 39,286 | 40,311 | 41,336 |
| | Bi-Wkly | 1116.85 | 1156.27 | 1195.65 | 1235.08 | 1274.50 | 1313.92 | 1353.35 | 1392.77 | 1432.19 | 1471.58 | 1511.00 | 1550.42 | 1589.85 |
| | Hourly | 13.9606 | 14.4534 | 14.9456 | 15.4385 | 15.9313 | 16.4240 | 16.9169 | 17.4096 | 17.9024 | 18.3948 | 18.8875 | 19.3803 | 19.8731 |
| PS2 | Annual | 30,813 | 31,901 | 32,988 | 34,076 | 35,163 | 36,251 | 37,339 | 38,426 | 39,514 | 40,601 | 41,689 | 42,776 | 43,864 |
| | Bi-Wkly | 1185.12 | 1226.96 | 1268.77 | 1310.62 | 1352.42 | 1394.27 | 1436.12 | 1477.92 | 1519.77 | 1561.58 | 1603.42 | 1645.23 | 1687.08 |
| | Hourly | 14.8140 | 15.3370 | 15.8596 | 16.3828 | 16.9053 | 17.4284 | 17.9515 | 18.4740 | 18.9971 | 19.5198 | 20.0428 | 20.5654 | 21.0885 |
| PS3 | Annual | 37,511 | 38,834 | 40,158 | 41,482 | 42,808 | 44,130 | 45,454 | 46,778 | 48,102 | 49,428 | 50,750 | 52,073 | 53,397 |
| | Bi-Wkly | 1442.73 | 1493.62 | 1544.54 | 1595.46 | 1646.38 | 1697.31 | 1748.23 | 1799.15 | 1850.08 | 1901.00 | 1951.92 | 2002.81 | 2053.73 |
| | Hourly | 18.0341 | 18.6703 | 19.3068 | 19.9433 | 20.5798 | 21.2164 | 21.8529 | 22.4894 | 23.1260 | 23.7625 | 24.3990 | 25.0351 | 25.6716 |
| PS4 | Annual | 41,341 | 42,800 | 44,259 | 45,718 | 47,177 | 48,636 | 50,095 | 51,554 | 53,013 | 54,472 | 55,931 | 57,390 | 58,850 |
| | Bi-Wkly | 1590.04 | 1646.15 | 1702.27 | 1758.38 | 1814.50 | 1870.62 | 1926.73 | 1982.85 | 2038.96 | 2095.08 | 2151.19 | 2207.31 | 2263.46 |
| | Hourly | 19.8755 | 20.5769 | 21.2784 | 21.9798 | 22.6813 | 23.3828 | 24.0841 | 24.7856 | 25.4870 | 26.1885 | 26.8899 | 27.5914 | 28.2933 |
| PS5 | Annual | 48,028 | 49,724 | 51,420 | 53,115 | 54,810 | 56,505 | 58,200 | 59,895 | 61,590 | 63,286 | 64,981 | 66,676 | 68,371 |
| | Bi-Wkly | 1847.27 | 1912.46 | 1977.69 | 2042.88 | 2108.08 | 2173.27 | 2238.46 | 2303.65 | 2368.85 | 2434.08 | 2499.27 | 2564.46 | 2629.65 |
| | Hourly | 23.0909 | 23.9058 | 24.7211 | 25.5360 | 26.3510 | 27.1659 | 27.9808 | 28.7956 | 29.6106 | 30.4260 | 31.2409 | 32.0558 | 32.8706 |
| PS6 | Annual | 56,025 | 58,003 | 58,980 | 61,957 | 63,935 | 65,912 | 67,888 | 69,867 | 71,844 | 73,821 | 75,799 | 77,776 | 79,754 |
| | Bi-Wkly | 2154.81 | 2230.88 | 2306.92 | 2382.96 | 2459.04 | 2535.08 | 2611.12 | 2687.19 | 2763.23 | 2839.27 | 2915.35 | 2991.38 | 3067.46 |
| | Hourly | 26.9351 | 27.8860 | 28.8365 | 29.7870 | 30.7380 | 31.6885 | 32.6390 | 33.5899 | 34.5404 | 35.4909 | 36.4419 | 37.3923 | 38.3433 |
| PS7 | Annual | 66,640 | 68,992 | 71,344 | 73,696 | 76,048 | 78,400 | 80,752 | 83,104 | 85,456 | 87,808 | 90,160 | 92,512 | 94,864 |
| | Bi-Wkly | 2563.08 | 2653.54 | 2744.00 | 2834.46 | 2924.92 | 3015.38 | 3105.85 | 3196.31 | 3286.77 | 3377.23 | 3467.69 | 3558.15 | 3648.62 |
| | Hourly | 32.0385 | 33.1693 | 34.3000 | 35.4308 | 36.5615 | 37.6923 | 38.8231 | 39.9539 | 41.0846 | 42.2154 | 43.3461 | 44.4769 | 45.6078 |
| PS8 | Annual | 86,672 | 89,731 | 92,790 | 95,849 | 98,908 | 101,967 | 105,028 | 108,085 | 111,144 | 114,203 | 117,262 | 120,321 | 123,380 |
| | Bi-Wkly | 3333.54 | 3451.19 | 3568.85 | 3686.50 | 3804.15 | 3921.81 | 4039.46 | 4157.12 | 4274.77 | 4392.42 | 4510.00 | 4627.73 | 4745.38 |
| | Hourly | 41.6693 | 43.1399 | 44.6106 | 46.0813 | 47.5519 | 49.0226 | 50.4933 | 51.9640 | 53.4346 | 54.9053 | 56.3760 | 57.8466 | 59.3173 |

McInnish 471

DEFENDANT'S
EXHIBIT

53

# C. MICHAEL MCINNISH
# P.O. BOX 194
# MONTGOMERY, AL 36101-0194

December 30, 2004

Mr. Lane Boggs
Montgomery Housing Authority          SENT VIA EMAIL ONLY
1020 Bell Street
Montgomery, AL 36104

RE: REQUEST OF APPOINTING AUTHORITY FOR DETAILS OF
ALLEGATIONS

Dear Mr. Boggs:

I have received your letter recommending termination for ten alleged violations
committed by me. They are very general and vague and do not give me
specifics so that I can prepare for the hearing. I therefore am requesting that you
provide me more specific information about the charges and the documentation
requested in this letter. In order to have the opportunity to prepare my defense, I
am requesting that the following be supplied to me by noon on Tuesday, January
4, 2005:

1. The basis of the allegation that the Mayor had offered twelve million for
   the property on the date specified and that the board did not know about
   the offer, in that the figure had been discussed for many months, there
   were two letters signed by me concerning the project with the city, and the
   Mayor does not have the authority to make the offer without City Council
   approval.
2. A copy of any documents used for your allegation concerning the
   insurance issues relating to the lawsuit.
3. Information relating to the allegation that I had delegated duties to an
   unnamed staff member that should have been given to you. This would
   include a list of those projects and duties.
4. A copy of any policy or regulation that proves that a board member may
   not travel on MHA business, including requirements of notification, etc.
5. A list of all travel that was deemed by you to be in excess. Please include
   dates of travel and the problems associated with the travel. Please
   remember that the board and I agreed at the October board meeting that I
   would supply an itinerary to the Chairman in the future and the issue was
   resolved at that time.
6. A list of all of the outside work that I did for hire, the dates in question and
   any documents which support the claim that I did the work on MHA time.

McInnish 639

7. A copy of any documents that support the claim that I allowed an unnamed person to do extensive travel, including the dates of the travel and a reason for them being excessive.
8. A copy of any documents or other proof that I violated any City/County Personnel Rules in having jobs reviewed by that agency and took any act that was not approved by them or was in violation of any of their policies or MHA policies.
9. A description of how I did not follow a mandate and directive of the board about a legal position of neutrality, including dates.
10. A description of how an issue was not raised in the litigation.
11. A list of how I gave false, misleading and incomplete information to the insurance company about the lawsuit, including any documents to support your allegation about this subject.
12. A description of the false, misleading and incomplete information furnished to the board concerning this same subject.
13. Any policy that would prohibit me from erasing any MHA official emails.
14. A copy of any resolution by the board which authorized you or any other person to file the specific charges against me which were issued by you and received by me on Christmas Eve.
15. A copy of the home addresses of all board members for any possible legal purposes.
16. Copies of any documents or files you used in making your recommendation.

In addition, I need to come to my office for one day, preferably during non-business hours to review materials in my MHA computer and my papers to prepare my defense. I am available next Wednesday or on Friday the 15th of January to do this. I will be out of town from the sixth through the fourteenth of January. Please contact me via email at mmcinnish@mycingular.blackberry.net to arrange a convenient time for this meeting so that I can prepare my responses, answers and defense to your allegations.

Thank you for your prompt response to this letter. In the interest of time, please respond via email or telephone (467-6184).

Sincerely,


C. Michael McInnish

CC:    Wayne Sabel

McInnish 640

Yahoo! My Yahoo! Mail

 **YAHOO!** MAIL    Welcome, m_mcinnish
[Sign Out, My Account]        Search: the Web!

Mail Home - Mail Tutorials - Help



| Mail ▾ | Addresses ▾ | Calendar ▾ | Notepad ▾ | | Mail Upgrades - Mail Options |

Previous | Next | Back to Messages                                    Printable Vie

| Folders       [Add – Edit] |
| Inbox (1) |
| Draft |
| Sent |
| Bulk          [Empty] |
| Trash         [Empty] |
| My Folders        [Hide] |
| Communication |
| Save |

 **Online Degrees-**
**Free Info Fast!**

 Trade with
CyberTrader.

 Bad Credit?
Refinance 2.9%

 Harrisdirect
Get $100 Credit

This message is not flagged. [ Flag Message - Mark as Unread ]

To:       "Lane Boggs" <lboggs@elmore.rr.com>

Subject:  Re: REQUEST OF APPOINTING AUTHORITY

From:     "Mickey" <mmcinnish@mycingular.blackberry.net>  Add to Address Book

Date:     Sat, 1 Jan 2005 00:33:29 +0000 GMT

Thanks. Have good New Year.
-----Original Message-----
From: "Lane Boggs" <lboggs@elmore.rr.com>
Date: Fri, 31 Dec 2004 18:32:07
To:"'Mickey'" <mmcinnish@mycingular.blackberry.net>
Cc:"Terry Davis" <tdavis@dhlaw1.com>,         "Thomas Taylor"
<ttaylor@montgome.gannett.com>
Subject: RE: REQUEST OF APPOINTING AUTHORITY

Mickey:

This confirms receipt of your e-mail requesting more specific
information
and documentation concerning the charges against you.  The pa
regarding the charges, was signed by me by virtue of my posit
interim
Executive Director.  Attorney Davis discussed these procedure
Barbara
Montoya and Bobby Segall, counsel for the Personnel Board, wh
concurred
that procedurally the Executive Director present the evidence

Since I did not conduct the investigation nor write the charg
you,
I am unable to answer any of your questions. Instead, I am fo
this
e-mail, with your WORD document, to the MHA Board Attorney, M
Davis,
who is conducting the investigation.

McInnish 641

Thanks,

Lane Boggs

-----Original Message-----
From: Mickey [mailto:mmcinnish@mycingular.blackberry.net]
Sent: Thursday, December 30, 2004 3:40 PM
To: leboggs@mhatoday.org; lboggs@mhatoday.org
Subject: REQUEST OF APPOINTING AUTHORITY

Attached is Word file with letter from me
requesting more specific information and
documentation so I can prepare my defense to
the charges signed by you.  Thanks.
Mickey McInnish

Mickey McInnish



Previous | Next | Back to Messages                                                    Sa

                                   

Copyright © 1994-2005 Yahoo! Inc. All rights reserved. Terms of Service - Copyright Policy - Guidelines - Ad Feedback
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

McInnish 642



DEFENDANT'S
EXHIBIT

139

## Montgomery HOUSING Authority

C. MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET . ♦ MONTGOMERY ♦ ALABAMA ♦ 36104-3006
(334) 206-7200 ♦ (334) 206-7222 Fax ♦ MHAToday.org

THOMAS TAYLOR
CHAIRMAN

## ADDENDUM TO DIRECTOR'S REPORT

October 15, 2004

Board of Commissioners.
Montgomery Housing Authority

Dear Members:

Two new agenda items are being placed on the agenda for the upcoming board meeting at the request of Ms. Barnett. They have to do with proposed investigations of me as Executive Director dealing with travel and with my lack of response to safety issues of the Resident Commissioner and other residents. The purpose of this letter is to again say that I am willing to meet with any of you to discuss any issues you have with me or with the housing authority.  .

It is a fact that I do travel on behalf of the MHA. I am a member of several committees which directly benefit our operations at the housing authority. On May 20 of this year, I met with Mr. Taylor who had some questions about how committee work helps the MHA. I sent him a memo, a copy of which is attached to this letter. I sent the board a memo on June 15, 2004 relating to the same subject. I outlined in this memo some information about costs and gave an outline of future meetings. There were no questions or responses to me from these memos. I gave a list of future meetings in my September director's report. I still am more than willing to meet with any of you to discuss any of these issues.

On June 9, I had a phone call from a person who wanted to inform me that a member of the board had been complaining about travel. Another person called on June 14 and said that two members of the board were trying to get rid of me. I called a third party to confirm this conversation. I met with Mr. Taylor that date and reviewed my committee work with him and told him of the rumors of several commissioners trying to get rid of me. I had another call from our attorney on June 15 saying that a board member had called him wanting to know about my contract. On June 18 I had another call that said the talk in the community was that one or more board members were out to get rid of me. On July 20, our attorney called me to say that he had been asked about an evaluation of me. He said he had downloaded some evaluations and given those to the board member. During the midst of all of these rumors and calls, an investigation was



LUAN LONG, Vice-Chair
BETTIE BARNETT

RICHARD N. BOLLINGER
CLIFFORD HOLMES

JOHN F. KNIGHT Jr.
RON DRINKARD

McInnish 452

being conducted about why one law firm was getting more business than others, and other such questions. I promptly responded to all questions asked by the board and sent many memos to the board with the information. Needless to say, many work hours have been spent in answering allegations, writing memos answering questions, etc., since May of this year.

I have taken very little annual leave this year and currently have 324 hours of annual leave on the books. In addition, I have not taken my personal leave day. I will again lose leave that has been earned because it was not taken. While I am attending meetings, I am constantly available by email and promptly respond to emails and phone messages. All staff and commissioners have my access numbers and email addresses and I regularly get communications and take care of the business of the housing authority while attending these meetings.

I have been out of the office this year 12 work days for the Neg Reg meetings in Washington. I did not go to the other week of meetings and sent an alternate in my place. I missed six and one-half days this year for Task Force meetings. We revised the ACOP and other policies. MHA has adopted these policies. I have missed six and one-half days to attend housing authority insurance board and committee meetings. I did not attend the meeting in September. I have been taking courses sponsored by Rutgers called Executive Directors Education Program. These are intense courses and I have taken Ethics, Public Relations, Financial Management, Preparing for Change, Legal Issues and Maintenance Management. These courses are offered in conjunction with PHADA workshops, and I have not been able to stay for the workshops this year. I did stay for one set of committee meetings. I missed a week to attend the Fair Housing Conference. We are in the middle of doing our disability assessment and I have implemented many procedures to bring us in compliance with fair housing issues. I have taught several courses this year on commissioner training and personnel issues. Preparation and interaction with the participants has been an invaluable tool in keeping me up to date on these subjects which are common areas of discussion in my job.

I have not gone to many meetings that were scheduled, such as APHADA meetings in March and June, a Serc/Nahro committee meeting, PHADA annual meeting, Serc/Nahro meeting in June, and the annual NAHRO conference in July. I did go to do a presentation at this meeting, leaving on Friday and returning on Saturday, but did not attend the meetings and this was not on MHA time.

I have made several trips to HUD for meetings which all relate to the MHA either directly or indirectly. In fact, I was there for two days last week on business. I have made several trips to Birmingham where I left Montgomery in the late afternoon, attended meetings and returned the next morning. I have used my free hotel nights so there would be no charge to the MHA for these meetings.

I have tried to answer questions board members have raised in the past and particularly since May of this year. I promptly answered travel questions in May and June and have heard nothing until the agenda addition this week. Again, I will be more than willing to go through these items again with you and explain the unusual nature of the housing industry and the benefits I feel the MHA has because of our involvement in organizations. I will likewise look forward to meeting with the committee to review the issues Ms. Barnett has asked to be investigated.

If you have any questions or would like to review any of our documentation, please feel free to call me on Monday or Tuesday.

Sincerely,

C. Michael McInnish

# MONTGOMERY HOUSING AUTHORITY

C. MICHAEL MCINNISH
EXECUTIVE DIRECTOR
334-206-7187
Fax: 334-206-7119

## MEMORANDUM

Date:    May 20, 2004

To:    THOMAS TAYLOR

From:    C. MICHAEL MCINNISH

Copy:

Subject:    ORGANIZATIONAL MEMBERSHIPS

---

Mr. Taylor: I am currently a member of the following organizations:

**Member of the Claims Committee for Housing Authority Insurance**, the national insurance company representing housing authorities. I have been asked to be a member of the Underwriting Committee next year. This is our insurance company and I have been on the committee for over five years. It directly benefits our housing authority in many areas. Board and committee meetings are held quarterly. The company pays the MHA $350.00 for each meeting to offset my expenses.

**SERC/NAHRO Educational Committee.** This organization does training for commissioners, housing authority staff, and residents in the southeastern states. It is composed of other PHA directors and staff. This committee meets on the same day as the Legislative Committee and I attend both. These committees meet four times per year, two as committee meetings and two as part of semi-annual conferences. Our housing authority is a member of SERC/NAHRO and NAHRO.

McInnish 455

**SERC/NAHRO Legislative Committee.** This committee works to review new laws and proposed laws of congress relating to housing authorities. We draft position papers on legislative issues such as funding, Section 8 funding cuts, regulations, etc. This information is very important to the ongoing activities at the MHA. These two committees are composed of other housing authority directors and staff.

**PHADA Professional Development Committee.** PHADA is the Public Housing Authorities Directors' Association. It is a national organization. I serve on the Professional Development Committee which is charged with all training and programs at conferences. The committee is composed of PHA Executive Directors and some staff. We review current topics, formulate programs for educational training, and work to help better educate all housing authority staffs and commissioners. This committee meets four times a year in conjunction with the national meetings of PHADA.

**AAHRA: Member of HUD Task Force and Chairman of Education Committee.** The Alabama Association of Housing and Redevelopment Authorities is the statewide organization composed of housing authorities. I have served on the education committee for three years and was the chairman last year. This group works closely with the association and the HUD office on workshops for the state association, commissioners, annual convention, and other meetings. I rotate off of this board in July.

The **Task Force** is comprised of five members who write the policies for the state to use. We have written all of the policies currently in effect at our housing authority. This group meets three to four times per year, depending on new material received from HUD.

I have also given assistance to the **Scholarship Committee** while at other board meetings. There has been no special travel at all related to any assistance to this committee.

**APHADA.** The Alabama Public Housing Authorities Directors' Association meets quarterly. I try to attend at least two of these per year.

I feel that memberships and participation in these groups has been very beneficial to the Montgomery Housing Authority as we keep up with current

McInnish 456

practices, current rules and regulations, and have a very good reputation among the organizations and other entities with whom we work. All of these groups are comprised of Executive Directors and other PHA staff. I would hope that we will continue to be able to participate in these organizations.

**NEG-REG COMMITTEE.** I was appointed by HUD Washington to this committee and have kept the board up to date on the activities. We have met three times since March and have one more week in June to meet. HUD reimburses the majority of the expenses for these trips.

McInnish 457

# MONTGOMERY HOUSING AUTHORITY MEMORANDUM

### C. MICHAEL MCINNISH
### EXECUTIVE DIRECTOR
### 334-206-7187
### 334-799-4406
### MMCINNISH@MHATODAY.ORG

June 15, 2004

TO:        BOARD OF COMMISSIONERS
FROM:    C. MICHAEL MCINNISH
RE:        COMMITTEES
CC:

I have been asked to outline the committees on which I serve on the state and national level. They are as follows:

**Member of the Claims Committee for Housing Authority Insurance,** the national insurance company representing housing authorities. I have been asked to be a member of the Underwriting Committee next year. This is our insurance company and I have been on the committee for over five years. It directly benefits our housing authority in many areas. Board and committee meetings are held quarterly. The company pays the MHA $350.00 for each meeting to offset my expenses.

**SERC/NAHRO Educational Committee.** This organization does training for commissioners, housing authority staff, and residents in the southeastern states. It is composed of other PHA directors and staff. This committee meets on the same day as the Legislative Committee and I attend both. These committees meet four times per year, two as committee meetings and two as part of semi-annual conferences. Our housing authority is a member of SERC/NAHRO and NAHRO.

**SERC/NAHRO Legislative Committee.** This committee works to review new laws and proposed laws of congress relating to housing authorities. We draft position papers on legislative issues such as funding, Section 8 funding cuts, regulations, etc. This information is very important to the ongoing activities at the MHA. These two committees are composed of other housing authority directors and staff.

McInnish 458

**PHADA Professional Development Committee.** PHADA is the Public Housing Authorities Directors' Association. It is a national organization. I serve on the Professional Development Committee which is charged with all training and programs at conferences. The committee is composed of PHA Executive Directors and some staff. We review current topics, formulate programs for educational training, and work to help better educate all housing authority staffs and commissioners. This committee meets four times a year in conjunction with the national meetings of PHADA.

**AAHRA: Member of HUD Task Force and Chairman of Education Committee.** The Alabama Association of Housing and Redevelopment Authorities is the statewide organization composed of housing authorities. I have served on the education committee for three years and was the chairman last year. This group works closely with the association and the HUD office on workshops for the state association, commissioners, annual convention, and other meetings. I rotate off of this committee in July.

The **Task Force** is comprised of five members who write the policies for the state to use. We have written all of the policies currently in effect at our housing authority. This group meets three to four times per year, depending on new material received from HUD.

I have also given assistance to the **Scholarship Committee** of AAHRA while at other board meetings. There has been no special travel at all related to any assistance to this committee.

**APHADA.** The Alabama Public Housing Authorities Directors' Association meets quarterly. I try to attend at least two of these per year.

Memberships and participation in these groups has been very beneficial to the Montgomery Housing Authority as we keep up with current practices, current rules and regulations, and have a very good reputation among the organizations and other entities with whom we work. All of these groups are comprised of Executive Directors and other PHA staff. I would hope that we will continue to be able to participate in these organizations.

**NEG-REG COMMITTEE.** I was appointed by HUD Washington to this committee and have kept the board up to date on the activities. We have met three times since March and have one more week in June to meet. HUD reimburses the majority of the expenses for these trips. These meetings are now concluded and the new regulation has been drafted. It is now being sent through the government channels for final publication.

My currently planned schedule for committee and organizational meetings through January 2005 is as follows:

| June 22-25 | HAI Board of Directors, Committee Meetings |
| July 26-29 | State Convention |
| Sept. 10-12 | Executive Director Training |
| Sept. 13-16 | HAI Annual Board and Committee Meetings |
| Oct. | Fall Workshop |
| Nov. 5-6 | SERC Committees (Conference following?) |
| Dec. 1-4 | HAI |
| Jan. 6-8 | Director Training/PHADA Committee Meetings (Conference following?) |

There will be two additional APHADA meetings, one of which is in Montgomery that MHA is hosting in December.

There will also be approximately two Task Force Meetings during the late summer or early fall. These will be scheduled as needed.

Should any member of the board have any questions or need further information about these committees, please do not hesitate to ask.

The MHA organizational memberships are as follows:

| NAME: | COST: | BEGAN: |
|-------|-------|--------|
| PHADA | $2800 | Prior to 1988 |
| NAHRO | $4875 | Prior to 1988 |
| APHADA | $150 | Prior to 1988 |
| AAHRA | $950 | Prior to 1988 |
| ACCOUNTING | $100 | Prior to 1988 |
| PUBLIC RELATIONS | $85 | 2000 |
| CHAMBER | I Pay | 2004 |

*The Housing Authority of the City of Montgomery, Alabama*

## AMENDED AGENDA
## Regular Monthly Meeting of the Board of Commissioners
Tuesday, October 19, 2004 at 5:00 P.M.
at the Riverside Heights Training Facility at 1020 Bell Street
Montgomery, Alabama 36104

1.   **CALL TO ORDER**

2.   **APPROVAL OF AMENDED AGENDA**

Offered by_____ Seconded by _____

**APPROVAL OF MINUTES**

3.   Approval of the minutes of the regular monthly meeting of the Board of Commissioners of the Montgomery Housing Authority held on September 21, 2004.

Offered by _____ Seconded by _____

4.   **AUTHORITY REPORTS**
     Presentation by:  Maxine Sledge

5.   **DIRECTOR'S REPORT**

**UNFINISHED BUSINESS** – None

**NEW BUSINESS**

6.   To consider a resolution approving and authorizing a 3% Cost of Living increase for employees of the Montgomery Housing Authority, retroactive to October 1, 2004, contingent to City County Personnel Board approval. (Note: This item tabled at September 21, 2004 board meeting.)

Offered by _____ Seconded by _____

7.   To consider a resolution accepting the Request For Qualification evaluation report for Financial and Technical advisement services to the Montgomery Housing Authority in regard to disposition/demolition/redevelopment proposals of housing properties and approval to award the contract for these services to the party named therein.

Offered by _____ Seconded by _____

Continued...2

McInnish 461

*The Housing Authority of the City of Montgomery, Alabama*

## AMENDED AGENDA
## Regular Monthly Meeting of the Board of Commissioners
Tuesday, October 4, 2004 at 5:00 P.M.
at the Riverside Heights Training Facility at 1020 Bell Street
Montgomery, Alabama 36104

**Page 2..**

8.    To consider a resolution authorizing the write-off and disposition miscellaneous obsolete scrap items, of no real value, as per list attached, in accordance with the Authority's Disposition policy.


Offered by _____ Seconded by _____

9.    To consider a resolution authorizing the write-off of un-collectible and vacated accounts from the books of the Montgomery Housing Authority's Conventional Housing program for the month of May 2004.


Offered by _____ Seconded by _____

10.    To consider a resolution authorizing the Administrative committee to investigate the absences of the Executive Director from the MHA office and the frequent travel for the past twelve months not related to the day-to-day performance of his duties as Executive Director.


Offered by _____ Seconded by _____

11.    To consider a resolution authorizing the Administrative committee to investigate whether the Executive Director is investigating and addressing complaints of Resident-Commissioner Barnett and other residents regarding safety concerns and disorderly tenants.


Offered by _____ Seconded by _____

12.    COMMITTEE REPORT(S), IF ANY.

13.    PUBLIC COMMENTS (FROM SIGN-UP SHEET, IF ANY)

14.    EXECUTIVE SESSION

15.    ADJOURNMENT



DEFENDANT'S
EXHIBIT
206

# MONTGOMERY HOUSING AUTHORITY MEMORANDUM

### C. MICHAEL McINNISH
### EXECUTIVE DIRECTOR
### 334-206-7187
### 334-799-4406
### MMCINNISH@MHATODAY.ORG

June 15, 2004

TO:       BETTIE BARNETT
FROM:     C. MICHAEL McINNISH
RE:       TRAVEL ISSUE
CC:       GAIL MOSELEY

It has been brought to my attention that you have some issues with your outstanding plane ticket repayment. You have spoken with several of our staff, including me, about this issue. You elected not to go to Washington and we told you that Delta would only charge one hundred dollars for ticket reassignment to another trip within one year. You did not make arrangements to pay that and the year has expired. You went to Nashville last year, but that was still within the one year period wherein you could have traveled. At this point, you have requested to travel to the AAHRA convention in Biloxi in July. We will be more than willing to make the arrangements for you to travel, but the money owed for the ticket must be paid. You may bring the amount due to Ms. Moseley and we can then pay your registration fee. Or, you can pay your registration fee and we will apply that toward payment of your plane ticket.

We would like very much for you to be able to attend the meetings, but I know you understand that we have to be accountable for our funds. An auditor could see the plane ticket, ask questions, and see that the ticket was neither used nor reimbursed.

Please let me know what you want to do to clear this matter.

# MONTGOMERY HOUSING AUTHORITY
# MEMORANDUM

### C. MICHAEL MCINNISH
### EXECUTIVE DIRECTOR
### 334-206-7187
### 334-799-4406
### MMCINNISH@MHATODAY.ORG

June 16, 2004

TO:        BETTIE BARNETT
FROM:   C. MICHAEL MCINNISH
RE:        TRAVEL ISSUE
CC:        GAIL MOSELEY

As per our discussion last night at the board meeting, you can clear this matter by signing a repayment agreement for the plane ticket. We can accept payments of $20.00 per month. If you can agree to this, please contact Ms. Moseley to sign the agreement. That will then allow us to mark the matter resolved for the upcoming audit.

Thank you for your understanding and help.

X 59

# The Housing Authority of the City of Montgomery, Alabama

MEMBERS OF AUTHORITY
JOHN F. KNIGHT, JR.
Chairman
JESSE H. GRIFFIN
TYNA D. DAVIS
WILLIE ALBERT ASHLEY
ANNE B. UPCHURCH
JOHNNY HARDWICK
RICK STALLINGS
HERBERT WEBB
RON DRINKARD

1020 BELL STREET
MONTGOMERY, ALABAMA 36104-3056

PHONE (334) 206-7200
FAX (334) 206-7222

EXECUTIVE DIRECTOR
WILEY THOMAS, JR.

Date: 6-18-2004

I, __Bettie Barnett__, hereby agree to pay the Montgomery Housing Authority an initial payment of $ __0__ and $ __20.00__ per month by the __5th__ of the month for the next __15__ months until my account # 01-_____ in the balance of $ __282.50__ is paid in full.

I understand that default on any payment will cause the account to become due in full immediately after the due date of the missed payment. If the account is not paid in full, the account will be turned over to the Montgomery Housing Authority attorney for legal action.

Name _Bettie Barnett_

Address _29 Eugene St_

Phone _263-5749_

Witness _Gaie Moseley_

X 60



EQUAL HOUSING OPPORTUNITY

DEFENDANT'S
EXHIBIT
207

# Montgomery HOUSING Authority

MICHAEL McINNISH
EXECUTIVE DIRECTOR

1020 BELL STREET ♦ MONTGOMERY ♦ ALABAMA ♦ 36104-3006
(334) 206-7200 ♦ (334) 206-7222 Fax ♦ MHAToday.org

THOMAS TAYLOR
CHAIRMAN

September 23, 2004

Ms. Bettie Barnett
29 Eugene Street
Montgomery, AL 36104

Re: Meeting Yesterday

Dear Ms. Barnett:

I always appreciate your dropping by to see me both in your capacity as a resident of the MHA and as a Commissioner of the MHA. After our conversation yesterday, I again reviewed the state law, the federal regulations, our lease and our ACOP. Contrary to whatever your attorney told you, we cannot do a self-help eviction at the housing authority. Every resident has a right to certain due process rights, including: a termination of tenancy with notice of specific violations, a right to the grievance process, and a right to a trial before the District Court of Montgomery County, Alabama. He or she can then appeal that decision to the Circuit Court of Montgomery County, Alabama. I have been hired to not only enforce our policies, but to also follow them and the law of this state. You said that before I became the Director, people were moved out without having to go to Court. I have represented the MHA for many years in evictions and know of no instance where a person was denied their right to due process and was evicted without going through the court process. I am sure there were times when a resident moved out voluntarily after the eviction process began, but they were never denied their right to have a Judge hear their case to the best of my knowledge.

When you first started complaining about your neighbors and children, I asked you to write your complaint the same as I would tell every other resident. Your Manager has had a lease review and has also requested that you write out your complaint. I can find no writing from you in the file. I asked you if you would take a picture of the children who were in your flowerbed and on your porch. I have seen no pictures. I have asked if you could identify the children and you have stated you could not.

I have consistently told you that I would be more than willing to start the eviction process for a lease violation. The lease review is the first step towards that. I have also told you many times that we would have to have a witness in court. You stated several weeks ago that you would go to court with us as a witness. On yesterday, you said you would not go to court, that we did not need any witness to go to court, and that I was not doing my job by not evicting the residents. I asked for the name of the attorney who had given you the information about the eviction process and I offered to call him or her. You would not give me the name. I then asked you to have him/her call me and I would be glad to discuss the process with him/her. That offer still stands.

However, until such time that HUD changes the rules and our board changes the policies, I must respect and follow the law. A Judge will not allow me nor the Manager to testify in court as to what you have said, as that is hearsay. I know of no exception to the hearsay rule. We all have to respect the law, our policies, the HUD rules, and our residents' rights.

LUAM LONG, Vice-Chair
BETTIE BARNETT

RICHARD N. BOLLINGER
CLIFFORD HOLMES

JOHN F. KNIGHT Jr.
RON DRINKARD

ANNE B. UPCHURCH
DAVID S. BARLEY II

McInnish 424

I regret that you are having trouble with your flowers and porch and will be glad to enforce any policy we have, but I must have the cooperation and commitment of our residents to follow through with complaints all the way to court if necessary.

I informed you of your right to request a transfer to another community if you so chose. We have a policy on that procedure and will be glad to review your request the same as any other resident's request if you file it with your Manager.

I respect your thoughts and ideas both as a resident and as a commissioner. However, I can not give you any preferential treatment just because you are a commissioner. I have to be very careful to treat all residents equally. This duty also goes to other commissioners who ask for favors. I will not knowingly allow any of our commissioners to break a policy or procedure. We cannot hire a person, house a person, give a person special consideration, or take any other action just because a commissioner has requested it. As I told you yesterday, I will be more than willing to work with you or any other commissioner to develop policies for board consideration that will help our operations and our residents. However, a policy which calls for self-help evictions would not be legal and would not be approved by HUD.

Please let me know if I can be of any further help to you both as a resident and as a commissioner. As Chief Davis said at the board meeting, residents have to be willing to work together to make their communities safer. That will include going to court if required to complete an eviction process so that we can follow the laws of this state and provide due process to other residents.

If you will provide me the names of your attorneys, I will be glad to call them and discuss the eviction and testimony issue with them. You indicated that you were going to call Mr. Davis and I will also be glad to discuss these issues with him.

Thank you again for coming by to see me. I trust our conversation and this letter answer your questions. Please let me know any suggestions you have on how we can make our communities safer.

Sincerely,

C. Michael McInnish

CC:    Thomas Taylor
       Terry G. Davis


DEFENDANT'S
EXHIBIT

208

Mr. Thomas Taylor, Chairman
Montgomery Housing Authority
1020 Bell Street
Montgomery, AL  36106
October 8, 2004

Dear Mr. Thomas,

I have two items I want to put on the agenda for the September 19, 2004 board meeting.

I want a resolution that authorizes the Administrative Committee to investigate the excessive absences from the Montgomery Housing Authority and all the travel that Mickey does. I have told Mickey that he is gone too much and I don't see that all the travel is related to his job as our executive director. He travels all the time and is gone from the MHA office two or three days almost every week. I am requesting that the Board to look into this right away.

I also want a resolution that asks the Board to appoint a committee to look into complaints by tenants that disrupt the peace at night and engage in illegal activity. For over a year, I have brought things to Mickey's attention and he ignores my requests. He gives me the run-around. A few days ago when I told Mickey about disorderly tenants that were bothering me and other tenants, he wrote a letter to me to try and make me look bad and make it look like I was asking for special favors. I am not asking for special favors. I am asking Mickey to do his job. Tenants should not be afraid to go to sleep at night. It upset me highly to receive this letter and I was also insulted when Mickey told me I should move.

Mickey should be doing everything he can to make residents feel safe. He is not. I am not only concerned about my safety, but also the safety of the many residents who look to me for help when they see nothing being done about disorderly tenants and unwelcome visitors all hours of the night. I live here and I see things with my own eyes. I am asking the Board to look into this because we are on this Board to serve the residents. If the situation does not get better soon, I plan to contact HUD.

Thank you .

Sincerely,

Bettie Barnett

Bettie Barnett

cc:  Mickey McInnish
     Attorney Terry Davis
     MHA Board